**DUNCAN G. McCULLY, ESQ.**
**McCULLY & BEGGS, P.C.**
Suite 200, 139 Murray Blvd.
Hagatna, Guam 96910
Tel: 671-477-7418
Fax: 671-472-1201
e-mail: mblaw@kuentos.guam.net

Attorneys for Defendant
BTC 97 SP, LLC



FILED
DISTRICT COURT OF GUAM

JAN 3 0 2004

MARY L. M. MORAN
CLERK OF COURT

10

## IN THE DISTRICT COURT OF GUAM
## TERRITORY OF GUAM

| | |
|---|---|
| GUAM TUMON COMPANY, LLC, a Guam limited liability company, JAE SEUNG PARK, an individual, CENTRAL MILLS SUPPLY, LTD., a Korean Corporation, MICHAEL LEE, an individual dba Global Realty,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>BTC 97 SP, LLC, a Delaware limited liability company, DOES 1-10, real parties in interest,<br><br>　　　　　　　Defendants. | CIVIL CASE NO. 03-00043<br><br><br><br>**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT** |

**ORIGINAL**

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION...................................................................................1

II.  SUMMARY OF TERMINATED NEGOTIATIONS....................................2

III.  THE PARTIES CORRESPONDENCE DID NOT CREATE A
BINDING AND ENFORCEABLE CONTRACT TO BUY AND SELL
THE PROPERTY..............................................................................13

IV.  IN THE ALTERNATIVE TO DISMISSING THE COMPLAINT,
THE COURT SHOULD DISMISS THE CLAIMS FOR SPECIFIC
PERFORMANCE AND CONSTRUCTIVE TRUST....................................18

V.  CONCLUSION.................................................................................19

-i-

# TABLE OF AUTHORITIES

**CASES**                                                      **PAGE(S)**

*Apablasa vs. Merritt and Company*
        176 Cal. App. 2d 719, 1 Cal. Rptr. 500,
        (Cal. Dist. Ct. App. 1964)..................................................13,16,17

*Beck vs. American Health Group*
        211 Cal. App. 3d 1555,
        260 Cal. Rptr. 237 (1989)................................................13

*C.L. Smith Co. vs. Rodger Ducharme, Inc.*
        135 Cal. Rptr. 483, 487
        (Cal. Ct. App. 1977).........................................................15

*Greyhound Lines vs. Superior Court*
        159 Cal. Rptr. 657
        (Cal. Ct. App. 1979).........................................................17

*Louis Lesser Enterprises vs. Roeder*
        209 Cal. App. 2d 401,
        25 Cal. Rptr. 917 (1962)..................................................16

*Store properties vs. Neal*
        (1945) 72 C.A. 2d 112, 164, P.2d 38...............................18

*Takano-Towa Guam vs. Cox*
        (Dist. Ct. of Guam, App. Div. 1993)
        1993 WL 128214...........................................................13,14,15,17

## MISCELLANEOUS

Witken, Summary of California Law,
Ninth Edition, Vol. 1, "Contracts", § 142, p. 166.........................16

58 Cal Jur 3d., "Specific Performance", § 10, p.22.......................18

54 Cal Jur 3d Rev, "Real Estate", § 65, p.128.............................18

Witken, Summary of California Law,
Ninth Edition, Vol. 11, "Trusts", §310, p.1145............................19

-ii-

## STATUTES

18 GCA §65109................................................................19

18 GCA §65110................................................................19

18 GCA §85102................................................................13

18 GCA §85301................................................................13

18 GCA §85316................................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

-iii-

# I.  **INTRODUCTION**

The parties did not enter into a contract or enforceable agreement for BTC 97 SP, LLC (the "Defendant" or the "Seller") to sell its property to the Plaintiffs. Between July 4, 2003 and November 20, 2003, the parties exchanged correspondence which they hoped would form the basis for negotiations of a separate comprehensive, final and written contract for the buyer to purchase the Seller's property. Neither party intended the correspondence itself to be a final agreement. Based on the exchange of letters, Plaintiffs and Defendant commenced negotiation of a contract of sale for the Property. On December 8, 2003 the Defendant terminated negotiations before all of the terms of the sale were agreed to and before a contract was signed. The Defendant then proceeded to negotiate and conclude an agreement with a third party to buy its property.

After the Seller refused to continue negotiating, the Plaintiff asserted that the exchange of correspondence in November of 2003 had resulted in an enforceable agreement. The Plaintiffs filed this action to disrupt the sale of the Property and to force the Seller to negotiate with them only.

The November correspondence relied on by the Plaintiffs only resulted in a preliminary understanding as to some – but not all – of the material terms of the sale. Other material terms – including the amount of the down payment – were not addressed. The principal terms agreed to were the price and an unconditional obligation to close by December 15, 2003, subject to acceptance by Plaintiffs of the title to the property. The parties continued to negotiate both the supposedly agreed to

1

terms and the remaining open terms. They exchanged drafts of and comments on a form of a final purchase agreement. If, as Plaintiffs contend, a final agreement had been reached in November, the Plaintiffs' subsequent conduct belies their contention, since they subsequently demanded material changes to the few business terms which they had proposed in November. More specifically, during the negotiation of the purchase agreement, the Plaintiffs revealed that their ability and willingness to close the transaction and pay the purchase price would be conditioned upon the approval of the Korean government <u>and</u> that they required the ability to extend the closing beyond the date they themselves had proposed – December 15, 2003 – well into 2004. Because those changes were unacceptable to the Seller, on December 8, 2003 it broke off further discussions.

After the Defendant terminated discussions, the Plaintiffs attempted to resurrect the transaction. However, the Plaintiffs' post-termination proposal for the time and manner of payment was materially different than the terms they themselves offered in November. More specifically, the Plaintiffs' performance was still conditioned on the consent of a third party and still did not commit them to close in calendar 2003, let alone by December 15. In any event, a party cannot revive and accept an offer previously rejected without the affirmative assent of the offering party. The Defendant declined to accept the Plaintiffs' new proposals.

II.    **<u>SUMMARY OF THE TERMINATED NEGOTIATIONS</u>**

The Defendant is the owner of Lots 5098, 5100-1, and 5090-REM-1,

2

Tamuning, Guam commonly known as the New Tumon Village Apartments. (Further referred to as the "Property") The Defendant is a wholly owned subsidiary of BTC Mortgage Investor Trust 1997-S1 (the "Trust"). The Trust is controlled by Deutsche Bank Trust Company Americas ("Deutsche Bank"). Bruce P. Morrison ("Mr. Morrison") was the Defendants managing director during the negotiations. Mr. Morrison resigned his positions with Deutsche Bank and the Defendant effective December 31, 2003.

On July 4, 2003 Plaintiff Michael S. Lee, dba Global Realty ("Mr. Lee") communicated to Mr. Morrison that he was a real estate broker and had a client interested in buying the Property. Mr. Lee asked for information about the Property. (See Exhibit 1 to the Declaration of Mr. Morrison and Andrew J. Weiner, Esq. ("Mr. Weiner"), filed herewith.) (All further references to "Exhibit ___" refer to those exhibits.) After several telephone conversations, Mr. Morrison followed his standard procedure and requested that Mr. Lee and his then undisclosed client sign confidentiality agreements before he provided information (See Exhibits 2 and 6). Mr. Morrison also requested financial and banking information about the potential buyer (See Exhibit 3). Mr. Morrison declined to provide Mr. Lee with information until confidentiality agreements were signed and returned. (See Exhibits 4 and 5) Mr. Lee returned the necessary confidentiality agreements on August 22, 2003 (See Exhibits 6 and 11).

On September 6, Mr. Lee requested a proposed price which his client, Jae Seung Park (Further referred to as "Mr. Park" or collectively with Mr. Cho as the

3

"Buyer") was "eager" to receive (See Exhibit 7). As of September 16, Mr. Morrison had not proposed a price and Mr. Lee reported that Mr. Park was "impatient" and interested in buying other properties. The next day Mr. Morrison replied he was preparing information to the "several parties" who had expressed interest in the Property. Having not yet received a proposed price, on October 4, Mr. Lee communicated Mr. Park's "ultimatum" that if he did not have one by October 10, then Mr. Park would purchase a different property.

Over the next few days, Mr. Morrison provided Mr. Lee with information about the Property, including size, number of units, revenues and profits (See Exhibits 13 and 15). On October 8, Mr. Morrison told Mr. Lee verbally that the Defendant's proposed sales price was $4,000,000 (See Declaration of Mr. Morrison.).

On October 9, Mr. Lee inquired if the Seller would pay his commission if Mr. Park purchased the Property. Mr. Lee explained that he would "feel very awkward" receiving a large sum of money from his "dear friend" Mr. Park. After obtaining approval, Mr. Morrison agreed and sent a Non-Exclusive Listing Agreement, which Mr. Lee signed and returned on October 21, 2003 (See Exhibits 18-21).

The next day Mr. Lee asked for another price so that Mr. Park could "begin negotiations". On October 24, Mr. Park asked Mr. Morrison to provide him with a "final price" directly (See Exhibit 24). On October 29, Mr. Morrison requested background and financial information from Mr. Park (See Exhibit 25). On October 29, Mr. Lee disclosed that Mr. Park had said he would pay $3,500,000 for the Property (See Exhibit 26). On October 30, Mr. Park provided the requested background and

4

financial information to Mr. Morrison (See Exhibit 27). On November 2, Mr. Lee extended another ultimatum – if Mr. Morrison did not provide a new proposed selling price, then Mr. Park would buy another property (See Exhibit 28).

On November 4, Mr. Park, through Attorney Robert P. Kutz ("Mr. Kutz"), offered to purchase the Property for $3,300,000. Mr. Kutz's letter proposed that the Defendant would make no warranties as to the condition of the Property, except that the title was "clear" and "insurable". Mr. Kutz contemplated that the "closing documentation" would require the Defendant to provide "financial records, maintenance agreements, lease/rental agreements" and the most recent appraisal at the "closing of escrow".

On the next day (still November 4 New York Time ("NYT")), Mr. Morrison rejected the offer and proposed a price of $3,750,000. Mr. Morrison told Mr. Park if the price was acceptable, then his attorney would work with Mr. Park's attorney to prepare "appropriate documents". (Exhibit 30) On November 5, Mr. Kutz increased Mr. Park's offer to $3,500,000 and clarified that the Defendants' title to the Property which was set forth on a title report from Pacific American Title and Escrow Company ("PATICO") would be "clear" and "insurable" under his previous offer.

On November 7, Mr. Morrison counteroffered to sell for $3,700,000, which might be further reduced if Mr. Lee reduced his commission. However, Mr. Morrison stated that "before we could go to contract", he would need information about the individuals who would purchase the Property and the source of the money for the purchase price (Exhibit 33). On November 13, Mr. Park identified Kyu Young Cho the

5

chairman of Central Mill Supply Co. in Korea ("Mr. Cho"), as his partner. Mr. Park also provided substantiation of his ability to pay part of the purchase price. (See Exhibit 34.) In response to this information Mr. Morrison contacted his associates in Korea to begin an investigation of Mr. Cho's reputation, financial ability and background. (See Declaration of Mr. Morrison.)

On November 13, 2003, Mr. Park also requested that Mr. Morrison give Mr. Park a copy of the appraisal then, rather than at closing, as had been previously proposed by Mr. Kutz. (See Exhibits 35 and 29.) Mr. Park indicated that the appraisal was necessary for "the bank to transact money out of... Korea". (See Exhibit 35.) Mr. Morrison responded that he would gladly provide a copy of the appraisal to Mr. Cho, but only after the price had been agreed to and the parties had entered into a contract (See Exhibit 36). Mr. Morrison proceeded to contact Mr. Cho directly and ask for his cooperation in the Seller's "due diligence" background investigation. (See Exhibit 37.)

On November 12, Mr. Lee proposed two alternatives for reducing his commission and reaching an agreement on the price. Mr. Lee also represented that if price was agreed upon, then the escrow would close in three weeks. (Exhibit 34) On November 19, Mr. Morrison wrote to Mr. Park confirming a conversation the prior evening, and that "our price is $3,650,000...you and Mr. Cho will pay all cash and will close within 15 days. If that is not the case, we will need to reconsider our final price." (Exhibit 39, emphasis added) In addition, Defendant would pay a brokerage commission to Mr. Lee, and title would be as set forth on PATICO OER-98-3-14651A. He also asked for a copy of the PATICO OER which he had not yet seen

6

(See Exhibit 39). On November 19, Mr. Morrison confirmed in a letter to Mr. Lee that he and Mr. Park had "agreed on a price of $3,650,000", subject to a reduction of Mr. Lee's commission to $100,000 (See Exhibit 40).

Mr. Lee agreed to reduce his commission to $100,000. The reduction was confirmed by altering the Non-Exclusive Listing Agreements (See Exhibits 40 and 41). On November 20, 2003, Mr. Lee provided Mr. Morrison with the PATICO OER (See Exhibit 42).

On November 20, Mr. Park wrote a letter to Mr. Morrison confirming receipt of Mr. Morrison's letter of November 19. He stated "the irrevocable commitment of my self and my associate, Kyu Young Cho, to purchase the...property for a cash price of $3,650,000". He proposed a closing date of December 15, 2003. However, in this very same letter he began to renege on the offer he had previously made, a pattern which would continue until Defendant terminated negotiations. Mr. Park stated that their willingness to proceed was "subject to one change from our previous proposals". In contradiction to what Mr. Kutz had previously communicated, Mr. Park requested that Mr. Morrison immediately provide a copy of the most recent appraisal so it could be "incorporated in the financing arrangements" in Korea. (See Exhibit 43) Mr. Park directed his attorney – Mr. Kutz to work with the Defendant's New York counsel – Mr. Weiner – to prepare a sales agreement (See Exhibit 43). The pattern of revising continued on November 21, 2003, when Mr. Cho sent Mr. Morrison a letter (See Exhibit 44) which now disclosed that the appraisal documents were needed, not for financing, but "in order to take the approval of foreign direct investment from Korean

7

government and bank". This, of course, was a material variance to the Plaintiffs previous characterizations of their need for the appraisal.

On November 21, 2003 Mr. Kutz requested that Mr. Weiner prepare a "short-form purchase agreement" and also requested the immediate delivery of the most recent appraisal (See Exhibit 45). On November 25 NYT, Mr. Morrison told Mr. Cho and Mr. Park that the appraisal would be released "once the Purchase and Sale Agreement has been signed." (See Exhibit 49) Mr. Kutz agreed with that procedure (See Section 11 of Exhibit 51).

On November 24 NYT, Mr. Weiner forwarded his draft of an agreement of sale (See Exhibit 47). The cover message from Mr. Weiner stated that the draft "has not been reviewed by my client and is subject to their comments". Moreover, Section 13.17 of the draft stated that "The submission of this Agreement for examination does not constitute an offer by or to any party. This Agreement shall be effective and binding only after execution and delivery by the parties hereto". On November 26 NYT, Mr. Weiner forwarded another draft which included changes by the Seller's Guam attorneys (See Exhibit 50). Mr. Weiner also disclosed to Mr. Kutz that a fence encroached into adjoining property. This encroachment was not set forth on the PATICO OER (See Exhibits 48 and 42). Mr. Weiner's draft purchase agreement required Mr. Park to accept the encroachment without any adjustment to the price (See Section 4.2.1 of Exhibit 47).

On behalf of Mr. Park, Mr. Kutz responded by his memorandum of November 28 objecting to numerous provisions of the draft Agreement of Sale. Some objections

8

related to terms of the transaction which had not been addressed in the prior exchange of correspondence, but which were material to the transaction – for example, the down payment and the state of the title (See Sections 5 and 10 of Exhibit 51). Others contradicted material terms of the offer made by his client in the prior exchange of correspondence. Mr. Kutz did not object, however, to the proposed Section 13.17 quoted above. Mr. Kutz admitted in the memorandum that he had previously mischaracterized to Mr. Weiner the reason why release of the appraisal was required. (See Section 11 of Exhibit 51). (See Exhibit 51.) Mr. Kutz disagreed with 21 other terms of the Seller's proposed agreement of sale, many of which remained unresolved when the Seller broke off negotiations ten (10) days later.

On December 1 NYT, Mr. Weiner objected to the proposed changes to the transaction (See Exhibit 52). Mr. Weiner pointed out that the Buyer was "CHANGING THE ACCEPTED OFFER MATERIALLY" by making "THE DEAL...CONTINGENT ON KOREAN GOVERNMENT APPROVAL, WITH AN UNCERTAIN TIME FRAME" (See Exhibit 52 at Section 5; capitalization in original). He requested that Mr. Kutz clarify Mr. Park's position before "CHECKING TO SEE IF THE SELLER WAS PREPARED TO ACCEPT THESE NEW TERMS (AND WITHOUT SUGGESTING THAT IT IS SO PREPARED)" (See Exhibit 52 at Section 11). Mr. Weiner went on to accept some of Mr. Kutz's other required changes to the agreement of sale, but rejected others.

On December 2 NYT, Mr. Kutz reaffirmed that Mr. Park wanted the sale to be contingent on Korean government approval (See Exhibit 53). He required that Mr.

9

Park be able to delay the payment of the price by up to eighty (80) days and if Korean government approval did not occur, then the Buyer's proposed initial deposit would be split 50/50 (See Section 5 of Exhibit 53). Although Mr. Kutz agreed to accept the Seller's position on certain other disputed terms, he continued to insist on Mr. Park's requested terms for material provisions, such as a reduced initial deposit, a pre-closing survey, the immediate release of the appraisal, the effect of fence encroachment, a limitation on actions, responsibility for pre-closing casualty, the assumption of tenant rental arrears and the Buyer's right to contact tenants before closing.

Significantly, in his December 2 memo Mr. Kutz reserved Mr. Park's right to terminate negotiations if the Seller would not change its position and agree to immediately deliver the appraisal. "Bottom line is, no appraisal, no deal" (See Exhibit 53 at Section 11). Clearly, on December 2, 2003 the Buyer believed that a final and enforceable agreement had <u>not</u> been agreed to by the parties.

Rather than suggest new terms or language to the proposed agreement of sale, on December 3 NYT – December 4, 2003 at 9:00 a.m. Guam time – Mr. Weiner again warned Mr. Kutz in writing that the buyer's requested changes to the previously agreed upon terms were so material that unless retracted, the Seller would "have to reconsider" proceeding "with a sale of the property to your client" (See Exhibit 54). Mr. Weiner pointed out that negotiations had proceeded on the understanding that the sale would close within 15 days or by December 15, 2003. However, in the process of negotiating the agreement of sale, Mr. Park had disclosed that he could not perform

10

on that timetable and that his ability to pay the purchase price at any future date was uncertain (See Exhibit 54).

A few hours later, Mr. Kutz provided the cryptic response "[D]esignated escrow shortened to 15 Korean working days following release of the appraisal, other details per my last e-mail." (See Exhibit 55) On Mr. Weiner's inquiry, Mr. Kutz stated by telephone that his clients still required a provision allowing the transaction to close after December 31, 2003 and that his new proposal only shortened the time period after which the forfeitable portion of the down payment would increase. (See Declaration of Mr. Weiner.)

Because Mr. Park had materially changed his offer to purchase the Property before December 31, 2003 – a date of considerable and communicated importance to the Seller – and because of the uncertainty of when, if ever, Mr. Cho would obtain the necessary Korean government approval, Mr. Morrison decided to terminate further negotiations with Mr. Park and to attempt to sell the Property to another interested buyer before December 31, 2003. (See Declaration of Bruce Morrison.)

In the evening of December 8, 2003 NYT – the morning of December 9, 2003 on Guam – Mr. Morrison told Mr. Park by telephone that the Seller had decided to discontinue negotiating with him and that the Seller would be negotiating with other buyers. (See Declaration of Mr. Morrison.) Mr. Weiner was instructed to communicate this discussion to Mr. Kutz. In the evening of December 8, 2003 Mr. Weiner telephoned Mr. Kutz to so advise him, but did not reach Mr. Kutz (See Declaration of Mr. Weiner). The next day Mr. Morrison confirmed the telephone conversation by

11

telefax (See Exhibit 57).

After Mr. Morrison had ended negotiations Mr. Kutz wrote to Mr. Weiner and attempted to resurrect the deal. Mr. Kutz tendered a "proposal" that Mr. Park would increase the initial deposit to $100,000 – still less than the Seller wanted – and if closing did not occur within "15 Korean working days" of the release of the appraisal, then the $100,000 would be "liquidated damages" (See Exhibit 59). The Buyer's performance was still conditioned on "permission" from the Korean government. Mr. Kutz made no verifiable assurances of the Buyer's ability to perform before December 31, 2003 or that the Buyer had agreed to the Seller's proposals on the several open issues in the draft agreement of sale. Also, on December 10, 2003, it was doubtful that "15 Korean working days" following the signing of the still disputed Agreement of Sale would have been before December 31, 2003.

On December 10, 2003 (Guam time) Mr. Park made a similar proposal. (See Exhibit 58.) Significantly, Mr. Park acknowledged that there were still other open issues which needed to be resolved (See Exhibit 58). Mr. Morrison declined to reconsider or to continue negotiating with Mr. Park.

On December 9 and 10 NYT, by both e-mail and telephone, Mr. Weiner told Mr. Kutz that negotiations were finished and Mr. Morrison was talking to other interested buyers. (See Declaration of Mr. Weiner and Exhibits 59 and 60.)

On December 12, 2003, the Defendant entered into an agreement of sale with another buyer, in form substantially similar to Exhibit 50. The new buyer agreed to close – and was capable of closing – before December 31, 2003. The new buyer

12

deposited the full purchase price into an account on Guam before December 31, 2003. However, on December 12, 2003, Mr. Kutz filed this civil action and caused a notice of lis pendens to be recorded and delivered to the escrow, with the specific intent of disrupting the Seller's new sale. The Plaintiffs continue to try to revive negotiations, but still require Korean government approval to buy the Property. (See e-mail from Mr. Lee to Mr. Morrison of January 13, 2004; Exhibit 62.)

## III. THE PARTIES CORRESPONDENCE DID NOT CREATE A BINDING AND ENFORCEABLE CONTRACT TO BUY AND SELL THE PROPERTY

In order for a contract to exist, all of the parties must agree to the same thing at the same time. (18 GCA §§ 85102, 85301 and 85316; _Apablasa vs. Merritt and Company_, 176 Cal. App. 2d 719, 1 Cal. Rptr. 500 (Cal. Dist. Ct. App. 1964.).) Whether or not writings or verbal communications result in an agreement sufficient to create an enforceable contract is determined by looking to the intent of the parties. _Takano-Towa Guam vs. Cox_ (Dist. Ct. of Guam, App. Div. 1993) 1993 WL 128214; _Beck vs. American Health Group_, 211 Cal. App. 3d 1555, 260 Cal. Rptr. 237 (1989). "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." _Takano-Towa_, _Supra_ at *6, quoting from _Beck_ at 241.

At all times between the Buyer's first proposal to purchase the Property for a specific price – November 4, 2003 (Exhibit 29) and the termination of negotiations –

13

December 8, 2003 NYT (Exhibit 57), the Buyer knew that the Seller did not intend to conclude a final agreement based on an exchange of letters. At all times both the Buyer and the Seller understood that terms preliminary agreed upon would be reduced to writing and signed by the parties. (See Exhibits 30,33,36,43,45,47 and 49 - 53) Mr. Morrison consistently refused to release the appraisal until a contract was signed. After the letters of November 19 and 20 (Exhibits 40 and 43), which the Buyer now argues created an enforceable contract, the Buyer participated in the negotiation of the contemplated final contract. Significantly in his December 2 memo, (Exhibit 53) Mr. Kutz expressly stated that "no deal" then existed, and would not exist in the future unless the Seller agreed to his client's requirement for delivering the appraisal.

As noted by the former Appellate Division of this Court in *Takano-Towa*, the fact that the Seller subsequently prepared a written agreement (See Exhibits 51 and 53) is convincing evidence that it did not intend to be bound by the previous exchange of correspondence. The draft Agreement of Sale, - not Plaintiff's self-serving letters of November 20 (Exhibit 43) and November 21 (Exhibit 45) - constituted Mr. Morrison's response, and set forth the additional terms on which he was prepared to consider a sale of the Property to the Plaintiffs. Similarly, the Buyer's request that its terms be included in the subsequent written agreement is proof that they did not intend to bound by the November agreements or consider them to be final. Noneworthy is that, among all of Mr. Kutz's numerous objections to the draft agreement of sale, he did not object to the provision stating that submission of the draft was not an offer, and that no binding agreement would exist until a fully-negotiated contract of sale was executed

and delivered by both the Seller and the Buyer; an event which never occurred. "[W]here the parties intend to reduce there agreement to writing there is no binding agreement between them until the contract is signed." *Takano-Towa* at *6, quoting from *C.L. Smith Co. vs. Rodger Ducharme, Inc.*, 135 Cal. Rptr. 483, 487 (Cal. Ct. App. 1977). Clearly, before December 8, 2003, neither party intended or believed the November correspondence resulted in a final enforceable agreement.

Similar evidence that the Plaintiffs did not intend to bound by the November correspondence, is that they proceeded to propose significant changes to the material terms for the time and manner of payment which they had earlier proposed in those letters (See Exhibits 51 and 53). Clearly, when the Buyers requested that the final contract allow them up to eighty (80) days to close, they did not believe their proposal to pay the price in cash before December 15, 2003 had been anything more than a preliminary understanding. There could not have been any meeting of the minds if one party "did not even know a contract had been formed". *Takano-Towa* at *6.

Further, many of the terms discussed and proposed were inconsistent with, or not covered by, the correspondence of November 19 and 20 (Exhibits 40 and 43). Most significantly, the parties clearly reached no agreement as to the time and manner for payment. The Buyer's proposal to have the transaction conditioned on Korean government approval and be permitted to close after December 31, 2003 was unequivocally rejected by the Seller. Other terms left for future agreement included the down payment, the Buyer's acceptance of the encroachment of a fence into adjoining property, a possible right of redemption caused by a December 10, 2003 foreclosure

15

of a small sliver of the Property, the Seller's assignment and the Buyer's purchase of unpaid rents and the cost and consequences of a pre-closing survey (See Exhibits 52 and 53). Where essential terms are left for future determination, no binding contract results from preliminary agreements. _Louis Lesser Enterprises vs. Roeder_ 209 Cal. App. 2d 401, 25 Cal. Rptr. 917 (1962); _Apablasa_, Supra; Witken, Summary of California Law, Ninth Edition, Vol. 1, "Contracts", § 142, p. 166.

In their complaint, the Plaintiffs suggest that after the Seller had terminated further negotiations, the Buyer withdrew its requested changes to the terms for the time and manner of the payment price and therefore created or resurrected a binding and enforceable contract. Nonetheless, even assuming a contract existed, it was terminated by the Buyer's requirement to alter its terms. The Plaintiffs did not successfully revive and accept the Defendant's November proposal for two reasons. First, the proposals did not offer what the Plaintiffs had offered in November — and Defendant had been insisting on since — an unconditional obligation to close on or before December 31, 2003, without a requirement for a third party consent. Second, a party cannot unilaterally accept an offer previously rejected without some manifestation of assent by the offering party. (See _Apablasa_, Supra at 504.)

In the letters following the termination of negotiations, the Buyer only offered to increase the initial deposit to $100,000 and to close within "15 Korean working days" of the release of the appraisal. (See Mr. Kutz's December 9, 2003 e-mail, Exhibit 59 and Mr. Park's letter of December 20, Exhibit 58.) The letters proposed that if Korean government approval was not obtained and the Buyer was unable to close within that

16

period, then the Seller would receive the $100,000 as liquidated damages. The proposal continued to condition the Buyer's performance on Korean government approval; something never agreed to by the Seller. Similarly, "15 Korean working days" would almost certainly not have been a date on or before December 31, 2003. Defendant wanted to sell the Property by December 31, 2003, not to have the right to retain a $100,000 down payment. Clearly, Mr. Kutz's proposal of December 9, 2003 (Exhibit 59) and Mr. Park's proposal of December 10, 2003 (Exhibit 58), were substantially different than November's unconditional agreement to close before December 15, 2003. They were simply new offers to continue negotiations, not the precise and unequivocal acceptance required to create a binding contract. See *Apablasa*, Supra, at 505.

The Plaintiffs' contention that they could unilaterally accept a previously rejected offer is similar to the issue dealt with by the court in *Takano-Towa* by reference to *Greyhound Lines vs. Superior Court* 159 Cal. Rptr. 657 (Cal. Ct. App. 1979). The court found that a party's waiver of its rejection of a previous offer by demanding new terms was ineffective to create a contract. The court found that the fact that the party had previously asserted the terms at all was evidence that there was no meeting of the minds. Similarly, the court in *Apablasa* dealt squarely with this issue, holding that a party could not revive a previously rejected offer and create a contract by accepting it "without some act of the Defendant's manifesting consent..." *Apablasa*, Supra at 504.

17

## IV. IN THE ALTERNATIVE TO DISMISSING THE COMPLAINT, THE COURT SHOULD DISMISS THE CLAIMS FOR SPECIFIC PERFORMANCE AND CONSTRUCTIVE TRUST

If the Court declines to dismiss the Plaintiff's complaint, then the Court should dismiss the Plaintiff's claims for specific performance and constructive trust. It should further void the lis pendens, allowing the Plaintiff to sell its property.

In order for a contract to be ordered performed, all of its terms must be definite, certain and complete. The precise act to be done must be ascertainable. _Store Properties vs. Neal_ (1945) 72 C.A. 2d 112, 164 P.2d 38; See also 58 Cal Jur 3d., "Specific Performance", § 10, p.22) Further, a greater degree of certainty is required in the terms of a contract that is to be specifically performed, than is necessary if the contract will be the basis of a claim for damages. 54 Cal Jur 3d Rev, "Real Estate" § 65, p.128 A contract may be sufficient to support an action for damages, but too uncertain to support an action for specific performance. Id.

The supposed agreement the Plaintiffs urge be enforced is too uncertain for the Court to determine what specific acts it should order. The only possible terms that can be established are that the price was $3,650,000 and it should be paid in "15 Korean working days". What will happen if the price is not paid in "15 Korean working days" was never agreed to. Similarly, there is no agreement concerning the amount of the down payment, the Defendant's remedies should Buyer otherwise default, the fence encroachment, the requirement (if any) for a survey of the Property, the proration of unpaid rents or when, to whom or if the Seller would release its appraisal. Since the Court cannot resolve these issues without writing a contract for the parties, it cannot

order specific performance.

Similarly, the Plaintiffs cannot use the remedy of a constructive trust to compel the Defendant to sell the Property. The circumstances allowing a constructive trust are set forth at 18 GCA §§65109 and 65110. The record of this matter does not set forth facts justifying relief under those statutes.

In order to have a constructive trust imposed under Section 65109, the Plaintiffs have to establish that they are the owners of the Property and that the Defendant is wrongfully detaining it. Similarly, to obtain relief under Section 65110, the Plaintiffs must prove that the Defendant obtained the Property by "fraud, accident, mistake, and undue influence, the violation of a trust or other wrongful act". The Plaintiffs have not alleged facts which support the remedy of a constructive trust under either statute.

The Plaintiffs are attempting to use a constructive trust to enforce its alleged contract with the Defendant. "Mere failure to perform is not, therefore, enough; there must be some circumstance, such as fraud, breach of a confidential relation, or unjust enrichment, before equity will use the remedy of constructive trust to compel performance of an unenforceable promise." Witken, Summary of California Law, Ninth Edition, Vol. 11, "Trusts", §310, p.1145. The Defendant is entitled to judgment as a matter of law dismissing the Plaintiffs count to impose a constructive trust on the Property.

## V.    CONCLUSION

The complaint is without merit and not supported by existing law. The

19

complaint was filed for the improper purpose of forcing the Defendant to continue to negotiate the sale of the Property with the Plaintiffs – and only the Plaintiffs. Because there are no genuine issues of material fact and the Defendant is entitled to judgment as a matter of law, the complaint should be dismissed. In the alternative, the Plaintiffs' claims for specific performance and constructive trust should be dismissed and the lis pendens declared void.

McCULLY & BEGGS, P.C.
Attorneys for the Defendant
BTC 97 SP, LLC


By: _____
        DUNCAN G. McCULLY

Dated: ___1/24/04_____

20