**DUNCAN G. McCULLY, ESQ.**
**McCULLY & BEGGS, P.C.**
Suite 200, 139 Murray Blvd.
Hagatna, Guam 96910
Tel: 671-477-7418
Fax: 671-472-1201
e-mail: mblaw@kuentos.guam.net

Attorneys for Defendant
BTC 97 SP, LLC

FILED
DISTRICT COURT OF GUAM

JAN 3 0 2004

MARY L. M. MORAN
CLERK OF COURT

13

# IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| GUAM TUMON COMPANY, LLC, a Guam limited liability company, JAE SEUNG PARK, an individual, CENTRAL MILLS SUPPLY, LTD., a Korean corporation, MICHAEL LEE, an individual dba Global Realty, <br><br> Plaintiffs, <br><br> v. <br><br> BTC 97 SP, LLC, a Delaware limited liability company, DOES 1-10, real parties in interest, <br><br> Defendants. | CIVIL CASE NO. 03-00043 <br><br><br> **DEFENDANT'S EXHIBITS IN SUPPORT OF SUMMARY JUDGMENT** |

Exhibits 1 through 62 to Declarations of:

Bruce P. Morrison

and

Andrew J. Weiner

**ORIGINAL**

# "INDEX OF EXHBITS"
## GUAM TUMON COMPANY, LLC, JAE SEUNG PARK, CENTRAL MILLS SUPPLY, LTD., MICHAEL LEE,
### v.
## BTC 97 SP, LLC
## (CV03-00043)

| Exhibit # | Date | Document Description |
|---|---|---|
| 1 | 07/04/03 | Letter from Michael Lee to Bruce Morrison |
| 2 | 07/15/03 | E-mail from Bruce Morrison to Michael Lee |
| 3 | 07/29/03 | E-mail from Bruce Morrison to Michael Lee |
| 4 | 07/31/03 | E-mail from Michael Lee to Bruce Morrison |
| 5 | 07/31/03 | Email from Bruce Morrison to Michael Lee |
| 6 | 08/20/03 | Confidentiality Agreement |
| 7 | 09/06/03 | E-mail from Michael Lee to Bruce Morrison |
| 8 | 09/16/03 | E-mail from Michael Lee to Bruce Morrison |
| 9 | 09/17/03 | E-mail from Bruce Morrison to Michael Lee |
| 10 | 09/18/03 | Facsimile from Michael Lee to Bruce Morrison |
| 11 | 09/23/03 | E-mail from Michael Lee to Bruce Morrison |
| 12 | 10/04/03 | E-mail from Michael Lee to Bruce Morrison |
| 13 | 10/07/03 | Letter from Bruce Morrison to Michael Lee |
| 14 | 10/08/03 | Facsimile from Michael Lee to Bruce Morrison |
| 15 | 10/08/03 | Letter from Bruce Morrison to Michael Lee |
| 16 | 10/09/03 | Facsimile from Michael Lee to Bruce Morrison |
| 17 | 10/10/03 | E-mail from Michael Lee to Bruce Morrison |
| 18 | 10/10/03 | E-mail from Bruce Morrison to Michael lee |
| 19 | 10/17/03 | Facsimile from Michael Lee to Bruce Morrison |
| 20 | 10/19/03 | E-mail from Bruce Morrison to Michael Lee from |
| 21 | 10/21/03 | Facsimile from Michael Lee to Bruce Morrison |
| 22 | 10/22/03 | E-mail from Michael Lee to Bruce Morrison |
| 23 | 10/22/03 | Letter from Jae S. Park to Bruce Morrison |

| | | |
|---|---|---|
| 24 | 10/23/03 | Letter from Jae S. Park to Bruce Morrison |
| 25 | 10/29/03 | Letter from Bruce Morrison to Jae S. Park |
| 26 | 10/29/03 | E-mail from Michael Lee to Bruce Morrison |
| 27 | 10/30/03 | Letter from Jae S. Park to Bruce Morrison |
| 28 | 11/02/03 | E-mail from Michael Lee to Bruce Morrison |
| 29 | 11/04/03 | Letter from Robert Kutz to Bruce Morrison |
| 30 | 11/04/03 | Letter from Bruce Morrison to Jae S. Park |
| 31 | 11/05/03 | Letter from Robert Kutz to Bruce Morrison |
| 32 | 11/07/03 | Letter from Bruce Morrison to Robert Kutz |
| 33 | 11/07/03 | Letter from Bruce Morrison to Jae S. Park |
| 34 | 11/13/03 | Letter from Jae S. Park to Bruce Morrison |
| 35 | 11/13/03 | Letter from Jae S. Park to Bruce Morrison |
| 36 | 11/14/03 | Letter from Bruce Morrison to Jae S. Park |
| 37 | 11/14/03 | Letter from Bruce Morrison to Kyu Young Cho |
| 38 | 11/12/03 | Facsimile from Michael Lee to Bruce Morrison |
| 39 | 11/19/03 | Letter from Bruce Morrison to Jae S. Park |
| 40 | 11/19/03 | Letter from Bruce Morrison to Michael Lee |
| 41 | 11/19/03 | E-mail from Michael Lee to Bruce Morrison |
| 42 | 11/20/03 | Facsimile from Michael Lee to Bruce Morrison |
| 43 | 11/20/03 | Letter from Jae Park to Bruce Morrison |
| 44 | 11/21/03 | Letter from Kyu Cho to Bruce Morrison |
| 45 | 11/21/03 | E-mail from Robert Kutz to Andrew Weiner |
| 46 | 11/24/03<br>11/21/03 | E-mail from Andrew Weiner to Robert Kutz<br>E-mail from Robert Kutz to Andrew Weiner |
| 47 | 11/24/03 | E-mail from Andrew Weiner to Robert Kutz |
| 48 | 11/25/03 | E-mail from Andrew Weiner to Robert Kutz |
| 49 | 11/25/03 | Letter from Bruce Morrison to Kyu Young Cho |
| 50 | 11/26/03 | E-mail from Robert Kutz to Andrew Weiner |
| 51 | 11/28/03 | E-mail from Robert Kutz to Andrew Weiner |
| 52 | 12/01/03 | E-mail from Andrew Weiner to Robert Kutz |

| | | |
|---|---|---|
| 53 | 12/02/03 | Memo from Robert Kutz to Andrew Weiner |
| 54 | 12/03/03 | E-mail from Andrew Weiner too Robert Kutz |
| 55 | 12/04/03 | E-mail from Andrew Weiner to Robert Kutz |
| 56 | 12/04/03 | E-mail from Michael Lee to Bruce Morrison |
| 57 | 12/09/03 | Letter from Bruce to Jae S. Park |
| 58 | 12/10/03 | Letter from Jae Park to Bruce Morrison |
| 59 | 12/09/03 | E-mail from Andrew Weiner to Robert Kutz |
| 60 | 12/10/03 | E-mail from Andrew Weiner to Robert Kutz |
| 61 | 12/11/03 | E-mail from Andrew Weiner to Robert Kutz |
| 62 | 01/14/04 | E-mail from Michael Lee to Bruce Morrison |



*Rick —*
*WHO IS GLOBAL ?*
*I asked Lee do send letter of Info*

# GLOBAL REALTY

[MLS]

P.O. BOX 25375 GMF, GUAM 96921 U.S.A. • SUITE 201, LEE'S BLDG. • 2014 ROUTE 16, HARMON, GUAM 96912
TEL: (671) 637-3090/91 • FAX: (671) 637-3092 • EMAIL: globalrt@ite.net

*Real Estate*
*Korean Broker*

Date: July 04, 2003

To: BTC 97, SP LLC, New York

Attn: Mr. Bruce Morrison/ Managing Director

Subject: Tumon Village Apartment, Guam


Dear Mr. Morrison,

Presently, Global Realty has a client who is interested in purchasing the Tumon Village Apartment, Guam.

Aforementioned before, we are submitting an offer to purchase the real property in exchange for a real estate commission upon a successful sale. My clients intends to offer to purchase of the aforementioned property upon the following principal terms:

1. Seller to provide;

    a. Property to be free and clear of all liens, encumbrances and restrictions with a marketable title conveyed through Warranty Deed, a preliminary title research to be done subject to buyer's approval.

    b. Seller shall relocate, at Seller's expense, shall hire a Guam licensed surveyor chosen by Buyer to have the property points relocated and flagged. Buyer(s) will approve these property points after Seller's acceptance of the offer. In the event the property points are not approved by the Buyer's, the buyer(s) may terminate the agreement and all deposits returned to the Buyer(s) without penalties.

    c. Property Lot Nos.

    d. How many percent of units are occupied?

    e.  Average current income-monthly?

    f.  How many units are 3, 2, 1, bedrooms each and other facilities?

2.  Seller shall allow reasonable access to subject property by Buyer.
    Buyer's construction consultant or engineer for building inspection.

3.  This letter of intent is based on damages by Typhoon Pongsona,
    "AS IS" CONDITION.

Please advise at your earliest convenience, if your company is interested
in entering into a contract of sale with Buyer.

I anxiously await your response.  If your company agrees on the proposal
provided, Buyer shall submit a proposed Purchase Agreement and
escrow instructions, assignment of Freehold interest and other necessary
pertinent documents for the parties approval.

Your prompt attention on this matter is greatly appreciated.

Sincerely,



Michael S. Lee/ Principal Broker

---

# GLOBAL REALTY

P.O. BOX 25375 GMF, GUAM  96921 U.S.A. • SUITE 201, LEE'S BLDG. • 2014 ROUTE 16, HARMON, GUAM  96912
TEL: (671) 637-3090/91 • FAX: (671) 637-3092 • EMAIL: globalrlt@ite.net

3119

Bruce P Morrison
To:       globalrt@ite.net@HUB
7/15/2003 03:00
cc:
Subject:   Confidentiality Agreements



Dear Michael -

As promised, I'm sending the confidentiality agreements we typically
use.  You will notice that one is for use with brokers and the other is
for use with principals (your client).

    (See attached file: Tumon Confidentiality Agmt Broker.doc)(See
attached file: Tumon Confidentiality Agmt.doc)

In going over your letter of July 4, I notice mention of a real estate
commission, but no mention of how much and who will pay.  Do I
therefore assume that your client will be paying your fee?

Should you have any questions regarding the confidentiality agreements,
please don't hesitate to contact me.

Regards,

Bruce

*********************************
Bruce P. Morrison
Phone: 646-324-3070
FAX:   646-324-7934
US Mobile:  917-678-1031
China Mobile:  86-1364-162-8339
***********************************


Delivery Priority:          Normal
Delivery Report:        Basic
Receipt Report:         No
Personal Categories:    Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----


(Embedded image moved to file: pic27506.pcx)

Memorandum

To:          globalrt@ite.net@HUB
cc:
bcc:
From: Bruce P Morrison/NewYork/DBNA/DeuBa
Date:        07/29/2003 03:41:10 PM
Subject:     Confidentiality Agreements


NOTE: There are 2 files attached to this note
Dear Michael -

Here is the e-mail I sent on the 15th of July.  In addition to the
confidentiality agreements, as I mentioned today, I will need
information about your client, who it is, financial information,
banking references, etc. so that we may do our required due diligence.

Regards,

Bruce

**********************************
Bruce P. Morrison
Phone: 646-324-3070
FAX:  646-324-7934
US Mobile:  917-678-1031
China Mobile:  86-1364-162-8339
**********************************
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 07/29/2003
03:36 PM -----

Memorandum

To:          Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:        07/31/2003 01:23:10 AM
Subject:     Re: Confidentiality Agreements


Dear Mr. Morrison,

We have received your email message.On our recent fax, dated on July 4,
2003, we requested for the following on the fax, a through f and
paragraph 2 and 3.We are anxiously waiting for your response. After
that Buyer will inspect building and then submit a formal purchase
offer.

Thank you very much.

Regards,

Michael Lee

Reply to Message

To:        "Global Realty" <globalrt@ite.net>@DEUBAINT
cc:
From:      Bruce P Morrison/NewYork/DBNA/DeuBa
Date:      07/31/2003 05:33:53 PM
Subject:   Re: Confidentiality Agreements


Dear Michael -

As I mentioned on the phone and as I mentioned in my e-mail, we will
not disclose any information or make any other response until we have
entered into confidentiality agreements with Global and with you.  I
would like to pursue discussion with you, but this is a precondition.

Regards,

Bruce

*********************************
Bruce P. Morrison
Phone: 646-324-3070
FAX:   646-324-7934
US Mobile:  917-678-1031
China Mobile:  86-1364-162-8339
***********************************

**Confidentiality Agreement**
**The New Tumon Village**
**Tamuning, Guam**

Please execute this Confidentiality Agreement (this "Agreement") and return, via facsimile, to Bruce P. Morrison of BTC 97 SP, LLC at facsimile number 646-324-3082.

Following your execution of this letter, you ("Broker") will be provided with confidential information from BTC 97 SP, LLC and/or one or more of its affiliates ("BTC" or the "Seller"), representatives or advisors relating to the sale of The New Tumon Village (the "Project") to Buyer ~~or New Buyer (as defined in the Non-Exclusive Listing Agreement dated as of August 7, 2002 between broker and BTC 97 SP, LLC, "Listing Agreement"~~ ), (the "Proposed Transaction"). In furnishing such information, we are relying on your agreement to preserve the confidential nature of all such information, whether furnished before or after the date of this letter agreement (collectively, the "Evaluation Material"); provided, however, that there shall be no obligation under this letter agreement with respect to any Evaluation Material which (i) is or becomes generally available to the public other than as a result of disclosure by you, or Buyer ~~or New Buyer~~ or (ii) is required by law or requested by judicial process to be disclosed. You agree that such material will be used solely for the purpose of working with Seller in pursuing the Proposed Transaction.

To facilitate the transaction, you are authorized to provide the Evaluation Material to Buyer ~~or New Buyer~~, once they have signed a Confidentiality Agreement. Without the prior written consent of BTC, you will not have any discussions regarding the Proposed Transaction or the Project with any other third party. You shall be responsible for the breach of this Agreement by any of the persons referred to in this paragraph.

Upon termination of discussions with Buyer ~~or New Buyer~~, or upon our written demand, you will promptly return to us all Evaluation Material previously delivered to you, without retaining any copy, extract or other reproduction (in whole or in part) of such Evaluation Material.

Although the Evaluation Material has been prepared in good faith and is believed to be accurate, notwithstanding BTC have not and shall not be deemed to have made any express or implied representation or warranty whatsoever regarding the Evaluation Material.

You acknowledge that in the event you breach any of the provisions of this letter agreement, or threaten or attempt to do so, BTC would be irreparably harmed. Accordingly, you agree in advance to the granting of injunctive or other equitable relief in favor of BTC without proof of actual damages. Such injunctive or equitable relief will not be the exclusive remedy for a breach of this Agreement, but will be in addition to all other remedies available at law or in equity. You also agree to indemnify against and hold BTC and their respective employees, officers, affiliates, successors, and assigns harmless and it's respective employees and officers against all losses, damages, costs, expenses, claims, causes of action, liabilities and obligations directly or indirectly associated with any breach by you of this Agreement, and you agree to reimburse BTC for all costs and expenses, including attorneys' fees, incurred by BTC in enforcing your obligations under this Agreement. The provisions of this Agreement are for the benefit of BTC and may be enforced by any of such parties.

You agree that the failure or delay by BTC in exercising any right or privilege under this Agreement will not operate as a waiver of such right or privilege. This Agreement may be signed in counterparts and may only be modified or waived by subsequent written agreement signed by the parties.

~~You acknowledge that you are acting solely as a broker in accordance with the terms of the Listing Agreement.~~ You may cooperate with other brokers in the marketing and sale of the property to Buyer or New Buyer but are not authorized to ~~provide them with the information known as confidential may be provided by Buyer or New Buyer's~~ ~~in connection with any of its duties or Buyer's or New Buyer's Confidentiality Agreement.~~

This Agreement shall be binding on and shall, inure to the benefit of the parties hereto and their representatives, heirs, legatees, successors, and assigns; provided Broker shall have no rights whatsoever to assign its interest under this Agreement and any such attempted assignment shall automatically be null and void and of no force and effect whatsoever, and shall be deemed a breach by Broker of its obligations hereunder.

You agree that this Agreement will be governed and construed in accordance with the laws of the State of New York without giving effect to choice of law doctrines.

Please sign and return to us one (1) copy of this Agreement in the space provided below in order to evidence your agreement to be bound by the provisions set forth in this letter agreement. To facilitate the execution of this letter agreement, the parties have agreed to accept facsimile transmissions as original documents.

ACCEPTED AND AGREED TO THIS __~~22~~ 20__ DAY OF __August__ __~~2002~~ 2003__ :

## BROKER

Company: __Global Realty__

By: _____

Name (please print): __Michael S. Lee__

Title: __Principal Broker/Owner__

Address: __P. O. BOX 25375__

City, State, Zip Code: __GMP,  Guam 96921 USA__

Phone: __671 ) 637-3090/91__

Facsimile: __671 ) 637-3119__

```
                    _____

                    JOB STATUS REPORT

                    _____

                                        TIME : 10/09/2003 15:49
                                        NAME : DB REAL ESTATE
                                        FAX# : 6463247934
                                        TEL# : 6463243000


    _____
    |                                                               |
    |   DATE,TIME              10/09  15:48                          |
    |   FAX NO./NAME           916716373119                         |
    |   DURATION               00:00:54                             |
    |   PAGE(S)                03                                    |
    |   RESULT                 OK                                    |
    |   MODE                   STANDARD                             |
    |                          ECM                                  |
    |_____|
```

Memorandum

To:        Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:      09/06/2003 12:59:08 AM
Subject:   Price Quote


Dear Bruce,



As per your request, I have faxed you the signed confidentiality
agreement with Mr. Park's signature.  He is very eager to know the
price of the property.  Please get in touch with me as soon as
possible.



Best Regards,


Michael


Global Realty
Michael Lee Principal Broker
P.O. Box 25375
GMF, Guam 96921

Tel: (671)-637-3090
Fax: (671)-637-3119



Delivery Priority:           Normal
Delivery Report:       Basic
Receipt Report:        No
Personal Categories:   Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----


(Embedded image moved to file: pic01655.pcx)

FAX: 646-324-793● ●
US Mobile: 917-678-1031
China Mobile: 86-1364-162-8339
**************************************

"Global Realty"
<globalrt@ite.net        To:     Bruce P
Morrison/NewYork/DBNA/DeuBa@DBNA
>                       cc:
                        Subject:  The New Tumon Village, Tamunig, Guam
09/16/2003 01:02
AM

Dear Bruce,

My buyer is getting very impatient. I have been showing him other
properties for the past few weeks and there are some other properties
that he is interested in. However, I have been advising him to wait on
your reply before he makes a final decision. I don't know how much
longer I can hold him for. Please let me know if you are still
interested in selling your property.

Regards,
Mike

Global Realty
Michael Lee Principal Broker
P.O. Box 25375
GMF, Guam 96921

Tel: (671)-637-3090
Fax: (671)-637-3119

----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003 04:32 PM
-----

(Embedded image moved to file: pic32591.pcx)

Reply to Message

To:     "Global Realty" <globalrt@ite.net>@DEUBAINT
cc:
From:   Bruce P Morrison/NewYork/DBNA/DeuBa

14

9

-----Original Message-----
From: Bruce P Morrison [mailto:bruce.p.morrison@db.com]
Sent: Wednesday, September 17, 2003 11:49 PM
To: globalrt@ite.net
Subject: Re: The New Tumon Village, Tamunig, Guam


Dear Michael -

I am in the process of putting together  information to circulate to the
several parties who have expressed interest and hope to have something
ready to go next week.  We are still interested to entertain bids.

I sent you an e-mail a week or so ago saying that I had received your
confidentiality agreement, signed, but that the confidentiality
agreement of Mr Park was not signed.  Please ask your client to sign and
fax to me.

Regards,

Bruce

*********************************
Bruce P. Morrison
Phone: 646-324-3070
FAX:   646-324-7934
US Mobile:  917-678-1031
China Mobile:  86-1364-162-8339
************************************



# GLOBAL REALTY

P.O. BOX 25375 GMF • GUAM 96921 U.S.A.
TEL. (671) 637-3090 / 91 • FAX: (671) 637-3119
EMAIL: globalrl@ite.net / michaelslee1882@hotmail.com

## Fax Transmission

☐ Please call to confirm receipt

☒ Please respond by return fax

☒ Call only if transmission is incomplete

Date: _____September 18, 2003_____

To: ____Mr. Bruce P. Morrison____

Fax number: ____1-646-324-7934____

From: ____Michael S. Lee____

Subject: ____Confidentiality Agreement - Re-Send of Prinicipal Buyer copy.____

____The New Tumon Village, Tamuning. Guam____

**Number of pages including cover page:** ____3____

Dear. Mr. Morrison

Well, We received of your acknowledgement to-day.

We will send again for Principal Buyer signed copy.

Thank you for your cooperation.

Sincerely yours,

Michael S. Lee   _(signature)_

You agree that the failure or delay by BTC in exercising any right or privilege under this Agreement will not operate as a waiver of such right or privilege. *This Agreement may be signed in counterparts and may only be modified or waived by subsequent written agreement signed by the parties.*

You acknowledge that you are acting solely as principal and (i) agree to pay all brokerage commissions, finders' fees and other compensation that may be due to your brokers, finders, advisors, and other persons retained by you in connection with the Proposed Transaction and acknowledge that no broker or agent shall have any claim for a commission, finder's fee or other type of compensation *from BTC should you enter into the Proposed Transaction,* (ii) agree to indemnify and save harmless BTC and their respective employees, officers, affiliates, and successors and assigns against and from any loss, damage, liability claim, cause of action, obligation or expense, including attorneys' fees and expenses, arising out of any claim or claims by any broker, finder or similar agent, representative or advisor for commissions, fees or other compensation relating to any Proposed Transaction, and (iii) acknowledge that BTC shall in no way be bound or be deemed to have agreed to any such transaction or the terms and conditions thereof until such time (if any) as BTC has executed and delivered a written agreement to enter into any transaction involving the above-referenced property under terms and conditions that are acceptable to it in its sole discretion.

This Agreement shall be binding on and shall, inure to the benefit of the parties hereto and their representatives, heirs, legatees, successors, and assigns; provided Recipient shall have no rights whatsoever to assign its interest under this Agreement and any such attempted assignment shall automatically be null and void and of no force and effect whatsoever, and shall be deemed a breach by Recipient of its obligations hereunder.

You agree that this Agreement will be governed and construed in accordance with the laws of the State of New York without giving effect to choice of law doctrines.

Please sign and return to us one (1) copy of this Agreement in the space provided below in order to evidence your agreement to be bound by the provisions set forth in this letter agreement. To facilitate the execution of this letter agreement, the parties have agreed to accept facsimile transmissions as original documents.

ACCEPTED AND AGREED TO THIS **20** DAY OF **August** 2003:

PRINCIPAL:

|  |  |
|---|---|
| | **Pacific Produce Corporation** |
| By: | Jae s. Park |
| Name (please print): | Jae s. Park |
| Title: | President |
| Address: | P. O. BOX 8801 |
| City, State, Zip Code: | Tamuning, Guam 96931 |
| Phone: | ( 671 ) 646-5248 |
| Facsimile: | ( 671 ) 646-4388 |

You hereby acknowledge and agree that BTC 97 SP, LLC will have no obligation with respect to the payment to you of any fees or commissions relating to this transaction. Any such obligation will be solely the obligation of your principal.

**Confidentiality Agreement**
**The New Tumon Village**
**Tamuning, Guam**

**Please execute this Confidentiality Agreement (this "Agreement") and return, via facsimile, to Bruce P. Morrison of BTC 97 SP, LLC at facsimile number 646-324-7934.**

Following your execution of this letter, you ("Recipient" or "Principal") will be provided with confidential information from BTC 97 SP, LLC and/or one or more of its affiliates ("BTC" or the "Seller"), representatives or advisors relating to an acquisition of all or a part of The New Tumon Village (the "Proposed Transaction"). In furnishing such information, we are relying on your agreement to preserve the confidential nature of all such information, whether furnished before or after the date of this letter agreement (collectively, the "Evaluation Material"); provided, however, that there shall be no obligation under this letter agreement with respect to any Evaluation Material which (i) is or becomes generally available to the public other than as a result of disclosure by you, or the Advisors (hereafter defined), or (ii) is required by law or requested by judicial process to be disclosed. You agree that such material will be used solely for the purpose of evaluating (at your sole cost and expense) whether you have an interest in pursuing the Proposed Transaction.

To facilitate your review, you are authorized to disclose the Evaluation Material to your directors, partners, officers, employees, attorneys, accountants or other professional representatives or consultants who need to know such information for the purpose of evaluating the Proposed Transaction (collectively, "Advisors"); provided, however, that such Advisors will be informed by you of the confidential nature of such information and will be directed by you to treat such information confidentially and to otherwise comply with all of the provisions of this letter agreement. Without the prior written consent of BTC, neither you nor any of your Advisors will have any discussions regarding the Proposed Transaction with any other third party. You shall be responsible for the breach of this Agreement by any of the persons referred to in this paragraph.

Upon termination of discussions, or upon our written demand, you will promptly return to us all Evaluation Material previously delivered to you, without retaining any copy, extract or other reproduction (in whole or in part) of such Evaluation Material and will require your Advisors to do the same.

Although the Evaluation Material has been prepared in good faith and is believed to be accurate, notwithstanding BTC have not and shall not be deemed to have made any express or implied representation or warranty whatsoever regarding the Evaluation Material.

You acknowledge that in the event you and/or any of your Advisors breach any of the provisions of this letter agreement, or threaten or attempt to do so, BTC would be irreparably harmed. Accordingly, you agree in advance to the granting of injunctive or other equitable relief in favor of BTC without proof of actual damages. Such injunctive or equitable relief will not be the exclusive remedy for a breach of this Agreement, but will be in addition to all other remedies available at law or in equity. You also agree to indemnify against and hold BTC and their respective employees, officers, affiliates, successors, and assigns harmless and it's respective employees and officers against all losses, damages, costs, expenses, claims, causes of action, liabilities and obligations directly or indirectly associated with any breach by you of this Agreement, and you agree to reimburse BTC for all costs and expenses, including attorneys' fees, incurred by BTC in enforcing your obligations under this Agreement. The provisions of this Agreement are for the benefit of BTC and may be enforced by any of such parties.

Memorandum

To:        Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:        09/23/2003 03:30:33 AM
Subject:    RE: The New Tumon Village, Tamunig, Guam


Dear Bruce,

I faxed you the documents on the 22nd of August with Mr. Park's
signature as you requested.  Please let me know if you do not have the
document on file and I will fax it to you again.

Regards,
Mike

Global Realty
Michael Lee Principal Broker
P.O. Box 25375
GMF, Guam 96921

Tel: (671)-637-3090
Fax: (671)-637-3119

Memorandum

To:         Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:       10/04/2003 03:58:41 AM
Subject:    RE: The New Tumon Village, Tamunig, Guam


Dear Bruce,

My buyer feels that he has been patient waiting for your reply.  As I
mentioned in my previous message, I have been showing him my other
listings while he waits for your price.  This past week, he issued me
an
ultimatum; although he is interested in your property, he cannot wait
any longer.  He has given me until the end of next week (October 10,
2003) to bring him a price.  If I am unable to do so, then he will
purchase another property.

I pride myself on helping my clients get the home of their choice; your
property was his first choice.  However, he is ready to buy and is
growing impatient, and I am afraid that it is now out of my hands.
Please get back to me with a price by October 4th.

Respectfully,

Michael Lee

Global Realty
Michael Lee Principal Broker
P.O. Box 25375
GMF, Guam 96921

Tel: (671)-637-3090
Fax: (671)-637-3119

TO:      Michael Lee
         Global Realty

FROM:    Bruce Morrison
         BTC 97 SP, LLC

DATE:    October 7, 2003

SUBJECT: The New Tumon Village


The information that you requested about the New Tumon Village is as follows:

1. Land Size:        74,491 ± sq. meters (18.4 ± acres).  Note that there is a small
                     parcel of 769 sq. meters that we are still in the process of
                     acquiring.

2. Building Size:    20 Residential Buildings with gross area of 350,340 sq. ft.
                      2 Commercial Buildings with gross area of 9,970 sq. ft.
                      1 Community Center / Office with gross area of 4,500 sq. ft.
                      4 Laundry/Maintenance Buildings with  gross area of 5,600 sq. ft.

3. Number of Units:  412 Units
                      48 One Bedroom / One Bath
                     280 Two Bedroom / One Bath
                      84 Three Bedroom / One Bath

4. Occupancy:        104 units or 25% occupancy

I have e-mail Rick Cruz, our project manager, and have asked him to notify Eloy Hara
and Judy Ann that you will be contacting them to arrange a time to tour the property.

I look forward to continuing our discussions.

```
                    JOB STATUS REPORT

                                    TIME : 10/07/2003 17:36
                                    NAME : DB REAL ESTATE
                                    FAX# : 6463247934
                                    TEL# : 6463243000


 ┌─────────────────────────────────────────────────────────┐
 │   DATE,TIME              10/07  17:36                     │
 │   FAX NO./NAME           916716373119                     │
 │   DURATION               00:00:26                         │
 │   PAGE(S)                                                 │
 │   RESULT                                                  │
 │   MODE                   STANDARD                         │
 │                                                           │
 └─────────────────────────────────────────────────────────┘
```



# GLOBAL REALTY

P.O. Box 25375 GMF • GUAM 96921 U.S.A.
TEL. (671) 637-3090 / 91 • FAX: (671) 637-3119
EMAIL: globalrt@ite.net / michaelslee1882@hotmail.com

*Fax Transmission*

☒ Please call to confirm receipt

☐ Please respond by return fax

☐ Call only if transmission is incomplete

Date:         October 8, 2003

To:           Bruce Morrison/BTC 97 SP, LLC

Fax number:   646-324-7934

From:         Michael S. Lee

Subject:      The New Tumon Village

**Number of pages including cover page:** _____ 1 _____

Dear. Mr. Morrison

Thank you, Well received on your Fax,dated on October 7, 2003

We had good meeting with Rick Cruz/Project Manager, Principal Buyer

and Myself.  Hearrange for tour and inspection of some units the property.

But, We need of following documents are as follows:

1. Average current income - monthly ?

2. Profit and Loss statements, back to near of three (3) months.

3. Owned of equipments and furnitures listing.

4. Current Insurance Status, How much insurance coverage ?.

5. Will call you,  Our time ( Guam ) on 4.30/5.00 AM on tomorrow
   October 9, 2003.

   Thank you for your cooperation.

Michael Lee

TO:        Michael Lee
           Global Realty

FROM:      Bruce Morrison
           BTC 97 SP, LLC

DATE:      October 8, 2003

SUBJECT:   The New Tumon Village


In response to your fax of earlier today, I provide the following additional information:

1.  Revenues
        Last 3 months    July         $70,124
                         August       $73,811
                         September    $73,879

2.  Profit & Loss:       See Attached.  In reviewing the expenses, you should be aware that
                         we have a tax appeal pending which, if successful, will reduce real
                         estate taxes from $49,000 to $20,000.  Further, we have just
                         located and repaired a water leak which will significantly reduce
                         the water bill.  We are inspecting for additional leaks.  Also, we are
                         carrying much more insurance than is typical in the marketplace.
                         Therefore, your insurance premiums will likely be much lower.

3.  List of Equipt:      I will ask Rick Cruz to provide you with a listing.

4.  Insurance:           We currently carry $15.7 million replacement cost limit with no
                         agreed amount endorsement.  We are self-insuring rent loss.  There
                         is a mold exclusion.  Typhoon and earthquake deductible of 2% on
                         a per building basis.

5.  Unit Sizes:          I am attaching additional detail on the unit and building sizes

I look forward to continuing our discussions

## Tumon Village
## Expenses & Expenditures - Compacted Summary
### July 2002 - June 2003

| | Jul-02 | Aug-02 | Sep-02 | Oct-02 | Nov-02 | Dec-02 | Jan-03 | Feb-03 | Mar-03 | Apr-03 | May-03 | Jun-03 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Income/Expense** | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | |
| Rent | 52,859.97 | 71,998.35 | 70,356.27 | 67,498.69 | 61,844.35 | 48,646.00 | 60,927.97 | 56,281.01 | 63,604.00 | 73,286.11 | 71,635.40 | 75,587.65 | 776,907.81 |
| Cabo | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tipping | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NSF Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Late Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Miscellaneous | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Income** | 52,859.97 | 71,998.35 | 70,356.27 | 67,498.69 | 61,844.35 | 48,646.00 | 60,927.97 | 56,281.01 | 63,604.00 | 73,286.11 | 71,635.40 | 75,987.69 | 776,907.81 |
| **Expense** | | | | | | | | | | | | | |
| Leasing Commissions | 4,947.20 | 4,500.00 | 8,093.13 | 10,174.00 | 1,147.00 | 441.75 | 2,721.00 | 4,304.25 | 1,559.25 | - | 9,437.93 | 9,642.12 | 10,233.25 |
| Staff Contracts | 4,500.00 | 2,250.00 | 4,500.00 | 4,500.00 | 4,500.00 | 1,600.00 | 11,251.40 | 8,096.90 | 8,379.81 | 4,500.00 | 4,500.00 | 4,500.00 | 34,137.26 |
| Project Management | 2,250.00 | 5,727.11 | 9,816.23 | 6,613.03 | 5,261.90 | 5,000.00 | 4,500.00 | 4,500.00 | 4,500.00 | 5,998.83 | 8,013.48 | 6,831.91 | 47,750.00 |
| Repairs & Maintenance | 6,216.65 | 9,816.23 | 1,589.28 | 1,644.96 | 1,644.96 | 2,975.47 | 3,618.42 | 13,665.59 | 42,371.79 | 1,810.95 | 1,877.04 | 1,610.87 | 117,330.47 |
| Security | 1,579.28 | 1,589.28 | 1,026.00 | 1,026.00 | 1,644.96 | 1,644.96 | 1,710.64 | 1,652.00 | 988.16 | 1,877.04 | 92.18 | 317.85 | 19,274.84 |
| Utilities | 24,590.55 | 41,608.18 | 16,566.39 | 16,566.39 | 25,189.99 | 17,525.86 | 17,664.71 | 23,940.46 | 23,249.19 | 23,792.93 | 26,932.78 | 26,932.78 | 259,659.75 |
| General & Administrative | 1,003.75 | 1,248.57 | 352.03 | 163.81 | 682.00 | 365.90 | 532.00 | 283.42 | 704.31 | 226.21 | 92.18 | 317.85 | 5,999.03 |
| Insurance | 17,509.33 | 17,509.33 | 17,509.33 | 17,509.33 | 17,509.33 | 7,509.33 | 17,509.33 | 18,891.30 | 17,509.33 | 17,509.33 | 25,173.33 | 25,173.33 | 226,822.00 |
| Taxes | 9,756.80 | 9,522.30 | 9,456.85 | 9,242.35 | 9,116.17 | 8,558.24 | 8,556.64 | 8,781.86 | 8,921.54 | 9,573.12 | 9,541.38 | 9,415.15 | 109,633.53 |
| **Total Expense** | 68,703.77 | 84,076.16 | 52,342.70 | 66,713.87 | 74,548.28 | 55,555.51 | 68,272.34 | 70,895.91 | 102,461.90 | 71,706.27 | 82,169.17 | 84,422.01 | 890,869.33 |
| **Net Operating Income** | (16,843.80) | (12,077.81) | 16,013.57 | 784.82 | (12,703.93) | (6,909.51) | (7,344.37) | (21,614.90) | (38,857.90) | 1,559.84 | (10,533.77) | (8,434.32) | (113,962.12) |
| **Expenditure** | | | | | | | | | | | | | |
| Capital Improvements | - | - | - | - | - | 2,521.74 | - | 3,033.06 | - | 925.19 | - | - | 6,450.00 |
| Extraordinary Property Repairs | - | - | - | - | - | 5,884.07 | - | 7,007.15 | - | 2,158.79 | - | - | 15,050.00 |
| **Total Expenditure** | - | - | - | - | - | 8,405.91 | - | 10,010.21 | - | 3,083.98 | - | - | 21,500.00 |
| **Total Expense & Expenditure** | 68,703.77 | 84,076.16 | 52,342.70 | 66,713.87 | 74,548.28 | 63,961.32 | 68,272.34 | 89,906.12 | 102,461.90 | 74,792.25 | 82,169.17 | 64,422.01 | 912,369.93 |
| **Net Cash Flow** | (16,843.80) | (12,077.81) | 16,013.57 | 784.82 | (12,703.93) | (16,315.32) | (7,344.37) | (31,625.11) | (38,857.90) | (1,524.14) | (10,533.77) | (8,434.32) | (135,462.12) |

**Tumon Village**
## Expenses & Expenditures
July 2002 - June 2003

| Operating Income/Expense | Jul-02 | Aug-02 | Sep-02 | Oct-02 | Nov-02 | Dec-02 | Jan-03 | Feb-03 | Mar-03 | Apr-03 | May-03 | Jun-03 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| Rent | 52,850.97 | 71,908.38 | 70,356.27 | 67,468.89 | 81,844.35 | 48,646.00 | 60,927.97 | 58,281.01 | 63,604.00 | 73,268.11 | 71,635.40 | 75,987.89 | 776,907.81 |
| Cable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tipping | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NSF Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Late Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Miscellaneous | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Income** | 52,850.97 | 71,908.38 | 70,356.27 | 67,468.89 | 81,844.35 | 48,646.00 | 60,927.97 | 58,281.01 | 63,604.00 | 73,268.11 | 71,635.40 | 75,987.89 | 776,907.81 |
| **Expense** | | | | | | | | | | | | | |
| Leasing Commissions | | | | | 1,147.00 | 641.75 | 2,721.00 | 4,364.25 | 1,569.25 | | | | 10,233.25 |
| Staff Contracts | 4,547.20 | 4,500.00 | 8,083.13 | 10,174.00 | 8,476.93 | 1,500.00 | 11,251.40 | 8,098.90 | 8,379.81 | 8,037.84 | 8,437.93 | 8,642.12 | 94,127.26 |
| Project Management | 4,500.00 | 2,250.00 | 4,500.00 | 4,500.00 | 4,500.00 | 5,000.00 | 4,500.00 | | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 47,750.00 |
| **Repairs & Maintenance** | | | | | | | | | | | | | |
| Supplies | 818.18 | 258.76 | 5,002.44 | 1,195.58 | 1,183.98 | 1,971.97 | 681.29 | 451.23 | 231.31 | 1,069.50 | 2,843.18 | 1,477.07 | 17,275.50 |
| Appliance Repair | - | - | 97.50 | - | - | - | - | 298.90 | - | - | - | 77.00 | 414.42 |
| Common Area Repair | - | - | - | - | - | - | - | 480.00 | - | - | - | - | 480.00 |
| Electric Repair | - | 307.00 | 54.45 | - | 764.20 | - | 8.50 | - | - | 364.00 | - | - | 1,488.15 |
| Exterior Paint | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Exterminator | - | - | - | 2,700.00 | - | - | 288.08 | 288.08 | 288.08 | 288.08 | 288.08 | 288.08 | 4,416.48 |
| Grounds | 1,150.00 | 2,250.00 | 3,250.00 | 2,250.00 | 2,250.00 | - | 1,126.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 23,569.00 |
| HVAC | 264.30 | 144.00 | 571.50 | - | 812.26 | 68.00 | 362.00 | 538.00 | 9,403.58 | 685.00 | 807.20 | 736.52 | 14,184.47 |
| Plumbing Repair | - | 70.00 | 738.00 | - | - | 420.00 | 220.00 | 890.00 | 70.00 | - | 848.00 | - | 3,456.00 |
| Rental Equipment | - | - | - | - | - | 400.00 | 280.00 | - | - | - | - | - | 680.00 |
| Roof Repair | - | 200.00 | - | - | 70.00 | - | - | 105.85 | - | - | - | - | 375.85 |
| Vehicle | 71.04 | 81.45 | 30.00 | 50.00 | 48.50 | 117.50 | 80.45 | 74.88 | - | - | 82.76 | 306.48 | 903.04 |
| **Readying Apartments** | | | | | | | | | | | | | |
| Ceramic Tile Rep | 715.00 | - | 99.20 | 587.50 | - | - | 413.56 | 99.20 | 78.90 | 1,314.06 | 683.15 | 595.85 | 4,565.90 |
| Cleaning | - | - | 3.19 | 28.98 | 56.67 | - | 63.05 | 24.25 | 3.90 | - | - | 38.25 | 218.44 |
| Renovation Supp | - | 2,090.87 | - | - | 325.10 | - | 117.00 | 559.90 | - | - | - | 63.70 | 3,539.57 |
| Painting | - | - | - | - | - | - | 139.00 | 161.50 | - | - | 1,081.10 | - | 239.50 |
| Other | 3,068.14 | 325.00 | - | 618.45 | 501.37 | - | 614.10 | 8,239.85 | 30,048.10 | - | 1,744.25 | 687.78 | 41,997.34 |
| **Total Readying Apart** | 3,813.14 | 2,415.87 | 92.39 | 618.45 | 501.37 | - | 614.10 | 8,239.85 | 30,132.90 | 1,314.06 | 1,744.25 | 687.78 | 50,260.75 |
| **Total Repairs & Maintena** | 8,218.88 | 5,727.11 | 9,818.28 | 8,813.03 | 5,281.90 | 2,975.47 | 3,618.42 | 13,665.59 | 42,371.79 | 5,998.83 | 8,013.48 | 5,831.91 | 117,330.47 |
| **Security** | | | | | | | | | | | | | |
| Security Service | 1,379.28 | 1,510.84 | 1,379.28 | 1,444.98 | 1,444.98 | 1,444.98 | 1,710.64 | 1,642.00 | 788.16 | 1,498.87 | 1,473.86 | 1,498.87 | 17,032.18 |
| Armored Car | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | - | 200.00 | 200.00 | 204.06 | 204.06 | 204.00 | 2,312.18 |
| New Locks | - | - | 10.00 | - | - | - | - | 20.00 | - | - | - | - | 50.00 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Security** | 1,579.28 | 1,710.84 | 1,589.28 | 1,644.98 | 1,644.98 | 1,644.98 | 1,710.64 | 1,862.00 | 988.16 | 1,810.95 | 1,877.94 | 1,810.87 | 19,274.54 |
| **Utilities** | | | | | | | | | | | | | |
| Cable | 1,887.89 | 2,304.86 | - | - | - | - | - | - | - | - | - | - | 3,872.74 |
| Electricity | 4,776.46 | 1,279.73 | - | 1,337.99 | 1,792.29 | 2,096.81 | 1,919.81 | 1,893.71 | 2,379.26 | 2,989.29 | 4,129.73 | 5,830.57 | 29,924.55 |
| Garbage | 828.00 | 828.00 | 828.00 | - | 828.00 | 828.00 | 828.00 | 828.00 | 828.00 | 889.00 | 958.00 | 850.00 | 10,298.00 |
| Gas | - | - | 198.00 | 242.00 | - | - | - | - | 298.00 | 284.00 | - | 188.00 | 1,298.00 |
| Water & Sewer | 17,819.20 | 37,495.60 | - | 14,158.40 | 22,548.70 | 14,601.05 | 15,116.90 | 21,218.75 | 13,871.45 | 19,106.90 | 18,849.20 | 19,952.21 | 214,326.34 |
| **Total Utilities** | 24,560.55 | 41,908.18 | 1,026.00 | 18,506.39 | 25,180.99 | 17,525.88 | 17,884.71 | 23,940.46 | 17,474.71 | 23,349.18 | 23,752.93 | 26,950.78 | 259,699.75 |
| **General & Administrative** | | | | | | | | | | | | | |
| **Administrative Expenses** | | | | | | | | | | | | | |
| Computer | 415.00 | - | - | - | 450.00 | - | - | - | - | - | - | - | 865.00 |
| Copy Machine | 312.00 | - | - | - | - | - | 532.00 | - | - | - | - | - | 844.00 |
| Pager | - | 80.92 | - | - | - | - | - | - | - | - | - | - | 80.92 |
| Postage | 34.10 | 17.88 | 17.88 | 17.88 | 17.88 | 30.40 | - | - | - | - | 31.60 | 17.88 | 186.25 |
| Supplies | 10.99 | - | 13.89 | 18.65 | - | - | - | - | - | 229.21 | - | - | 273.64 |
| Telephone | - | 648.40 | 530.19 | 43.55 | - | - | - | - | - | - | 60.66 | - | 1,080.62 |
| Other | 231.06 | - | - | 83.56 | 214.15 | 338.90 | - | 17.42 | 704.31 | - | - | 17.85 | 1,590.69 |
| **Total Administrative E** | 1,003.75 | 754.17 | 362.03 | 163.81 | 682.00 | 369.90 | 532.00 | 17.42 | 704.31 | 229.21 | 92.18 | 17.85 | 4,924.63 |
| Advertising & Promot | - | 494.40 | - | - | - | - | - | 278.00 | - | - | - | 300.00 | 1,070.40 |
| Engineering Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other General & Adm | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total General & Administ** | 1,003.75 | 1,248.57 | 362.03 | 163.81 | 682.00 | 369.90 | 532.00 | 293.42 | 704.31 | 229.21 | 92.18 | 317.85 | 5,995.03 |
| Insurance | 17,509.33 | 17,509.33 | 17,509.33 | 17,509.33 | 17,509.33 | 17,509.33 | 17,509.33 | 18,691.33 | 17,509.33 | 17,509.33 | 25,173.33 | 25,173.33 | 226,622.00 |
| **Taxes** | | | | | | | | | | | | | |
| Gross Receipts Tax | 2,114.40 | 2,879.83 | 2,814.25 | 2,699.95 | 2,473.77 | 1,945.84 | 1,922.44 | 2,130.56 | 2,332.14 | 2,930.72 | 2,866.98 | 2,772.75 | 29,924.73 |
| Real Property Tax | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 6,642.40 | 79,708.80 |
| Dumping Fee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Taxes** | 8,756.80 | 9,522.23 | 9,456.65 | 9,342.35 | 9,116.12 | 8,588.24 | 8,564.84 | 8,781.06 | 8,974.54 | 9,573.12 | 9,541.38 | 9,415.15 | 109,633.81 |
| **Total Expense** | 66,703.77 | 84,076.16 | 52,342.70 | 66,713.67 | 74,548.28 | 55,556.51 | 68,272.34 | 79,895.91 | 102,481.90 | 71,708.27 | 82,189.17 | 84,422.01 | 890,669.93 |
| **Net Operating Income** | (15,843.80) | (12,077.81) | 18,013.57 | 784.92 | (12,703.93) | (6,909.51) | (7,344.37) | (21,614.90) | (38,857.90) | 1,559.84 | (10,533.77) | (8,434.32) | (113,902.12) |
| **Expenditure** | | | | | | | | | | | | | |
| **Capital Improvements** | | | | | | | | | | | | | |
| Apartment Interior Re | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Appliance Replaceme | - | - | - | - | - | 2,521.74 | - | 3,003.06 | - | 925.19 | - | - | 6,450.00 |
| Handrail Replacemen | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Replacements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Capital Improvemen** | - | - | - | - | - | 2,521.74 | - | 3,003.06 | - | 925.19 | - | - | 6,450.00 |
| **Extraordinary Property Repairs** | | | | | | | | | | | | | |
| Appliance Repair | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Electrical Repair | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping & Drain | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plumbing Repair | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Stairs Repair | - | - | - | - | - | 5,884.07 | - | 7,007.15 | - | 2,158.78 | - | - | 15,050.00 |
| Other Repairs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Extraordinary Prope** | - | - | - | - | - | 5,884.07 | - | 7,007.15 | - | 2,158.78 | - | - | 15,050.00 |
| **Total Expenditure** | - | - | - | - | - | 8,405.81 | - | 10,010.21 | - | 3,083.98 | - | - | 21,500.00 |
| **Total Expense & Expenditure** | 66,703.77 | 84,076.16 | 52,342.70 | 66,713.67 | 74,548.28 | 63,961.32 | 68,272.34 | 89,906.12 | 102,481.90 | 74,792.25 | 82,189.17 | 84,422.01 | 912,569.93 |
| **Net Cash Flow** | (15,843.80) | (12,077.81) | 18,013.57 | 784.92 | (12,703.93) | (15,315.32) | (7,344.37) | (31,625.11) | (38,857.90) | (1,524.14) | (10,533.77) | (8,434.32) | (136,482.12) |

## TUMON VILLAGE
### Building Square Footages

| Building | One Bedrooms | Two Bedrooms | Three Bedrooms | Total Units | Net Rentable Total Sq Footage | Building |
|---|---|---|---|---|---|---|
| A | 12 x 584 sq ft | 12 x 765 sq ft | | 24 | 16,188 | A |
| B | | 32 x 765 sq ft | | 32 | 24,480 | B |
| C | 12 x 584 sq ft | 12 x 765 sq ft | | 24 | 16,188 | C |
| D | | | 12 x 828 sq ft | 12 | 9,936 | D |
| E | | 24 x 765 sq ft | | 24 | 18,360 | E |
| F | | 24 x 765 sq ft | | 24 | 18,360 | F |
| G | | | 12 x 828 sq ft | 12 | 9,936 | G |
| H | | | 12 x 828 sq ft | 12 | 9,936 | H |
| J | | 24 x 765 sq ft | | 24 | 18,360 | J |
| K | | | 12 x 828 sq ft | 12 | 9,936 | K |
| L | | | 12 x 828 sq ft | 12 | 9,936 | L |
| M | | 24 x 765 sq ft | | 24 | 18,360 | M |
| N | | 32 x 765 sq ft | | 32 | 24,480 | N |
| O | | 24 x 765 sq ft | | 24 | 18,360 | O |
| P | 12 x 584 sq ft | 12 x 765 sq ft | | 24 | 16,188 | P |
| Q | | 24 x 765 sq ft | | 24 | 18,360 | Q |
| R | | 24 x 765 sq ft | | 24 | 18,360 | R |
| S | | | 12 x 828 sq ft | 12 | 9,936 | S |
| T | | | 12 x 828 sq ft | 12 | 9,936 | T |
| U | 12 x 584 sq ft | 12 x 765 sq ft | | 24 | 16,188 | U |
| | 48 | 280 | 84 | : 412 | 311,784 | |

| | | |
|---|---|---|
| Commercial | | 5,376 |
| Commercial | | 4,608 |
| Office | | 3,160 |
| Mechanical | | 1,354 |
| Mechanical | | 1,354 |
| Mechanical | | 1,354 |
| Mechanical | | 1,354 |
| | | 18,560 |

| | | |
|---|---|---|
| TOTAL PROJECT | | 330,344 |



# GLOBAL REALTY

P.O. Box 25375 GMF • GUAM 96921 U.S.A.
TEL. (671) 637-3090 / 91 • FAX: (671) 637-3119
EMAIL: globalrt@ite.net / michaelslee1882@hotmail.com

## Fax Transmission

☒ Please call to confirm receipt

☐ Please respond by return fax

☐ Call only if transmission is incomplete

Date:       October 9, 2003

To:        Mr. Bruce P. Morrison/BTC 97 SP, LLC

Fax number:   646-324-7934

From:       Michael Lee

Subject:     The New Tumon Village

**Number of pages including cover page:** _____1_____

Dear. Mr. Morrison

Thank you again, Received on your Fax dated on October 8, 2003.

We have continue discuss with Rick Cruz, Also we are set-up meeting again

1.30 PM.

We had fully discuss of your selling price.

Please deeply consideration and set up of your final selling price.

And will discuss with your regarding of Confidentiality Agreement.

Will callyou, 4.30/5.00 AM Tomorrow.

Thank you for your cooperation.

Michael Lee    /michael Lee

Dear Bruce,

In regards to our telephone conversation on October 10, 2003, I am
writing you this email to make a formal request regarding the topic of
our discussion.  This morning we discussed the issue of my commission.
Although normally, the commission is paid by the buyer, however, for
this case, I ask that my commission be paid by the seller.  The buyer,
Jae Park, is a dear friend of mine and I would feel very awkward
receiving a large amount of money from the buyer.

Usually, the commission is paid by the seller and the normal charge is
6% of the selling price.  But for this deal, I am willing to charge
only 4% commission of the selling price.  Please add the 4% commission
to be paid to me, to your final selling price.  Thank you for your
efforts to accommodate my needs.  Please let me know of your decision
by fax or email.

Respectfully,
Mike

Global Realty
Michael Lee Principal Broker
P.O. Box 25375
GMF, Guam 96921

Tel: (671)-637-3090
Fax: (671)-637-3119

----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----
(Embedded image moved to file: pic20537.pcx)

Reply to Message

To:        "Global Realty" <globalrt@ite.net>@DEUBAINT
cc:
From:      Bruce P Morrison/NewYork/DBNA/DeuBa
Date:      10/10/2003 04:18:26 PM
Subject:   Re: The New Tumon Village, Tamunig, Guam


Dear Mike -

I think that your request is reasonable; however, I will need to get
internal permission.  Assuming that permission is granted, I think that
we should document our agreement.  I will get back to you early next
week.

Regards,

Bruce

**********************************
Bruce P. Morrison
Phone: 646-324-3070
FAX:   646-324-7934
US Mobile:  917-678-1031
China Mobile:  86-1364-162-8339
************************************

# GLOBAL REALTY

P.O. Box 25375  GMF • GUAM 96921 U.S.A.
TEL. (671) 637-3090 / 91 • FAX: (671) 637-3119
EMAIL: globalrt@ite.net / michaelslee1882@hotmail.com

## Fax Transmission

[X] Please call to confirm receipt

[ ] Please respond by return fax

[ ] Call only if transmission is incomplete

Date:          October 17, 2003

To:      Mr. Bruce P. Morrison/BTC 97 SP, LLC

Fax number:  646-324-7934

From:      Michael S. Lee

Subject:      The New Tumon Village Apartment, Tamuning.

**Number of pages including cover page:** 1

Dear. Mr. Morrison

We received on your E-mail on last October 10, 2003.

We are expecting on your response, regarding for internal permission

of Commission Agreement,  and

We are anxious waiting on your Final Selling Price ?.

Thank you for your cooperation

Michael Lee

Memorandum

To:         globalrt@ite.net @ DEUBAINT
cc:
bcc:
From: Bruce P Morrison/NewYork/DBNA/DeuBa
Date:       10/19/2003 09:34:02 AM
Subject:    The New TVA


NOTE: There is a file attached to this note
Hi Michael -

Attached is a nonexclusive listing agreement which you should complete,
sign and fax to me.  I will sign and fax back to you.  This will
register Mr Park as your client and indicate that BTC 97 SP, LLC will
pay you a 4% commission, should your client be the successful purchaser
of the New TVA.


(See attached file: Tumon NON-Exclusive Listing Agreement Michael
Lee.doc)

Regards,

Bruce

*********************************
Bruce P. Morrison
Phone: 646-324-3070
FAX:   646-324-7934
US Mobile:   917-678-1031
China Mobile:  86-1364-162-8339
***********************************

Delivery Priority:            Normal
Delivery Report:      Basic
Receipt Report:       No
Personal Categories:   Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----


(Embedded image moved to file: pic21548.pcx)



## GLOBAL REALTY

P.O. Box 25375  GMF  •  Guam 96921 U.S.A.
Tel. (671) 637-3090 / 91  •  Fax: (671) 637-3119
Email: globalrt@ite.net / michaelslee1882@hotmail.com

### Fax Transmission

☐ Please call to confirm receipt

☒ Please respond by return fax

☐ Call only if transmission is incomplete

Date:     October 21, 2003

To:   Mr. Bruce P. Morrison/BTC 97 SP, LLC

Fax number: 1-646-324-7934

From:   Michael Lee

Subject:   The New Tumon Village Apartment, Tamuning.

**Number of pages including cover page:** ___1___

Dear. Mr. Morrison

Please be find of enclose of " Non-Exclusive Listing Agreement ".
Please review and signed, Fax back to us is highly appreciated.
Also we need confirmation, As per we indicate last Fax, dated on
on October 09, 2003. on our buyer are waiting on your Final
Selling Price ??.

Thank you for your cooperation

Michael Lee       _Michael Lee_

## NON-EXCLUSIVE LISTING AGREEMENT

The undersigned Owner's representative hereby grants the undersigned Broker a Non-Exclusive Listing Agreement ("Agreement"), for a period commencing this date and terminating __December 31__ , 2003, to sell the Tumon Village Apartments Project located at Upper Tumon, Island of Guam (the "Property") to __Jae S. Park__ .

Owner agrees to pay Broker as compensation for services rendered a fee of 4% (four percent) of the selling price if Broker procures an offer to purchase from __Jae S. Park__ , on the terms acceptable to Owner during the term of this Agreement. Broker shall also be entitled to compensation if the Owner sells or transfers the property to __Jae S. Park__ within ninety (90) days after the termination of this Agreement. Any compensation due Broker shall only be due and payable at the close of the escrow of a purchase offer accepted by Owner. No compensation shall be paid if an accepted purchase offer does not close, for any reason.

The Owner reserves the right to sell the Property during the term hereof, without incurring liability for any compensation to the Broker, to any purchaser other than __ __Jae S. Park__ . The Broker shall notify Owner of any and all offers before accepting them. Owner reserves the right to reject any and all offers for any reason. In the event that Owner shall sell the Property, it shall immediately notify the Broker in writing stating the name of the purchaser and the purchase price to be paid.

Broker is authorized to cooperate with other Brokers in the marketing and sale of the Property and may divide the above compensation with such other Brokers. Owner agrees to deliver escrow instructions irrevocably assigning Broker's compensation from Owner's proceeds at the close of escrow. Owner shall have the right to enter into non-exclusive listing agreements with other real estate brokers on such terms and conditions as it deems appropriate. Subject to Broker's right to compensation, Owner shall have the right to negotiate directly with __Jae S. Park__ after the execution of this Agreement.

**BROKER:**

Name: __Michael S. Lee / Broker__
Date: __October 21, 2003__
Address: __Global Realty__
__P.O. Box 25375__
__G.M.F., Guam 96921__

Telephone: __(671) 637-3090/91__
Fax: (671) 637-3119

By: _Michael S. Lee_

**OWNER:**

Name: BTC 97 SP, LLC, a Delaware
limited liability company

Date: _____
Address: _____
_____
_____

Telephone: _____

By: _____

Memorandum

To:        Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:      10/22/2003 12:16:33 AM
Subject:   New Tumon Village

Dear Bruce,

Thank you for working with me on the listing agreement.  I just wanted
to follow up on the fax I sent you yesterday.  When you get a chance,
please send me confirmation that you have received the fax and that the
form is filled out properly.  I would also like to let you know that my
buyer, Mr. Park, is getting very impatient and would like to close the
deal as soon as possible.  Please give me a price I can take to him so
that we can begin negotiations.


Respectfully,
Mike


Global Realty
Michael Lee Principal Broker
P.O. Box 25375
GMF, Guam 96921

Tel: (671)-637-3090
Fax: (671)-637-3119




Delivery Priority:           Normal
Delivery Report:       Basic
Receipt Report:        No
Personal Categories:   Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----


(Embedded image moved to file: pic27595.pcx)

# JAE SEUNG PARK

P.O. Box 8801 Tamuning, Guam 96931
Tel: (671) 646-8082/5248*Fax(671) 646-4388

Date: October 22, 2003

To : Mr. Bruce Morrison
Dutsch Bank
D.B. Real Estate
1251 Avenue of the Americans 9<sup>th</sup> floor
NYNY 10020

Subject : The New Tumon Village

It was my pleasure that MR. MICHAEL LEE gave me all the information in reference to
THE NEW TUMON VILLAGE.

You may call me anytime at the following telephone nos.:

WORK PHONE : (671) 646-8082
                (671) 646-5248
FAX NO.      (671) 646-4388

HOME PHONE: (671) 646-5464
CELL PHONE:  (671) 687-1714

Or you my contact our Attorney – ATTY. ROBERT P. KUTZ at Tel .(671) 789-2500;
Fax (671) 789-2503.

Could you please when is the best time to call you.

Thank you.

Sincerely,

*[signature]*
JAE SEUNG PARK

# JAE SEUNG PARK
P.O. Box 8801 Tamuning, Guam 96931
Tel: (671) 646-8082/5248*Fax(671) 646-4388

Date: October 23, 2003

To : Mr. Bruce Morrison
Dutsch Bank
D.B. Real Estate
1251 Avenue of the Americans 9th floor
NYNY 10020

Subject : Final Price for "The New Tumon Village".

Dear Mr. Morrison;

It was nice talking to you this morning. Sorry, I have flu that is why you can't hardly hear my voice.

Once you have final price for 'THE NEW TUMON VILLAGE" on friday . You don't mind if you will send to me directly?

Appreciate it very much.

Sincerely,

JAE SEUNG PARK

# BTC 97 SP, LLC

October 29, 2003

Mr. Jae Seung Park
P.O. Box 8801
Tamuning, Guam 96931

## BY FACSIMILE

Dear Mr. Park:

It was nice to talk with you last week. We are still having internal discussions about an acceptable price, so it will be a few more days before you and I can continue our discussions.

In the interim, I would appreciate getting to know more about you and your company or companies. Please let me know the name of your companies and the types of businesses they are in. If I recall correctly, you mentioned that you own other real estate on Guam. It would be helpful if you would identify those assets, giving a description of each, along with its address.

Which entity would you use to purchase the New Tumon Village? Please send a financial statement of that entity, as well as your personal financial statement, signed by you. Also, please describe how you would finance and pay for the purchase of the project.

Finally, we will need references from people with whom you do business and, very importantly, from your bank and other financing sources. Please provide us with names of people we can contact, along with their phone numbers.

I look forward to continuing our discussions

Sincerely,

Bruce P. Morrison
Managing Director

BTC 97 SP, LLC
C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 • NEW YORK, NY • 10020
PHONE: 646-324-3070 • FAX: 646-324-3682

```
        JOB #639

        DATE   TIME            TO/FROM        MODE   MIN/SEC   PGS   STATUS
001  10/29  17:07          916716464388   G3--S   01'07"   002     OK
```

**Deutsche Bank** ◪
DB Real Estate
1251 Avenue of the Americas
25ᵗʰ Floor – MS: NYC07-2500
New York, NY 10020-1104

| *Date Sent:* | **10-29-03** |
|---|---|

*pages (including this cover)*

| *To:* | **Mr. Jae Seung Park** |
|---|---|
| *Company:* | |
| *Re:* | **New Tumon Village** |
| *Phone:* | |
| *Fax:* | **671-646-4388** |

| *From:* | **Bruce P. Morrison** |
|---|---|
| *Group:* | **Real Estate Investment Banking** |
| *Phone:* | **646-324-3070** |
| *Fax:* | **646-324-7934** |

*Comments:*

26

Memorandum

To:        Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:      10/29/2003 11:28:06 PM
Subject:   New Tumon Village

Dear Bruce,

I have been trying to call you for the past two days and I am still
unable to get a hold of you.  Since the first time I contacted you on
July 4th of this year, you were hesitant to mention a selling price.
My buyer, Mr. Park is getting very impatient and so let me be frank;
Mr. Park has made a verbal offer of 3.5 million in cash for the subject
property.  Please let me know if this is an acceptable price.  If you
do accept this offer, please reply to me via email or fax so I can
formalize the offer.

Best Regards,

Michael


Global Realty


Michael Lee Principal Broker<?xml:namespace prefix = o ns =
"urn:schemas-microsoft-com:office:office" />


P.O. Box 25375
GMF, Guam 96921
Tel: (671)-637-3090
Fax: (671)-637-3119




Delivery Priority:          Normal
Delivery Report:       Basic
Receipt Report:        No
Personal Categories:   Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----

(Embedded image moved to file: pic04041.pcx)

# JAE SEUNG PARK

P.O. Box 8801 Tamuning, Guam 96931
Tel: (671) 646-8082/5248*Fax(671) 646-4388

Date:  October 30, 2003

To : Mr. Bruce Morrison
Dutsch Bank
D.B. Real Estate
1251 Avenue of the Americans 9th floor
NYNY 10020

Dear Mr. Morrison

Received your letter via fax date 10/29/2003.

Per your request,  I would be very glad to give you more information about myself
especially my businesses in Guam.

Following are the lists of my businesses in Guam:

1). PACIFIC PRODUCE CORPORATION
          TYPE OF BUSINESS:  GROCERY WHOLESALE
          DOING BUSINESS FOR OVER TWENTY-FIVE YEARS.
          APPROXIMATELY 6,500 SQ. METER (LOT)
                         12,000 SQ.FT. ( WAREHOUSE)

ASIDE FROM DOING WHOLESALE BUSINESS WE HAVE ALSO RENTAL
BUSINESS. RENTAL INCOME OF $11,000.00 PER MONTH FROM OFFICE
BUILDING.

2). KOREA T.V. MARIANAS
          TYPE OF BUSINESS:  T.V. STATION FOR KOREAN COMMUNITY
                         HERE IN GUAM
          DOING BUSINESS SINCE 1998.

3). OKA BUILDING
          APPROXIMATELY 20,000 SQ.FT. FULLY OCCUPIED BY DOCTORS/
          CLINIC.  MONTHLY RENTAL INCOME OF $25,000.00.
          3,700 SQ. METER - FOR LAND

Korea T.V. Marianas and Pacific Produce Corporation are in one (1) building located at 190 Chalan San Antonio Road, Tamuning, Guam

Oka Building- is a two storey building located at 241 Farenholt Ave., Oka Tamuning, Guam 96911.

I am interested to purchase New Tumon Village as my additional investment. I will send you financial statement later on.

I am ready to pay 2.5 million anytime as soon as all conditions are acceptable on both parties. Remaining balance will be loan from the bank.

Following are our suppliers for your references:

A). RICHMOND WHOLESALE MEAT CO.
    TEL: (510) 233-5111
    FAX: (510) 234-6186
    CONTACT PERSON: MARISS HANS

B). BRUNO'S QUALITY PRODUCE
    TEL: (650) 588-9925
    FAX: (650) 588-9928
    CONTACT PERSON: BRUNO OR LINDA

C). MCL DISTRIBUTING, INC.
    TEL: (323) 981-1810
    FAX: (323) 981-1820
    CONTACT PERSON: KEVIN WHITE

D). ATLAPAC TRADING
    TEL: (323) 722-2472
    FAX: (323) 726-3452
    CONTACT PERSON: SUE OR TIM

E). GEORGE PURI CO.
    TEL: (323) 666-6609
    FAX: (323) 666-6604
    CONTACT PERSON: GEORGE

F). AJC INTERNATIONAL, INC.
    TEL: (404) 252-6750
    FAX: (404) 252-9340
    CONTACT PERSON: JOSHUA MORILL

BANK REFERENCES:

A). BANK OF HAWAII
      TEL (671) 479-3500
         (671) 479-2000

B). FIRST HAWAIIAN BANK
      TEL: (671) 646-1355
      FAX: (671) 646-1391

C). CITIBANK
      TEL: (671) 477-2484
      FAX: (671) 477-9441

We don't have any bank loan on all my above businesses.

I hope the above information will be enough for your references.

If you have any question, please let me know.

Sincerely,

JAE SEUNG PARK

# PACIFIC PRODUCE CORP (P.P.C)
### WHOLESALE
### ALL KINDS OF
## FRESH VEGETABLES, FRUITS & EGGS
SHIPMENT ARRIVES EVERY TUESDAY FROM WEST COAST.
WE ALSO CARRY ALL KINDS OF FROZEN VEGETABLES.

## FROZEN MEAT

| | | | | | |
|---|---|---|---|---|---|
| PORK LOIN BN-IN | | $1.10/LB | BEEF INTESTINE | 20#/LB | $0.85/LB |
| PORK RIBS | 20#/CS | $0.70/LB | BEEF MARROW BONE | | $0.65/LB |
| PORK HOCK LARGE | 33.07#/CS | $0.57/LB | BEEF OX-TAIL | | $2.70/LB |
| PORK BELLY | | $1.98/LB | BEEF FLANK STEAK | | $3.09/LB |
| PORK BUTT BNLS | | $1.20/LB | BF SHORTRIB "MONFORT" | | $3.99/LB |
| BEEF GROUND | 40#/CS | $1.25/LB | BEEF RIB EYE "COM" | | $3.09/LB |
| BEEF PATTIES | 4-1 "2.5" | $1.29/LB | BEEF TOP SIRLOIN "SELECT" | | $2.90/LB |
| BEEF TOP SIRLOIN-CM | "COM" | $1.89/LB | BEEF CHUCK | | $1.85/LB |
| BEEF SPARERIBS | 20#/CS | $0.90/LB | | | |

## SAUSAGES/CHEESE

| | | | | | |
|---|---|---|---|---|---|
| SAUSAGE, BF HOT LINK | 40#/CS | $1.95/LB | PORTUGESE SAUSAGE | 4-12/12OZ | $2.55/LB |
| BOLOGNA MEAT | 4/5# | $1.35/LB | MEATBALLS | | $2.09/LB |
| SALAMI MEAT | 2/10# | $1.79/LB | BACON PRE-COOKED | 300 SLICES | $28.40/CS |
| PORK LINK SAUSAGE | 1 OZ | $1.85/LB | TURKEY ROLL WHITE | 2/10# | $1.49/LB |
| | | | AM SLICED CHEESE | 4/5# | $2.49/LB |

## POULTRY

| | | | | | |
|---|---|---|---|---|---|
| CHIX WHOLE CHICKEN | 30#/CS | $21.95/CS | CHIX LEG QUARTER | 6/5# | $16.25/CS |
| CHIX BREAST BNLS/SON | 24/8 OZ | $31.00/CS | CHIX NUGGETS | 20#/CS | $23.00/CS |
| PARTY WINGS | 13/3# | $47.60/CS | CHIX PATTIES "BRD" | 8/5# | $31.60/CS |
| CHICKEN BREAST SPLIT | 6/5#/CS | $28.30/CS | CHIX DRUMSTICK | 8/5#/CS | $23.30/CS |
| CHIX THIGH | 6/5# | $16.80/CS | | | |

FREE DELIVERY (MONDAY - FRIDAY 8:00 AM - 5:00 PM) While Supplies Last!
TEL. NO. (671) 646-8082/5248 • FAX (671) 646-4338
LOCATION: BEHIND OLYMPIA MARKET HOSPITAL ROAD, TAMUNING
*CASH ON DELIVERY*

ADVERTISE 10/30/2003 (LOCAL NEWS PAPER).

**KOREA T.V.MARIANAS (MCV CH26)**
**PACIFIC PRODUCE CORPORATION**
**P.O.BOX 8801 TAMUNING, GUAM 96931**

JAE SEUNG PARK
*President*

Tel : (671) 646-5248/8082
Fax : (671) 646-4388
Los Angeles : (310) 247-9288



괌 한 인 회
Korean Association of Guam



회 장 박 재 승
President Jae Seung Park

P.O. Box 8801
Tamuning, Guam 96931

Tel.: (671) 649-1575
Fax.: (671) 646-4388

Memorandum

To:        Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:      11/02/2003 11:43:09 PM
Subject:   The New Tumon Village


Dear Bruce,

I sent you an email on October 30, 2003 and you have yet to reply.  I
must get this deal done this week or Mr Park will walk.  Can you either
give me a selling price or request that he make a formal offer?  I am
afraid that Mr Park's patience has run out.  Like I mentioned to you
before, I have other properties that I have been showing him, but the
New Tumon Village was his first choice.  If I do not hear from you by
the end of this week, I will start the paperwork on another property
that he has in mind.

Bruce, I urge you to give me a reply as soon as possible.

Respectfully,

Mike


Global Realty
Michael Lee Principal Broker<?xml:namespace prefix = o ns =
"urn:schemas-microsoft-com:office:office" />
P.O. Box 25375
GMF, Guam 96921
Tel: (671)-637-3090
Fax: (671)-637-3119


Delivery Priority:          Normal
Delivery Report:      Basic
Receipt Report:       No
Personal Categories:    Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----
(Embedded image moved to file: pic30836.pcx)

# LAW OFFICE OF ROBERT P. KUTZ
## P.O. BOX 7310
## AGAT, GUAM 96915
### TEL: (671) 789-2500 FAX (671) 789-2503
### EMAIL: rpklaw@ite.net

November 4, 2003

Mr. Bruce Morrison                    **VIA FACSIMILE 646-324-7934**
Deutsche Bank
DB Real Estate
1251 Avenue of the Americas, 9th Floor
New York, NY 10020

RE: Guam New Tumon Village Apartment Complex

Mr. Morrison:

Per our telephone conversation, this is to confirm that I represent Jae S. Park and his business associates with respect to their proposed purchase of the Tumon Village apartment complex.

I met with Mr. Park following our conversation, and he has authorized me to extend an all-cash offer for the property in the amount of $3,300,000, payable in lump sum within fifteen business days of your client's acceptance of this offer.

This offer is extended for the property in "as is, where is" condition, without seller's warranty of any kind, except warranty and delivery of clear, insurable title to the property. As part of closing documentation, however, my clients will expect delivery of all relevant financial records, maintenance agreements, lease/rental agreements, and similar documents with respect to the property now in the possession, custody or control of the owners, together with a copy of the most recent appraisal for the property, the contents of which need not be disclosed prior to closing of escrow.

This offer will remain until 5:00pm, November 10, 2003, New York time. If not accepted within that time, the offer will expire without further notice.

I look forward to your response as soon as possible.

Sincerely,

ROBERT P. KUTZ

cc:    J. S. Park

# Law Office of Robert P. Kutz
## PO Box 7310 Agat, GU 96915
## Tel: 671-789-2500  Fax: 671-789-2503
## Email: rpklaw@ite.net

### FACSIMILE COVER PAGE

| | |
|---|---|
| To: Bruce Morrison | From: Robert P. Kutz |
| Fax #: 16463247934 | Fax #: 671-789-2503 |
| Company: Deutsche Bank | Tel #: 671-789-2500 |

| | |
|---|---|
| Subject: New Tumon Village Apartment | |
| Sent: 11/4/03 at 9:56:10 AM | Pages: 2 (including cover) |

**MESSAGE:**

Please refer to attached correspondence.

Thank You.

Gloria Alvendia
Law Office of Robert P. Kutz

WinFax PRO Cover Page

# BTC 97 SP, LLC

November 4, 2003

Mr. Jae Seung Park
P.O. Box 8801
Tamuning, Guam 96931

### BY FACSIMILE

Dear Mr. Park:

We have had our internal meetings and are pleased to offer you the opportunity to purchase the New Tumon Village at a price of $3,750,000 on an "as is" basis. If this is acceptable to you, please respond no later than November 11, including any terms on which your acceptance is based. Assuming that the terms are agreeable to BTC 97, I will put our attorney in touch with your attorney and we will start preparing the appropriate documents.

I look forward to hearing from you

Sincerely,

Bruce P. Morrison
Managing Director

cc: Michael Lee

BTC 97 SP, LLC
C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 • NEW YORK, NY • 10020
PHONE: 646-324-3070 • FAX: 646-324-3082

```
┌──────────────────────┐
│  JOB STATUS REPORT   │
└──────────────────────┘
```

TIME : 11/04/2003 12:05
NAME : DB REAL ESTATE
FAX# : 6463247934
TEL# : 6463243000

| DATE,TIME | 11/04 12:04 |
| FAX NO./NAME | 916716464388 |
| DURATION | 00:01:04 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |



New York, NY 10019

| Date Sent: | 1F-04-03 |
|---|---|
| This Transmission Consists of: | 2 pages (including this cover) |

| To: | Mr. Jae Seung Park |
|---|---|
| Company: | |
| Re: | New Tumon Village |
| Phone: | |
| Fax: | 671-646-4388 |

| From: | Bruce P. Morrison |
|---|---|
| Group: | Real Estate Investment Banking |
| Phone: | 646-324-3070 |
| Fax: | 646-324-7934 |

| Comments: | |
|---|---|

```
                            JOB STATUS REPORT

                                            TIME : 11/04/2003 12:06
                                            NAME : DB REAL ESTATE
                                            FAX# : 6463247934
                                            TEL# : 6463243000


    DATE,TIME                     11/04  12:06
    FAX NO./NAME                  916716373119
    DURATION                      00:00:24
    PAGE(S)                       02
    RESULT                        OK
    MODE                          STANDARD
                                  ECM
```

**Deutsche Bank** 

DB Real Estate
1251 Avenue of the Americas
25th Floor – MS: NYC07-2500
New York, NY 10020-1104

| Date Sent: | 11-04-03 | |
|---|---|---|
| This Transmission Consists of: | **2** | pages (including this cover) |

| To: | Mr. Michael S. Lee |
|---|---|
| Company: | |
| Re: | New Tumon Village |
| Phone: | 671-637-3090 |
| Fax: | 671-637-3119 |

| From: | Bruce P. Morrison |
|---|---|
| Group: | Real Estate Investment Banking |
| Phone: | 646-324-3070 |
| Fax: | 646-324-7934 |

Comments:

# LAW OFFICE OF ROBERT P. KUTZ
## P.O. BOX 7310
### AGAT, GUAM 96915
### TEL: (671) 789-2500 FAX (671) 789-2503
### EMAIL: rpklaw@ite.net

November 5, 2003

Mr. Bruce Morrison            **VIA FACSIMILE 646-324-7934**
Deutsche Bank
DB Real Estate
1251 Avenue of the Americas, 9th Floor
New York, NY 10020

RE: Guam New Tumon Village Apartment Complex

Mr. Morrison:

Mr. Park has forwarded your November 5 fax to me for response.

Mr. Park and his associates are not willing to accept the counter-proposal set forth in your letter, but are prepared to increase their offer to a total of $3,500,000, payable on and subject to the same terms and conditions set forth in my own November 4th fax to you.

With respect to the matter of "clear, insurable title", as a condition of sale, I have been provided with a copy of Ownership and Encumbrance Report no. OER 09 2 14651A, issued by Pacific American Title Insurance Company. Title to the property remaining at close of escrow in the condition described in that report will deemed clear and insurable, for our purposes. I presume that you have a copy of that report – if not, it may be readily obtained either from me or broker Michael Lee.

Although as a licensed broker myself, I am well aware that the topic of commissions is regarded as sacrosanct, I am informed by Mr. Park that because of the singularly simple and uncomplicated nature of this proposed transaction, Mr. Lee would be willing to re-negotiate his commission arrangement with you. Assuming that to be the case, I strongly suggest that, if necessary, you consider doing likewise with respect to your principals so that this deal may be completed on terms satisfactory to all.

For simplicity of continuing these negotiations, Mr. Park and I request that you communicate your response directly to me, with copies to Mr. Park and to Mr. Lee. In that way, unnecessary time loss and duplication of effort may be avoided.

This counter-offer will remain open until 5:00pm, November 12, New York time, at which time it will terminate without further notice.

I look forward to your response as soon as possible.

Sincerely,

ROBERT P. KUTZ

cc:     J. S. Park

# BTC 97 SP, LLC

November 7, 2003

Mr. Robert P. Kutz
P.O. Box 7310
Agat, Guam 96915

BY FACSIMILE

Dear Mr. Kutz:

Let me begin by correcting what may be a misunderstanding on your part. I am neither a lawyer nor a broker. I am an officer of the company that owns the New Tumon Village and, as such, am a principal. However, as in most companies, I need to communicate with others before committing to a transaction such as this. Further, during the entirety of my career, I have only negotiated with my business counterparts and not with a counterpart's attorney, a practice that I believe is prudent to continue. At the appropriate time, my attorney will become involved, in which case we will welcome the opportunity to converse with you and Mr. Park.

In the interim, I will communicate directly with Mr. Park

Very truly yours,

Bruce P. Morrison
Managing Director

cc: Jae Seung Park

# BTC 97 SP, LLC

November 7, 2003

Mr. Jae Seung Park
P.O. Box 8801
Tamuning, Guam 96931

### BY FACSIMILE

Dear Mr. Park:

Thank you for your counter-offer of $3,500,000 which was presented to me in a letter from your attorney, Mr. Robert Kutz, on November 5. While it is a step in the right direction, it is an offer that we just cannot accept. We would seriously consider $3,700,000, which might be further modified, depending on the results of the suggested re-negotiation with your broker, Mr. Michael Lee. If this price is acceptable to you, please respond no later than November 12, 5:00 PM, New York time.

However, before we could go to contract and closing, I must have additional information regarding the entity which will purchase the project, including the identity of any partners in the project, as well as the source of the funds from all parties that will be tendered in payment for the project.

I look forward to hearing from you

Sincerely,

Bruce P. Morrison
Managing Director

cc: Michael Lee
    Robert P. Kutz

BTC 97 SP, LLC
C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 • NEW YORK, NY • 10020
PHONE: 646-324-3070 • FAX: 646-324-3082

# JAE SEUNG PARK
### P.O. BOX 8801
### TAMUNING, GUAM 96931
### TEL: (671)646-8082/5248*FAX(671)646-4388

November 13, 2003

Attn: Mr. Bruce P. Morrison
    Managing Director

Subject: The New Tumon Village Apartment Complex

Dear Mr. Morrison

It was nice talking to you this morning.

As per our discussion, you need to know if where will I get the money that I am going to use as payment for the New Tumon Village apartment.

I am sending you the copy of bank statement from the bank for your reference. And also, I am giving you the contact number my partner, MR. CHO, KYU YOUNG where you can contact him. Either way he will contact or you may contact him on the telephone number indicated below.

Mr. Cho, Kyu Young is the chairman of Central Mill Supply Co. and owner of Central Construction Co. in Korea.

Telephone number of Mr. Cho, Kyu Young – Tel: (822) 703-5066  Fax:(822) 707-2794

We look forward to hear from you on the above matter.

Thank you.

JAE SEUNG PARK

## Time Certificate of Deposit

**Financial Institution:**   Pacific Union Bank, Vermont Office
933 S. Vermont Avenue, Los Angeles, CA 90006

2066001334

| Account Name: JEFFREY J PARK (M) or HEE SOOK CHO PARK (F) | | | SSN/TIN: 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 |
|---|---|---|---|
| OWNERSHIP TYPE: Joint (Right of Survivorship) | | | |

| Account Number | Issue Date | Deposit Amount | Term | Maturity Date |
|---|---|---|---|---|
| 2066001334 | October 16, 2003 | $1,000,740.60 | 30 Days | November 15, 2003 |

**Rate Information:** This Account is an interest bearing account. For your opening deposit of $1000740.60, your interest rate is 1.40%, and your annual percentage yield is 1.41%.

The interest rate and annual percentage yield will not change for the term of the account. The interest rate will be in effect until November 15, 2003. Interest begins to accrue on the business day you deposit noncash items (for example, checks). Interest will not be compounded on the account. Interest will be credited at maturity.

If you deposit funds prior to maturity, your interest rate will be for the tier that applies to the resulting balance.

**Balance Information:** We use the daily balance method to calculate the interest on the account. This method applies a daily periodic rate to the principal in the account each day. We will use an interest accrual basis of 365 (or 366 in leap year) for each day in the year. You must maintain a minimum balance of $1,000.00 in the account each day to obtain the disclosed annual percentage yield.

**Limitations:** You must deposit $100,000.00 to open this account. You may not make additional deposits except at maturity or during the grace period. You may not make withdrawals from your account until the maturity date.

**Time Account Information:** Your account will mature on November 15, 2003. If you withdraw any of the principal before the maturity date, we may impose a penalty of All accrued interest or 7 days' simple interest whichever is greater. This account will automatically renew. You will have 10 calendar days after the maturity date to withdraw funds without penalty.

**Account Fees:** The following fees apply to this account: Verification of Deposit: $5.00/each; and Charge Back Fee: $5.00/per returned item.

| NON TRANSFERABLE - NON NEGOTIABLE | Member FDIC | Signature of Authorized Financial Institution Signer |
|---|---|---|

## TIME DEPOSIT AGREEMENT - (30DAYS) SIMPLY BETTER TIME DEPOSIT 100M+

We appreciate your decision to open a time deposit account with us. This Agreement sets forth certain conditions, rates, and rules that are specific to your Account. Each signer acknowledges that the Account Holder named has placed on deposit with the Financial Institution the Deposit Amount indicated, and has agreed to keep the funds on deposit until the Maturity Date. As used in this Agreement, the words "you", "your" or "yours" mean the Account Holder(s), the word "Account" means this Time Deposit Account and the word "Agreement" means this Time Deposit Agreement, and the words "we", "us" and "our" mean the Financial Institution. This Account is effective as of the Issue Date and is valid as of the date we receive credit for noncash items (such as checks drawn on other financial institutions) deposited to open the Account. Deposits of foreign currency will be converted to U.S. funds as of the date of deposit and will be reflected as such on our records.

**INTEREST RATE.** The interest rate is the annual rate of interest paid on the Account which does not reflect compounding ("Interest Rate"), and is based upon the interest accrual basis described above.

**AUTOMATIC RENEWAL POLICY.** If the Account will automatically renew as described above, the principal amount and all paid earned interest that has not been withdrawn will automatically renew on each Maturity Date for an identical period of time as the original deposit term. Interest on renewed accounts will be calculated at the interest rate then in effect for time deposits of that Deposit Amount and term. If you wish to withdraw funds from your Account, you must notify us during the grace period after the Maturity Date.

**EARLY WITHDRAWAL PENALTY.** You have agreed to keep the funds on deposit until the Maturity Date of your Account. Any withdrawal of all or part of the funds from your Account prior to maturity may result in an early withdrawal penalty. We will consider requests for early withdrawal and, if granted, the penalty as specified above will apply.

Minimum Required Penalty. If you withdraw money within six (6) days after the date of deposit, the Minimum Required penalty is seven (7) days' simple interest on the withdrawn funds. If partial early withdrawal(s) are permitted, we are required to impose the Minimum Required Penalty on the amount(s) withdrawn within six (6) days after each partial withdrawal. The early withdrawal penalty may be more than the Minimum Required Penalty. You pay the early withdrawal penalty by forfeiting part of the accrued interest on the Account. If your Account has not earned enough interest, or if the interest has been paid, we take the difference from the principal amount of your Account.

Exceptions. We may let you withdraw money from your Account before the Maturity Date without an early withdrawal penalty: (1) when one or more of you dies or is determined legally incompetent by a court or other administrative body of competent jurisdiction; or (2) when the Account is an Individual Retirement Account (IRA) established in accordance with 26 USC 408 and the money is paid within seven (7) days after the Account is opened; or (3) when the Account is a Keogh Plan (Keogh), if you forfeit at least the interest earned on the withdrawn funds; or (4) if the Account is an IRA or a Keogh Plan established pursuant to 26 USC 408 or 26 USC 401, when you reach age 59 1/2 or become disabled; or (5) within an applicable grace period (if any).

**RIGHT OF SETOFF.** Subject to applicable law, we may exercise our right of setoff or security interest against any and all of your Accounts (except IRA, Keogh plan and Trust Accounts) without notice, for any liability or debt of any of you, whether joint or individual, whether direct or contingent, whether now or hereafter existing, and whether arising from overdrafts, endorsements, guarantees, loans, attachments, garnishments, levies, attorneys' fees, or other obligations. If the Account is a joint or multiple-party account, each joint or multiple party account holder authorizes us to exercise our right of setoff against any and all Accounts of such Account Holder.

**OTHER ACCOUNT RULES.** The following rules also apply to this Account.

Surrender of Instrument. We may require you to endorse and surrender this Agreement to us when you withdraw funds, transfer or close your Account. If you lose this Agreement, you agree to sign any affidavit of lost instrument, or other Agreement we may require, and agree to hold us harmless from liability, prior to our honoring your withdrawal or request.

Death of Account Holder. Each Account Holder agrees to notify us immediately upon the death of any other Account Holder. You agree that we may hold the funds in your Account until we have received all required documentation and instructions.

Indemnity. If you ask us to follow instructions that we believe might expose us to any claim, liability or damages, we may refuse to follow your instructions or may require a bond or other protection, including your agreement to indemnify us.

Pledge. You agree not to pledge your Account without our prior consent. You may not withdraw funds from your Account until all obligations secured by your Account are satisfied.

Citibank, N.A., P.O. Box 11, Hagåtña, Guam 96932                        PACIFIC PRODUCE CORP.
Citiphone Banking 1-671-477-2484, Fax 1-671-475-4124            Statement Period Oct 06,2003 - Nov 05,2003

PACIFIC PRODUCE CORP                          Your Relationship Manager is
P.O. BOX 8801                                 PATRICK KEHRES
TAMUNING GUAM 96931
UNITED STATES

## SUMMARY OF YOUR CITIBANK ACCOUNT

|  | USD Equivalent Balance - Nov 05 | |
|---|---|---|
|  | Deposits & Investments | Loans |
| Checking | 413,416.41 | |
| Savings & Investments | 0.00 | |
| Loans | | 0.00 |
| Credit Cards | | 0.00 |
| TOTAL | 413,416.41 | 0.00 |

## CHECKING SUMMARY

| Account Type | Account Number | Currency | Foreign Ccy Balance | USD Balance |
|---|---|---|---|---|
| BUSINESS CITICHECKING | 0-000116-475 | | | 413,416.41 |
| CHECKING TOTAL | | | | 413,416.41 |

## TOTAL RELATIONSHIP BALANCE

YOUR TOTAL RELATIONSHIP BALANCE (TRB) FOR THE PAST MONTH WAS    244,453.74.

To access your account and to know more about our products and services, visit us on the web at http://www.guam.citibank.com. Use your Citicard
(ATM card) or Citibank Visa Card number and PIN to enter Citibank Online and view your account activity, pay bills, pay school tuition or transfer
funds. It is safe and convenient.

A member of citigroup

# JAE SEUNG PARK
P.O. BOX 8801
TAMUNING, GUAM 96931
TEL: (671)646-8082/5248*FAX(671)646-4388

November 13, 2003

Attn: Mr. Bruce P. Morrison
    Managing Director

Subject: The New Tumon Village Apartment Complex

Dear Mr. Morrison

Could you please send either to me or Mr. Cho in Seoul your current copy of appraisal of New Tumon Village Apartment.

Mr. Cho need that copy because he needs to get approval from the bank to transact money out of the country or outside Korea.

Thank you.

*Jeesey park*
Jae Seung Park

# BTC 97 SP, LLC

November 14, 2003

Mr. Jae Seung Park
P.O. Box 8801
Tamuning, Guam 96931

BY FACSIMILE

Dear Mr. Park:

    As you know from my letter to Mr. Cho, we will be in touch with him early next week to start that part of our due diligence. I forgot to mention your request that we provide Mr. Cho with a copy of our latest appraisal. Once we have agreed on price and we have gone to contract, we will be more than happy to provide a copy of the appraisal.

Sincerely,

Bruce P. Morrison
Managing Director

cc: Mr. Kyu Young Cho

BTC 97 SP, LLC

C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 • NEW YORK, NY • 10020
PHONE: 646-324-3070 • FAX: 646-324-3082

# BTC 97 SP, LLC

November 14, 2003

Mr. Kyu Young Cho
Fax: (822) 707-2794

### BY FACSIMILE

Dear Mr. Cho:

Mr. Jae Seung Park, with whom I am discussing the sale of Tumon Village Apartments in Guam, has indicated that you will be his partner in the purchase of the project. He has described you as an important businessman and a person of significant financial strength. We are currently in the process of doing our due diligence, which includes background checks and references on potential purchasers. Since you and I are in dramatically different time zones, coordinating our schedules could prove to be quite problematic. Therefore, let me suggest that it would be far easier for Mr. Steven Cha, one of my colleagues in our Korea Real Estate Group, to contact you and coordinate our due diligence. I have passed your contact information on to Steven and have asked him to be in touch with you early next week.

We look forward to continued progress towards a successful transaction

Sincerely,

Bruce P. Morrison
Managing Director

cc: Mr. Jae Seung Park
Mr. Steven Cha

BTC 97 SP, LLC
C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 · NEW YORK, NY · 10020
PHONE: 646-324-3070 · FAX: 646-324-7934



# GLOBAL REALTY

P.O. Box 25375 GMF • GUAM 96921 U.S.A.
TEL. (671) 637-3090 / 91 • FAX: (671) 637-3119
EMAIL: globalrt@ite.net / michaelslee1882@hotmail.com

## Fax Transmission

☒ Please call to confirm receipt

☒ Please respond by return fax

☐ Call only if transmission is incomplete

Date: November 12, 2003

To: Mr. Bruce P. Morrison/Managing Director
         BTC 97 Sp, LLC

Fax number: 646-324-7934

From: Michael Lee

Subject: The New Tumon Village Apartment, Tamuning

Number of pages including cover page: 2

Dear, Mr. Morrision

Please be find of enclose of  Request fixed final Selling Price.

Please carefully review of my two (2) proposals,

and I need of your commitment,  Where have to go ?.

I will call you on your NY time, 2.00 - 3.00 PM.

Thank you for your cooperation.

Respectfully yours,

Michael Lee



# GLOBAL REALTY

P.O. Box 25375 GMF, Guam 96921 U.S.A.
TEL: (671) 637-3090/91 FAX: (637) 637-3119 EMAIL: globalrt@ite.net

Date:   November 11, 2003

To:   BTC 97.SP. LLC

Attn:   Bruce P. Morrison/ Managing Director

Subject:   Guam, The New Tumon Village Apartment Complex
                   Request fixed final selling price

Dear Mr. Morrison,

Thank you for your counter offer of $3,700,000.   Mr. Park is still requesting for a re-negotiation of the price, even if the broker must cut his commission.   I would like to present you with two options to close this deal:

1. How much would you want to reduce the commission to be paid to Global Realty to accept a final selling price of $3,600,000?
2. If no commission is paid to Global Realty, would you accept a final price of $3,500,000?

Mr. Morrison, this is the final stage of the deal, from the two proposals listed above, please choose one.   With respect to the matter of clear, insurable title, Mr. Park is willing to accept "as is" condition of sale.   Escrow will be closed within three weeks.

I look forward to your response as soon as possible.

Sincerely Yours,

Michael Lee/ Principal Broker
Global Realty

Cc: Jae Seung Park

# BTC 97 SP, LLC

November 19, 2003

Mr. Jae Seung Park
P.O. Box 8801
Tamuning, Guam 96931

BY FACSIMILE

Dear Mr. Park:

It was good to talk with you last night. Confirming our conversation, our final price is $3,650,000. It is my understanding that you and Mr. Cho will pay all cash and will close within 15 days. If that is not the case, we will need to reconsider our final price. As we discussed, BTC 97 will be responsible to pay the commission of Mr. Michael Lee. As to title, your attorney, Mr. Robert P. Kutz, stated in his letter of November 5, 2003, that as long as the property is in the same condition as described in Pacific American Title Insurance Company's Ownership and Encumbrance Report No. 08 2014651A, then that will satisfy your requirement for "clear and insurable" title. Since I have not seen that report, please have Mr. Kutz or Mr. Lee courier me a copy.

I mentioned to you that I thought Mr. Steven Cha of our Korea Real Estate Group would be in contact with Mr. Cho on Wednesday. I regret to report that the project he's been working on went an additional day. Therefore, he will be contacting Mr. Cho on Thursday.

Sincerely,

Bruce P. Morrison
Managing Director

cc: Mr. Kyu Young Cho
    Mr. Michael Lee
    Mr. Steven Cha

BTC 97 SP, LLC
C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 • NEW YORK, NY • 10020
PHONE: 646-324-3070 • FAX: 646-324-3082

# BTC 97 SP, LLC

November 19, 2003

Mr. Michael S. Lee
Global Realty
P.O. Box 25375
GMF, Guam 96921

BY FACSIMILE

Dear Michael:

I had a conversation with Mr. Park last night and we agreed to a price of $3,650,000, subject to my reaching agreement with you regarding a satisfactory modification to your Non-Exclusive Listing Agreement. As you and I have discussed and agreed, you are willing to modify the agreement by accepting a flat commission of $100,000. I have done a pen-and-ink amendment to our agreement, initialing and dating the change in both the left and right hand margins. I would appreciate your doing the same and faxing a copy back to me.

Sincerely,

Bruce P. Morrison
Managing Director

Attachment

## NON-EXCLUSIVE LISTING AGREEMENT

The undersigned Owner's representative hereby grants the undersigned Broker a Non-Exclusive Listing Agreement ("Agreement"), for a period commencing this date and terminating **December 31**, 2003, to sell the Tumon Village Apartments Project located at Upper Tumon, Island of Guam (the "Property") to **Jae S. Park**.

Owner agrees to pay Broker as compensation for services rendered a fee of ~~4%~~ $100,000.00 ~~(four percent) of the selling price~~ if Broker procures an offer to purchase from **Jae S. Park**, on the terms acceptable to Owner during the term of this Agreement. Broker shall also be entitled to compensation if the Owner sells or transfers the property to **Jae S. Park** within ninety (90) days after the termination of this Agreement. Any compensation due Broker shall only be due and payable at the close of the escrow of a purchase offer accepted by Owner. No compensation shall be paid if an accepted purchase offer does not close, for any reason.

The Owner reserves the right to sell the Property during the term hereof, without incurring liability for any compensation to the Broker, to any purchaser other than **Jae S. Park**. The Broker shall notify Owner of any and all offers before accepting them. Owner reserves the right to reject any and all offers for any reason. In the event that Owner shall sell the Property, it shall immediately notify the Broker in writing stating the name of the purchaser and the purchase price to be paid.

Broker is authorized to cooperate with other Brokers in the marketing and sale of the Property and may divide the above compensation with such other Brokers. Owner agrees to deliver escrow instructions irrevocably assigning Broker's compensation from Owner's proceeds at the close of escrow. Owner shall have the right to enter into non-exclusive listing agreements with other real estate brokers on such terms and conditions as it deems appropriate. Subject to Broker's right to compensation, Owner shall have the right to negotiate directly with **Jae S. Park** after the execution of this Agreement.

**BROKER:**

Name: _Michael S. Lee / Broker_
Date: _October 21, 2003_
Address: _Global Realty_
_P.O. Box 25375_
_G.M.F., Guam 96921_

Telephone: _(671) 637-3090/91_
Fax: (671) 637-3119

By: _[signature]_

**OWNER:**

Name: BTC 97 SP, LLC, a Delaware
limited liability company
Date: _October 21, 2003_
Address: _c/o DB Real Estate_
_1251 Avenue of the Americas_
_NYC 07-0991_
_New York, NY 10020_

Telephone: _646-324-3070_
FAX _646-324-7934_
By: _[signature]_

---
JOB STATUS REPORT
---

TIME : 10/21/2003 14:40
NAME : DB REAL ESTATE
FAX# : 6463247934
TEL# : 6463243000

| DATE,TIME | 10/21  14:39 |
|---|---|
| FAX NO./NAME | 916716373119 |
| DURATION | 00:00:41 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
|  | ECM |

Memorandum

To:        Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:      11/19/2003 07:51:10 PM
Subject:   The New Tumon Village

Dear Bruce,

I have received your fax this morning and I have reviewed the changes
that you have made.  Everything seems to be in good order and I will
sign it and fax back to you later this afternoon.

As per your request, I will also be faxing you a copy of the PTR and I
will also send you a copy by Express Mail, which you should receive in
about 3 working days.

Please send me a final copy of the purchase agreement so I can have for
my records.


Best Regards,

Mike
Global Realty


Michael Lee Principal Broker<?xml:namespace prefix = o ns =
"urn:schemas-microsoft-com:office:office" />
P.O. Box 25375
GMF, Guam 96921
Tel: (671)-637-3090
Fax: (671)-637-3119

Delivery Priority:          Normal
Delivery Report:       Basic
Receipt Report:        No
Personal Categories:    Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----


(Embedded image moved to file: pic06900.pcx)



# GLOBAL REALTY

P.O. Box 25375 GMF • GUAM 96921 U.S.A.
TEL. (671) 637-3090 / 91 • FAX: (671) 637-3119
EMAIL: globalrt@ite.net / michaelslee1882@hotmail.com

## Fax Transmission

☒ Please call to confirm receipt

❑ Please respond by return fax

❑ Call only if transmission is incomplete

Date: __November 20, 2003__

To: __Mr. Bruce P. Morrison/BTC 97 SP, LLC__

Fax number: __1-646-324-7934__

From: __Michael Lee__

Subject: __The New Tumon Village Apartment, Tamuning__

**Number of pages including cover page:** _____

Dear. Mr. Morrison

Please be find of enclose of modified Commission Agreement copy, and

initial, and Fax back to you, and Ownership and Encumbrance Report

from Pacific American title insurance Co, Express mail out to you today,

Will take for 3/4 days to New York. and will fax to you.

I talk with Mr. Jae S. Park this morning, on regarding your letter,

Mr. Park told me, will follow-up for Purchase Process.

Thank you for your cooperation.

Sincerely yours,

Michael Lee

FROM : GLOBAL REALTY
11/19/2003 14:03        6463247934

FAX NO. : 671 637 3092
DB REAL ESTATE

Nov. 20 2003 04:07PM P2
PAGE  03/03

FROM :                                 FAX NO. : 646 2848        Oct. 21 2003 07:25PM P1

## NON-EXCLUSIVE LISTING AGREEMENT

The undersigned Owner's representative hereby grants the undersigned Broker a Non-Exclusive Listing Agreement ("Agreement"), for a period commencing this date and terminating __December 31__, 2003, to sell the Tumon Village Apartments Project located at Upper Tumon, Island of Guam (the "Property") to __Jae S. Park__.

Owner agrees to pay Broker as compensation for services rendered a fee of 4% ~ $100,000.00 (four percent) of the selling price if Broker procures an offer to purchase from __Jae S. Park__, on the terms acceptable to Owner during the term of this Agreement. Broker shall also be entitled to compensation if the Owner sells or transfers the property to __Jae S. Park__ within ninety (90) days after the termination of this Agreement. Any compensation due Broker shall only be due and payable at the close of the escrow of a purchase offer accepted by Owner. No compensation shall be paid if an accepted purchase offer does not close, for any reason.

The Owner reserves the right to sell the Property during the term hereof, without incurring liability for any compensation to the Broker, to any purchaser other than __Jae S. Park__. The Broker shall notify Owner of any and all offers before accepting them. Owner reserves the right to reject any and all offers for any reason. In the event that Owner shall sell the Property, it shall immediately notify the Broker in writing stating the name of the purchaser and the purchase price to be paid.

Broker is authorized to cooperate with other Brokers in the marketing and sale of the Property and may divide the above compensation with such other Brokers. Owner agrees to deliver escrow instructions irrevocably assigning Broker's compensation from Owner's proceeds at the close of escrow. Owner shall have the right to enter into non-exclusive listing agreements with other real estate brokers on such terms and conditions as it deems appropriate. Subject to Broker's right to compensation, Owner shall have the right to negotiate directly with __Jae S. Park__ after the execution of this Agreement.

**BROKER:**

Name: __Michael S. Lee / Broker__
Date: __October 21, 2003__
Address: __Global Realty__
__P.O. Box  25375__
__G.M.F., Guam 96921__

Telephone: __(671) 637-3090/91__
Fax: (671) 637-3119

By: _____

**OWNER:**

Name: BTC 97 SP, LLC, a Delaware
limited liability company
Date: __October 21, 2003__
Address: __c/o DB Real Estate__
__1251 Avenue of the Americas__
__NYC 07-0891__
__New York, NY 10020__

Telephone: __646-324-3070__
Fax: __646-324-7434__
By: _____

# Pacific American Title
# Insurance & Escrow Co.

### 134 Chalan Santo Papa, Suite 101
### Agana, Guam 96910

## OWNERSHIP & ENCUMBERANCE REPORT

OER#:  OER-03-8-4418                    Date:   October 13,    03

Requested By:  MICHAEL LEE @ GLOBAL REALTY

Property          LOT NO. 5090-REM-1, TAMUNING, GUAM
Description:



No: **OER-03-8-4418**

## OWNERSHIP AND ENCUMBRANCE REPORT

OWNERSHIP AND ENCUMBRANCE REPORT

I. This Report is Not:

1. A guarantee or warranty of title.
2. A legal opinion as to the status of the title.
3. A title commitment to issue a title insurance policy.
4. A title insurance policy.

II. The Status or Validity of the Title to Subject Property may also be affected by the following matters:

1. Rights or claims of parties in possession not shown by the public records .
2. Easements, or claims of easements, not shown by the public records.
3. Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of premises.
4. Taxes or special assessments which are not shown as existing liens by the public records.
5. Any lien, or right to a lien, for services, labor or material hereto or hereafter furnished, imposed by law and not shown by the public records.

Therefore, no one should rely on this report as a basis for the Consummation of any real estate transaction until it is converted into an actual Title Insurance Commitment, at which time additional requirements and exceptions will necessarily be added.

III. Liability of Pacific American Title Insurance & Escrow Co. under this report:

1. Pacific American Title Insurance & Escrow Co disclaims any and all liability or responsibility for defects in, or the marketability of the title to the real Property which is the subject of this ownership and encumbrance report.
2. The total liability of Pacific American Title Insurance & Escrow Co, shall not exceed $100.00 paid for the ownership and encumbrance report.

*This report is subject to the terms, conditions and stipulations contained on title page.*

No: OER-03-8-4418                                                    Date: 10/08/03

## REPORT

Pacific American Title Insurance and Escrow, Co. has made a thorough search of the Department of Land Management, Government of Guam, as disclosed by the public indexes, relating to the hereinafter described real property, viz:

LOT NO. 5090-REM-1, TAMUNING, GUAM, as siad lot is marked and designated on the Map Drawing No. I4-73T013, (LM#248FY74) dated December 10, 1973 and recorded in the Department of Land Management, Government of Guam.

The following is shown for information purposes only: Said map shows the area to be: 768.7 ± square meters; Last Certificate of Guaranteed Claim No. 2995 issued to The United States of America on Lot No. 5090, Agana, Guam.

The search of said records shows TUMON VILLAGE, a HAWAII CORPORATION, as the last Grantee of the subject property.

The search of said records also shows the subject property being affected or encumbered by the following recorded instruments:

1. Territorial Real Estate Taxes for the year 2003 is due February 20, 2004.

2. Territorial Real Estate Taxes for the following years are delinquent, plus penalties and interest which may have accrued:

Acct. #1440315413   Tumon Village Hawaii Partners   land

2002   BN#31338   $71.23
2001   BN#31155   $35.62 - 2nd Installment

3. Grant of Easement dated January 18, 1972 and recorded on June 12, 1972, under Instrument No. 112927 by and between the Government of Guam and Ted Valdez, Lloyd W. Martin and Honomo, Inc., a Hawaii Corporation, a joint venture, recorded in the Department of Land Management, Government of Guam.

4. Mortgage dated July 05, 1972 and recorded on July 06, 1972, under Instrument No. 113777, in the Department of Land Management, Government of Guam, executed by Tumon Village, a registered Hawaii partnership qualified to do business in Guam, by its partners, Ted Valdez (husband of Paricia Jea Valdez), Lloyd W. Martin (husband of Sarah Ann Martin) and HONOMO, INC., a Hawaii Corporation, Mortgagors, to Honolulu Mortgage Co., Ltd., a corporation, Mortgagee, which states it secures a debt in the principal amount of $9,375,200.00, plus interest.

Page 2.

Amendment of Mortgage dated September 18, 1974 and recorded on September 20, 1974, under Instrument No. 240201, in the Department of Land Management, Government of Guam, executed by Tumon Village, a registered Hawaii partnership qualified to do business in Guam, by its partners, Ted Valdez (husband of Paricia Jea Valdez), Lloyd W. Martin (husband of Sarah Ann Martin) and HONOMO, INC., a Hawaii Corporation, Mortgagors, to Honolulu Mortgage Co., Ltd., a corporation, Mortgagee, which states it secures a debt in the principal amount of $9,322,100.00, plus interest.

Regulatory Agreement for Multi-Family Housing Projects dated July 05, 1972 and recorded on July 05, 1972, under Instrument No. 113778, in the Department of Land Management, Government of Guam, executed by Tumon Village, a registered Hawaii partnership qualified to do business in Guam, by its partners, Ted Valdez (husband of Paricia Jea Valdez), Lloyd W. Martin (husband of Sarah Ann Martin) and HONOMO, INC., a Hawaii Corporation, Owners, to Secretary Housing and Urban Development Acting by and through the Federal Housing Commissioner.

Amendment of Regulatory Agreement for Multi-Family Housing Projects dated September 18, 1974 and recorded on September 20, 1974, under Instrument No. 240202, in the Department of Land Management, Government of Guam, executed by Tumon Village, a registered Hawaii partnership qualified to do business in Guam, by its partners, Ted Valdez (husband of Paricia Jea Valdez), Lloyd W. Martin (husband of Sarah Ann Martin) and HONOMO, INC., a Hawaii Corporation, Owners, to Secretary Housing and Urban Development Acting by and through the Federal Housing Commissioner.

Assignment of Mortgage and Assignment of Chattel Mortgage and Security Agreement dated on September 18, 1974 and recorded on September 20, 1974, under Instrument No. 240204, in the Department of Land Management, Government of Guam, executed by Honolulu Mortgage Co., Ltd., a Hawaii Corporation, Assignor, to Federal National Mortgage Association, Assignee.

Assignment of Mortgage dated on December 16, 1997 and recorded on August 01, 2000, under Instrument No. 625023, in the Department of Land Management, Government of Guam, executed by Bankers Trust Company, a New York Corporation, Assignor, to LaSalle National Bank as indenture Trustee for BTC Mortgage Investors Trust 1997-S1, Secured Notes, Series 1997-S1, Assignee.

PACIFIC AMERICAN TITLE INSURANCE & ESCROW CO.

BY: _____
AUTHORIZED SIGNATURE

End................kte

Page 3.



# Pacific American Title
# Insurance & Escrow Co.
### 134 Chalan Santo Papa, Suite 101
### Agana, Guam 96910

## OWNERSHIP & ENCUMBERANCE REPORT

OER#: **OER-98-3-14651A**           Date:   **October 13, · 03**

Requested By: **MICHAEL LEE @ GLOBAL REALTY**



Property          **PARCEL I:   LOT NO. 5098, TAMUNING, GUAM**
Description:      **PARCEL II:  LOT NO. 5100-1, TAMUNING, GUAM**

No: **OER-98-3-14651A**

## OWNERSHIP AND ENCUMBRANCE REPORT

I. This Report is Not:
    1. A guarantee or warranty of title.
    2. A legal opinion as to te status of the title.
    3. A title commitment to issue a title insurance policy.
    4. A title insurance policy.

II. The Status or Validity of the Title to Subject Property may also be
    affected by the following matters:
    1. Rights or claims of parties in possession not shown by the public
       records .
    2. Easements, or claims of easements, not shown by the public records.
    3. Encroachments, overlaps, boundary line disputes, or other matters
       which would be disclosed by an accurate survey and inspection of
       premises.
    4. Taxes or special assessments which are not shown as existing liens
       by the public records.
    5. Any lien, or right to a lien, for services, labor or material hereto or
       hereafter furnished, imposed by law and not shown by the public
       records.

    Therefore, no one should rely on this report as a basis for the
    Consummation of any real estate transaction until it is converted into an
    actual Title Insurance Commitment, at which time additional
    requirements and exceptions will necessarily be added.

III. Liability of Pacific American Title Insurance & Escrow Co. under
    this report.
    1. Pacific American Title Insurance & Escrow Co disclaims any and
       all liability or responsibility for defects in, or the marketability
       of the title to the real Property which is the subject of this
       ownership and encumbrance report.
    2. The total liability of Pacific American Title Insurance & Escrow
       Co. shall not exceed $200 paid for the ownership and encumbrance
       report.



*This report is subject to the terms, conditions and stipulations contained on title page.*

No: **OER-98-3-14651A**                                    Date:   **10/08/03**

# REPORT



Pacific American Title Insurance and Escrow Company has made a thorough search of the Department of Land Management, Government of Guam, as disclosed by the public indexes, relating to the hereinafter described real property, viz:

PARCEL I:
LOT NO. 5098, TAMUNING, GUAM, ESTATE NO. 20850, SUBURBAN, as said lot is marked and designated on Map Drawing No. 70-59-1 (LM#357FY71), dated February 23, 1971 and recorded on July 6, 1962 under Instrument No. 113776, in the Department of Land Management, Government of Guam.

The following is shown for information purposes only:  said map shows the area to be 642,421 ± square feet / 59,683 ± square meters;  Last Certificate of Title No. 31813 issued to Ted Valdez, Lloyd W. Martin and Honomo Inc., a Hawaii corporation doing business as Tumon Village.

PARCEL II:
LOT NO. 5100-1, TAMUNING, GUAM, ESTATE NO. 20850, SUBURBAN, as said lot is marked and designated on Map Drawing No. 70-59-1 (LM357FY71), dated February 23, 1971 and recorded on July 6, 1972 under Instrument No. 113776, in the Department of Land Management, Government of Guam.

The following is shown for information purposes only:  said map shows the area to be 151,115 ± square feet / 14,039 ± square meters;  Last Certificate of Title No. 32287 issued to Ted Valdez, Lloyd W. Martin and Honomo Inc., a Hawaii corporation doing business as Tumon Village.

The search of the records shows BTC 97 SP, LLC, as the last Grantee of the subject property.

The search of said records also shows the subject property being affected or encumbered by the following recorded instruments:

AFFECTS PARCEL I:

1.  Territorial Real Estate Taxes for the year 2003 is due February 20, 2004.

2.  Territorial Real Estate Taxes for the years 2001 and 2002 are not available at this time, a supplemental report with this information will soon follow.

Continued.....kte

Page 2.

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 120 of 249

**AFFECTS PARCEL II:**

3. Territorial Real Estate Taxes for the year 2003 is due February 20, 2004.

4. Territorial Real Estates Taxes for the years 2001 and 2002 are not available at this time, a supplemental report with this information will soon follow.

5. Declaration of Taking Civil No. 23-50, dated on June 22, 1950 and recorded on September 28, 1951 under Instrument No. 23708 in the Department of Land Management, Government of Guam. (affects both parcels)

6. Right of Entry dated December 4, 1964 executed by The Heirs of Jose Pangelinan Guerrero to Government of Guam, the United States of America, and recorded on December 22, 1964 under Instrument No. 58679, in the Department of Land Management, Government of Guam. Re: For installation of road and utility lines. (affects both parcels)

7. Grant of Easement dated September 20, 1972 executed by Tumon Village to Guam Power Authority, and recorded under Instrument No. 232915, in the Department of Land Management, Government of Guam. Re: A 10' foot strip of land extending across Lot No. 5098, Dededo, for erection and maintenance of power and communication lines, poles and towers. (affects both parcels)

8. Declaration of Taking, Civil Case No. 35-65, executed by The Government of Guam "plaintiff" versus 21,580 ± Square Meters of land, situated in the Municipality of Dededo, Guam, and Jose Rivera Unpingco, etal., and unknown owners "defendants", dated April 20, 1965 and recorded under Instrument No. 307790, in the Department of Land Management, Government of Guam. Re: Area taken from Lot No. 5100, states 2,170 ± Square Meters for sewer easement. (affects Parcel II)


PACIFIC AMERICAN TITLE INSURANCE AND ESCROW COMPANY


By: AUTHORIZED SIGNATURE


End.........ktc


Page 3.

43

# JAE SEUNG PARK

P.O. BOX 8801
TAMUNING, GUAM 96931
TEL: (671)646-8082/5248*FAX(671)646-4388

November 20, 2003

Attn: Mr. Bruce P. Morrison
       Managing Director

Subject: The New Tumon Village Apartment Complex

Dear Mr. Morrison

This is to confirm my receipt of your faxed letter dated November 19, 2003, and the irrevocable commitment of myself and my associate, Kyu Young Cho, to purchase the Tumon Village Apartment property for a cash price of $3,650,000.

The terms of the purchase will be those set out in the letters exchanged between yourself and my attorney, Robert Kutz, so far as the condition of the property, documentation to be supplied and insurable title are concerned. Mr. Kutz told me that he has spoken to your attorney, Andrew Weiner, regarding preparation of sale documents, confirmation of title status, and similar matters.

Our agreement to purchase the property is, however, subject to one change from our previous proposals. In Mr. Kutz' correspondence with you, he indicated that a copy of the most recent appraisal of the property was to be provided to the purchasers at close of escrow. Please be advised that the appraisal copy must be provided to me, or either Mr. Cho or Atty. Kutz prior to close of escrow, so that it can be forwarded to our colleagues in Korea and incorporated by them in the financing arrangements to be made there.

We understand and agree that neither the purchase price nor the terms of sale are dependent upon any statements or conclusions to be found in the appraisal, and that it is quite possible that the appraised value may be less than the agreed price of $3,650,000.

For purposes of ultimate completion of the purchase, it is anticipated that a new entity will be formed, to be called Guam Tumon Investement Company, a Guam limited liability company. Pending formation of that entity, however, sale documents should be prepared identifying the purchasers as Mr. Cho and myself, or our nominees. I have directed Mr. Kutz to work with your attorney to prepare and complete the sale documentation.

Because of the Thanksgiving holiday, we propose an escrow closing date of December 15, 2003, by which date funds will be deposited in escrow in the amount of

the entire purchase price. At this time, it is anticipated that some funds will be transferred from accounts in the United States, while other funding will be provided from Korea. The particular details of the funding arrangements will be included in escrow instructions to be prepared by our attorneys.

I look forward to your response and acknowledgement of this letter.

Sincerely,

Jae Seung Park

# JoongAng (Central) Construction Co.,LTD.

Department of Overseas Business
#172-2 Yosan-Dong, Mapo-Gu, Seoul, Korea
E-mail : cmos53@telecghz.co.kr



Tel : 82-2-3271-8443, 82-2-701-8001-25
Fax : 82-2-706-0474
URL : www.heughis.co.kr

Date  :  _21 NOV. 2003_

To  :  Mr. Bruce P. Morrison
       Managing Director

Subject  :  The New Tunnon Village Apartment Complex

Dear Mr. Morrison

It's Kyu Young Cho in Seoul, Korea.

Thanks for your letter of November 14, 2003 informing us the visit of Mr. Steven Cha, your colleagues. We have been looking forward to seeing him and discussing more in details our identity and financial status. But As of today (November 20), Mr. Steven Cha has not contact us yet. Please let me know, if you would not mind, about his telephone number or mobile phone to contact him first.

In addition, we need the appraisal documents of the properties in order to proceed to take the approval of foreign direct investment from Korean Government and bank.

In accordance with your inquiry of the letter on November 7, 2003, we prepared our information regarding our identity and financial status. If you want, we will provide them via fax or mail.

Sincerely Yours,

**Cho, Kyu Young**
Chairman
Central Construction Co.,LTD.

## McCully & Beggs, P.C.

**From:** Weiner, Andrew J. [AWeiner@mofo.com]
**Sent:** Thursday, January 15, 2004 8:15 AM
**To:** Duncan McCully
**Subject:** FW: Tumon Village Apartment


-----Original Message-----
**From:** R P Kutz [mailto:rpklaw@ite.net]
**Sent:** November 21, 2003 1:01 AM
**To:** Weiner, Andrew J.
**Subject:** Tumon Village Apartment

Andrew:

It was a pleasure to speak with you on the telephone the other day. Just in case you have not yet received it, I am attaching a copy of a letter drafted by me, which was sent by my client to Bruce Morrison, accepting the negotiated price, and setting other terms for the sale.

It is most critical that a copy of the appraisal be forwarded to me by fax, email or carrier pigeon ASAP, so that I can provide it to the Korean bank which will, in turn, be lending a portion of the purchase price to my clients.

Because of the shortness of time, and the fact that Guam now has a typhoon heading down toward us, I request that you prepare a short-form purchase agreement which can be incorporated in escrow instructions, based on the prior correspondence of Mr. Morrison, myself and Mr. Park.

Even without the possible typhoon, I am scheduled to leave Guam for California on Tuesday, November 25, Guam date which is Monday night your time. Accordingly, we may have to push a bit to get this transaction in place. I will be available until at least 9:00pm, Friday, New York time, and as necessary during the next two days.

I look forward to your early response, and a quick conclusion to this project.

Rob Kutz



PS. Don't hesitate to telephone me if necessary, even if a call comes late at night or early morning – I am pretty used to it.

===========================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
===========================================================================

1/15/04

Mr. Morrison:

This is to confirm my receipt of your faxed letter dated November 19, 2003, and the irrevocable commitment of myself and my associate, Kyu Young Cho, to purchase the Tumon Village Apartment property for a cash price of $3,650,000.

The terms of the purchase will be those set out in the letters exchanged between yourself and my attorney, Robert Kutz, so far as the condition of the property, documentation to be supplied and insurable title are concerned. Mr. Kutz told me that he has spoken to your attorney, Andrew Weiner, regarding preparation of sale documents, confirmation of title status, and similar matters.

Our agreement to purchase the property is, however, subject to one change from our previous proposals. In Mr. Kutz' correspondence with you, he indicated that a copy of the most recent appraisal of the property was to be provided to the purchasers at close of escrow. Please be advised that the appraisal copy must be provided to our attorney prior to close of escrow, so that it can be forwarded to our colleagues in Korea and incorporated by them in the financing arrangements to be made there.

We understand and agree that neither the purchase price nor the terms of sale are dependent upon any statements or conclusions to be found in the appraisal, and that it is quite possible that the appraised value may be less than the agreed price of $3,650,000.

For purposes of ultimate completion of the purchase, it is anticipated that a new entity will be formed, to be called Guam Tumon Investment Company, a Guam limited liability company. Pending formation of that entity, however, sale documents should be prepared identifying the purchasers as Mr. Cho and myself, or our nominees. I have directed Mr. Kutz to work with your attorney to prepare and complete the sale documentation.

Because of the upcoming Thanksgiving holiday, we propose an escrow closing date of December 15, 2003, by which date funds will be deposited in escrow in the amount of the entire purchase price. At this time, it is anticipated that some funds will be transferred from accounts in the United States, while other funding will be provided from Korea. The particular details of the funding arrangements will be included in escrow instructions to be prepared by our attorneys.

I look forward to your response and acknowledgement of this letter.

Sincerely,


JAE S. PARK

## McCully & Beggs, P.C.

| | |
|---|---|
| **From:** | Weiner, Andrew J. [AWeiner@mofo.com] |
| **Sent:** | Thursday, January 15, 2004 8:14 AM |
| **To:** | Duncan McCully |
| **Subject:** | FW: Tumon Village Apartment |

-----Original Message-----
**From:** Weiner, Andrew J.
**Sent:** November 24, 2003 7:30 AM
**To:** 'R P Kutz'
**Subject:** RE: Tumon Village Apartment

Bruce Morrison and local counsel are reviewing a draft contract, which I expect will be ready tomorrow. We have ordered a title update as well. I also have instructions about when and how to deliver the appraisal.

Please give me a call. Also, please let me know where you can be reached in California.

> -----Original Message-----
> **From:** R P Kutz [mailto:rpklaw@ite.net]
> **Sent:** November 21, 2003 1:01 AM
> **To:** Weiner, Andrew J.
> **Subject:** Tumon Village Apartment
>
> Andrew:
>
> It was a pleasure to speak with you on the telephone the other day. Just in case you have not yet received it, I am attaching a copy of a letter drafted by me, which was sent by my client to Bruce Morrison, accepting the negotiated price, and setting other terms for the sale.
>
> It is most critical that a copy of the appraisal be forwarded to me by fax, email or carrier pigeon ASAP, so that I can provide it to the Korean bank which will, in turn, be lending a portion of the purchase price to my clients.
>
> Because of the shortness of time, and the fact that Guam now has a typhoon heading down toward us, I request that you prepare a short-form purchase agreement which can be incorporated in escrow instructions, based on the prior correspondence of Mr. Morrison, myself and Mr. Park.
>
> Even without the possible typhoon, I am scheduled to leave Guam for California on Tuesday, November 25, Guam date which is Monday night your time. Accordingly, we may have to push a bit to get this transaction in place. I will be available until at least 9:00pm, Friday, New York time, and as necessary during the next two days.
>
> I look forward to your early response, and a quick conclusion to this project.
>
> Rob Kutz
>
>
> PS. Don't hesitate to telephone me if necessary, even if a call comes late at night or early morning – I am pretty used to it.

=================================================================================

This message contains information which may be confidential and privileged.

1/15/04

Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message. Thank you very much.

===============================================================



## McCully & Beggs, P.C.

**From:** Weiner, Andrew J. [AWeiner@mofo.com]

**Sent:** Thursday, January 15, 2004 8:14 AM

**To:** Duncan McCully

**Subject:** FW: Contract of Sale (Tumon Village II)

-----Original Message-----
**From:** Weiner, Andrew J.
**Sent:** November 24, 2003 6:09 PM
**To:** Robert Kutz (rpklaw@ite.net)
**Cc:** Duncan McCully (mblaw@kuentos.guam.net); 'Bruce.p.morrison@db.com'
**Subject:** Contract of Sale (Tumon Village II)

<<Contract of Sale (Tumon Village II)_v3.DOC>>

Attached, for your review, is a first draft of the contract of sale. It has not been reviewed by my client and is subject to their comments. It is also being reviewed by Messrs. McCully & Betts for Guam law input; I had expected to wait until I could receive and incorporate their input before sending you a first draft. However, we are willing to accommodate your time constraints, and will advise you of their comments, which I hope to receive tomorrow.

The draft shows the McCully & Betts firm as escrow agent for the deposit. They have indicated their preference for the title company to act in that capacity, and are investigating that approach. We can also do the closing as an escrow closing, but need to work through the mechanics.

We look forward to discussing the draft with you.

===================================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.

===================================================================================

1/15/04

# AGREEMENT OF SALE

### Between

## BTC 97 SP, LLC

### as Seller,

### and

_____

### as Buyer

ny-542244

# TABLE OF CONTENTS

**PAGE**

ARTICLE I Definitions .......................................................................................................... 1

ARTICLE II Agreement to Sell and Purchase and Purchase Price ................................. 4

   2.1      Agreement to Sell and Purchase ........................................................... 4

   2.2      Total Purchase Price and Payment of Total Purchase Price ................. 4

ARTICLE III Property Included in Purchase and Sale...................................................... 5

ARTICLE IV Title and Survey............................................................................................. 5

   4.1      Permitted Title Exceptions..................................................................... 5

   4.2      Evidence of Title..................................................................................... 5

   4.3      Survey ..................................................................................................... 7

   4.4      Violations................................................................................................ 7

   4.5      Real Estate Taxes ................................................................................... 7

   4.6      Foreclosure of Mortgage ....................................................................... 7

ARTICLE V "As-Is"............................................................................................................. 8

   5.1      Seller Furnished Items ........................................................................... 8

   5.2      Access to Records .................................................................................. 8

   5.3      Access to Governmental Records ........................................................... 8

   5.4      Access to Property .................................................................................. 8

   5.5      Confidentiality ........................................................................................ 9

   5.6      As Is ........................................................................................................ 9

ARTICLE VI Closing; Conditions Precedent to Closing............................................... 10

   6.1      Time and Place...................................................................................... 10

   6.2      Conditions Precedent to Buyer's Obligations...................................... 10

   6.3      Seller's Closing Documentation and Requirements ............................ 11

   6.4      Buyer's Closing Documents and Requirements ................................... 12

   6.5      Form...................................................................................................... 13

   6.6      Access to Records Post-Closing .......................................................... 13

ARTICLE VII Representations and Warranties .............................................................. 13

   7.1      Seller's Representations........................................................................ 13

   7.2      Buyer's Representations ....................................................................... 15

ARTICLE VIII [Intentionally Deleted] ............................................................................ 15

ARTICLE IX Adjustments and Prorations...................................................................... 15

   9.1      Prorations ............................................................................................. 15

   9.2      Rents and Other Amounts Under Leases .............................................. 16

   9.3      Real Estate Taxes ................................................................................. 16

i

ny-542244

| 9.4 | Assessments | 16 |
|---|---|---|
| 9.5 | Deposits; Insurance Premiums | 17 |
| 9.6 | Errors | 17 |

ARTICLE X Risk of Loss; Eminent Domain ................................................. 17

| 10.1 | Casualty | 17 |
|---|---|---|
| 10.2 | Eminent Domain | 17 |

ARTICLE XI Additional Agreements ........................................................... 18

| 11.1 | Operation of Property. | 18 |
|---|---|---|
| 11.2 | Extension to Cure | 18 |

ARTICLE XII Remedies ............................................................................. 19

| 12.1 | Seller's Remedies | 19 |
|---|---|---|
| 12.2 | Buyer's Remedies | 19 |

ARTICLE XIII Miscellaneous ..................................................................... 20

| 13.1 | Costs and Expenses | 20 |
|---|---|---|
| 13.2 | Attorneys' Fees | 20 |
| 13.3 | Assignment | 20 |
| 13.4 | Successors and Assigns | 20 |
| 13.5 | Gender and Number | 20 |
| 13.6 | Entire Agreement | 21 |
| 13.7 | Counterparts | 21 |
| 13.8 | Modifications | 21 |
| 13.9 | Notices | 21 |
| 13.10 | Exhibits | 22 |
| 13.11 | Governing Law | 22 |
| 13.12 | Captions | 22 |
| 13.13 | Severability | 22 |
| 13.14 | No Joint Venture Partnership, Agency, Etc. | 22 |
| 13.15 | No Third Party Beneficiaries | 23 |
| 13.16 | No Waiver | 23 |
| 13.17 | Execution | 23 |
| 13.18 | Time of the Essence | 23 |
| 13.19 | No Broker | 23 |
| 13.20 | Business Day | 23 |
| 13.21 | Escrow and Escrow Agent | 23 |
| 13.22 | Press Releases | 26 |
| 13.23 | No Recording | 26 |
| 13.24 | Limited Liability | 26 |
| 13.25 | Reporting Person | 26 |

ARTICLE XIV Waiver of Trial by Jury ......................................................... 26

ny-542244

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 138 of 249

# EXHIBITS

"A"  —  Legal Description of Land
"B"  —  Permitted Title Exceptions"
"C"  —  Form of Deed
"D"  —  Form of Assignment of Intangible Personal Property
"E"  —  Form of Rent Roll
"F"  —  Form of Assignment and Assumption of Landlord's Interest in Leases
"G"  —  Form of Bill of Sale
"H"  —  Legal Description of Foreclosure Parcel

ny-542244

## AGREEMENT OF SALE

THIS AGREEMENT OF SALE (this "**Agreement**") made as of the Date of this Agreement (defined below) by and among BTC 97 SP, LLC, a Delaware limited liability company ("**Seller**"), having an address at c/o Deutsche Bank Realty, 1251 Avenue of the Americas, 25th Floor - MS: NYC07-0901, New York, New York 10020, Attention: Bruce P. Morrison, and _____, a _____ limited liability company ("**Buyer**"), having an address at _____.

### W I T N E S S E T H:

WHEREAS, Seller, is the owner of certain land in Tamuning, Guam, more particularly described in Exhibit "A" attached hereto (such land, the "**Land**") and the buildings and other improvements thereon;

NOW, THEREFORE, in consideration of the mutual agreements, covenants, representations and warranties set forth herein, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I

### Definitions

(a)    "**Agreement**" shall have the meaning set forth in the Introductory Paragraph hereto.

(b)    "**Appraisal**" shall mean the Self-Contained Appraisal Report, dated October 2003, by The Captain Company, containing an appraisal of the Property.

(c)    "**Assignment and Assumption of Landlord's Interests in Leases**" shall have the meaning set forth in Section 6.3.5 hereof.

(d)    "**Balance of the Total Purchase Price**" shall mean the Total Purchase Price less the Deposit.

(e)    "**BTC Mortgage Investors Trust**" shall have the meaning ascribed thereto in Section 4.6.

(f)    "**Buildings**" shall mean the buildings and other improvements on the Land.

(g)    "**Business Day**" shall have the meaning set forth in Section 13.20 hereof.

(h)    "**Buyer**" shall have the meaning set forth in the Introductory Paragraph hereto.

(i)    "**Buyer's Documents**" shall have the meaning set forth in Section 7.2.3 hereof.

ny-542244

(j)     **"Claims"** shall mean all of Sellers' right, title and interest, if any, in all claims, credits, causes of action and rights of setoff against third parties relating to all or any portion of the Land, any of the Improvements, any of the Intangible Personal Property and any of the Personal Property, including unliquidated rights under manufacturers' and vendors' warranties and guaranties, except for claims to insurance or workers compensation coverage under existing or former insurance policies, and except as herein expressly provided to the contrary.

(k)     **"Closing"** shall have the meaning set forth in Section 6.1 hereof.

(l)     **"Closing Date"** shall have the meaning set forth in Section 6.1 hereof.

(m)     **"Closing Statement"** shall have the meaning set forth in Section 6.3.7 hereof.

(n)     **"Collateral"** shall mean all collateral securing the obligations of the tenants under the Leases.

(o)     **"Confidentiality Agreement"** shall mean the Confidentiality Agreement, dated _____, 2003, between Seller and _____.

(p)     **"Contracts"** shall mean those construction, service, vendor and other contracts (excluding the Permitted Title Exceptions and the Leases), whether written or oral, entered into by Seller or on Seller's behalf and which relate to the Land or any portion thereof, all of which shall be terminated by Seller effective no later than the Closing Date except as otherwise agreed by the parties.

(q)     **"Date of this Agreement"** shall mean the date when the last one of Seller and Buyer has executed this Agreement and both parties shall have received a fully-executed copy of this Agreement.

(r)     **"DBTCA"** shall mean Deutsche Bank Trust Company Americas (formerly known as "Bankers Trust Company"), a New York banking corporation, whose address is 1251 Avenue of the Americas, 25th Floor, New York, New York 10020, Attention: Bruce P. Morrison.

(s)     **"Deposit"** shall have the meaning set forth in Section 2.2.2 hereof and shall include all interest accruing thereon.

(t)     **"Designated Individual"** shall have the meaning set forth in Section 7.1 hereof.

(u)     **"Escrow Agent"** shall mean McCully & Beggs, P.C., acting in its capacity as Escrow Agent hereunder.

(v)     **"Existing Secured Loans"** shall have the meaning set forth on Exhibit "B".

(w)     **"Existing Survey"** shall have the meaning set forth in Section 4.3 hereof.

(x)     **"Existing Title Report"** shall have the meaning set forth in Section 4.2.1 hereof.

(y) **"Governmental Requirements"** shall mean all applicable laws, statutes, ordinances, orders, codes, rules and requirements of any federal, state, county or municipal governmental authority or quasi-governmental entity having jurisdiction over the Property, its use and occupancy or other matter in question.

(z) **"Improvements"** shall mean collectively the Buildings and all other improvements to the Land.

(aa) **"Intangible Personal Property"** shall mean all of the respective right, title and interest, if any, of Seller in all (i) transferable or assignable warranties and guaranties relating to the Improvements, (ii) Permits, vested rights, development rights, and all other transferable rights relating to the Land and/or the Improvements and the utilization thereof, (iii) all Contracts (to the extent assignable and not terminated prior to the Closing in accordance with the terms hereof), (iv) all trademarks, trade names, service marks and other intellectual property rights pertaining to the Land and/or the Improvements, (v) all Claims and (vi) other intangible property of Seller (excluding cash or cash equivalents, other than Collateral) pertaining to, located on or used in connection with the Land and/or the Improvements; in each case to the extent that Seller may legally transfer the same. The terms "Claims" and "Intangible Personal Property" shall exclude, and Seller is not transferring to Purchaser, rights of Seller to pursue, settle and retain insurance proceeds under existing or former insurance policies for casualties or other insurable events which occurred prior to the Date of this Agreement.

(bb) **"Land"** shall mean the real property described in Exhibit "A" attached hereto.

(cc) **"Leases"** shall mean all leases, licenses and other occupancy agreements of any kind or nature, whether written or oral, if any, in effect on the Closing Date relating to the Land or the Improvements, together with all guaranties, reserves, security deposits, letters of credit, other Collateral and rents relating thereto, prorated as hereinafter provided; provided, however, that "Leases" shall exclude any licenses, subleases or other rights of occupancy granted by any tenant or other occupant in the Improvements.

(dd) **"Loss Incident"** shall have the meaning set forth in Section 7.1 hereto.

(ee) **"Manager"** shall mean ITI Power Savers, Seller's management agent for the Property.

(ff) **"Notice"** shall have the meaning set forth in Section 13.9 hereof.

(gg) **"Permits"** shall mean all permits, licenses, and other authorizations of every nature whatsoever required by, or issued under, applicable Governmental Requirements benefiting, relating to or affecting all or any portion of the Land, any of the Improvements or any of the Personal Property.

(hh) **"Permitted Title Exceptions"** shall mean (i) those exceptions to title set forth on Exhibit "B" attached hereto and (ii) any other matters caused, created or consented to by Buyer prior to the Closing Date.

ny-542244

3

(ii)   **"Personal Property"** shall mean those certain tangible items of personal property and fixtures owned by Seller and used in the operation or maintenance of any of the Land and/or the Improvements.

(jj)   **"Post-Contract Commitment"** shall have the meaning set forth in Section 4.2.1.

(kk)   **"Property"** shall mean the Buildings and all rights, title and interest of Seller in any other Improvements, the Leases, the Personal Property, the Intangible Personal Property, and the Rights.

(ll)   **"Registry"** shall mean the Department of Land Management, Government of Guam.

(mm)   **"Rent Roll"** shall have the meaning set forth in Section 6.3.5 hereof.

(nn)   **"Seller"** shall have the meaning set forth in the Introductory Paragraph hereto.

(oo)   **"Seller's Documents"** shall have the meaning set forth in Section 7.1.1 hereof.

(pp)   **"Surveyor"** means _____.

(qq)   **"Title Company"** shall mean First American Title Insurance Company or any other nationally recognized title insurance company engaged by Buyer to issue the Title Policy.

(rr)   **"Title Nominee"** shall have the meaning set forth in Section 13.3.

(ss)   **"Title Policy"** shall mean the title insurance policy to be issued by the Title Company to Buyer in accordance with Article IV hereof.

(tt) **"Total Purchase Price"** shall have the meaning set forth in Section 2.2 hereof.

(uu)   **"Violations"** shall have the meaning set forth in Section 4.4.

## ARTICLE II

### Agreement to Sell and Purchase and Purchase Price

2.1   **Agreement to Sell and Purchase.**  Seller agrees to sell, assign and convey all of its respective rights, title and interest in the Property to Buyer, and Buyer agrees to purchase and accept all of such rights, title and interest in the Property from Seller, for the Total Purchase Price, upon the terms and conditions set forth herein.

2.2   **Total Purchase Price and Payment of Total Purchase Price.**  The total purchase price for the Property to be acquired hereunder (the **"Total Purchase Price"**) shall be Three Million Six Hundred Fifty Thousand and 00/100 U.S. Dollars ($3,650,000.00), payable to Seller as follows:

2.2.1   Buyer shall deposit with Escrow Agent the sum of Three Hundred Sixty-Fifty Thousand and 00/100 (U.S. $365,000) (the "**Deposit**") by wire transfer of immediately available U.S. Federal Funds upon the execution of this Agreement by Buyer.

2.2.2   The Deposit shall be held in escrow pursuant to the terms hereof by the Escrow Agent and shall be invested by Escrow Agent as provided in Section 13.21.  The Deposit escrow account or accounts shall be opened utilizing Buyer's federal identification number, which is [_____].  A form W-9 for Buyer is being delivered by Buyer contemporaneously herewith.  At the consummation of the Closing, the Deposit shall be applied against the Total Purchase Price.  If the transaction contemplated hereby is not consummated on the Closing Date, the Deposit shall be disposed of in the manner provided herein.

2.2.3   At the time of Closing, Buyer shall pay (by wire transfer of immediately available U.S. Federal Funds) to an account or accounts designated by Seller, a sum equal to THREE MILLION TWO HUNDRED EIGHTY-FIVE THOUSAND AND NO/100 U.S. DOLLARS ($3,285,000.00), on account of the Total Purchase Price.  To the extent that there are any adjustments to the Total Purchase Price required hereunder, such adjustments shall be reflected on the Closing Statement and shall be effected by a credit against or an increase in the sums due under this Section 2.2.3.

2.2.4   Buyer and Seller acknowledge that no portion of the Total Purchase Price has been allocated to Personal Property.


# ARTICLE III

## Property Included in Purchase and Sale

The Property to be conveyed hereunder  includes all right, title and interest of Seller, if any, in and to all easements and rights of ingress and egress, rights of way, privileges, licenses, appurtenances and other rights and benefits belonging to, running with the owner of, or in any way related to the Land and/or the Improvements, all of which shall be transferred from Seller to Buyer, subject to the terms and conditions of this Agreement, at the Closing.


# ARTICLE IV

## Title and Survey

4.1   **Permitted Title Exceptions.**  In addition to any other condition precedent in favor of Buyer as may be expressly set forth elsewhere in this Agreement, it is a condition precedent to Buyer's obligation hereunder that Seller shall convey to Buyer good and insurable fee simple title to the Land and the Buildings, subject only to the Permitted Title Exceptions.

4.2   **Evidence of Title.**  Provided that Buyer shall have performed all acts necessary and exclusively within Buyer's control or responsibility hereunder for the Title Company's issuance of

the Title Policy, including the payment of all premiums as agreed upon herein, Buyer's obligation to close shall be conditioned upon the Title Company issuing at Closing, within the time provided at the end of this Section 4.2, an ALTA Form (10-17-92) owner's policy of title insurance or an irrevocable binder therefor, insuring Buyer as the owner of the Land and the Improvements, in each case free and clear of all liens, encumbrances and other exceptions to title (other than the Permitted Title Exceptions) (the "**Title Policy**").

      4.2.1  Buyer hereby acknowledges its receipt of (a) a title report issued by Pacific American Title Insurance and Escrow Company, under its title number _____, dated _____ (the "**Existing Title Report**"), and (b) legible copies of all instruments of record referred to in the Existing Title Report. All matters listed on Exhibit "B" shall be deemed to be Permitted Title Exceptions. If, after the date hereof, Buyer shall obtain a revised title report (a "**Post-Contract Commitment**") showing additional matters affecting title which were not disclosed by the Existing Title Insurance Report or Exhibit "B", then Buyer shall promptly notify Seller of the same and as to whether Buyer deems such additional matters to be Permitted Title Exceptions. **[Exhibit "B" to include reference to encroachment of fence at a width of approximately 20 feet onto Lot 5089#1-4.]** If Buyer does not consider such additional matters to be Permitted Title Exceptions, then Seller shall have until Closing to cure such additional matters by reasonable commercial efforts and delete such defects from the Post-Contract Commitment. If any of the Post-Contract Commitments show, and Buyer so objects to, defects of title (other than Permitted Title Exceptions), and if such defects cannot be removed with the payment of sums which, in the aggregate, do not exceed $25,000, then Seller shall notify Buyer within fifteen (15) Business Days after Seller's receipt of Buyer's notice whether or not Seller shall remove the same at or before Closing. Any items not so objected to by Buyer shall be deemed Permitted Title Exceptions hereunder. Notwithstanding the foregoing, Seller shall cause to be satisfied at Closing the Existing Secured Loans. In lieu of eliminating any defects of title objected to by Buyer, Seller may elect to deposit with the Title Company such amount of money or take such other action as may be determined by the Title Company as being sufficient to induce the Title Company, without the payment of any additional premium by Buyer, to omit such defects from Buyer's Title Policy as to insure Buyer against collection of the same.

      4.2.2  If any Post-Contract Commitment shows additional defects or matters of title which are so objected to by Buyer, Seller may provide the Title Company at or prior to the time of Closing with sufficient funds to remove such matters or defects, and the Title Company shall delete such defects from the Post-Contract Commitment by endorsement delivered to Buyer. Notwithstanding the foregoing, while a mechanics' or other lien created by a tenant of any portion of the Property unaffiliated with Seller (a "**Tenant Lien**") shall not be a Permitted Title Exception, Seller shall have no obligation to remove the same by bonding or otherwise at Closing, unless Seller otherwise agrees. Any unpaid taxes, charges and assessments, together with interest and penalties thereon to a date not more than five (5) Business Days following the Closing Date (in each case subject to any applicable apportionment), and any encumbrances or liens of a definite or ascertainable amount which Seller may elect to pay at or prior to Closing, together with the cost of recording or filing any instruments necessary to discharge the same, may be paid out of the Balance of the Closing Date Purchase Price.

4.2.3  If the additional defects disclosed by the Post-Contract Commitment and objected to by Buyer cannot be removed by any of the foregoing means, and if Seller shall not have an obligation to, and does not elect to, remove the same, Buyer shall within five (5) Business Days after the receipt by Buyer of Notice from Seller that such defects cannot and will not be removed by Seller, by Notice to Seller, at Buyer's option either to (i) terminate this Agreement and obtain the return of the Deposit or (ii) waive such defects, which shall become Permitted Title Exceptions hereunder, and accept title subject to them; if Buyer fails to give Seller timely Notice of its election of (i) or (ii), Buyer shall be deemed to have elected (ii).  At Closing, Buyer shall pay all premiums and costs necessary to cause the Title Company to issue to Buyer a final Title Policy in accordance with the provisions of this Section 4.2.

4.3  **Survey.**  Buyer hereby acknowledges its receipt of and approval of all matters shown on the Survey of the Land and the Improvements prepared by the Surveyor and having an effective date of _____ (the "**Existing Survey**").

4.4  **Violations.**  Buyer agrees to purchase the Property subject to any and all notices of violations of any Governmental Requirements whatsoever issued by any federal, state, municipal or other governmental department, agency or bureau or any other governmental authority having jurisdiction over the Property (collectively, "**Violations**"), or any lien imposed in connection with any of the foregoing, or any condition or state of repair or disrepair or other matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Property (or any portion thereof).  Seller shall have no duty to remove or comply with or repair any condition, matter or thing, whether or not noted, which, if noted, would result in a violation being placed on the Property (or any portion thereof).  Seller shall have no duty to remove or comply with or repair any of the aforementioned Violations or other conditions, and Buyer shall accept the Property subject to all such Violations and liens, the existence of any conditions at the Property which would give rise to such Violations or liens, if any, and any governmental claims arising from the existence of such Violations and liens, in each case without any abatement of or credit against the Total Purchase Price.

4.5  **Real Estate Taxes.**  The parties acknowledge that Seller is disputing the payment of certain real estate taxes for the Land and the Improvements, and that such dispute is not expected to be resolved as of the Closing.  If the dispute is not resolved as of the Closing, Seller shall escrow at Closing with Escrow Agent the amount in dispute, such amounts to be released from escrow to be paid to the applicable taxing authority to the extent that it is finally determined that such taxes are owed thereto, and the remainder to be paid to Seller.

4.6  **Foreclosure of Mortgage.**  The parties acknowledge and agree that a portion of the Land more particularly described hereto as Exhibit "H" (the "Foreclosure Parcel") is not yet owned by Seller, but is in the process of being acquired pursuant to a Notice of Sale Under Mortgage, dated November 13, 2003, filed for record as Instrument No. 684079 in the Register's Office.  If title to the Foreclosure Parcel has not been acquired by Seller as of the Closing Date, then, subject to satisfaction of the conditions precedent to Buyer's obligation to close title to the portion of the Property excluding the Foreclosure Parcel, Buyer shall purchase the remainder of the Property for the Total Purchase Price, but, in lieu of conveyance of the Foreclosure Parcel to Buyer, and in lieu of

any obligation of Seller to own the Foreclosure Parcel free and clear of liens and encumbrances other than Permitted Title Exceptions, or of any condition relating to obtaining a Title Policy covering the Foreclosure Parcel, Seller shall transfer or cause to be transferred to Buyer all of the rights of Seller or of BTC Mortgage Investors Trust 1997 S-1, Secured Notes, Series 1997-S1 ("**BTC Mortgage Investors Trust**", under the proceeding described in said Notice of Sale under Mortgage to acquire the Foreclosure Parcel, and otherwise in and to the Foreclosure Parcel.

4.7 **Appraisal**. Seller shall provide a copy of the Appraisal to _____ within two (2) Business Days after the Date of this Agreement, subject to the Confidentiality Agreement.

## ARTICLE V

## "As-Is"

5.1 **Seller Furnished Items.** Seller has provided or will provide to Buyer, at Seller's option, either at the office in the Improvements of Manager, true and correct copies of: (a) the Leases in effect as of the Date of this Agreement; (b) the most recent real estate tax bills for the Property for the last two (2) years; and (c) the Contracts in effect as of the Date of this Agreement.

5.2 **Access to Records.** From time to time, until the earlier of the termination of this Agreement and the Closing, Seller shall provide Buyer and its agents with reasonable access to its records regarding the Property kept by Manager at the Improvements. Such records which may be so examined by Buyer shall specifically include any correspondence contained in such records to or from (i) any governmental authorities having jurisdiction over the Property and/or (ii) tenants of the Property; but, shall specifically exclude any records dealing with appraisals or valuations, interoffice correspondence, records of any mortgage lender, and proprietary information (other than the matters referred to in the foregoing clauses (i) and (ii)).

5.3 **Access to Governmental Records.** Subject to compliance with Section 5.4 and Section 5.5, Buyer shall be permitted to investigate and examine any and all governmental records and to conduct interviews with any and all relevant governmental and regulatory authorities with respect to the use and ownership of the Property.

5.4 **Access to Property.** Until the earlier of the termination of this Agreement and the Closing, Seller shall provide Buyer and its agents, employees and contractors with reasonable access to the Property, upon reasonable prior oral or written notice and arrangement with Seller, for investigation purposes. Prior to its (or any of its agents', employees' or contractors') initial entry upon the Property, Buyer shall provide Seller with proof (e.g., an insurance certificate) reasonably satisfactory to Seller that any person or entity performing any work on the Property carries at least $2,000,000 of liability insurance, naming each of Seller and Manager as an additional insured, to protect the Property and all persons from loss or damage arising from accident or malfeasance involving or caused by such person or entity. In connection with such access to the Property, Buyer shall, in good faith, attempt to minimize, to the greatest extent possible, any unreasonable interference with Seller's business and the business of Seller's tenants. Buyer hereby indemnifies and holds Seller harmless from any loss, cost or expense incurred including, but not limited to,

reasonable attorneys' fees and costs incurred by Seller as a result of any such investigation, including costs necessary to remove any mechanic's or similar liens by any contractor or materialman engaged by Buyer and asserted as a result of any such investigation; provided, however, that (a) such indemnification shall not cover any loss, cost or expense occasioned by Seller's negligence or malfeasance and (b) any claim made by Seller against Buyer under such indemnification shall not include claims or expenses to the extent that they are attributable to any pre-existing condition (except to the extent adversely affected as a result of such investigation). The provisions of this Section shall survive the Closing or the termination of this Agreement.

5.5 **Confidentiality.** All materials furnished to Buyer and/or its agents or accessed by Buyer and its agents shall be treated by Buyer and its agents in the manner specified in the Confidentiality Agreement, the terms and provisions of which are hereby incorporated herein by reference as though set forth herein in full. Seller shall have reasonable prior notice of, and the right to require Buyer to include a representative of Seller in, any meetings or other contacts with third parties (including representatives of governmental agencies) at which confidential information will be disclosed, or to review and approve in advance any communications with third parties which will disclose confidential information. Buyer shall not contact tenants of the Property or employees of Manager without Seller's prior consent.

5.6 **"As Is."** Accordingly, except as it may otherwise be expressly provided in this Agreement, and except for any express representations or warranties which may be contained herein, Seller assumes no obligation to remedy any problem or condition which Buyer may discover during its investigation of the Property as the Property is being purchased "as is", "where is" and with all faults. Buyer specifically acknowledges and agrees that, except as otherwise expressly provided in this Agreement or in any of the Seller's Documents, Seller is selling and Buyer is purchasing the Property on an "as is", "where is" and with all faults basis and that, except as otherwise expressly provided in this Agreement or in any of the Seller's Documents, Seller is not making, and Buyer is not relying on, any representations or warranties of any kind whatsoever, express or implied, provided to Buyer, from Seller, its agents, or brokers as to any matters concerning the Property, including, without limitation: (i) the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances, (ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Property, (iv) the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value or adequacy of the Property for any particular purpose, (v) the zoning or other legal status of the Property or any other public or private restrictions on use of the Property, and any Violations or any condition, matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Property (or any portion thereof), (vi) the compliance of the Property or its operation with any Governmental Requirements or any covenants, conditions and restrictions applicable to the Property, (vii) the presence of asbestos-containing materials, or other hazardous or toxic materials on, under or about the Property or the adjoining or neighboring property, (viii) the quality of any labor and materials used in any of the Improvements, (ix) the condition of title to the Property, (x) the economics of the operation of the Property; and (xi) any defaults or events of default under any of the Leases. Without

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 148 of 249

limiting the above, except with respect to liability of Seller for a breach by Seller of any of its representations and warranties contained in this Agreement or in any of the Seller's Documents, Buyer on behalf of itself and its successors and assigns waives its right to recover from, and forever releases and discharges, Seller, DBTCA, BTC Mortgage Investors Trust, each of Seller's, BTC Mortgage Investors Trust's and DBTCA's affiliates, Seller's, BTC Mortgage Investors Trust's and DBTCA's investment manager, the partners, members, trustees, shareholders, directors, officers, employees and agents of each of them, and their respective heirs, successors, personal representatives and assigns, from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses whatsoever (including, without limitation, attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise from and after the Closing on account of or in any way be connected with the physical condition of the Property or any Governmental Requirement. The provisions of this Section 5.6 shall in no event limit, detract from, abrogate or otherwise modify any representations or warranties made by Seller herein or in any of the Seller's Documents.

## ARTICLE VI

### Closing; Conditions Precedent to Closing

6.1 **Time and Place.** The closing of the purchase and sale contemplated by this Agreement (the "**Closing**") shall take place at 10:00 A.M., New York, New York time, on December __, 2003 (the "Closing Date"). The Closing shall take place in the offices of Sellers' counsel McCully & Beggs, P.C. in Guam. At the Closing, the parties contemplate that (a) Seller shall deliver to Buyer good, clear record and insurable fee simple title to the Land and the Improvements, subject only to the Permitted Title Exceptions, the Leases and other matters permitted hereunder; (b) the deeds, assignments and other recording items provided for herein shall promptly be recorded; and (c) the Total Purchase Price, net of prorations and adjustments credited or debited to Buyer as provided for herein, shall be paid to or at the direction of Seller by wire transfer of immediately available U.S. Federal Funds.

6.2 **Conditions Precedent to Buyer's Obligations.** In addition to any other condition precedent expressly set forth herein, Buyer's obligations under this Agreement to close title to the Property and to satisfy its other obligations to be performed on the Closing Date are subject to the following conditions precedent, any or all of which Buyer may waive in writing:

6.2.1 The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the date when made and as of the Closing, except as herein provided, and Seller shall have performed, in all material respects, all of its affirmative covenants set forth in this Agreement.

6.2.2 Seller shall not be in breach or default, in any material respect, of any of its material covenants or obligations under this Agreement.

6.2.3  It is expressly acknowledged by Buyer that the Closing of the transactions contemplated by this Agreement is not subject to any financing contingency and that no financing for this transaction shall be provided by Seller or any of its affiliates.

6.2.4  On the Closing Date, the Property shall be in substantially the same condition as it is at the end of the Investigation Period, reasonable wear and tear and the provisions of Article X excepted.

6.2.5  Seller shall have delivered all of the items set forth in Section 6.3.

6.3  **Seller's Closing Documentation and Requirements.**  At the Closing, Seller shall, at its expense, deliver the following to Buyer:

6.3.1  one (1) or more deed(s) in substantially the form of Exhibit "I" attached hereto conveying any right, title and interest of Seller in and to the Land and the Improvements to Buyer, subject only to the Permitted Title Exceptions, duly executed and acknowledged and in recordable form;

6.3.2  a certificate of Seller dated as of the Closing Date certifying that the representations and warranties of Seller made in this Agreement were true and complete in all material respects and, if applicable, stating whether and in what respects any of such representations and warranties is not true and complete in all material respects as of the Date of this Agreement and unless stated otherwise are deemed restated as of the Closing Date, except as herein provided;

6.3.3  an assignment in substantially the form of Exhibit "L" attached hereto of all Intangible Personal Property, if any, and the originals, if in the possession or control of Seller, of (a) permanent certificate(s) of occupancy for the Improvements and the tenant spaces and (b) all other Permits;

6.3.4  a rent roll for the Land and the Improvements (the "**Rent Roll**"), certified to Buyer as of the Closing Date by Seller and in substantially the format as that attached hereto as Exhibit "G";

6.3.5  an assignment and assumption agreement in substantially the form of Exhibit "M" attached hereto with respect to the landlord's interest under the Leases (which shall include transfer of the rights to any security deposits, prepaid rentals or letters of credit constituting security of tenants), and with respect to Seller's interest in any Contracts required or permitted to survive the Closing (the "**Assignment and Assumption of Landlord's Interests in Leases**");

6.3.6  a closing statement setting forth the appropriate adjustments and prorations to be made at the Closing as provided in this Agreement (the "**Closing Statement**");

6.3.7  a Certificate of Non-Foreign Status certifying, pursuant to Internal Revenue Code Section 1445, that Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

6.3.8   a certified copy of Seller's resolution authorizing the sale of the Property;

6.3.9   one or more bills of sale in substantially the form of Exhibit "N" attached hereto conveying to Buyer title to all items of Personal Property included in the Property;

6.3.10   if requested by Buyer, a letter to tenants under the Leases notifying them of the sale in a form approved by Seller and Buyer, such approval to be reasonably given;

6.3.11   original copies of all Leases or, to the extent original copies are not available, certified copies of all Leases;

6.3.12   all keys and passcards for the Property, with identification of the lock or locks to which each item relates;

6.3.13   such evidence or documents as may be reasonably required by the Title Company (a) in order to delete pre-printed exceptions relating to: (i) mechanics' or materialmen's liens; (ii) parties in possession (except as herein provided to the contrary and except for Permitted Title Exemptions) and (iii) the status and capacity of Seller and the authority of the Person or Persons who are executing the various documents on behalf of Seller in connection with the Sale of the Property and/or the legal existence of Seller and (b) to provide so-called gap coverage from the latest effective date of the Title Commitments; and

6.3.14   such other documents, consistent with this Agreement, as are reasonably required by Seller, Buyer or the Title Company to consummate the transaction contemplated hereunder.

6.4   **Buyer's Closing Documents and Requirements.**   At or prior to the Closing, (a) Buyer shall pay by wire transfer of immediately available U.S. Federal Funds the Balance of the Total Purchase Price (plus or minus prorations and adjustments as reflected on the Closing Statement) to Seller by one or more wire transfers of immediately available U.S. Federal Funds to an account or accounts designated by Seller and (b) Buyer shall execute and deliver to Seller the following:

6.4.1   the Closing Statement;

6.4.2   the Assignment and Assumption of Landlord's Interests in Leases for all of the Leases and, to the extent applicable, Contracts;

6.4.3   from Buyer, a certificate of Buyer dated as of the Closing Date certifying that the representations and warranties of Buyer made in this Agreement were true and complete in all material respects and, if applicable, stating whether and in what respects any of such representations and warranties is not true and complete in all material respects, as of the Date of this Agreement and unless stated otherwise are deemed restated as of the Closing Date, except as herein provided;

6.4.4   a certified copy of Buyer's resolution (or other appropriate consents) authorizing the purchase of the Property and the execution, delivery and performance by Buyer of this Agreement;

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 151 of 249

6.4.5   affidavits, certificates and other information or documents reasonably required by the Title Company to effect the issuance of the Title Policy, subject to no exceptions other than Permitted Title Exceptions; and

6.4.6   such other documents, consistent with this Agreement, as are reasonably required by Seller or the Title Company to consummate the transaction contemplated hereunder.

6.5   **Form.**   All documents and instruments required hereby shall be in either the form attached hereto (if a form is so attached) or in form and substance reasonably satisfactory to Seller and Buyer (if a form is not so attached).   Drafts of closing documents to be prepared by Seller or Buyer that are not attached hereto shall be furnished to the other party reasonably in advance of Closing so that such other party may comment upon them.

6.6   **Access to Records Post-Closing.**   After the Closing, Seller shall provide Buyer, and Buyer shall provide Seller, reasonable access at reasonable times on reasonable prior notice to books and records in their respective possession regarding the Property, excluding information covered by the attorney-client privilege and information of the kind described in the second sentence of Section 5.4.

## ARTICLE VII

### Representations and Warranties

7.1   **Seller's Representations.**   Without limiting the representations, covenants and warranties of Seller contained elsewhere in this Agreement, as a material inducement for Buyer to enter into this Agreement and to consummate the Closing hereunder, Seller makes the following representations and warranties to Buyer, which representations and warranties shall be true and correct in all material respects on the Date of this Agreement and on the Closing Date, except as hereinafter specifically provided, as though such representations and warranties were made at and as of the Closing Date. The phrase "to Seller's knowledge" (or words of like import) shall mean, with respect to Seller, to the actual knowledge of Bruce P. Morrison (the "**Designated Individual**"), and not any implied, imputed or constructive knowledge, without any independent investigation having been made or any implied duty to investigate.   Without limiting the generality of the foregoing, Buyer specifically acknowledges that certain of Seller's records relating to the Property may be located at 130 Liberty Street, New York, New York, that such records are, and for the foreseeable future will be, inaccessible as a result of events occurring in the vicinity of such location on September 11, 2001 and that information within the knowledge of Seller shall specifically exclude information that is embodied or included only in materials located at 130 Liberty Street, New York, New York. Buyer acknowledges that the Designated Individual named above is named herein solely for the purpose of defining and narrowing the scope of Seller's knowledge and not for the purpose of imposing any liability upon or creating any duties running from such Designated Individual or his employer (other than Seller, and then only to the extent expressly set forth herein) to Buyer.   Buyer covenants that it will bring no action of any kind against such Designated Individual or his employer (except for Seller) related to or arising out of this Agreement.   Seller's representations or warranties shall survive the Closing for a period of one hundred and eighty (180) days, at which time they shall

expire. Buyer must give Seller Notice of any claim it may have against any Seller for a breach of Seller's representations or warranties contained in this Agreement or any of the Seller's Documents, or for breach of any covenants of any Seller contained in this Agreement or any of the Seller's Documents, within one hundred and eighty (180) days after the Closing Date and any action, suit or proceeding with respect to any breach of any of Seller's representations or warranties contained in this Agreement or the Seller's Documents, or for breach of any covenants of Seller contained in this Agreement or any of the Seller's Documents, shall be commenced, if at all, within two hundred ten (210) days after the Closing Date. Any claim which Buyer may have at any time under this Agreement or any of the Seller's Documents, whether known or unknown, which is not asserted by Notice from Buyer to Seller within such one hundred and eighty (180) day period or with respect to which an action, suit or proceeding is not commenced within such two hundred and ten (210) day period shall not be valid or effective, and Seller shall have no liability with respect thereto. Without limiting the foregoing, Buyer may not bring any action against Seller for a breach of any such representation or warranty unless and until the aggregate amount of all liability and losses arising out of any such untruth or inaccuracy, or any such breach, exceeds $25,000.00 (a "**Loss Incident**"). In addition, in no event will Seller's liability for all such breaches exceed, in the aggregate, $500,000.00. Buyer specifically waives, relinquishes and releases any right of rescission it may have against Seller after the Closing by virtue of any breach by Seller of any representation, warranty or covenant hereunder or under any of the Seller's Documents. Notwithstanding anything to the contrary contained herein, Buyer acknowledges that Buyer shall not be entitled to bring any action after the Closing Date based on any representation made by Seller in this Agreement to the extent that, prior to Closing, Buyer shall have obtained actual knowledge of any information that was contradictory to such representation or warranty, except as expressly provided in the last sentence of this paragraph. In furtherance thereof, Buyer expressly agrees that Seller shall have no liability with respect to any of such representations and warranties to the extent that, prior to the Closing, Buyer obtains actual knowledge (from whatever source, including, without limitation, any property manager, any materials furnished to Buyer, the estoppel certificates, Buyer's due diligence tests, investigations and inspections of the Property, or written disclosure by Seller, or any of Seller's agents, affiliates and employees) that renders any of such representations and warranties untrue or incorrect, and Buyer nevertheless consummates the transaction contemplated by this Agreement unless, prior to Closing, Buyer advises Seller in reasonable detail of the existence and nature of such knowledge and Seller reaffirms in writing its original representations and warranties notwithstanding such information.

   7.1.1  Due Authority; Enforceability. (a) Seller, and the person on behalf of Seller executing this Agreement each has full power and authority to execute and deliver this Agreement and all documents now or hereafter to be executed and delivered by Seller pursuant to this Agreement ("**Seller's Documents**") to which Seller is a party, and Seller has full power and authority to perform all of its respective obligations arising under this Agreement and under the Seller's Documents to which Seller is a party, (b) this Agreement and the Seller's Documents to which Seller is a party will each constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, covenants and conditions, except as such enforceability may be limited by bankruptcy, moratorium or insolvency or other laws affecting creditors' rights generally and subject to general principles of equity (regardless of whether

such enforceability is considered in a proceeding in equity or at law) and (c) Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Internal Revenue Code.

7.1.2 Formation; Existence; Qualification To Do Business. Seller is a limited liability company duly organized and validly existing under the laws of the State of Delaware and is authorized to do business in Guam.

7.2 **Buyer's Representations**. Without limiting the representations, covenants and warranties of Buyer contained elsewhere in this Agreement, and as a material inducement for Seller to enter into this Agreement and to consummate the Closing hereunder, Buyer makes the following representations and warranties which shall be true and correct in all material respects on the date hereof and on the Closing Date. Buyer's warranties shall survive the Closing for a period of one hundred eighty (180) days, at which time they shall expire.

7.2.1 Formation; Existence. Buyer is a _____ duly created and validly existing under the laws of _____ and is authorized to conduct business in Guam.

7.2.2 Enforceability. This Agreement and Buyer's Documents each will constitute the legal, valid and binding obligations of Buyer, enforceable in accordance with their respective terms, covenants and conditions, except as such enforceability may be limited by bankruptcy, moratorium or insolvency or other laws affecting creditors' rights generally and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.2.3 Due Authority. Buyer and the officer of Buyer executing this Agreement each has full power and authority to execute and deliver this Agreement and all documents now or hereafter to be executed and delivered by Buyer pursuant to this Agreement ("**Buyer's Documents**") and Buyer has full power and authority to perform all obligations arising under this Agreement and under Buyer's Documents.

## ARTICLE VIII

### [Intentionally Deleted]

## ARTICLE IX

### Adjustments and Prorations

9.1 **Prorations.** The following shall be prorated between the parties as of 11:59 P.M. of the day before the Closing Date (except as otherwise provided herein): real estate taxes; base and additional rents under the Leases; electricity, water, sewer and other utility charges; fuel oil; fees and other amounts payable under any Intangible Personal Property; and such other items of income and expense as are customarily prorated in transactions of this nature. Notwithstanding the foregoing, in the event that the Balance of the Total Purchase Price is not received by Seller on or before 2:00

Case 1:03-cv-00043   Document 13   Filed 01/30/2004   Page 154 of 249

P.M., Guam time, on the Closing Date, then the Closing shall for purposes of this Section shall be deemed to have occurred on the next Business Day and all prorations shall be recomputed accordingly.

9.2 **Rents and Other Amounts Under Leases.** (a) All collected rents with respect to the then current rental period for the month in which the Closing Date occurs shall be prorated between Seller and Buyer as of the Closing Date. All reserves and security deposits (including with regard to each of the foregoing, unpaid interest thereon), if any, held by Seller under any of the Leases shall be paid to Buyer or credited against the Total Purchase Price. Uncollected rents due under Leases shall be adjusted on an if, as and when collected basis. If, on the Closing Date, any tenant under a Lease is in arrears in the payment of such rent, then any amounts received by Seller or Buyer from any such tenant after the Closing (net of reasonable costs of collection) shall be applied in the following order or priority: (i) first to be apportioned between Seller and Buyer for the month in which the Closing occurred, (ii) then to Seller for any period prior to the month in which the Closing occurred, and (iii) then to Buyer for any period after the month in which the Closing occurred. If any rents received by Seller or Buyer after the Closing are payable to the other party by reason of the foregoing, then the same (net of reasonable out-of-pocket costs of collection) shall be promptly paid to the other party. Buyer shall use commercially reasonable efforts after the Closing Date to collect any such rents and shall not waive or settle any claim against any tenant for such rents without Seller's prior written consent. Seller shall have the right, from time to time, on Notice to Buyer, to review Buyer's books and records with respect to the collection of rents under the Leases in order to determine whether any amounts are due to Seller hereunder. Seller shall have no right to sue or commence legal proceedings against any tenant or occupant of the Property for delinquent rent or other amount owing for a period prior to Closing.

(b) All items to be apportioned between Seller and Buyer that are not subject to an exact determination as of the Closing Date shall be reasonably estimated by the parties; when any such item is, after the Closing, capable of an exact determination, the party having the information permitting the exact determination shall send the other party a detailed report on the exact determination so made. Within twenty (20) days after Seller and Buyer have received any such report, Seller and Buyer shall reasonably adjust the amounts apportioned pursuant to the estimates made at Closing to reflect the exact determinations contained in the report. The foregoing two sentences shall survive the Closing for a period of sixty (60) days.

9.3 **Real Estate Taxes.** If, on the date of the Closing, the real estate tax rate and the assessed valuation are not determined and a real estate tax bill has not yet been issued for the then current calendar year, real estate taxes shall be prorated upon the basis of the most recent ascertainable tax bill, but such taxes shall be readjusted at the request of Seller or Buyer as soon as a final tax bill is issued for that calendar year. The first of Buyer or Seller to receive the tax bill for the year of Closing shall promptly deliver a copy of such bill to the other party.

9.4 **Assessments.** If, at the time of Closing, the Property or any part thereof is affected by an assessment or assessments, which are or may become payable in installments, of which the first installment is then a charge or lien, or has been paid, then (A) Seller shall be obligated to pay all installments of any such assessments which are due and payable prior to the Closing Date, and (B)

for the purposes of this Agreement all the unpaid installments of any such assessments which are to become due and payable on or after the Closing shall not be deemed to be liens upon the Property and the payment thereof shall be assumed by Buyer without abatement of or credit to the Total Purchase Price.

9.5 **Deposits; Insurance Premiums.** Any deposits paid by Seller for utilities which can be transferred to Buyer, shall be so transferred at Closing, if Buyer so requests, and Buyer shall be debited at Closing for such amounts. None of Seller's insurance shall be assigned or transferred to Buyer, and there shall be no apportionment of insurance premiums between Seller and Buyer.

9.6 **Errors.** If any errors or omissions are made at the Closing regarding adjustments or prorations, the parties shall make the appropriate corrections promptly after the discovery thereof. The provisions of this Article shall survive Closing for a period of one hundred eighty (180) days.

## ARTICLE X

### Risk of Loss; Eminent Domain

10.1 **Casualty.** If, prior to the Closing Date, the Improvements are damaged by fire, vandalism, acts of God or other casualty or cause, such loss shall be borne by Seller. Seller shall promptly give Buyer Notice of any such damage, together with Seller's estimate of the cost and time necessary for repair and restoration. If the cost (as reasonably estimated by Seller) to repair any such damage is $500,000.00 or less, then, Buyer shall take the Property as is, together with the insurance proceeds, if any, or the right to receive the same, and the right to any other claims arising as a result of such damage. If the cost (as reasonably estimated by Seller) to repair any such damage is more than $500,000.00, then, Buyer shall have the option of (i) closing and taking the Property as it is, together with the insurance proceeds, if any, or the right to receive the same, and the rights to any other claims arising as a result of the damage, or (ii) terminating this Agreement and obtaining the return of the Deposit. Buyer shall give Seller Notice of its election of one of the foregoing options within thirty (30) days of its receipt of Seller's Notice of the loss and estimate of the cost to repair. If Buyer does not give Seller such Notice of its election within the aforementioned time, Buyer shall be presumed for the purposes of this Agreement to have elected option (i). If Buyer elects option (i) above, Seller agrees to cooperate with Buyer in any loss adjustment negotiations, legal actions and agreements with the insurance company, and to assign to Buyer Seller's rights to such insurance proceeds net of Seller's expenses in excess of any deductibles and will not settle any insurance claim or legal actions relating thereto without Buyer's prior written consent. Seller shall pay to Buyer the amount of any deductible to such insurance policy, less qualifying expenses previously expended by Seller toward such deductible with Buyer's prior written consent, provided that such consent shall not be unreasonably withheld or delayed.

10.2 **Eminent Domain.** If, prior to the Closing, the entire Property becomes subject to an eminent domain proceeding, this Agreement shall be deemed cancelled and Buyer and Seller shall have no further obligations hereunder, except (a) Seller shall promptly notify the Escrow Agent of such eminent domain proceeding and promptly upon receipt of such notice the Escrow Agent shall return the Deposit to Buyer, (b) Buyer shall remain obligated under the indemnification provisions of

Section 5.4, and (c) Buyer and Seller shall all remain obligated under the indemnification provisions of Section 13.19. If only a portion of the Property is so subject, Buyer shall proceed with the Closing and acquire the Property subject to such taking, together with all compensation and damages awarded or the right to receive same, provided that such taking does not (i) materially and adversely affect any portion of the Improvements, (ii) result in a material and adverse reduction of the square footage of the Improvements, a (iii) materially and adversely impair or restrict ingress and egress or the intended use of the Property. If such taking does not give rise to any of the circumstances described in clauses (i) through (iii) above, Seller agrees to assign to Buyer its right to such compensation and damages, and will not settle any proceedings relating to such taking without Buyer's prior written consent. Seller shall promptly give Notice to Buyer of any actual or known threatened condemnation affecting the Property. If such taking gives rise to any of the circumstances described in clauses (i) through (iii) above, then Buyer, at its option, may either (a) terminate this Agreement (Buyer shall, however, remain obligated under the indemnification provisions of Section 5.4 and Buyer and Seller shall all remain obligated under the indemnification provisions of Section 13.19) and obtain a return of the Deposit or (b) proceed with the Closing and acquire the Property subject to such taking, together with all compensation and damages awarded or the right to receive the same. Buyer shall give Seller Notice of its election of one of the foregoing options within thirty (30) days of its receipt of Seller's Notice of the condemnation. If Buyer does not give Seller such Notice of its election within the aforementioned time, Buyer shall be presumed for the purposes of this Agreement to have elected option (a).

## ARTICLE XI

### Additional Agreements

11.1 **Operation of Property.** Between the Date of this Agreement and the Closing Date and except as herein provided, Seller shall:

(a) maintain and operate the Property in substantially the same manner as Seller has done prior to the Date of this Agreement and as may be required under the Leases;

(b) not create or incur any new mortgage, lien, pledge, or other encumbrance in any way affecting its portion of the Property, nor transfer all or any portion of the Property except for items of the Personal Property transferred in the ordinary course of business, provided that Seller shall furnish all necessary replacements of any items of the Personal Property that are transferred (but Seller may enter into and modify Leases at Seller's discretion in the ordinary course of business); and

(c) except for agreements which may be terminated on thirty (30) days' notice without payment of premium or penalty, and for leases entered into in the ordinary course of business, not enter into any new agreement with respect to the Property that will survive Closing or bind Buyer, without the prior consent of Buyer, which consent shall not be unreasonably withheld or delayed.

11.2 **Extension to Cure**. If, on the Closing Date, all of conditions precedent to Buyer's obligation to close have not been satisfied in any material respect (or waived in writing), then Seller shall have the right to notify Buyer and, in such event, the Closing Date shall be extended up to sixty

(60) days to allow the closing conditions to be satisfied and (b) Seller shall use commercially reasonable efforts, consistent with this Agreement, to satisfy the Closing Conditions (subject to the limitations set forth in Section 4.2). Buyer shall have the election, at either the original or extended time for performance, to accept such title as the Seller can deliver to the Property (in its then condition) and/or to waive any unsatisfied closing conditions and to pay the Total Purchase Price for the Property without deduction (except as otherwise expressly provided in this Agreement), and without any surviving claims against Seller, in which case, Seller shall convey such title to the Property. If the original time for performance has been extended and on such extended Closing Date such closing conditions precedent to Buyer's obligations are still not satisfied, then, either party shall have the option of terminating this Agreement on such extended Closing Date, exercisable by written notice to the other party or parties and the Escrow Agent. In the event that either party exercises such option to terminate this Agreement in accordance with the terms hereof, subject to Article XII, the Deposit shall be promptly refunded to Buyer, whereupon this Agreement shall terminate and none of the parties hereto shall have any further rights or remedies hereunder, except as otherwise specifically provided herein to survive the termination of this Agreement.

## ARTICLE XII

### Remedies

12.1 **Seller's Remedies.** If Buyer defaults in the performance of its obligations under this Agreement or if Buyer willfully breaches one or more of the representations, warranties, or affirmative obligations made or undertaken by it herein, Seller shall give Buyer Notice of the default, specifying the nature of such default, and Buyer shall have twenty (20) days to cure the default. If Buyer fails to cure such default within the time provided, Seller shall have the right to terminate this Agreement by Notice to Buyer and to obtain the Deposit (and Escrow Agent shall pay the Deposit to or at the direction of Seller) as agreed upon as liquidated damages (and not as a penalty or forfeiture provision) in full settlement of all claims of Seller against Buyer arising hereunder, except those arising under Sections 5.6 and 13.19 hereof. The parties have agreed that Seller's actual damages in the event of a failure to consummate the sale due to Buyer's default would be extremely difficult or impracticable to determine. After negotiation, the parties have agreed that, considering all the circumstances existing on the Date of this Agreement, the amount of the Deposit is a reasonable estimate of the damages that Seller would incur in the event of Buyer's default. Seller's retention of the Deposit shall be Seller's sole remedy at law and in equity in the event of Buyer's default, except as otherwise specifically provided herein to service the termination of this Agreement.

12.2 **Buyer's Remedies.** If, as of the Closing Date, as the same may have been extended pursuant to Section 11.9, Seller is in default in the performance of its material obligations under this Agreement or if Seller has willfully breached any one or more of the representations or warranties made by it herein, Buyer shall give Seller Notice of the default or breach, specifying the nature of such default or breach, and Seller shall have twenty (20) days, from receipt of such Notice to cure the default or breach. If Seller fails to cure such default or breach within the time provided, and Buyer is capable of performing hereunder, Buyer shall have the right, as its exclusive remedy hereunder, to

Case 1:03-cv-00043     Document 13     Filed 01/30/2004     Page 158 of 249

either (i) enforce specific performance of this Agreement or (ii) terminate this Agreement and obtain the return of the Deposit (and Escrow Agent shall pay the Deposit to or at the direction of Buyer).

If the Closing occurs, then Buyer's remedies for any breach by Seller of its representations and warranties set forth herein and/or in the Seller's Documents are as set forth in, and as limited by, Section 7.1. Notwithstanding anything in this Agreement to the contrary, neither BTC Mortgage Investors Trust nor DBTCA is not a party to this Agreement, and neither BTC Mortgage Investors Trust nor DBTCA shall not be liable in any way for a breach of this Agreement by Seller or a representation or warranty of Seller which is not true, correct and complete.

## ARTICLE XIII

### Miscellaneous

13.1 **Costs and Expenses.** Seller shall pay all expenses in connection with releases of liens on the Property. Buyer shall pay the recording fees in connection with the recording of the deeds of conveyance to Buyer, all transfer taxes on the deeds of conveyance to Buyer, all premiums and other charges for the Title Policy, and the costs of its due diligence activities.

13.2 **Attorneys' Fees.** Each party shall pay its own attorneys' fees in connection with the preparation and negotiation of this Agreement; however, if any legal action is instituted hereunder, the prevailing party in such action shall be entitled to recover from the other party reasonable attorneys' fees and costs related to such legal action, including reasonable attorneys' fees and costs in all trial, appellate, post-judgment and bankruptcy proceedings.

13.3 **Assignment.** This Agreement and any rights hereunder shall not be assigned, sold, hypothecated, pledged or otherwise transferred by Seller in whole or in part, without the prior consent of Buyer in its sole discretion. Notwithstanding anything to the contrary set forth herein, at Closing, Buyer may designate, by written notice to Seller, any one or more separate entities that are controlled by Buyer as Buyer's title nominees (the "**Title Nominee**") to take title to all or any portion of the Property, provided that any such Title Nominee is (x) a corporation in which Buyer owns and controls, directly or indirectly, all of the ownership interest therein, or (y) a limited liability company or partnership in which Buyer is (or owns all of the interest in an entity which is) the sole managing member or general partner thereof and owns and controls, directly or indirectly, all of the ownership interests therein.

13.4 **Successors and Assigns.** Except as is otherwise provided in Section 13.3 hereof, this Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto.

13.5 **Gender and Number.** Whenever the context so requires, the singular number shall include the plural and the plural the singular, and the use of any gender shall include all genders.

13.6 **Entire Agreement.** This Agreement, together with the Confidentiality Agreement, contains the complete and entire agreement between the parties respecting the transaction contemplated herein, and such agreements supersede all other prior negotiations, agreements, representations and understandings between the parties respecting such matters. As used herein, the terms "include", "including" and similar terms shall be construed as if followed by the phrase, "without limitation".

13.7 **Counterparts.** This Agreement may be executed in any number of original counterparts, all of which evidence only one agreement.

13.8 **Modifications.** This Agreement may not be modified, terminated (except as otherwise expressly provided herein) or changed in any respect whatsoever, except by a further agreement in writing duly executed by Buyer and Seller. Any consent, waiver, approval or authorization shall be effective if signed by the party granting or making such consent, waiver, approval or authorization.

13.9 **Notices.** Any notice, approval, demand, consent, authorization, waiver or other communication (collectively a "Notice") which any party is required or may desire to give to or make upon the other parties pursuant to this Agreement shall be effective and valid only if given strictly in accordance with this provision, in writing, signed by the party or its below-named attorney giving such Notice, and (a) delivered personally (upon an officer of the other party if such party is not an individual or to such individual as may be noted in the addresses stated below) to the party in question or (b) sent by (i) express courier or overnight delivery service for next day delivery prepaid, (ii) certified mail of the United States Postal Service, return receipt requested or (iii) facsimile, addressed to the party in question as follows (or to such other address or person as any party or person entitled to Notice may by Notice to the other specify):

To Seller:

  c/o Deutsche Bank Realty
  1251 Avenue of the Americas
  9th Floor- MS:NYC07-0901
  New York, New York 10020
  Attention: Bruce P. Morrison
  Facsimile: (646) 324-3082

With a copy concurrently delivered to:

  Morrison & Foerster LLP
  1290 Avenue of the Americas
  New York, New York 10104
  Attention: Andrew J. Weiner, Esq.
  Facsimile: (212) 468-7900

Case 1:03-cv-00043  Document 13  Filed 01/30/2004  Page 160 of 249

To Buyer:

c/o Jae Seung Park
P.O. Box 8801
Tamuning, Guam  96931
Facsimile:_____

With a copy concurrently delivered to:

Robert P. Kutz, Esq.
P.O. Box 7310
Agat, Guam  96915
Facsimile:  671-646-4388

To Escrow Agent:

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York  10104
Attention:  Andrew Weiner, Esq.
Facsimile: (212) 468-7900

All notices shall be deemed to have been given upon receipt or refusal of delivery, whichever first occurs Unless otherwise specified, the time within which any consent or approval is to be given hereunder shall commence on the first (1st) Business Day after receipt of the request of such consent or approval together with all material necessary for such consent or approval to be given or if delivery is not accepted, on the first Business Day after the date delivery is refused.

13.10  **Exhibits.** All recitals and all exhibits referred to in this Agreement are incorporated herein by reference and shall be deemed part of this Agreement for all purposes as if set forth at length herein.

13.11  **Governing Law.** This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of New York.

13.12  **Captions.** The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope, meaning or intent of this Agreement.

13.13  **Severability.** The invalidation or unenforceability in any particular circumstance of any of the provisions of this Agreement shall in no way affect any of the other provisions hereof, which shall remain in full force and effect.

13.14  **No Joint Venture Partnership, Agency, Etc.**  This Agreement shall not be construed as in any way establishing a partnership, joint venture, express or implied agency, or employer-employee relationship between Buyer and Seller.

13.15 **No Third Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto, their respective successors and permitted assigns, and no other person or entity shall be entitled to rely upon or receive any benefit from this Agreement or any term hereof.

13.16 **No Waiver.** No consent or waiver, express or implied, by Buyer to or of any breach of representation, covenant or warranty of Seller shall be construed as a consent or waiver to or of any other breach of the same or any other representation, covenant or warranty.

13.17 **Execution.** The submission of this Agreement for examination does not constitute an offer by or to any party. This Agreement shall be effective and binding only after execution and delivery by the parties hereto.

13.18 **Time of the Essence.** Time shall be of the essence with respect to all obligations of Seller and Buyer under this Agreement.

13.19 **No Broker.** Buyer and Seller represent and warrant to each other that neither of them has negotiated through or communicated with any broker in connection with the transaction contemplated by this Agreement, except Global Realty ("Broker"). Each of Seller and Buyer severally agree to indemnify, defend and hold the other harmless from and against all claims, losses, liability, costs and expenses (including reasonable attorney's fees and costs, and reasonable attorney's fees and costs upon appeal), resulting from the claims that may be made against Buyer or Seller by any broker or any other person (other than Broker) claiming a commission, fee, or other compensation by reason of this transaction if the same shall arise by, through or on account of any act of Buyer, Seller or their respective representatives. Notwithstanding the foregoing, at the Closing, Seller shall pay the Commission due Broker in accordance with a separate agreement. The indemnifications set forth herein shall survive the Closing.

13.20 **Business Day.** For all purposes of this Agreement "Business Day" shall mean any day, excluding (x) Saturday and Sunday, (y) any day which is a legal holiday under the laws of the State of New York or Guam, and (z) any day on which banking institutions located in the State of New York or Guam are required or authorized by law or other governmental action to close.

13.21 **Escrow and Escrow Agent.** The parties further agree that:

13.21.1 Escrow Agent shall accept the Deposit with the understanding of the parties that Escrow Agent is not a party to this Agreement except to the extent of its specific responsibilities hereunder, and does not assume or have any liability for the performance or non-performance of Buyer or Sellers hereunder to either of them.

13.21.2 The Escrow Agent shall be protected in relying upon the accuracy, acting in reliance upon the contents, and assuming the genuineness of any notice, demand, certificate, signature, instrument or other document which is given to the Escrow Agent without verifying the truth or accuracy of any such notice, demand, certificate, signature, instrument or other document.

13.21.3   The Escrow Agent shall not be bound in any way by any other agreement or understanding between the parties hereto, whether or not the Escrow Agent has knowledge thereof or consents thereto unless such consent is given in writing.

13.21.4   The Escrow Agent's sole duties and responsibilities shall be to hold and disburse the Deposit in accordance with this Agreement. The Escrow Agent shall hold the Deposit in escrow in an interest bearing money market or bank account, but the Escrow Agent shall not be liable for any reasonable delay in investing, reinvesting or distributing the Deposit (including any interest earned thereon) or for any loss incurred by reason of any such investments. The Deposit (including any interest earned thereon) shall be paid by the Escrow Agent as follows: (a) upon Closing, to Seller at the Closing; (b) to Buyer, if, as and when this Agreement is terminated and Buyer is entitled thereby to a return of the Deposit in accordance with the provisions hereof; or (c) to Seller, in all other instances if, as and when this Agreement is terminated.

13.21.5   It is agreed that the duties of the Escrow Agent are only as herein specifically provided and are purely ministerial in nature, and the Escrow Agent shall not be liable for any action taken or omitted by the Escrow Agent in good faith and reasonably believed by the Escrow Agent to be authorized or within its rights or powers conferred upon it by this Agreement, except for damage caused by the gross negligence, bad faith or willful misconduct of the Escrow Agent. Subject to the immediately preceding sentence, Seller and Buyer hereby release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

13.21.6   Upon the disbursement of the Deposit in accordance with this Agreement, the Escrow Agent shall be relieved and released from any liability under this Agreement.

13.21.7   The Escrow Agent may resign at any time upon at least ten (10) days prior written notice to the parties hereto. If, prior to the effective date of such resignation, the parties hereto shall all have approved, in writing, a successor escrow agent, then upon the resignation of the Escrow Agent, the Escrow Agent shall deliver the Deposit to such successor escrow agent. From and after such resignation and the delivery of the Deposit to such successor escrow agent, the Escrow Agent shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement, all of which duties, responsibilities and obligations shall be performed by the appointed successor escrow agent. If for any reason the parties hereto shall not approve a successor escrow agent within such period, the Escrow Agent may bring any appropriate action or proceeding for leave to deposit the Deposit with a court of competent jurisdiction, pending the approval of a successor escrow agent, and upon such deposit the Escrow Agent shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement.

13.21.8   Seller and Buyer hereby agree to, jointly and severally, indemnify, defend and hold the Escrow Agent harmless from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against, the Escrow Agent (including reasonable attorneys' fees, expenses and court costs) by reason of the Escrow Agent's acting or failing to act in connection with any of the matters contemplated by this Agreement or in carrying out the terms of this Agreement, except as a result of the Escrow Agent's gross negligence, bad faith or willful

misconduct. Notwithstanding the foregoing and, without limiting the provisions hereof as such provisions pertain to the rights and protections afforded to the Escrow Agent and the obligations of Seller and Buyer to the Escrow Agent, as between Seller and Buyer, in the event of any dispute hereunder involving the funds held in escrow by the Escrow Agent pursuant to this Agreement, Seller and Purchaser agree that the prevailing party shall be entitled to be reimbursed for any contribution made by such party toward payment of costs and expenses incurred by the Escrow Agent.

13.21.9   If there is any dispute in connection with this Agreement, or as to the rights of any of the parties in and to, or the disposition of, the Deposit, including but not limited to disputes as to when the Escrow Agent is obligated to disburse the Deposit or as to whom the same is to be disbursed, the Escrow Agent shall not be obligated to disburse the Deposit but in such event may hold the same until receipt by Escrow Agent of an authorization in writing, signed by Sellers and Buyer, directing the disposition of same, or, in the absence of such authorization, the Escrow Agent may: (w) hold and retain all or any part of the Deposit until such dispute is settled or finally determined by litigation, arbitration or otherwise, or (x) deposit the Deposit in an appropriate court of law, following which the Escrow Agent shall thereby and thereafter be relieved and released from any liability or obligation under this Agreement, or (y) institute an action in interpleader or other similar action permitted by stakeholders in the State of New York, or (z) interplead any of the parties in any action or proceeding which may be brought to determine the rights of the parties to all or any part of the Deposit. The Escrow Agent is hereby expressly authorized to comply with and obey any and all orders, judgments, or decrees of any court relating hereto, and in case the Escrow Agent obeys or complies with any such order, judgment or decree of any court, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside or vacated, or found to have been entered without jurisdiction, unless prior to such compliance, the Escrow Agent shall have received notice of an appeal, having been timely filed, appealing such order, judgment or decree, and such appeal legally stays the Escrow Agent's compliance with such orders, judgments, or decrees.

13.21.10   The Escrow Agent shall not have any liability or obligation for loss of all or any portion of the Deposit by reason of the insolvency or failure of the institution of depository with whom the escrow account is maintained.

13.21.11   The Escrow Agent shall provide Seller and Buyer with written notice (by facsimile and overnight delivery) prior to any release of any funds held by it hereunder in escrow other than in connection with the consummation of the Closing or pursuant to written instructions executed by both Buyer and Seller.

13.21.12   This Agreement shall not create any right in any person or entity other than the parties hereto and their respective successors and permitted assigns, and no third party shall have the right to enforce or benefit from the terms hereof. Buyer hereby acknowledges and confirms that the Escrow Agent and any member of its firm shall be permitted to act as counsel for Seller in any dispute or question as to the disbursement of the Deposit, and any other matter relating to or unrelated to this Agreement and/or the transactions contemplated hereby.

13.22  **Press Releases.**  No party shall issue any press release or other public announcement regarding this Agreement or the transaction contemplated hereby without first obtaining each other party's written approval with respect to the release or announcement and the content thereof, which approval shall not be unreasonably withheld, delayed or conditioned.

13.23  **No Recording.**  Neither this Agreement or any memorandum or short form thereof may be recorded by Buyer.

13.24  **Limited Liability.**  The obligations of Seller are intended to be binding only on the Seller's interests in the Property subject to the limits of Section 7.1, and the obligations of Seller shall not be personally binding upon, nor shall any resort be had to, the private properties of Seller's trustees, officers, directors, or shareholders, the members, partners, officers, directors or shareholders thereof, or any employees or agents of Seller.

13.25  **Reporting Person.**  Buyer and Sellers hereby agree that the Title Company (or, if the Title Company will not do so, then Buyer's counsel) shall act as "the person responsible for closing" the transaction which is the subject of this Agreement pursuant to Section 6045(e) of the Code and shall prepare and file all informational returns, including IRS Form 1099-S, and shall otherwise comply with the provisions of Section 6045(e) of the Code.

## ARTICLE XIV

### Waiver of Trial by Jury

THE PARTIES HEREBY MUTUALLY AGREE THAT NO PARTY, NOR ANY ASSIGNEE, SUCCESSOR, HEIR OR LEGAL REPRESENTATIVE OF ANY OF THE PARTIES (ALL OF WHOM ARE HEREINAFTER REFERRED TO AS THE "PARTIES") SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT, OR ANY RELATED AGREEMENT OR INSTRUMENT BETWEEN ANY OF THE PARTIES. NONE OF THE PARTIES WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS ARTICLE HAVE BEEN FULLY NEGOTIATED BY THE PARTIES. THE WAIVER CONTAINED HEREIN IS IRREVOCABLE, CONSTITUTES A KNOWING AND VOLUNTARY WAIVER, AND SHALL BE SUBJECT TO NO EXCEPTIONS. SELLER HAS IN NO WAY AGREED WITH OR REPRESENTED TO BUYER OR ANY OTHER PARTY THAT THE PROVISIONS OF THIS ARTICLE WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

[Signature pages follow.]

Case 1:03-cv-00043     Document 13     Filed 01/30/2004     Page 165 of 249

**IN WITNESS WHEREOF,** the parties have caused this instrument to be executed as an instrument under seal as of the Date of this Agreement.

**SELLER:**

BTC 97 SP, LLC,
a Delaware limited liability company

By: _____
        Name:
        Title:


**BUYER:**

_____
_____


By: _____
        Name:
        Title:

Date: _____ __, 2003

## ESCROW AGENT:

Escrow Agent is signing only for the purpose of agreeing to serve as Escrow Agent hereunder pursuant to the provisions hereof.

McCULLY & BEGGS, P.C.

By: _____

    Name:

    Title:

Date: _____ __, 2003

**McCully & Beggs, P.C.**

| | |
|---|---|
| **From:** | Weiner, Andrew J. [AWeiner@mofo.com] |
| **Sent:** | Tuesday, November 25, 2003 9:15 AM |
| **To:** | rpklaw@ite.net; |
| **Subject:** | FW: Tumon |

<<Scanned_.pdf>>

Here is the information regarding the fence encroachment.

==================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
==================================================================

11/25/03

There are overhead electrical lines and underground sewer and water lines located along the adjacent roadways and on-site. These utilities are reportedly adequate to serve the existing and future potential development of the subject property. Telephone and cable television services are also available on-site.

The subject land is encumbered by various easements and an encroachment on the adjacent land as previously discussed. The Tumon Maui Well easement is the most significant encumbrance, but this area was utilized to provide necessary recreation space at the project. The easements and encroachment do not significantly affect existing or potential development of the subject land, except as noted. The land is not significantly affected by a flood zone or other natural and manmade development constraints.

Topography of the subject property is fairly level to gently sloping in a southerly direction. Reportedly, the overall site slopes slightly downward in a south southeast direction from an elevation of 203.5 feet to 183.5 feet. There are no significant views available to the property.

According to the Sketch Survey map (shown in a previous section) for abutting Lot 5089#1-4 which abuts Subject Lot 5098 to the east, the subject fence is encroaching approximately 20 feet into the abutting lot. For purposes of this report, we assumed that this encroachment exists along the entire eastern boundary of Subject Lot 5098 at a width averaging approximately 20± feet. Based on the FHA As-Built Topo Survey map of the subject property (shown on a previous page), if the subject fence was moved to the actual assumed property line, the subject improvements would still conform to the required 10-foot multi-family rear yard setback. Therefore, solving the encroachment problem may involve moving the fence to a location on the subject land. This would not likely detract from the income generating ability of the property or its market value. The total encroachment area is summarized in the table as shown below.

| | | | |
|---|---|---|---|
| Length of Eastern Boundary of Subject Lot 5098 | | 844.78 | ft. |
| Assumed Encroachment Width | x | 20 | ± ft. |
| Total Estimated Encroachment Area | | 16,896 | ft. |
| | Say, | 17,000 | ± sq. ft. |
| | or | 1,579 | ± sq. m. |

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 170 of 249



SURVEY MAP OF POTENTIAL SUBJECT ENCROACHMENT
Upper Tumon, Island of Guam

SCALE
1 inch = 100 feet

SYMBOLS/LEGEND

● #4 REBAR W/ PLASTIC CAP SET,
  MARKED RLS # 62
● PIPE W/ WASHER FOUND,
  MARKED RLS # 18
● PIPE WITH WASHER FOUND,
  MARKED RLS # 24
○ PIPE WITH NAIL FOUND,
  NO IDENTIFICATION

REFERENCE/S:

1. DWG. # 1-48, LM. # 756-FY72, AS PREPARED
   BY RLS # 14, DOC. # 224388.

SKETCH SURVEY
OF
LOT 5089#1-4
HARMON, MUNICIPALITY OF DEDEDO

LOT 5089#1-9

LOT 5089#1-5

LOT 5089#1-2

LOT 5089#1-10

LOT 5089#1-4

ENCROACHMENT AREA
= 6,300 ± SQ. FT.
  585 ± SQ. M.
REC. & COMP. AREA
= 93,047 ± SQ. FT.
  8,644 ± SQ. M.
NET AREA
= 86,743 ± SQ. FT.
  8,059 ± SQ. M.

LOT 5089#1-3

LOT 5089
TUMON
VILLAGE
APARTMENTS

SUBJECT

PREPARED BY:

PROJECT SURVEYOR/ATLAS, RLS # 62

1-11-94
DATE

PROJECT NO.: 94-008
BOOK NO.: 146
CLIENT: CHING LUXAMANA

# BTC 97 SP, LLC

November 25, 2003

Mr. Kyu Young Cho
Chairman
Joongang Construction Co., Ltd.
# 172-2, Yeomri-Dong, Mapo-Ku
Seoul, Korea

BY FACSIMILE

Dear Mr. Cho:

Thank you for interrupting your meeting last week to talk with my colleague Steven Cha. The information you gave him and the information we have developed on our own is very impressive. You had mentioned, in your letter of November 21, that you have prepared certain information regarding your identity and financial status. While you may have given it all to Steven over the phone, I would appreciate it if you would be kind enough to fax it to me (1-646-324-7934) as well.

In order to assist you in your application to the Korean Government and your bank, I am sending a copy of the Tumon Village appraisal to Mr. Steven Cha so that, once the Purchase and Sale Agreement has been signed, he can immediately deliver the appraisal to you. This should save two or three days in what is going to be a very tight schedule.

I look forward to working with you and Mr. Park in consummating our Tumon Village transaction.

Sincerely,

Bruce P. Morrison
Managing Director

cc:   Mr. Jae Seung Park
     Mr. Steven Cha

BTC 97 SP, LLC
C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 · NEW YORK, NY · 10020
PHONE: 646-324-3070 · FAX: 646-324-7934

## McCully & Beggs, P.C.

**From:** Weiner, Andrew J. [AWeiner@mofo.com]
**Sent:** Wednesday, November 26, 2003 11:36 PM
**To:** rpklaw@ite.net
**Cc:** McCully & Beggs, P.C.; Bruce P. Morrison
**Subject:** FW: Sale of Tumon Village

Attached are the changes proposed by McCully & Beggs for Guam law purposes and to convert the closing into an escrow closing.

-----Original Message-----
**From:** McCully & Beggs, P.C. [mailto:mblaw@kuentos.guam.net]
**Sent:** November 26, 2003 2:11 AM
**To:** Weiner, Andrew J.
**Cc:** bruce.p.morrison@db.com
**Subject:** Sale of Tumon Village

Dear Andrew:

Attached please find an Agreement of Sale which I have redlined to show my changes. If you want to alter any of my changes, then please let me know. Please also let me know if I should send a redlined copy of this draft to Robert Kutz.

Please let me know if you have any other questions, or if I can be further assistance. Please keep me informed of any developments in this transaction.

Sincerely,
Duncan G. McCully

==================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
==================================================================

11/28/03

# AGREEMENT OF SALE

### Between

### BTC 97 SP, LLC

### as Seller,

### and

_____

### as Buyer

ny-542244

# TABLE OF CONTENTS

**PAGE**

ARTICLE I Definitions .................................................................................................................. 1

ARTICLE II Agreement to Sell and Purchase and Purchase Price ................................................ 4

   2.1      Agreement to Sell and Purchase ....................................................................... 4
   2.2      Total Purchase Price and Payment of Total Purchase Price ......................... 4̶5

ARTICLE III Property Included in Purchase and Sale .................................................................... 5

ARTICLE IV Title and Survey ....................................................................................................... 5

   4.1      Permitted Title Exceptions ................................................................................ 5
   4.2      Evidence of Title ................................................................................................ 5̶6
   4.3      Survey ................................................................................................................ 7
   4.4      Violations ........................................................................................................... 7
   4.5      Real Estate Taxes .............................................................................................. 7
   4.6      Foreclosure of Mortgage ................................................................................... 7

ARTICLE V "As-Is" ....................................................................................................................... 8

   5.1      Seller Furnished Items ...................................................................................... 8
   5.2      Access to Records ............................................................................................. 8
   5.3      Access to Governmental Records ..................................................................... 8
   5.4      Access to Property ............................................................................................. 8
   5.5      Confidentiality .................................................................................................. 9
   5.6      As Is .................................................................................................................. 9

ARTICLE VI Closing; Conditions Precedent to Closing ............................................................ 10

   6.1      Time and Place ................................................................................................ 10
   6.2      Conditions Precedent to Buyer's Obligations ................................................ 10
   6.3      Seller's Closing Documentation and Requirements ....................................... 11
   6.4      Buyer's Closing Documents and Requirements ............................................. 12
   6.5      Form ................................................................................................................ 13̶1̶2̶
   6.6      Access to Records Post-Closing ..................................................................... 13

ARTICLE VII Representations and Warranties ............................................................................ 13

   7.1      Seller's Representations ................................................................................... 13
   7.2      Buyer's Representations .................................................................................. 15̶1̶4̶

ARTICLE VIII [Intentionally Deleted] ........................................................................................ 16̶1̶5̶

ARTICLE IX Adjustments and Prorations .................................................................................. 16̶1̶5̶

   9.1      Prorations ........................................................................................................ 16̶1̶5̶
   9.2      Rents and Other Amounts Under Leases ........................................................ 16̶1̶5̶
   9.3      Real Estate Taxes ............................................................................................ 17̶1̶6̶
   9.4      Assessments .................................................................................................... 17̶1̶6̶

| | | |
|---|---|---|
| 9.5 | Deposits; Insurance Premiums | 17~~17~~ |
| 9.6 | Errors | 17 |

ARTICLE X Risk of Loss; Eminent Domain ............................................................. 17

| | | |
|---|---|---|
| 10.1 | Casualty | 17 |
| 10.2 | Eminent Domain | 18~~17~~ |

ARTICLE XI Additional Agreements ....................................................................... 18

| | | |
|---|---|---|
| 11.1 | Operation of Property | 18 |
| 11.2 | Extension to Cure | 19~~19~~ |

ARTICLE XII Remedies ........................................................................................ 19

| | | |
|---|---|---|
| 12.1 | Seller's Remedies | 19 |
| 12.2 | Buyer's Remedies | 20~~19~~ |

ARTICLE XIII Miscellaneous ................................................................................ 20

| | | |
|---|---|---|
| 13.1 | Costs and Expenses | 20 |
| 13.2 | Attorneys' Fees | 20 |
| 13.3 | Assignment | 20 |
| 13.4 | Successors and Assigns | 21~~20~~ |
| 13.5 | Gender and Number | 21~~20~~ |
| 13.6 | Entire Agreement | 21~~21~~ |
| 13.7 | Counterparts | 21~~21~~ |
| 13.8 | Modifications | 21~~21~~ |
| 13.9 | Notices | 21 |
| 13.10 | Exhibits | 23~~22~~ |
| 13.11 | Governing Law | 23~~22~~ |
| 13.12 | Captions | 23~~22~~ |
| 13.13 | Severability | 23~~22~~ |
| 13.14 | No Joint Venture Partnership, Agency, Etc. | 23~~22~~ |
| 13.15 | No Third Party Beneficiaries | 23~~23~~ |
| 13.16 | No Waiver | 23~~23~~ |
| 13.17 | Execution | 23 |
| 13.18 | Time of the Essence | 23 |
| 13.19 | No Broker | 23 |
| 13.20 | Business Day | 24~~23~~ |
| 13.21 | Escrow and Escrow Agent | 24~~23~~ |
| 13.22 | Press Releases | 26~~26~~ |
| 13.23 | No Recording | 26~~26~~ |
| 13.24 | Limited Liability | 26~~26~~ |
| 13.25 | Reporting Person | 26~~27~~ |

ARTICLE XIV Waiver of Trial by Jury .................................................................. 27~~27~~

ny-542244

## EXHIBITS

| | | |
|---|---|---|
| "A" | — | Legal Description of Land |
| "B" | — | Permitted Title Exceptions" |
| "C" | — | Form of Deed |
| "D" | — | Form of Assignment of Intangible Personal Property |
| "E" | — | Form of Rent Roll |
| "F" | — | Form of Assignment and Assumption of Landlord's Interest in Leases |
| "G" | — | Form of Bill of Sale |
| "H" | — | Legal Description of Foreclosure Parcel |

ny-542244

# AGREEMENT OF SALE

THIS AGREEMENT OF SALE (this "**Agreement**") made as of the Date of this Agreement (defined below) by and among BTC 97 SP, LLC, a Delaware limited liability company ("**Seller**"), having an address at c/o Deutsche Bank Realty, 1251 Avenue of the Americas, 25th Floor - MS: NYC07-0901, New York, New York 10020, Attention: Bruce P. Morrison, and _____, a _____ limited liability company ("**Buyer**"), having an address at _____.

## W I T N E S S E T H:

WHEREAS, Seller, is the owner of certain land in Tamuning, Guam, more particularly described in Exhibit "A" attached hereto (such land, the "**Land**") and the buildings and other improvements thereon;

NOW, THEREFORE, in consideration of the mutual agreements, covenants, representations and warranties set forth herein, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

### Definitions

(a)     "**Agreement**" shall have the meaning set forth in the Introductory Paragraph hereto.

(b)     "**Appraisal**" shall mean the Self-Contained Appraisal Report, dated October 2003, by The Captain Company, containing an appraisal of the Property.

(c)     "**Assignment and Assumption of Landlord's Interests in Leases**" shall have the meaning set forth in Section 6.3.5 hereof.

(d)     "**Balance of the Total Purchase Price**" shall mean the Total Purchase Price less the Deposit.

(e)     "**BTC Mortgage Investors Trust**" shall have the meaning ascribed thereto in Section 4.6.

(f)     "**Buildings**" shall mean the buildings and other improvements on the Land.

(g)     "**Business Day**" shall have the meaning set forth in Section 13.20 hereof.

(h)     "**Buyer**" shall have the meaning set forth in the Introductory Paragraph hereto.

(i)     "**Buyer's Documents**" shall have the meaning set forth in Section 7.2.3 hereof.

ny-542244

(y)     **"Governmental Requirements"** shall mean all applicable laws, statutes, ordinances, orders, codes, rules and requirements of any federal, state, county or municipal governmental authority or quasi-governmental entity having jurisdiction over the Property, its use and occupancy or other matter in question.

(z)     **"Improvements"** shall mean collectively the Buildings and all other improvements to the Land.

(aa)     **"Intangible Personal Property"** shall mean all of the respective right, title and interest, if any, of Seller in all (i) transferable or assignable warranties and guaranties relating to the Improvements, (ii) Permits, vested rights, development rights, and all other transferable rights relating to the Land and/or the Improvements and the utilization thereof, (iii) all Contracts (to the extent assignable and not terminated prior to the Closing in accordance with the terms hereof), (iv) all trademarks, trade names, service marks and other intellectual property rights pertaining to the Land and/or the Improvements, (v) all Claims and (vi) other intangible property of Seller (excluding cash or cash equivalents, other than Collateral) pertaining to, located on or used in connection with the Land and/or the Improvements; in each case to the extent that Seller may legally transfer the same. The terms "Claims" and "Intangible Personal Property" shall exclude, and Seller is not transferring to Purchaser, rights of Seller to pursue, settle and retain insurance proceeds under existing or former insurance policies for casualties or other insurable events which occurred prior to the Date of this Agreement.

(bb)     **"Land"** shall mean the real property described in Exhibit "A" attached hereto.

(cc)     **"Leases"** shall mean all leases, licenses and other occupancy agreements of any kind or nature, whether written or oral, if any, in effect on the Closing Date relating to the Land or the Improvements, together with all guaranties, reserves, security deposits, letters of credit, other Collateral and rents relating thereto, prorated as hereinafter provided; provided, however, that "Leases" shall exclude any licenses, subleases or other rights of occupancy granted by any tenant or other occupant in the Improvements.

(dd)     **"Loss Incident"** shall have the meaning set forth in Section 7.1 hereto.

(ee)     **"Manager"** shall mean ITI Power Savers, Seller's management agent for the Property.

(ff)     **"Notice"** shall have the meaning set forth in Section 13.9 hereof.

(gg)     **"Permits"** shall mean all permits, licenses, and other authorizations of every nature whatsoever required by, or issued under, applicable Governmental Requirements benefiting, relating to or affecting all or any portion of the Land, any of the Improvements or any of the Personal Property.

(hh)     **"Permitted Title Exceptions"** shall mean (i) those exceptions to title set forth on Exhibit "B" attached hereto and (ii) any other matters caused, created or consented to by Buyer prior to the Closing Date.

Case 1:03-cv-00043     Document 13     Filed 01/30/2004     Page 181 of 249

(ii)    **"Personal Property"** shall mean those certain tangible items of personal property and fixtures owned by Seller and used in the operation or maintenance of any of the Land and/or the Improvements.

(jj)    **"Post-Contract Commitment"** shall have the meaning set forth in Section 4.2.1.

(kk)    **"Property"** shall mean the Land, Buildings and all rights, title and interest of Seller in any other Improvements, the Leases, the Personal Property, and the Intangible Personal Property, and the Rights.

(ll)    **"Registry"** shall mean the Department of Land Management, Government of Guam.

(mm)    **"Rent Roll"** shall have the meaning set forth in Section 6.3.5 hereof.

(nn)    **"Seller"** shall have the meaning set forth in the Introductory Paragraph hereto.

(oo)    **"Seller's Documents"** shall have the meaning set forth in Section 7.1.1 hereof.

(pp)    **"Surveyor"** means _____.

(qq)    **"Title Company"** shall mean First American Title Insurance Company or any other nationally recognized title insurance company engaged by Buyer to issue the Title Policy.

(rr)    **"Title Nominee"** shall have the meaning set forth in Section 13.3.

(ss)    **"Title Policy"** shall mean the title insurance policy to be issued by the Title Company to Buyer in accordance with Article IV hereof.

(tt)    **"Total Purchase Price"** shall have the meaning set forth in Section 2.2 hereof.

(uu)    **"Violations"** shall have the meaning set forth in Section 4.4.

## ARTICLE II

### Agreement to Sell and Purchase and Purchase Price

2.1    **Agreement to Sell and Purchase.**  Seller agrees to sell, assign and convey all of its respective rights, title and interest in the Property to Buyer, and Buyer agrees to purchase and accept all of such rights, title and interest in the Property from Seller, for the Total Purchase Price, upon the terms and conditions set forth herein.

2.2    **Total Purchase Price and Payment of Total Purchase Price.**  The total purchase price for the Property to be acquired hereunder (the **"Total Purchase Price"**) shall be Three Million Six Hundred Fifty Thousand and 00/100 U.S. Dollars ($3,650,000.00), payable to Seller as follows:

2.2.1  Buyer shall deposit with Escrow Agent the sum of Three Hundred Sixty-Fifty Thousand and 00/100 (U.S. $365,000) (the "**Deposit**") by wire transfer of immediately available U.S. Federal Funds upon the execution of this Agreement by Buyer.

2.2.2  The Deposit shall be held in escrow pursuant to the terms hereof by the Escrow Agent and shall be invested by Escrow Agent as provided in Section 13.21. The Deposit escrow account or accounts shall be opened utilizing Buyer's federal identification number, which is [_____]. A form W-9 for Buyer is being delivered by Buyer contemporaneously herewith. At the consummation of the Closing, the Deposit shall be applied against the Total Purchase Price. If the transaction contemplated hereby is not consummated on the Closing Date, the Deposit shall be disposed of in the manner provided herein.

2.2.3  At~~Before~~ the time of Closing, Buyer shall pay to Escrow Agent (by wire transfer of immediately available U.S. Federal Funds) ~~to an account or accounts designated by Seller,~~ a sum equal to THREE MILLION TWO HUNDRED EIGHTY-FIVE THOUSAND AND NO/100 U.S. DOLLARS ($3,285,000.00), on account of the Total Purchase Price. To the extent that there are any adjustments to the Total Purchase Price required hereunder, such adjustments shall be reflected on the Closing Statement and shall be effected by a credit against or an increase in the sums due under this Section 2.2.3.

2.2.4  Buyer and Seller acknowledge that no portion of the Total Purchase Price has been allocated to Personal Property.

## ARTICLE III

### Property Included in Purchase and Sale

The Property to be conveyed hereunder includes all right, title and interest of Seller, if any, in and to all easements and rights of ingress and egress, rights of way, privileges, licenses, appurtenances and other rights and benefits belonging to, running with the owner of, or in any way related to the Land and/or the Improvements, all of which shall be transferred from Seller to Buyer, subject to the terms and conditions of this Agreement, at the Closing.

## ARTICLE IV

### Title and Survey

4.1  **Permitted Title Exceptions.** In addition to any other condition precedent in favor of Buyer as may be expressly set forth elsewhere in this Agreement, it is a condition precedent to Buyer's obligation hereunder that Seller shall convey to Buyer good and insurable fee simple title to the Land and the Buildings, subject only to the Permitted Title Exceptions.

4.2  **Evidence of Title.** Provided that Buyer shall have performed all acts necessary and exclusively within Buyer's control or responsibility hereunder for the Title Company's issuance of the Title Policy, including the payment of all premiums as agreed upon herein, Buyer's obligation to

close shall be conditioned upon the Title Company issuing at Closing, within the time provided at the end of this Section 4.2, an ALTA Form (10-17-92) owner's policy of title insurance or an irrevocable binder therefor, insuring Buyer as the owner of the Land and the Improvements, in each case free and clear of all liens, encumbrances and other exceptions to title (other than the Permitted Title Exceptions) (the "**Title Policy**").

  4.2.1 Buyer hereby acknowledges its receipt of (a) a title report issued by Pacific American Title Insurance and Escrow Company, under its title number _____, dated _____ (the "**Existing Title Report**"), and (b) legible copies of all instruments of record referred to in the Existing Title Report. All matters listed on <u>Exhibit "B"</u> shall be deemed to be Permitted Title Exceptions. If, after the date hereof, Buyer shall obtain a revised title report (a "**Post-Contract Commitment**") showing additional matters affecting title which were not disclosed by the Existing Title Insurance Report or <u>Exhibit "B"</u>, then Buyer shall promptly notify Seller of the same and as to whether Buyer deems such additional matters to be Permitted Title Exceptions. **[Exhibit "B" to include reference to encroachment of fence at a width of approximately 20 feet onto Lot 5089#1-4 and to any right of redemption which may exist in the Foreclosure Parcel.]** If Buyer does not consider such additional matters to be Permitted Title Exceptions, then Seller shall have until Closing to cure such additional matters by reasonable commercial efforts and delete such defects from the Post-Contract Commitment. If any of the Post-Contract Commitments show, and Buyer so objects to, defects of title (other than Permitted Title Exceptions), and if such defects cannot be removed with the payment of sums which, in the aggregate, do not exceed $25,000, then Seller shall notify Buyer within fifteen (15) Business Days after Seller's receipt of Buyer's notice whether or not Seller shall remove the same at or before Closing. Any items not so objected to by Buyer shall be deemed Permitted Title Exceptions hereunder. ~~Notwithstanding the foregoing, Seller shall cause to be satisfied at Closing the Existing Secured Loans.~~ In lieu of eliminating any defects of title objected to by Buyer, Seller may elect to deposit with the Title Company such amount of money or take such other action as may be determined by the Title Company as being sufficient to induce the Title Company, without the payment of any additional premium by Buyer, to omit such defects from Buyer's Title Policy as to insure Buyer against collection of the same.

  4.2.2 If any Post-Contract Commitment shows additional defects or matters of title which are so objected to by Buyer, Seller may provide the Title Company at or prior to the time of Closing with sufficient funds to remove such matters or defects, and the Title Company shall delete such defects from the Post-Contract Commitment by endorsement delivered to Buyer. Notwithstanding the foregoing, while a mechanics' or other lien created by a tenant of any portion of the Property unaffiliated with Seller (a "**Tenant Lien**") shall not be a Permitted Title Exception, Seller shall have no obligation to remove the same by bonding or otherwise at Closing, unless Seller otherwise agrees. Any unpaid taxes, charges and assessments, together with interest and penalties thereon to a date not more than five (5) Business Days following the Closing Date (in each case subject to any applicable apportionment), and any encumbrances or liens of a definite or ascertainable amount which Seller may elect to pay at or prior to Closing, together with the cost of recording or filing any instruments necessary to discharge the same, may be paid out of the Balance of the Closing Date Purchase Price.

  4.2.3 If the additional defects disclosed by the Post-Contract Commitment and objected to by Buyer cannot be removed by any of the foregoing means, and if Seller shall not have

an obligation to, and does not elect to, remove the same, Buyer shall within five (5) Business Days after the receipt by Buyer of Notice from Seller that such defects cannot and will not be removed by Seller, by Notice to Seller, at Buyer's option either to (i) terminate this Agreement and obtain the return of the Deposit or (ii) waive such defects, which shall become Permitted Title Exceptions hereunder, and accept title subject to them; if Buyer fails to give Seller timely Notice of its election of (i) or (ii), Buyer shall be deemed to have elected (ii). At Closing, Buyer shall pay all premiums and costs necessary to cause the Title Company to issue to Buyer a final Title Policy in accordance with the provisions of this Section 4.2.

4.3 **Survey.** Buyer hereby acknowledges its receipt of and approval of all matters shown on the Survey of the Land and the Improvements prepared by the Surveyor and having an effective date of _____ (the "**Existing Survey**").

4.4 **Violations.** Buyer agrees to purchase the Property subject to any and all notices of violations of any Governmental Requirements whatsoever issued by any federal, state, municipal or other governmental department, agency or bureau or any other governmental authority having jurisdiction over the Property (collectively, "**Violations**"), or any lien imposed in connection with any of the foregoing, or any condition or state of repair or disrepair or other matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Property (or any portion thereof). Seller shall have no duty to remove or comply with or repair any condition, matter or thing, whether or not noted, which, if noted, would result in a violation being placed on the Property (or any portion thereof). Seller shall have no duty to remove or comply with or repair any of the aforementioned Violations or other conditions, and Buyer shall accept the Property subject to all such Violations and liens, the existence of any conditions at the Property which would give rise to such Violations or liens, if any, and any governmental claims arising from the existence of such Violations and liens, in each case without any abatement of or credit against the Total Purchase Price.

4.5 **Real Estate Taxes.** The parties acknowledge that Seller is disputing the payment of certain real estate taxes for the Land and the Improvements, and that such dispute is not expected to be resolved as of the Closing. If the dispute is not resolved as of the Closing, Seller shall escrow at Closing with Escrow Agent the amount in dispute, such amounts to be released from escrow to be paid to the applicable taxing authority to the extent that it is finally determined that such taxes are owed thereto, and the remainder to be paid to Seller.

4.6 **Foreclosure of Mortgage.** The parties acknowledge and agree that a portion of the Land more particularly described hereto as Exhibit "H" (the "Foreclosure Parcel") is not yet owned by Seller, but is in the process of being acquired pursuant to a Notice of Sale Under Mortgage, dated November 13, 2003, filed for record as Instrument No. 684079 in the ~~Register's Office~~Department of Land Management of the Government of Guam. If title to the Foreclosure Parcel has not been acquired by Seller as of the Closing Date, then, subject to satisfaction of the conditions precedent to Buyer's obligation to close title to the portion of the Property excluding the Foreclosure Parcel, Buyer shall purchase the remainder of the Property for the Total Purchase Price, but, in lieu of conveyance of the Foreclosure Parcel to Buyer, and in lieu of any obligation of Seller to own the Foreclosure Parcel free and clear of liens and encumbrances other than Permitted Title Exceptions, or of any condition relating to obtaining a Title Policy covering the Foreclosure Parcel, Seller shall transfer or cause to be transferred to Buyer all of the rights of Seller or of BTC Mortgage Investors

Trust 1997 S-1, Secured Notes, Series 1997-S1 ("**BTC Mortgage Investors Trust**", under the proceeding described in said Notice of Sale under Mortgage to acquire the Foreclosure Parcel, and otherwise in and to the Foreclosure Parcel.

4.7 **Appraisal.**   Seller shall provide a copy of the Appraisal to _____ within two (2) Business Days after the Date of this Agreement, subject to the Confidentiality Agreement.

## ARTICLE V

### "As-Is"

5.1 **Seller Furnished Items.**  Seller has provided or will provide to Buyer, at Seller's option, either at the office in the Improvements of Manager, true and correct copies of:  (a) the Leases in effect as of the Date of this Agreement; (b) the most recent real estate tax bills for the Property for the last two (2) years; and (c) the Contracts in effect as of the Date of this Agreement.

5.2 **Access to Records.**  From time to time, until the earlier of the termination of this Agreement and the Closing, Seller shall provide Buyer and its agents with reasonable access to its records regarding the Property kept by Manager at the Improvements.  Such records which may be so examined by Buyer shall specifically include any correspondence contained in such records to or from (i) any governmental authorities having jurisdiction over the Property and/or (ii) tenants of the Property; but, shall specifically exclude any records dealing with appraisals or valuations, interoffice correspondence, records of any mortgage lender, and proprietary information (other than the matters referred to in the foregoing clauses (i) and (ii)).

5.3 **Access to Governmental Records.**  Subject to compliance with Section 5.4 and Section 5.5, Buyer shall be permitted to investigate and examine any and all governmental records and to conduct interviews with any and all relevant governmental and regulatory authorities with respect to the use and ownership of the Property.

5.4 **Access to Property.**  Until the earlier of the termination of this Agreement and the Closing, Seller shall provide Buyer and its agents, employees and contractors with reasonable access to the Property, upon reasonable prior oral or written notice and arrangement with Seller, for investigation purposes.  Prior to its (or any of its agents', employees' or contractors') initial entry upon the Property, Buyer shall provide Seller with proof (e.g., an insurance certificate) reasonably satisfactory to Seller that any person or entity performing any work on the Property carries at least $2,000,000 of liability insurance, naming each of Seller and Manager as an additional insured, to protect the Property and all persons from loss or damage arising from accident or malfeasance involving or caused by such person or entity.  In connection with such access to the Property, Buyer shall, in good faith, attempt to minimize, to the greatest extent possible, any unreasonable interference with Seller's business and the business of Seller's tenants.  Buyer hereby indemnifies and holds Seller harmless from any loss, cost or expense incurred including, but not limited to, reasonable attorneys' fees and costs incurred by Seller as a result of any such investigation, including costs necessary to remove any mechanic's or similar liens by any contractor or materialman engaged by Buyer and asserted as a result of any such investigation; provided, however, that (a) such

Case 1:03-cv-00043     Document 13     Filed 01/30/2004     Page 186 of 249

indemnification shall not cover any loss, cost or expense occasioned by Seller's negligence or malfeasance and (b) any claim made by Seller against Buyer under such indemnification shall not include claims or expenses to the extent that they are attributable to any pre-existing condition (except to the extent adversely affected as a result of such investigation). The provisions of this Section shall survive the Closing or the termination of this Agreement.

5.5 **Confidentiality.** All materials furnished to Buyer and/or its agents or accessed by Buyer and its agents shall be treated by Buyer and its agents in the manner specified in the Confidentiality Agreement, the terms and provisions of which are hereby incorporated herein by reference as though set forth herein in full. Seller shall have reasonable prior notice of, and the right to require Buyer to include a representative of Seller in, any meetings or other contacts with third parties (including representatives of governmental agencies) at which confidential information will be disclosed, or to review and approve in advance any communications with third parties which will disclose confidential information. Buyer shall not contact tenants of the Property or employees of Manager without Seller's prior consent.

5.6 **"As Is."** Accordingly, except as it may otherwise be expressly provided in this Agreement, and except for any express representations or warranties which may be contained herein, Seller assumes no obligation to remedy any problem or condition which Buyer may discover during its investigation of the Property as the Property is being purchased "as is", "where is" and with all faults. Buyer specifically acknowledges and agrees that EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN ANY OF THE SELLER'S DOCUMENTS, SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS", "WHERE IS" AND WITH ALL FAULTS BASIS AND THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN ANY OF THE SELLER'S DOCUMENTS, SELLER IS NOT MAKING, AND BUYER IS NOT RELYING ON, ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, PROVIDED TO BUYER, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE PROPERTY, including, without limitation: (i) the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances, (ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Property, (iv) the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value or adequacy of the Property for any particular purpose, (v) the zoning or other legal status of the Property or any other public or private restrictions on use of the Property, and any Violations or any condition, matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Property (or any portion thereof), (vi) the compliance of the Property or its operation with any Governmental Requirements or any covenants, conditions and restrictions applicable to the Property, (vii) the presence of asbestos-containing materials, or other hazardous or toxic materials on, under or about the Property or the adjoining or neighboring property, (viii) the quality of any labor and materials used in any of the Improvements, (ix) the condition of title to the Property, (x) the economics of the operation of the Property; and (xi) any defaults or events of default under any of the Leases. Without limiting the above, except with respect to liability of Seller for a breach by Seller of any of its representations and warranties

contained in this Agreement or in any of the Seller's Documents, Buyer on behalf of itself and its successors and assigns waives its right to recover from, and forever releases and discharges, Seller, DBTCA, BTC Mortgage Investors Trust, each of Seller's, BTC Mortgage Investors Trust's and DBTCA's affiliates, Seller's, BTC Mortgage Investors Trust's and DBTCA's investment manager, the partners, members, trustees, shareholders, directors, officers, employees and agents of each of them, and their respective heirs, successors, personal representatives and assigns, from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses whatsoever (including, without limitation, attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise from and after the Closing on account of or in any way be connected with the physical condition of the Property or any Governmental Requirement. Buyer's release as set froth above extends to and includes any and all claims, liabilities, injuries, damages and causes of action that the Buyer does not presently anticipate, know, or suspect to exist, but that may develop, accrue, or be discovered in the future. THE BUYER EXPRESSLY WAIVES ALL RIGHTS UNDER 18 G.C.A. §82602, WHICH PROVIDES AS FOLLOWS:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The provisions of this Section 5.6 shall in no event limit, detract from, abrogate or otherwise modify any representations or warranties made by Seller herein or in any of the Seller's Documents.

## ARTICLE VI

### Closing; Conditions Precedent to Closing

6.1 **Time and Place.** The closing of the purchase and sale contemplated by this Agreement (the "**Closing**") shall take place at ~~10:00 A.M., New York, New York~~ ___.m. Chamorro standard time, on December __, 2003 (the "Closing Date"). The Closing shall take place in the offices of ~~Sellers' counsel McCully & Beggs, P.C.~~ the Escrow Agent, Route 8, 715 Chalan Machaute Suite 101, Maite, Guam 96927 ~~in Guam~~. At the Closing, the parties contemplate that (a) Seller shall deliver to Buyer good, clear record and insurable fee simple title to the Land and the Improvements, subject only to the Permitted Title Exceptions, the Leases and other matters permitted hereunder; (b) the deeds, assignments and other recording items provided for herein shall promptly be recorded; and (c) the Total Purchase Price, net of prorations and adjustments credited or debited to Buyer as provided for herein, shall be paid by Escrow Agent to or at the direction of Seller by wire transfer of immediately available U.S. Federal Funds.

6.2 **Conditions Precedent to Buyer's Obligations.** In addition to any other condition precedent expressly set forth herein, Buyer's obligations under this Agreement to close title to the Property and to satisfy its other obligations to be performed on the Closing Date are subject to the following conditions precedent, any or all of which Buyer may waive in writing:

6.2.1  The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the date when made and as of the Closing, except as herein provided, and Seller shall have performed, in all material respects, all of its affirmative covenants set forth in this Agreement.

6.2.2  Seller shall not be in breach or default, in any material respect, of any of its material covenants or obligations under this Agreement.

6.2.3  It is expressly acknowledged by Buyer that the Closing of the transactions contemplated by this Agreement is not subject to any financing contingency and that no financing for this transaction shall be provided by Seller or any of its affiliates.

6.2.4  On the Closing Date, the Property shall be in substantially the same condition as it is at the end of the Investigation Period, reasonable wear and tear and the provisions of Article X excepted.

6.2.5  Seller shall have delivered all of the items set forth in Section 6.3.

6.3  **Seller's Closing Documentation and Requirements.**  At the Closing, Seller shall, at its expense, deliver the following to Buyer:

6.3.1  one (1) or more deed(s) in substantially the form of Exhibit "I" attached hereto conveying any right, title and interest of Seller in and to the Land and the Improvements to Buyer, subject only to the Permitted Title Exceptions, duly executed and acknowledged and in recordable form;

6.3.2  a certificate of Seller dated as of the Closing Date certifying that the representations and warranties of Seller made in this Agreement were true and complete in all material respects and, if applicable, stating whether and in what respects any of such representations and warranties is not true and complete in all material respects as of the Date of this Agreement and unless stated otherwise are deemed restated as of the Closing Date, except as herein provided;

6.3.3  an assignment in substantially the form of Exhibit "L" attached hereto of all Intangible Personal Property, if any, and the originals, if in the possession or control of Seller, of (a) permanent certificate(s) of occupancy for the Improvements and the tenant spaces and (b) all other Permits;

6.3.4  a rent roll for the Land and the Improvements (the "**Rent Roll**"), certified to Buyer as of the Closing Date by Seller and in substantially the format as that attached hereto as Exhibit "G";

6.3.5  an assignment and assumption agreement in substantially the form of Exhibit "M" attached hereto with respect to the landlord's interest under the Leases (which shall include transfer of the rights to any security deposits, prepaid rentals or letters of credit constituting security of tenants), and with respect to Seller's interest in any Contracts required or permitted to survive the Closing (the "**Assignment and Assumption of Landlord's Interests in Leases**");

6.3.6   a closing statement setting forth the appropriate adjustments and prorations to be made at the Closing as provided in this Agreement (the "**Closing Statement**");

6.3.7   a Certificate of Non-Foreign Status certifying, pursuant to Internal Revenue Code Section 1445, that Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

6.3.8   a certified copy of Seller's resolution authorizing the sale of the Property;

6.3.9   one or more bills of sale in substantially the form of Exhibit "N" attached hereto conveying to Buyer title to all items of Personal Property included in the Property;

6.3.10   if requested by Buyer, a letter to tenants under the Leases notifying them of the sale in a form approved by Seller and Buyer, such approval to be reasonably given;

6.3.11   original copies of all Leases or, to the extent original copies are not available, certified copies of all Leases;

6.3.12   all keys and passcards for the Property, with identification of the lock or locks to which each item relates;

6.3.13   such evidence or documents as may be reasonably required by the Title Company (a) in order to delete pre-printed exceptions relating to: (i) mechanics' or materialmen's liens; (ii) parties in possession (except as herein provided to the contrary and except for Permitted Title Exemptions) and (iii) the status and capacity of Seller and the authority of the Person or Persons who are executing the various documents on behalf of Seller in connection with the Sale of the Property and/or the legal existence of Seller and (b) to provide so-called gap coverage from the latest effective date of the Title Commitments; and

6.3.14   such other documents, consistent with this Agreement, as are reasonably required by Seller, Buyer or the Title Company to consummate the transaction contemplated hereunder.

6.4   **Buyer's Closing Documents and Requirements.**   At or pPrior to the Closing, (a) Buyer shall pay by wire transfer of immediately available U.S. Federal Funds the Balance of the Total Purchase Price (plus or minus prorations and adjustments as reflected on the Closing Statement) to Seller by one or more wire transfers of immediately available U.S. Federal Funds to an account or accounts designated by Seller andEscrow Agent (b) Buyer shall execute and deliver to Seller the following:

6.4.1   the Closing Statement;

6.4.2   the Assignment and Assumption of Landlord's Interests in Leases for all of the Leases and, to the extent applicable, Contracts;

6.4.3 from Buyer, a certificate of Buyer dated as of the Closing Date certifying that the representations and warranties of Buyer made in this Agreement were true and complete in all material respects and, if applicable, stating whether and in what respects any of such representations and warranties is not true and complete in all material respects, as of the Date of this Agreement and unless stated otherwise are deemed restated as of the Closing Date, except as herein provided;

6.4.4 a certified copy of Buyer's resolution (or other appropriate consents) authorizing the purchase of the Property and the execution, delivery and performance by Buyer of this Agreement;

6.4.5 affidavits, certificates and other information or documents reasonably required by the Title Company to effect the issuance of the Title Policy, subject to no exceptions other than Permitted Title Exceptions; and

6.4.6 such other documents, consistent with this Agreement, as are reasonably required by Seller or the Title Company to consummate the transaction contemplated hereunder.

6.5 **Form.** All documents and instruments required hereby shall be in either the form attached hereto (if a form is so attached) or in form and substance reasonably satisfactory to Seller and Buyer (if a form is not so attached). Drafts of closing documents to be prepared by Seller or Buyer that are not attached hereto shall be furnished to the other party reasonably in advance of Closing so that such other party may comment upon them.

6.6 **Access to Records Post-Closing.** After the Closing, Seller shall provide Buyer, and Buyer shall provide Seller, reasonable access at reasonable times on reasonable prior notice to books and records in their respective possession regarding the Property, excluding information covered by the attorney-client privilege and information of the kind described in the second sentence of Section 5.4.

## ARTICLE VII

### Representations and Warranties

7.1 **Seller's Representations.** Without limiting the representations, covenants and warranties of Seller contained elsewhere in this Agreement, as a material inducement for Buyer to enter into this Agreement and to consummate the Closing hereunder, Seller makes the following representations and warranties to Buyer, which representations and warranties shall be true and correct in all material respects on the Date of this Agreement and on the Closing Date, except as hereinafter specifically provided, as though such representations and warranties were made at and as of the Closing Date. The phrase "to Seller's knowledge" (or words of like import) shall mean, with respect to Seller, to the actual knowledge of Bruce P. Morrison (the "**Designated Individual**"), and not any implied, imputed or constructive knowledge, without any independent investigation having been made or any implied duty to investigate. Without limiting the generality of the foregoing, Buyer specifically acknowledges that certain of Seller's records relating to the Property may be located at 130 Liberty Street, New York, New York, that such records are, and for the foreseeable

13

future will be, inaccessible as a result of events occurring in the vicinity of such location on September 11, 2001 and that information within the knowledge of Seller shall specifically exclude information that is embodied or included only in materials located at 130 Liberty Street, New York, New York. Buyer acknowledges that the Designated Individual named above is named herein solely for the purpose of defining and narrowing the scope of Seller's knowledge and not for the purpose of imposing any liability upon or creating any duties running from such Designated Individual or his employer (other than Seller, and then only to the extent expressly set forth herein) to Buyer. Buyer covenants that it will bring no action of any kind against such Designated Individual or his employer (except for Seller) related to or arising out of this Agreement. Seller's representations or warranties shall survive the Closing for a period of one hundred and eighty (180) days, at which time they shall expire. Buyer must give Seller Notice of any claim it may have against any Seller for a breach of Seller's representations or warranties contained in this Agreement or any of the Seller's Documents, or for breach of any covenants of any Seller contained in this Agreement or any of the Seller's Documents, within one hundred and eighty (180) days after the Closing Date and any action, suit or proceeding with respect to any breach of any of Seller's representations or warranties contained in this Agreement or the Seller's Documents, or for breach of any covenants of Seller contained in this Agreement or any of the Seller's Documents, shall be commenced, if at all, within two hundred ten (210) days after the Closing Date. Any claim which Buyer may have at any time under this Agreement or any of the Seller's Documents, whether known or unknown, which is not asserted by Notice from Buyer to Seller within such one hundred and eighty (180) day period or with respect to which an action, suit or proceeding is not commenced within such two hundred and ten (210) day period shall not be valid or effective, and Seller shall have no liability with respect thereto. Without limiting the foregoing, Buyer may not bring any action against Seller for a breach of any such representation or warranty unless and until the aggregate amount of all liability and losses arising out of any such untruth or inaccuracy, or any such breach, exceeds $25,000.00 (a "**Loss Incident**"). In addition, in no event will Seller's liability for all such breaches exceed, in the aggregate, $500,000.00. Buyer specifically waives, relinquishes and releases any right of rescission it may have against Seller after the Closing by virtue of any breach by Seller of any representation, warranty or covenant hereunder or under any of the Seller's Documents. Notwithstanding anything to the contrary contained herein, Buyer acknowledges that Buyer shall not be entitled to bring any action after the Closing Date based on any representation made by Seller in this Agreement to the extent that, prior to Closing, Buyer shall have obtained actual knowledge of any information that was contradictory to such representation or warranty, except as expressly provided in the last sentence of this paragraph. In furtherance thereof, Buyer expressly agrees that Seller shall have no liability with respect to any of such representations and warranties to the extent that, prior to the Closing, Buyer obtains actual knowledge (from whatever source, including, without limitation, any property manager, any materials furnished to Buyer, the estoppel certificates, Buyer's due diligence tests, investigations and inspections of the Property, or written disclosure by Seller, or any of Seller's agents, affiliates and employees) that renders any of such representations and warranties untrue or incorrect, and Buyer nevertheless consummates the transaction contemplated by this Agreement unless, prior to Closing, Buyer advises Seller in reasonable detail of the existence and nature of such knowledge and Seller reaffirms in writing its original representations and warranties notwithstanding such information.

7.1.1 Due Authority; Enforceability. (a) Seller, and the person on behalf of Seller executing this Agreement each has full power and authority to execute and deliver this Agreement and all documents now or hereafter to be executed and delivered by Seller pursuant to this Agreement ("**Seller's Documents**") to which Seller is a party, and Seller has full power and authority to perform all of its respective obligations arising under this Agreement and under the Seller's Documents to which Seller is a party, (b) this Agreement and the Seller's Documents to which Seller is a party will each constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, covenants and conditions, except as such enforceability may be limited by bankruptcy, moratorium or insolvency or other laws affecting creditors' rights generally and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (c) Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Internal Revenue Code.

7.1.2 Formation; Existence; Qualification To Do Business. Seller is a limited liability company duly organized and validly existing under the laws of the State of Delaware and is authorized to do business in Guam.

7.2 **Buyer's Representations**. Without limiting the representations, covenants and warranties of Buyer contained elsewhere in this Agreement, and as a material inducement for Seller to enter into this Agreement and to consummate the Closing hereunder, Buyer makes the following representations and warranties which shall be true and correct in all material respects on the date hereof and on the Closing Date. Buyer's warranties shall survive the Closing for a period of one hundred eighty (180) days, at which time they shall expire.

7.2.1 Formation; Existence. Buyer is a _____ duly created and validly existing under the laws of _____ and is authorized to conduct business in Guam.

7.2.2 Enforceability. This Agreement and Buyer's Documents each will constitute the legal, valid and binding obligations of Buyer, enforceable in accordance with their respective terms, covenants and conditions, except as such enforceability may be limited by bankruptcy, moratorium or insolvency or other laws affecting creditors' rights generally and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.2.3 Due Authority. Buyer and the officer of Buyer executing this Agreement each has full power and authority to execute and deliver this Agreement and all documents now or hereafter to be executed and delivered by Buyer pursuant to this Agreement ("**Buyer's Documents**") and Buyer has full power and authority to perform all obligations arising under this Agreement and under Buyer's Documents.

# ARTICLE VIII

## [Intentionally Deleted]

# ARTICLE IX

## Adjustments and Prorations

9.1 **Prorations.** The following shall be prorated between the parties as of 11:59 P.M. of the day before the Closing Date (except as otherwise provided herein): real estate taxes; base and additional rents under the Leases; electricity, water, sewer and other utility charges; fuel oil; fees and other amounts payable under any Intangible Personal Property; and such other items of income and expense as are customarily prorated in transactions of this nature. Notwithstanding the foregoing, in the event that the Balance of the Total Purchase Price is not received by Seller on or before 2:00 P.M., Guam time, on the Closing Date, then the Closing shall for purposes of this Section shall be deemed to have occurred on the next Business Day and all prorations shall be recomputed accordingly. The fees and costs of the Escrow Agent shall be paid equally by the parties.

9.2 **Rents and Other Amounts Under Leases.** (a) All collected rents with respect to the then current rental period for the month in which the Closing Date occurs shall be prorated between Seller and Buyer as of the Closing Date. All reserves and security deposits (including with regard to each of the foregoing, unpaid interest thereon), if any, held by Seller under any of the Leases shall be paid to Buyer or credited against the Total Purchase Price. Uncollected rents due under Leases shall be adjusted on an if, as and when collected basis. If, on the Closing Date, any tenant under a Lease is in arrears in the payment of such rent, then any amounts received by Seller or Buyer from any such tenant after the Closing (net of reasonable costs of collection) shall be applied in the following order or priority: (i) first to be apportioned between Seller and Buyer for the month in which the Closing occurred, (ii) then to Seller for any period prior to the month in which the Closing occurred, and (iii) then to Buyer for any period after the month in which the Closing occurred. If any rents received by Seller or Buyer after the Closing are payable to the other party by reason of the foregoing, then the same (net of reasonable out-of-pocket costs of collection) shall be promptly paid to the other party. Buyer shall use commercially reasonable efforts after the Closing Date to collect any such rents and shall not waive or settle any claim against any tenant for such rents without Seller's prior written consent. Seller shall have the right, from time to time, on Notice to Buyer, to review Buyer's books and records with respect to the collection of rents under the Leases in order to determine whether any amounts are due to Seller hereunder. Seller shall have no right to sue or commence legal proceedings against any tenant or occupant of the Property for delinquent rent or other amount owing for a period prior to Closing.

(b) All items to be apportioned between Seller and Buyer that are not subject to an exact determination as of the Closing Date shall be reasonably estimated by the parties; when any such item is, after the Closing, capable of an exact determination, the party having the information permitting the exact determination shall send the other party a detailed report on the exact determination so made. Within twenty (20) days after Seller and Buyer have received any such report, Seller and Buyer shall reasonably adjust the amounts apportioned pursuant to the estimates

made at Closing to reflect the exact determinations contained in the report. The foregoing two sentences shall survive the Closing for a period of sixty (60) days.

9.3 **Real Estate Taxes.** If, on the date of the Closing, the real estate tax rate and the assessed valuation are not determined and a real estate tax bill has not yet been issued for the then current calendar year, real estate taxes shall be prorated upon the basis of the most recent ascertainable tax bill, but such taxes shall be readjusted at the request of Seller or Buyer as soon as a final tax bill is issued for that calendar year. The first of Buyer or Seller to receive the tax bill for the year of Closing shall promptly deliver a copy of such bill to the other party.

9.4 **Assessments.** If, at the time of Closing, the Property or any part thereof is affected by an assessment or assessments, which are or may become payable in installments, of which the first installment is then a charge or lien, or has been paid, then (A) Seller shall be obligated to pay all installments of any such assessments which are due and payable prior to the Closing Date, and (B) for the purposes of this Agreement all the unpaid installments of any such assessments which are to become due and payable on or after the Closing shall not be deemed to be liens upon the Property and the payment thereof shall be assumed by Buyer without abatement of or credit to the Total Purchase Price.

9.5 **Deposits; Insurance Premiums.** Any deposits paid by Seller for utilities which can be transferred to Buyer, shall be so transferred at Closing, if Buyer so requests, and Buyer shall be debited at Closing for such amounts. None of Seller's insurance shall be assigned or transferred to Buyer, and there shall be no apportionment of insurance premiums between Seller and Buyer.

9.6 **Errors.** If any errors or omissions are made at the Closing regarding adjustments or prorations, the parties shall make the appropriate corrections promptly after the discovery thereof. The provisions of this Article shall survive Closing for a period of one hundred eighty (180) days.

## ARTICLE X

### Risk of Loss; Eminent Domain

10.1 **Casualty.** If, prior to the Closing Date, the Improvements are damaged by fire, vandalism, acts of God or other casualty or cause, such loss shall be borne by Seller. Seller shall promptly give Buyer Notice of any such damage, together with Seller's estimate of the cost and time necessary for repair and restoration. If the cost (as reasonably estimated by Seller) to repair any such damage is $500,000.00 or less, then, Buyer shall take the Property as is, together with the insurance proceeds, if any, or the right to receive the same, and the right to any other claims arising as a result of such damage. If the cost (as reasonably estimated by Seller) to repair any such damage is more than $500,000.00, then, Buyer shall have the option of (i) closing and taking the Property as it is, together with the insurance proceeds, if any, or the right to receive the same, and the rights to any other claims arising as a result of the damage, or (ii) terminating this Agreement and obtaining the return of the Deposit. Buyer shall give Seller Notice of its election of one of the foregoing options within thirty (30) days of its receipt of Seller's Notice of the loss and estimate of the cost to repair. If Buyer does not give Seller such Notice of its election within the aforementioned time, Buyer shall be

presumed for the purposes of this Agreement to have elected option (i). If Buyer elects option (i) above, Seller agrees to cooperate with Buyer in any loss adjustment negotiations, legal actions and agreements with the insurance company, and to assign to Buyer Seller's rights to such insurance proceeds net of Seller's expenses in excess of any deductibles and will not settle any insurance claim or legal actions relating thereto without Buyer's prior written consent. Seller shall pay to Buyer the amount of any deductible to such insurance policy, less qualifying expenses previously expended by Seller toward such deductible with Buyer's prior written consent, provided that such consent shall not be unreasonably withheld or delayed.

10.2 **Eminent Domain.** If, prior to the Closing, the entire Property becomes subject to an eminent domain proceeding, this Agreement shall be deemed cancelled and Buyer and Seller shall have no further obligations hereunder, except (a) Seller shall promptly notify the Escrow Agent of such eminent domain proceeding and promptly upon receipt of such notice the Escrow Agent shall return the Deposit to Buyer, (b) Buyer shall remain obligated under the indemnification provisions of Section 5.4, and (c) Buyer and Seller shall all remain obligated under the indemnification provisions of Section 13.19. If only a portion of the Property is so subject, Buyer shall proceed with the Closing and acquire the Property subject to such taking, together with all compensation and damages awarded or the right to receive same, provided that such taking does not (i) materially and adversely affect any portion of the Improvements, (ii) result in a material and adverse reduction of the square footage of the Improvements, a (iii) materially and adversely impair or restrict ingress and egress or the intended use of the Property. If such taking does not give rise to any of the circumstances described in clauses (i) through (iii) above, Seller agrees to assign to Buyer its right to such compensation and damages, and will not settle any proceedings relating to such taking without Buyer's prior written consent. Seller shall promptly give Notice to Buyer of any actual or known threatened condemnation affecting the Property. If such taking gives rise to any of the circumstances described in clauses (i) through (iii) above, then Buyer, at its option, may either (a) terminate this Agreement (Buyer shall, however, remain obligated under the indemnification provisions of Section 5.4 and Buyer and Seller shall all remain obligated under the indemnification provisions of Section 13.19) and obtain a return of the Deposit or (b) proceed with the Closing and acquire the Property subject to such taking, together with all compensation and damages awarded or the right to receive the same. Buyer shall give Seller Notice of its election of one of the foregoing options within thirty (30) days of its receipt of Seller's Notice of the condemnation. If Buyer does not give Seller such Notice of its election within the aforementioned time, Buyer shall be presumed for the purposes of this Agreement to have elected option (a).

## ARTICLE XI

### Additional Agreements

11.1 **Operation of Property.** Between the Date of this Agreement and the Closing Date and except as herein provided, Seller shall:

(a) maintain and operate the Property in substantially the same manner as Seller has done prior to the Date of this Agreement and as may be required under the Leases;

18

(b) not create or incur any new mortgage, lien, pledge, or other encumbrance in any way affecting its portion of the Property, nor transfer all or any portion of the Property except for items of the Personal Property transferred in the ordinary course of business, provided that Seller shall furnish all necessary replacements of any items of the Personal Property that are transferred (but Seller may enter into and modify Leases at Seller's discretion in the ordinary course of business); and

(c) except for agreements which may be terminated on thirty (30) days' notice without payment of premium or penalty, and for leases entered into in the ordinary course of business, not enter into any new agreement with respect to the Property that will survive Closing or bind Buyer, without the prior consent of Buyer, which consent shall not be unreasonably withheld or delayed.

11.2 **Extension to Cure.** If, on the Closing Date, all of conditions precedent to Buyer's obligation to close have not been satisfied in any material respect (or waived in writing), then Seller shall have the right to notify Buyer and, in such event, the Closing Date shall be extended up to sixty (60) days to allow the closing conditions to be satisfied and (b) Seller shall use commercially reasonable efforts, consistent with this Agreement, to satisfy the Closing Conditions (subject to the limitations set forth in Section 4.2). Buyer shall have the election, at either the original or extended time for performance, to accept such title as the Seller can deliver to the Property (in its then condition) and/or to waive any unsatisfied closing conditions and to pay the Total Purchase Price for the Property without deduction (except as otherwise expressly provided in this Agreement), and without any surviving claims against Seller, in which case, Seller shall convey such title to the Property. If the original time for performance has been extended and on such extended Closing Date such closing conditions precedent to Buyer's obligations are still not satisfied, then, either party shall have the option of terminating this Agreement on such extended Closing Date, exercisable by written notice to the other party or parties and the Escrow Agent. In the event that either party exercises such option to terminate this Agreement in accordance with the terms hereof, subject to Article XII, the Deposit shall be promptly refunded to Buyer, whereupon this Agreement shall terminate and none of the parties hereto shall have any further rights or remedies hereunder, except as otherwise specifically provided herein to survive the termination of this Agreement.

## ARTICLE XII

### Remedies

12.1 **Seller's Remedies.** If Buyer defaults in the performance of its obligations under this Agreement or if Buyer willfully breaches one or more of the representations, warranties, or affirmative obligations made or undertaken by it herein, Seller shall give Buyer Notice of the default, specifying the nature of such default, and Buyer shall have twenty (20) days to cure the default. If Buyer fails to cure such default within the time provided, Seller shall have the right to terminate this Agreement by Notice to Buyer and to obtain the Deposit (and Escrow Agent shall pay the Deposit to or at the direction of Seller) as agreed upon as liquidated damages (and not as a penalty or forfeiture provision) in full settlement of all claims of Seller against Buyer arising hereunder, except those arising under Sections 5.6 and 13.19 hereof. The parties have agreed that Seller's actual damages in the event of a failure to consummate the sale due to Buyer's default would be extremely difficult or impracticable to determine. After negotiation, the parties have agreed that, considering all the

circumstances existing on the Date of this Agreement, the amount of the Deposit is a reasonable estimate of the damages that Seller would incur in the event of Buyer's default. Seller's retention of the Deposit shall be Seller's sole remedy at law and in equity in the event of Buyer's default, except as otherwise specifically provided herein to service the termination of this Agreement.

12.2 **Buyer's Remedies.** If, as of the Closing Date, as the same may have been extended pursuant to Section 11.9, Seller is in default in the performance of its material obligations under this Agreement or if Seller has willfully breached any one or more of the representations or warranties made by it herein, Buyer shall give Seller Notice of the default or breach, specifying the nature of such default or breach, and Seller shall have twenty (20) days, from receipt of such Notice to cure the default or breach. If Seller fails to cure such default or breach within the time provided, and Buyer is capable of performing hereunder, Buyer shall have the right, as its exclusive remedy hereunder, to either (i) enforce specific performance of this Agreement or (ii) terminate this Agreement and obtain the return of the Deposit (and Escrow Agent shall pay the Deposit to or at the direction of Buyer).

If the Closing occurs, then Buyer's remedies for any breach by Seller of its representations and warranties set forth herein and/or in the Seller's Documents are as set forth in, and as limited by, Section 7.1. Notwithstanding anything in this Agreement to the contrary, neither BTC Mortgage Investors Trust nor DBTCA is not a party to this Agreement, and neither BTC Mortgage Investors Trust nor DBTCA shall not be liable in any way for a breach of this Agreement by Seller or a representation or warranty of Seller which is not true, correct and complete.

## ARTICLE XIII

### Miscellaneous

13.1 **Costs and Expenses.** Seller shall pay all expenses in connection with releases of liens on the Property. Buyer shall pay the recording fees in connection with the recording of the deeds of conveyance to Buyer, all transfer taxes on the deeds of conveyance to Buyer, all premiums and other charges for the Title Policy, and the costs of its due diligence activities.

13.2 **Attorneys' Fees.** Each party shall pay its own attorneys' fees in connection with the preparation and negotiation of this Agreement; however, if any legal action is instituted hereunder, the prevailing party in such action shall be entitled to recover from the other party reasonable attorneys' fees and costs related to such legal action, including reasonable attorneys' fees and costs in all trial, appellate, post-judgment and bankruptcy proceedings.

13.3 **Assignment.** This Agreement and any rights hereunder shall not be assigned, sold, hypothecated, pledged or otherwise transferred by Seller in whole or in part, without the prior consent of Buyer in its sole discretion. Notwithstanding anything to the contrary set forth herein, at Closing, Buyer may designate, by written notice to Seller, any one or more separate entities that are controlled by Buyer as Buyer's title nominees (the "**Title Nominee**") to take title to all or any portion of the Property, provided that any such Title Nominee is (x) a corporation in which Buyer owns and controls, directly or indirectly, all of the ownership interest therein, or (y) a limited liability company

or partnership in which Buyer is (or owns all of the interest in an entity which is) the sole managing member or general partner thereof and owns and controls, directly or indirectly, all of the ownership interests therein.

13.4 **Successors and Assigns.** Except as is otherwise provided in Section 13.3 hereof, this Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto.

13.5 **Gender and Number.** Whenever the context so requires, the singular number shall include the plural and the plural the singular, and the use of any gender shall include all genders.

13.6 **Entire Agreement.** This Agreement, together with the Confidentiality Agreement, contains the complete and entire agreement between the parties respecting the transaction contemplated herein, and such agreements supersede all other prior negotiations, agreements, representations and understandings between the parties respecting such matters. As used herein, the terms "include", "including" and similar terms shall be construed as if followed by the phrase, "without limitation".

13.7 **Counterparts.** This Agreement may be executed in any number of original counterparts, all of which evidence only one agreement.

13.8 **Modifications.** This Agreement may not be modified, terminated (except as otherwise expressly provided herein) or changed in any respect whatsoever, except by a further agreement in writing duly executed by Buyer and Seller. Any consent, waiver, approval or authorization shall be effective if signed by the party granting or making such consent, waiver, approval or authorization.

13.9 **Notices.** Any notice, approval, demand, consent, authorization, waiver or other communication (collectively a "Notice") which any party is required or may desire to give to or make upon the other parties pursuant to this Agreement shall be effective and valid only if given strictly in accordance with this provision, in writing, signed by the party or its below-named attorney giving such Notice, and (a) delivered personally (upon an officer of the other party if such party is not an individual or to such individual as may be noted in the addresses stated below) to the party in question or (b) sent by (i) express courier or overnight delivery service for next day delivery prepaid, (ii) certified mail of the United States Postal Service, return receipt requested or (iii) facsimile, addressed to the party in question as follows (or to such other address or person as any party or person entitled to Notice may by Notice to the other specify):

To Seller:

> c/o Deutsche Bank Realty
> 1251 Avenue of the Americas
> 9th Floor- MS:NYC07-0901
> New York, New York 10020
> Attention: Bruce P. Morrison
> Facsimile: (646) 324-3082

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 199 of 249

With ~~a copies~~y concurrently delivered to:

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
Attention: Andrew J. Weiner, Esq.
Facsimile: (212) 468-7900

McCully & Beggs, P.C.

Suite 200 139 Murray Blvd.

Hagatna, Guam 96910

Attention: Duncan G. McCully, Esq.

Facsimile: (671) 472-1201

To Buyer:

c/o Jae Seung Park
P.O. Box 8801
Tamuning, Guam 96931
Facsimile:_____

With a copy concurrently delivered to:

Robert P. Kutz, Esq.
P.O. Box 7310
Agat, Guam 96915
Facsimile: 671-646-4388

To Escrow Agent:

~~Morrison & Foerster LLP~~
~~1290 Avenue of the Americas~~
~~New York, New York 10104~~
~~Attention: Andrew Weiner, Esq.~~
~~Facsimile: (212) 468-7900~~

Pacific American Title Insurance & Escrow Company

Route 8, 715 Chalan Machaute

Suite 101

Maite, Guam 96927

Facsimile: (671) 477-7213

All notices shall be deemed to have been given upon receipt or refusal of delivery, whichever first occurs Unless otherwise specified, the time within which any consent or approval is to be given hereunder shall commence on the first (1st) Business Day after receipt of the request of such consent or approval together with all material necessary for such consent or approval to be given or if delivery is not accepted, on the first Business Day after the date delivery is refused.

13.10 **Exhibits.** All recitals and all exhibits referred to in this Agreement are incorporated herein by reference and shall be deemed part of this Agreement for all purposes as if set forth at length herein.

13.11 **Governing Law.** This Agreement shall be construed, interpreted and enforced in accordance with the laws of ~~the State of New York~~Guam.

13.12 **Captions.** The captions of this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope, meaning or intent of this Agreement.

13.13 **Severability.** The invalidation or unenforceability in any particular circumstance of any of the provisions of this Agreement shall in no way affect any of the other provisions hereof, which shall remain in full force and effect.

13.14 **No Joint Venture Partnership, Agency, Etc.** This Agreement shall not be construed as in any way establishing a partnership, joint venture, express or implied agency, or employer-employee relationship between Buyer and Seller.

13.15 **No Third Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto, their respective successors and permitted assigns, and no other person or entity shall be entitled to rely upon or receive any benefit from this Agreement or any term hereof.

13.16 **No Waiver.** No consent or waiver, express or implied, by Buyer to or of any breach of representation, covenant or warranty of Seller shall be construed as a consent or waiver to or of any other breach of the same or any other representation, covenant or warranty.

13.17 **Execution.** The submission of this Agreement for examination does not constitute an offer by or to any party. This Agreement shall be effective and binding only after execution and delivery by the parties hereto.

13.18 **Time of the Essence.** Time shall be of the essence with respect to all obligations of Seller and Buyer under this Agreement.

13.19 **No Broker.** Buyer and Seller represent and warrant to each other that neither of them has negotiated through or communicated with any broker in connection with the transaction contemplated by this Agreement, except Global Realty ("Broker"). Each of Seller and Buyer severally agree to indemnify, defend and hold the other harmless from and against all claims, losses,

liability, costs and expenses (including reasonable attorney's fees and costs, and reasonable attorney's fees and costs upon appeal), resulting from the claims that may be made against Buyer or Seller by any broker or any other person (other than Broker) claiming a commission, fee, or other compensation by reason of this transaction if the same shall arise by, through or on account of any act of Buyer, Seller or their respective representatives. Notwithstanding the foregoing, at the Closing, Seller shall pay the Commission due Broker in accordance with a separate agreement. The indemnifications set forth herein shall survive the Closing.

13.20 **Business Day.** For all purposes of this Agreement "Business Day" shall mean any day, excluding (x) Saturday and Sunday, (y) any day which is a legal holiday under the laws of the State of New York or Guam, and (z) any day on which banking institutions located in the State of New York or Guam are required or authorized by law or other governmental action to close.

13.21 **Escrow and Escrow Agent.** The parties further agree that:

13.21.1 Escrow Agent shall accept the ~~Deposit~~ Total Purchase Price with the understanding of the parties that Escrow Agent is not a party to this Agreement except to the extent of its specific responsibilities hereunder, and does not assume or have any liability for the performance or non-performance of Buyer or Sellers hereunder to either of them.

13.21.2 The Escrow Agent shall be protected in relying upon the accuracy, acting in reliance upon the contents, and assuming the genuineness of any notice, demand, certificate, signature, instrument or other document which is given to the Escrow Agent without verifying the truth or accuracy of any such notice, demand, certificate, signature, instrument or other document.

13.21.3 The Escrow Agent shall not be bound in any way by any other agreement or understanding between the parties hereto, whether or not the Escrow Agent has knowledge thereof or consents thereto unless such consent is given in writing.

13.21.4 ~~The Escrow Agent's sole duties and responsibilities shall be to hold and disburse the Deposit in accordance with this Agreement.~~ The Escrow Agent shall hold the ~~Deposit~~ Total Purchase Price or any part thereof in escrow in an interest bearing money market or bank account, but the Escrow Agent shall not be liable for any reasonable delay in investing, reinvesting or distributing the ~~Deposit~~ Total Purchase Price or any part thereof (including any interest earned thereon) or for any loss incurred by reason of any such investments. The ~~Deposit~~ Total Purchase Price (including any interest earned thereon) shall be paid by the Escrow Agent as follows: (a) upon Closing, to Seller at the Closing; (b) to Buyer, if, as and when this Agreement is terminated and Buyer is entitled thereby to a return of the Deposit in accordance with the provisions hereof; or (c) to Seller, in all other instances if, as and when this Agreement is terminated.

13.21.5 It is agreed that the duties of the Escrow Agent are only as herein specifically provided and are purely ministerial in nature, and the Escrow Agent shall not be liable for any action taken or omitted by the Escrow Agent in good faith and reasonably believed by the Escrow Agent to be authorized or within its rights or powers conferred upon it by this Agreement, except for damage caused by the gross negligence, bad faith or willful misconduct of the Escrow Agent. Subject to the immediately preceding sentence, Seller and Buyer hereby release the Escrow

Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

13.21.6   Upon the disbursement of the ~~Deposit~~ Total Purchase Price in accordance with this Agreement, the Escrow Agent shall be relieved and released from any liability under this Agreement.

13.21.7   The Escrow Agent may resign at any time upon at least ten (10) days prior written notice to the parties hereto. If, prior to the effective date of such resignation, the parties hereto shall all have approved, in writing, a successor escrow agent, then upon the resignation of the Escrow Agent, the Escrow Agent shall deliver the Deposit to such successor escrow agent. From and after such resignation and the delivery of the Deposit to such successor escrow agent, the Escrow Agent shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement, all of which duties, responsibilities and obligations shall be performed by the appointed successor escrow agent. If for any reason the parties hereto shall not approve a successor escrow agent within such period, the Escrow Agent may bring any appropriate action or proceeding for leave to deposit the Deposit with a court of competent jurisdiction, pending the approval of a successor escrow agent, and upon such deposit the Escrow Agent shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement.

13.21.8   Seller and Buyer hereby agree to, jointly and severally, indemnify, defend and hold the Escrow Agent harmless from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against, the Escrow Agent (including reasonable attorneys' fees, expenses and court costs) by reason of the Escrow Agent's acting or failing to act in connection with any of the matters contemplated by this Agreement or in carrying out the terms of this Agreement, except as a result of the Escrow Agent's gross negligence, bad faith or willful misconduct. Notwithstanding the foregoing and, without limiting the provisions hereof as such provisions pertain to the rights and protections afforded to the Escrow Agent and the obligations of Seller and Buyer to the Escrow Agent, as between Seller and Buyer, in the event of any dispute hereunder involving the funds held in escrow by the Escrow Agent pursuant to this Agreement, Seller and Purchaser agree that the prevailing party shall be entitled to be reimbursed for any contribution made by such party toward payment of costs and expenses incurred by the Escrow Agent.

13.21.9   If there is any dispute in connection with this Agreement, or as to the rights of any of the parties in and to, or the disposition of, any part of the Total Purchase Price ~~the Deposit~~, including but not limited to disputes as to when the Escrow Agent is obligated to disburse the Deposit or as to whom the same is to be disbursed, the Escrow Agent shall not be obligated to disburse the Deposit or any other part of the Total Purchase Price but in such event may hold the same until receipt by Escrow Agent of an authorization in writing, signed by Sellers and Buyer, directing the disposition of same, or, in the absence of such authorization, the Escrow Agent may: (w) hold and retain all or any part of the Deposit until such dispute is settled or finally determined by litigation, arbitration or otherwise, or (x) deposit the Deposit or any other part of the Purchase Price in an appropriate court of law, following which the Escrow Agent shall thereby and thereafter be relieved and released from any liability or obligation under this Agreement, or (y) institute an action in interpleader or other similar action permitted by stakeholders in ~~the State of New York~~ Guam, or

(z) interplead any of the parties in any action or proceeding which may be brought to determine the rights of the parties to all or any part of the Deposit or any other part of the Purchase Price. The Escrow Agent is hereby expressly authorized to comply with and obey any and all orders, judgments, or decrees of any court relating hereto, and in case the Escrow Agent obeys or complies with any such order, judgment or decree of any court, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside or vacated, or found to have been entered without jurisdiction, unless prior to such compliance, the Escrow Agent shall have received notice of an appeal, having been timely filed, appealing such order, judgment or decree, and such appeal legally stays the Escrow Agent's compliance with such orders, judgments, or decrees.

13.21.10   The Escrow Agent shall not have any liability or obligation for loss of all or any portion of the ~~Deposit~~ Total Purchase Price by reason of the insolvency or failure of the institution of depository with whom the escrow account is maintained.

13.21.11   The Escrow Agent shall provide Seller and Buyer with written notice (by facsimile) ~~and overnight delivery)~~ prior to any release of any funds held by it hereunder in escrow other than in connection with the consummation of the Closing or pursuant to written instructions executed by both Buyer and Seller.

13.21.12   This Agreement shall not create any right in any person or entity other than the parties hereto and their respective successors and permitted assigns, and no third party shall have the right to enforce or benefit from the terms hereof. ~~Buyer hereby acknowledges and confirms that the Escrow Agent and any member of its firm shall be permitted to act as counsel for Seller in any dispute or question as to the disbursement of the Deposit, and any other matter relating to or unrelated to this Agreement and/or the transactions contemplated hereby.~~

13.22   **Press Releases.**   No party shall issue any press release or other public announcement regarding this Agreement or the transaction contemplated hereby without first obtaining each other party's written approval with respect to the release or announcement and the content thereof, which approval shall not be unreasonably withheld, delayed or conditioned.

13.23   **No Recording.**   Neither this Agreement or any memorandum or short form thereof may be recorded by Buyer.

13.24   **Limited Liability.**   The obligations of Seller are intended to be binding only on the Seller's interests in the Property subject to the limits of Section 7.1, and the obligations of Seller shall not be personally binding upon, nor shall any resort be had to, the private properties of Seller's trustees, officers, directors, or shareholders, the members, partners, officers, directors or shareholders thereof, or any employees or agents of Seller.

13.25   **Reporting Person.**   Buyer and Sellers hereby agree that the Title Company (or, if the Title Company will not do so, then Buyer's counsel) shall act as "the person responsible for closing" the transaction which is the subject of this Agreement pursuant to Section 6045(e) of the Code and shall prepare and file all informational returns, including IRS Form 1099-S, and shall otherwise comply with the provisions of Section 6045(e) of the Code.

## ARTICLE XIV

### Waiver of Trial by Jury

THE PARTIES HEREBY MUTUALLY AGREE THAT NO PARTY, NOR ANY ASSIGNEE, SUCCESSOR, HEIR OR LEGAL REPRESENTATIVE OF ANY OF THE PARTIES (ALL OF WHOM ARE HEREINAFTER REFERRED TO AS THE "PARTIES") SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT, OR ANY RELATED AGREEMENT OR INSTRUMENT BETWEEN ANY OF THE PARTIES. NONE OF THE PARTIES WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED.   THE PROVISIONS OF THIS ARTICLE HAVE BEEN FULLY NEGOTIATED BY THE PARTIES. THE WAIVER CONTAINED HEREIN IS IRREVOCABLE, CONSTITUTES A KNOWING AND VOLUNTARY WAIVER, AND SHALL BE SUBJECT TO NO EXCEPTIONS.   SELLER HAS IN NO WAY AGREED WITH OR REPRESENTED TO BUYER OR ANY OTHER PARTY THAT THE PROVISIONS OF THIS ARTICLE WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

[Signature pages follow.]

**IN WITNESS WHEREOF,** the parties have caused this instrument to be executed as an instrument under seal as of the Date of this Agreement.

<u>**SELLER:**</u>

BTC 97 SP, LLC,
a Delaware limited liability company

By: _____
      Name:
      Title:

<u>**BUYER:**</u>

_____
_____

By: _____
      Name:
      Title:

      Date: _____ __, 2003

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 206 of 249

**ESCROW AGENT:**

Escrow Agent is signing only for the purpose of agreeing to serve as
Escrow Agent hereunder pursuant to the provisions hereof.

McCULLY & BEGGS, P.C.
PACIFIC AMERICAN TITLE INSURANCE &
ESCROW COMPANY

By: _____
    Name:
    Title:

Date: _____ __, 2003

**McCully & Beggs, P.C.**

| | |
|---|---|
| **From:** | R P Kutz [rpklaw@ite.net] |
| **Sent:** | Friday, November 28, 2003 2:12 PM |
| **To:** | Andrew J. Weiner |
| **Cc:** | Duncan McCully |

**Subject:** Tumon Village Purchase Agreement

Gentlemen:

Please see attached correspondence from Atty. Robert P. Kutz to Mr. Andrew J. Weiner.

Thank you.
Gloria Alvendia
Law Office of Robert P. Kutz

11/28/03

November 28, 2003

## MEMO via EMAIL

TO:     Andrew Weiner

FR:     Robert P. Kutz

RE:     Tumon Village Purchase Agreement

---

Andy:

I received the amended version of the Sale Agreement, as marked up by Duncan McCully, and have no objection to any of the changes he has made.

As we discussed, however, my clients and I have some objections and concerns with respect to the rest of the your original draft, which matters I will address here. For convenience, these issues are noted below in the order they appear in your draft, without regard for the importance of the particular issue.

1.    Preamble – Purchaser will be Guam Tumon Company, LLC, a Guam limited liability company, whose address is #190 Chalan San Antonio, Tamuning, GU 96931.

2.    Article 1 (v) – "Existing Secured Loans" are supposedly identified on Exhibit "B", which has not been provided to me. Please identify those loans, including the pertinent details. However, unless I am told otherwise, I am presuming that the loans referred to are those which affect the "foreclosure parcel", Lot No. 5090-REM-1, as shown on Pacific American's O&E Report No. OER-03-8-4418, dated October 13, 2003. For whatever reason, I had not been provided with a copy of that report until November 20, and was unaware of the existence of the foreclosure parcel. Assuming that these are the only loans referred to, they will of course be extinguished at the time of the foreclosure sale, now set for December 10.

3.    Article 1(aa) – "Intangible Personal Property", refers to Seller's right to pursue, sell and retain insurance proceeds under existing or former insurance policies, thus implying that such claims are now pending. The nature and extent of these claims had not been previously disclosed to my clients, and has formed no part of the bargaining with respect to the

property. While my clients are not asserting a right to any of these proceeds, since the property is being purchased in "as is" condition, we are concerned that the existence of substantial insurance claims may affect the insurability of the property, or premiums charged for it, once the property changes hands. Naturally, we are concerned to avoid a lapse in insurance, and would like to confirm whether or not the existing carrier will renew its policy after close of escrow, or whether a new carrier must be sought. Accordingly, I would appreciate it if you provide this information as soon as possible.

4. Article 1(pp) – "Surveyor", which is left blank on your draft, is unclear. If it refers to the firm which produced the 1974 as-built topo survey which has been provided to my clients, that firm is no longer in business, and an updated survey must be provided by the Seller prior to close of escrow. Among other things, the Hotsun and Associates drawing does not clearly delineate the limits of the foreclosure parcel, and, of course, makes no account of the encroachment mentioned in the appraisal report. For all we know, there may be other encroachments. If, on the other hand, a more recent survey is available, upon which the Captain Company based their appraisal notes, we would like to be provided a copy of that survey as soon as possible. In this context, as we discussed, it appears that Captain has improperly labeled the adjacent property, but these matters need to be confirmed.

5. §2.2.1 "Deposit" – My clients are unwilling to provide a 10% liquidated damages deposit for this transaction. Considering that the property is sold "as is", without warranty, for all cash, and in contemplation of a very short escrow, such a figure is unreasonable. Recognizing that a good-faith deposit is, of course, appropriate, my clients are willing to deposit the sum of $75,000, representing slightly over 2% of the purchase price.

6. §2.2.3, Remaining payment amount adjusted to reflect the reduced deposit amount.

7. §4.2.2 Language of this section implies that a tenant lien may exist. If so, please provide the appropriate information with respect to the nature and amount of these liens. Until that information is provided, my clients cannot agree with the provisions of this paragraph.

8. §4.3 "Survey" – See remarks above.

9. §4.4 While my clients do not object to purchasing the property as outlined subject to any actual or existing violations, please provide notice of any such violations, the nature of them, and the status of any remediation measures made to remove the violation.

2

10. §4.6 The existence of the "Foreclosure Parcel" may create some difficulty. It has, of course, been the intention of my clients to purchase all of the Tumon Village property under the ownership or control of your clients, including the foreclosure property, of which I have recently become aware. On the other hand, in my letter to Bruce Morrison dated November 5, I specifically provide that my clients will accept clear, insurable title to the property as subject only to encumbrances as set forth in Pacific Title's Report OER-98-3-14651A, now reissued as of October 13, 2003. The encumbrances on the foreclosure property, however, are not set out in that title report, but are contained in a separate report, neither reviewed or contemplated when I sent my November 5 letter to Bruce.

I have talked with my clients, and have just spoken with Duncan McCully as well. From what we can tell, the original owners have no actual interest in the property, and have not responded to any of the foreclosure notices. No one else has expressed interest in it either. Given all that, we should reasonably expect that the sale will take place on December 10 as scheduled, and the transfer will be completed as contemplated. If, however, it does not and the sale is incomplete, my clients require that sufficient funds be retained in the escrow, chargeable against the Seller's account, to pay attorney's fees and costs associated with completing the foreclosure. We also understand that it is possible the title company will ensure around the right of redemption, and if so, that should take care of that problem. If not, that issue must be addressed.

11. §4.7 – I am in receipt of a copy of a letter from Bruce to Mr. Cho, regarding release of the appraisal to Mr. Cho for purposes of obtaining government approval for transmittal of the funds. My clients agree that this is a workable method of handling this disclosure, however, a copy should be faxed or mailed to this office at the same time. If McCully & Beggs have a copy, they can provide it directly to me. For the record, I was not accurate when I told you that the appraisal was required to obtain financing for a portion of the purchase price – instead, as you probably now know, Korean government approval must be obtained to release funds in this amount for overseas transmission, regardless of the source.
This requirement for government approval will, however, have to become a condition of close of escrow, such that escrow shall be extended for a reasonable period of time in order to receive the necessary permissions.

12. §5.5 "Confidentiality" – This document should be amended to provide that the C.A. provisions apply only prior to close of escrow. The rest of the section is unworkable, once escrow has opened. Inclusion of a Seller's representative in confidential communications in Korea, with respect to this or any other investment, simply would not be acceptable. By the same token, contact with the tenants and employees during the escrow period is

3

proper and necessary; however, it may be provided that information obtained from those tenants or employees should be treated in the same manner as any other confidential information, pursuant to terms of the previously-executed confidentiality agreement.

13. §5.6 "As Is" Section (vii), is garbled on my received copy. The word "forth" included in McCully's amendment is misspelled as "froth".

14. §6.1 – Although the buyers are willing to proceed as rapidly as may be reasonably possible, under the circumstances of foreclosure of the one parcel of property and the necessity to obtain Korean government permission for transmission of funds, the buyers are unwilling to commit to a specific closing date sooner than thirty days after the appraisal has been supplied to Mr. Cho in Korea and forwarded to the appropriate banking and governmental agencies. In any event, should close of escrow be delayed beyond thirty days by reason of the government's inability or refusal to act, and without any fault of my clients, escrow instructions must provide that escrow can remain open for a reasonable time to permit accomplishment of this purpose.

15. §7.1 – My clients are unwilling to waive the benefit of statutes of limitation with respect to this transaction, nor are they willing to set a liability limit, either high or low. In Guam, the SL for actions arising out of a contract in writing is five years from the date on which the Plaintiff knew, or should have known, of the conduct giving rise to the claim. Nice try, though.

16. §7.2.1 – As noted earlier, it is anticipated that the buyer will be a Guam limited liability company, presently in the process of formation.

17. §9.2 – Adjustment of post-closing collected rents (proration), and payment of any allocable amounts to either party will be made within thirty days of close of the parties' fiscal year. Although my clients are willing to report under penalty of perjury to the Sellers on a reasonable basis with respect to the status of uncollected rents, and efforts made to collect them, my clients will not agree to inspection of their books, nor will they be subject to the Seller's veto power with respect to waiver or settlement of any claims for past-due rent. Sellers will have to accept that buyers will proceed in good faith to deal with such accounts on a commercially reasonable basis, including commencement or abandonment of legal proceedings with respect to them.

18. §10.1 – In the event of casualty damage to the property prior to close of escrow, where damage is $500,000 or less, buyer will take the property as

4

is, plus insurance proceeds if any, or, if no insurance covers the loss, the price will be abated to reflect the reasonably estimated amount of the loss.

19. §11.1(b) – Any modification of the existing leases, or new leases made, shall not be at a material variance from the existing terms of such leases, without the consent of the buyer.

20. §13.20 "Business Day" – What are the letters (x), (y), (z) doing in here?

21. §13.21.4 Any interest earned on the purchase price, or any part thereof, held in escrow shall be divided equally between the parties.

22. §13.9 – Notices to buyer should be sent to Guam Tumon Company, C/O Jae S. Park, Fax No. 671-646-4388. My office fax is incorrect: the correct fax number is 671-789-2503.

23. §13.11 – Okay as amended by McCully, agreement construed under Guam law. However, venue for any action taken to enforce or interpret this agreement shall be brought in the Superior Court of Guam.

I believe that covers most of it. I look forward to your response to these matters, and to moving ahead with this deal.

Thanks again for your courtesy and cooperation.

Sincerely,

Robert P. Kutz

5



## McCully & Beggs, P.C.

**From:** Weiner, Andrew J. [AWeiner@mofo.com]
**Sent:** Thursday, January 15, 2004 8:12 AM
**To:** Duncan McCully
**Subject:** FW: purchaser comments

-----Original Message-----
**From:** Weiner, Andrew J.
**Sent:** December 01, 2003 5:38 PM
**To:** Robert Kutz (rpklaw@ite.net)
**Cc:** McCully & Beggs, P.C.; Bruce P. Morrison
**Subject:** purchaser comments

<<purchaser comments_v1.DOC>>

I have reviewed your memorandum of comments, dated 12/1/03, with Bruce Morrison. The responses are interlineated on the attached copy of your memorandum. I also raise some questions for Messrs. McCully & Beggs in the response. Mr. Morrison has not reviewed the responses, so he may have further comments or clarifications.

Please pay careful attention to the questions regarding Korean government approval. It appears that these represent a significant change from the deal which your client proposed, and the seller needs to understand more clearly what the situation is and what you are proposing.

We look forward to your response.

===================================================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
===================================================================================================

1/15/04

COMMENTS IN ALL CAPS

**LAW OFFICE OF ROBERT P. KUTZ**
**957 CROSS ISLAND ROAD**
**SANTA RITA, GUAM 96915**
**TEL: (671) 565-1800 FAX: (671) 565-1803**
**EMAIL: rpklaw@ite.net**

January 15, 2004

**MEMO via EMAIL**

TO:    Andrew Weiner

FR:    Robert P. Kutz

RE:    Tumon Village Purchase Agreement

Andy:

I received the amended version of the Sale Agreement, as marked up by Duncan McCully, and have no objection to any of the changes he has made.

As we discussed, however, my clients and I have some objections and concerns with respect to the rest of the your original draft, which matters I will address here. For convenience, these issues are noted below in the order they appear in your draft, without regard for the importance of the particular issue.

1.     Preamble – Purchaser will be Guam Tumon Company, LLC, a Guam limited liability company, whose address is #190 Chalan San Antonio, Tamuning, GU 96931.

RESPONSE: OK.

2.     Article 1 (v) – "Existing Secured Loans" are supposedly identified on Exhibit "B", which has not been provided to me. Please identify those loans, including the pertinent details. However, unless I am told otherwise, I am presuming that the loans referred to are those which affect the "foreclosure parcel", Lot No. 5090-REM-1, as shown on Pacific American's O&E Report No. OER-03-8-4418, dated October 13, 2003. For whatever reason, I had not been provided with a copy of that report until November 20, and was unaware of the existence of the foreclosure parcel. Assuming that these are the only loans referred to, they will of

ny-543781

course be extinguished at the time of the foreclosure sale, now set for December 10.

RESPONSE: AGREED.

3.   Article 1(aa) – "Intangible Personal Property", refers to Seller's right to pursue, sell and retain insurance proceeds under existing or former insurance policies, thus implying that such claims are now pending. The nature and extent of these claims had not been previously disclosed to my clients, and has formed no part of the bargaining with respect to the property. While my clients are not asserting a right to any of these proceeds, since the property is being purchased in "as is" condition, we are concerned that the existence of substantial insurance claims may affect the insurability of the property, or premiums charged for it, once the property changes hands. Naturally, we are concerned to avoid a lapse in insurance, and would like to confirm whether or not the existing carrier will renew its policy after close of escrow, or whether a new carrier must be sought. Accordingly, I would appreciate it if you provide this information as soon as possible.

RESPONSE: INSURANCE CLAIM WAS RESOLVED AND PAID LAST WEEK. NO REMAINING ISSUES WITH IT.

RESPONSE: SELLER'S INSURANCE IS NOT ASSIGNABLE, AND SELLER IS NOT PROPOSING TO ASSIGN IT (IT CANNOT DO SO AS OF RIGHT). IN AN "AS-IS" DEAL, THE PURCHASER HAS THE RESPONSIBILITY TO OBTAIN ITS OWN INSURANCE, AND IT IS NOT A CONDITION PRECEDENT TO CLOSING THAT THE INSURANCE BE OBTAINED. THIS IS SUCH AN "AS-IS" DEAL. HOWEVER, AS AN ACCOMMODATION, BRUCE MORRISON IS TRYING TO OBTAIN THE NAME AND PHONE NUMBER OF A CONTACT WHO CAN PROVIDE YOUR CLIENT AN INTRODUCTION TO THE EXISTING INSURER, SO THAT YOU CAN ASK WHETHER THEY WILL PROVIDE YOUR CLIENT WITH INSURANCE. DOES THIS RESOLVE THE ISSUE?

4.   Article 1(pp) – "Surveyor", which is left blank on your draft, is unclear. If it refers to the firm which produced the 1974 as-built topo survey which has been provided to my clients, that firm is no longer in business, and an updated survey must be provided by the Seller prior to close of escrow. Among other things, the Hotsun and Associates drawing does not clearly delineate the limits of the foreclosure parcel, and, of course, makes no account of the encroachment mentioned in the appraisal report. For all we know, there may be other encroachments. If, on the other hand, a more recent survey is available, upon which the Captain Company based their appraisal notes, we would like to be provided a copy of that survey as soon as possible. In this context, as we discussed, it appears that Captain has

improperly labeled the adjacent property, but these matters need to be confirmed.

RESPONSE: SELLER IS NOT PROPOSING TO OBTAIN A NEW OR UPDATED SURVEY. WHATEVER IS SHOWN ON THE MOST RECENT SURVEY SHOULD BE SIGNED OFF ON BY THE PURCHASER NOW.

MCCULLY & BEGGS: WHAT IS THE MOST RECENT SURVEY?

5. §2.2.1 "Deposit" – My clients are unwilling to provide a 10% liquidated damages deposit for this transaction. Considering that the property is sold "as is", without warranty, for all cash, and in contemplation of a very short escrow, such a figure is unreasonable. Recognizing that a good-faith deposit is, of course, appropriate, my clients are willing to deposit the sum of $75,000, representing slightly over 2% of the purchase price.

RESPONSE: WE ARE CONFUSED BY THE STATEMENT ABOUT "A VERY SHORT ESCROW". IF THE TRANSACTION WERE THE 15 DAY CLOSE (i.e., 12/15/03) SPECIFIED IN THE OFFER BY YOUR CLIENT WHICH WAS ACCEPTED, A SMALL DEPOSIT WOULD BE UNDERSTANDABLE (ALTHOUGH WE WOULD WANT SOMETHING IN EXCESS OF $75,000). HOWEVER, YOU ARE NOW CHANGING THE ACCEPTED OFFER MATERIALLY: THE DEAL IS CONTINGENT ON KOREAN GOVERNMENTAL APPROVAL, WITH AN UNCERTAIN TIME FRAME. THE ISSUE OF THE AMOUNT OF THE DEPOSIT CANNOT BE RESOLVED UNTIL THESE OTHER ISSUES ARE RESOLVED.

6. §2.2.3, Remaining payment amount adjusted to reflect the reduced deposit amount.

RESPONSE: SAME ISSUE.

7. §4.2.2 Language of this section implies that a tenant lien may exist. If so, please provide the appropriate information with respect to the nature and amount of these liens. Until that information is provided, my clients cannot agree with the provisions of this paragraph.

RESPONSE: THERE IS NO TENANT LIEN SHOWN ON THE CURRENT TITLE REPORT, AND NO PARTICULAR REASON TO SUSPECT THAT ONE EXISTS. WE ARE PREPARED TO REMOVE THE REFERENCES TO TENANT LIENS.

8. §4.3 "Survey" – See remarks above.

RESPONSE: SAME AS ABOVE.

9. §4.4 While my clients do not object to purchasing the property as outlined subject to any actual or existing violations, please provide notice of any such violations, the nature of them, and the status of any remediation measures made to remove the violation.

RESPONSE: THIS IS AN "AS-IS" TRANSACTION, WITHOUT REPRESENTATIONS. WE ARE NOT PROPOSING, AND HOPE THAT YOU ARE NOT ASKING, FOR SELLER TO REPRESENT THE STATUS OF VIOLATIONS. BRUCE MORRISON HAS ASKED THE PROJECT MANAGER ABOUT THIS, AND WILL GIVE YOU HIS RESPONSE SO LONG AS IT IS CLEAR THAT THERE IS NO LIABILITY WHATSOEVER IF THIS INFORMATION IS NOT CORRECT OR COMPLETE.

10. §4.6 The existence of the "Foreclosure Parcel" may create some difficulty. It has, of course, been the intention of my clients to purchase all of the Tumon Village property under the ownership or control of your clients, including the foreclosure property, of which I have recently become aware. On the other hand, in my letter to Bruce Morrison dated November 5, I specifically provide that my clients will accept clear, insurable title to the property as subject only to encumbrances as set forth in Pacific Title's Report OER-98-3-14651A, now reissued as of October 13, 2003. The encumbrances on the foreclosure property, however, are not set out in that title report, but are contained in a separate report, neither reviewed or contemplated when I sent my November 5 letter to Bruce.

I have talked with my clients, and have just spoken with Duncan McCully as well. From what we can tell, the original owners have no actual interest in the property, and have not responded to any of the foreclosure notices. No one else has expressed interest in it either. Given all that, we should reasonably expect that the sale will take place on December 10 as scheduled, and the transfer will be completed as contemplated. If, however, it does not and the sale is incomplete, my clients require that sufficient funds be retained in the escrow, chargeable against the Seller's account, to pay attorney's fees and costs associated with completing the foreclosure. We also understand that it is possible the title company will ensure around the right of redemption, and if so, that should take care of that problem. If not, that issue must be addressed.

RESPONSE: IF THE FORECLOSURE IS NOT COMPLETED BY CLOSING, SELLER WOULD PROPOSE TO ESCROW $50,000 FOR ATTORNEY'S FEES AND COSTS ASSOCIATED WITH COMPLETING THE FORECLOSURE.

IF THE FORECLOSURE IS COMPLETED BY CLOSING, THE REDEMPTION PAYMENT WOULD FAR EXCEED THE VALUE OF

Case 1:03-cv-00043    Document 13    Filed 01/30/2004    Page 220 of 249

THE PROPERTY AFFECTED AND WOULD BELONG TO YOUR CLIENT, WHO WOULD EXPERIENCE A WINDFALL. THIS CALCULATION ALSO MAKES IT CLEAR THAT THE PRICE FOR REDEMPTION WILL BE PROHIBITIVE. AS A RESULT, WE WOULD NOT EXPECT A BUYER TO CARE ABOUT A TECHNICAL RESERVATION FOR REDEMPTION RIGHTS IN THE TITLE POLICY.

MCCULLY & BEGGS: WHAT IS THE ANTICIPATED BID THAT THE MORTGAGEE WOULD MAKE AT THE FORECLOSURE SALE? HAVE YOU CHECKED WITH THE TITLE COMPANY AS TO WHETHER THEY WILL INSURE OVER THE RIGHT OF REDEMPTION?

11. §4.7 – I am in receipt of a copy of a letter from Bruce to Mr. Cho, regarding release of the appraisal to Mr. Cho for purposes of obtaining government approval for transmittal of the funds. My clients agree that this is a workable method of handling this disclosure, however, a copy should be faxed or mailed to this office at the same time. If McCully & Beggs have a copy, they can provide it directly to me. For the record, I was not accurate when I told you that the appraisal was required to obtain financing for a portion of the purchase price – instead, as you probably now know, Korean government approval must be obtained to release funds in this amount for overseas transmission, regardless of the source.
This requirement for government approval will, however, have to become a condition of close of escrow, such that escrow shall be extended for a reasonable period of time in order to receive the necessary permissions.

RESPONSE: WE ARE NOW CONFUSED AS TO WHY DISCLOSURE OF THE APPRAISAL IS NEEDED FOR KOREAN GOVERNMENT APPROVAL AND, IF SO, WHY ANYONE OTHER THAN THE KOREAN GOVERNMENT NEEDS TO SEE THE APPRAISAL. BRUCE MORRISON CONTINUES TO QUESTION THE NEED FOR ANYONE IN GUAM TO SEE THE APPRAISAL.

IN ADDITION, THE EQUITIES FOR SHARING THE APPRAISAL CHANGE WHEN THE DEPOSIT IS REDUCED, THE TIME TO CLOSE IS EXTENDED AND THE CERTAINTY OF CLOSING IS BROUGHT INTO QUESTION.

WE NEED TO DISCUSS THIS FURTHER.

AS TO GOVERNMENTAL APPROVAL, IT IS NOT CLEAR WHETHER YOU ARE ASKING FOR MORE TIME TO OBTAIN THE APPROVAL OR YOU ARE, IN ADDITION, SAYING THAT YOU CAN TERMINATE THE CONTRACT AND OBTAIN A RETURN OF THE DEPOSIT IF APPROVAL IS NOT OBTAINED. IN EITHER EVENT, THIS IS A MATERIAL CHANGE IN THE DEAL. BEFORE

CHECKING TO SEE WHETHER THE SELLER IS PREPARED TO ACCEPT THESE NEW TERMS (AND WITHOUT SUGGESTING THAT IT IS SO PREPARED), IT WOULD BE USEFUL TO KNOW EXACTLY WHAT YOU ARE NOW PROPOSING:

- IS THERE AN OUTSIDE DATE BY WHICH, IN ALL EVENTS, THE GOVERNMENTAL CONSENT MUST BE OBTAINED OR THE TRANSACTION MAY BE TERMINATED BY SELLER?
- ARE WE CORRECT THAT, IF GOVERNMENTAL CONSENT IS NOT OBTAINED BY THE OUTSIDE DATE, SELLER CAN RETAIN THE DEPOSIT? OR ARE YOU SUGGESTING THAT THE DEPOSIT WOULD, IN THAT EVENT, BE RETURNED TO THE PURCHASER?
- IF A DELAY BEYOND 12/15/03 OCCURS, DOES THIS CHANGE YOUR PROPOSAL ABOUT THE AMOUNT OF THE DEPOSIT?
- PLEASE PROVIDE US WITH MORE INFORMATION ABOUT THE APPROVAL PROCESS.

12.    §5.5 "Confidentiality" – This document should be amended to provide that the C.A. provisions apply only prior to close of escrow. The rest of the section is unworkable, once escrow has opened. Inclusion of a Seller's representative in confidential communications in Korea, with respect to this or any other investment, simply would not be acceptable. By the same token, contact with the tenants and employees during the escrow period is proper and necessary; however, it may be provided that information obtained from those tenants or employees should be treated in the same manner as any other confidential information, pursuant to terms of the previously-executed confidentiality agreement.

RESPONSE: THE C.A. WOULD NOT SURVIVE CLOSING. THE C.A. WOULD BE APPLICABLE UNTIL THE CLOSING OCCURS, NOT WHEN THE ESCROW IS OPENED. IF DISCLOSURES TO KOREAN GOVERNMENTAL OFFICIALS ARE REQUIRED IN ORDER TO OBTAIN ITS APPROVAL, THAT CAN BE EXPRESSLY APPROVED BY SELLER, SO THE C.A. WOULD NOT APPLY TO THOSE DISCLOSURES.

SELLER DOES NOT REQUIRE APPROVAL OF OR ITS PRESENCE AT MEETINGS WITH GOVERNMENTAL AGENCIES IN KOREA OR GUAM.  IT WILL MAKE THE PROJECT MANAGER AVAILABLE FOR QUESTIONING..  IT DOES NOT WANT TENANTS OR EMPLOYEES BOTHERED, AND SEES NO NEED FOR THE PURCHASER TO QUESTION THEM PRIOR TO CLOSING.

13.    §5.6 "As Is" Section (vii), is garbled on my received copy. The word "forth" included in McCully's amendment is misspelled as "froth".

RESPONSE: OK.

14. §6.1 – Although the buyers are willing to proceed as rapidly as may be reasonably possible, under the circumstances of foreclosure of the one parcel of property and the necessity to obtain Korean government permission for transmission of funds, the buyers are unwilling to commit to a specific closing date sooner than thirty days after the appraisal has been supplied to Mr. Cho in Korea and forwarded to the appropriate banking and governmental agencies. In any event, should close of escrow be delayed beyond thirty days by reason of the government's inability or refusal to act, and without any fault of my clients, escrow instructions must provide that escrow can remain open for a reasonable time to permit accomplishment of this purpose.

RESPONSE: SEE THE COMMENTS ABOVE.

15. §7.1 – My clients are unwilling to waive the benefit of statutes of limitation with respect to this transaction, nor are they willing to set a liability limit, either high or low. In Guam, the SL for actions arising out of a contract in writing is five years from the date on which the Plaintiff knew, or should have known, of the conduct giving rise to the claim. Nice try, though.

RESPONSE: TO BE DISCUSSED. WE SHOULD BE ABLE TO WORK SOMETHING OUT.

16. §7.2.1 – As noted earlier, it is anticipated that the buyer will be a Guam limited liability company, presently in the process of formation.

RESPONSE: OK.

17. §9.2 – Adjustment of post-closing collected rents (proration), and payment of any allocable amounts to either party will be made within thirty days of close of the parties' fiscal year. Although my clients are willing to report under penalty of perjury to the Sellers on a reasonable basis with respect to the status of uncollected rents, and efforts made to collect them, my clients will not agree to inspection of their books, nor will they be subject to the Seller's veto power with respect to waiver or settlement of any claims for past-due rent. Sellers will have to accept that buyers will proceed in good faith to deal with such accounts on a commercially reasonable basis, including commencement or abandonment of legal proceedings with respect to them.

Case 1:03-cv-00043  Document 13  Filed 01/30/2004  Page 223 of 249

RESPONSE: WE DO NOT AGREE TO YOUR PROPOSAL. HOWEVER, TO TRY A DIFFERENT APPROACH, WE MAKE THE FOLLOWING PROPOSAL: THE PURCHASER WILL ACQUIRE ALL RENT ARREARAGES WHICH ARE 60 DAYS OR LESS OVERDUE AT PAR, AND WILL BE ASSIGNED WITHOUT COST ALL RENT ARREARAGES WHICH ARE MORE THAN 60 DAYS OVERDUE. THEN THERE WILL BE NO NEED FOR POST-CLOSING ADJUSTMENTS. BRUCE MORRISON IS OBTAINING A LISTING OF CURRENT ARREARAGES.

18.  §10.1 – In the event of casualty damage to the property prior to close of escrow, where damage is $500,000 or less, buyer will take the property as is, plus insurance proceeds if any, or, if no insurance covers the loss, the price will be abated to reflect the reasonably estimated amount of the loss.

RESPONSE: OK FOR CASUALTY WHICH OCCURS AFTER THE CONTRACT IS SIGNED.

19.  §11.1(b) – Any modification of the existing leases, or new leases made, shall not be at a material variance from the existing terms of such leases, without the consent of the buyer.

RESPONSE: WE CAN WORK SOMETHING LIKE THIS OUT.

20.  §13.20 "Business Day" – What are the letters (x), (y), (z) doing in here?

RESPONSE: A DRAFTING CONVENTION, SEPARATING THREE SEPARATE ALTERNATIVES. WHAT WOULD YOU LIKE TO USE?

21.  §13.21.4 Any interest earned on the purchase price, or any part thereof, held in escrow shall be divided equally between the parties.

RESPONSE: OK.

22.  §13.9 – Notices to buyer should be sent to Guam Tumon Company, C/O Jae S. Park, Fax No. 671-646-4388. My office fax is incorrect: the correct fax number is 671-789-2503.

RESPONSE: OK.

23.  §13.11 – Okay as amended by McCully, agreement construed under Guam law. However, venue for any action taken to enforce or interpret this agreement shall be brought in the Superior Court of Guam.

RESPONSE: OK.



I believe that covers most of it. I look forward to your response to these matters, and to moving ahead with this deal.

Thanks again for your courtesy and cooperation.

Sincerely,

Robert P. Kutz

LAW OFFICE OF ROBERT P. KUTZ
957 CROSS ISLAND ROAD
SANTA RITA, GUAM 96915
TEL: (671) 565-1800 FAX: (671) 565-1803
EMAIL: rpklaw@ite.net

December ~~1~~ 2, 2003 *

**MEMO via EMAIL**

TO: Andrew Weiner

FR: Robert P. Kutz

RE: Tumon Village Purchase Agreement—reply to your response

---

Andy:

I think we're getting there, with only a little way to go. References to my 12/2 email paragraphs:

3. OK

4. Let's see what the most recent survey is. If it shows encroachments & boundaries of foreclosure parcel, OK; if not, parties to split cost of new boundary survey 50-50.

5. We will increase deposit to USD $100,000. Scheduled escrow close 30 days after release of appraisal to Mr. Cho in Korea. If Korean bank/gov't refuses permission to export funds within that 30 days, through no fault of either party, deal ends, Seller and Buyer each receive ½ of the deposit. If no refusal, but no approval either after 30 days, Buyer will increase deposit $20,000 for each ten working days extension of escrow, to a maximum of fifty days/$100,000, or a total deposit of $200,000 for 80 working day escrow. If permission is refused during this time, Buyer and Seller split deposit; if granted, Buyer gets full credit for total deposit amount. Based on current information, the extensions should be unnnecessary, but govenments tend to be sluggish at best, even though the funds are on hand and do not involve any new loan.

9. OK

10. OK

11. See reply to 10. It seems that the best person to inform us both about the government requirements is the Korean DB representative who will handle the turnover, and undoubtedly knows exactly what is required.. Candidly, I am now getting concerned about Morrison's position about this appraisal---since I have repeatedly stated my clients' willingness to make the deal independent of the value conclusion reached by

[* correction of date done by client]

the appraiser, what is being hidden? Or is it that he thinks my clients will somehow get the appraisal, breach or cancel this contract, and try to negotiate some new deal, either directly or through some straw man? Surely you can draft language to prevent either of those possibilities. Bottom line is, no appraisal, no deal. Deliver it to Mr. Cho, and he will take it from there, including sending a copy to Mr. Park, here in Guam. Or have McCully deliver one to my office, and save everybody some trouble.

12. My clients need to be able to make inquiries of tenants and employees. Confidentiality will be maintained. Since most of the tenants are low income, GovGuam subsidy cases, they couldn't care less who owns or manages the place—it's not Park Avenue. As for the employees, we need to have a chance to conduct interviews and plan personnel changes as necessary.

15 We will agree to a 2-year limitation of actions period. No maximum or minimum claim.

17. As noted above, we believe most if not all of these tenants are Section 8 low income subsidees, and Gov Guam is notoriously slow- or no-pay. Subject to review of the actual rent roll, my clients will pay 50% of par for the subsidised ones 60 days or less in arrears, nothing for the others.

19 What do you suggest?

20. The last convention I went to was Detroit in '68. I must have missed this one. I just use commas or (gasp) semicolons to separate things in a sentence, unless there are an awful lot of them, in which case I try to write shorter sentences.

If not noted above, your other responses are fine.

Rob

2

## McCully & Beggs, P.C.

**From:**    Weiner, Andrew J. [AWeiner@mofo.com]
**Sent:**    Wednesday, December 03, 2003 11:55 PM
**To:**      rpklaw@ite.net
**Cc:**      Bruce P. Morrison; McCully & Beggs, P.C.
**Subject:** FW: reply to response

I have reviewed your comments with Bruce Morrison.   There is a threshold issue to deal with.
Your client's original offer contemplated a closing within 15 days, well before the end of calendar
2003, and not contingent on third party consents.   It was on this basis that my client elected to
proceed to attempt to negotiate the transaction.   Your response indicates that your client no longer
can perform on that timetable or on that basis.  It now is proposing a transaction which could
extend well into calendar 2004, and which has a risk that it will not close due to Korean
governmental action or inaction.   These are material changes.   I would ask you to reconsider
them.   Unless you can revert to your client's original offer as to the closing date and the absence of
third party consents, my client will have to reconsider whether it is prepared to proceed with a sale
of the property to your client.

We look forward to your response.


-----Original Message-----
**From:** R P Kutz [mailto:rpklaw@ite.net]
**Sent:** December 02, 2003 6:18 AM
**To:** Weiner, Andrew J.
**Subject:** reply to response


========================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
========================================================================

## McCully & Beggs, P.C.

**From:** Weiner, Andrew J. [AWeiner@mofo.com]
**Sent:** Thursday, January 15, 2004 8:10 AM
**To:** Duncan McCully
**Subject:** FW: response to reply to response

-----Original Message-----
**From:** Weiner, Andrew J.
**Sent:** December 04, 2003 8:49 AM
**To:** 'R P Kutz'
**Subject:** RE: response to reply to response

Thank you. I have some questions about your response. Please call at your earliest convenience.

    -----Original Message-----
    **From:** R P Kutz [mailto:rpklaw@ite.net]
    **Sent:** December 04, 2003 3:47 AM
    **To:** Weiner, Andrew J.
    **Subject:** Re:response to reply to response

    Andy: Per our telcon, my clients are willing to accomodate yours as follows:

    1. Designated escrow shortened to 15 Korean working days following release of the appraisal, other details per my last email.

    2. DB's Mr. Cha can release the appraisal directly to Mr. Lee Ho Sung, director of Hana Bank's main office, Seoul, (tel #754-2121), copy· provided to Buyers at close of escrow only. This process must be coordinated with our Mr. Cho, of course.

    3. Mr. Cha can be notified directly by the bank when release permission is granted, funds to be transferred to escrow account from Korea in USD$2,650,000 amount within two Korean working days after release, other $1M will be wired to escrow from mainland USA as soon as Korean funds are released.

    Was the concert as great as expected? Is there an album released yet?

    Regards,

    Rob

    ----- Original Message -----
    **From:** Weiner, Andrew J.
    **To:** rpklaw@ite.net
    **Cc:** Bruce P. Morrison ; McCully & Beggs, P.C.
    **Sent:** Wednesday, December 03, 2003 11:54 PM
    **Subject:** FW: reply to response

    I have reviewed your comments with Bruce Morrison. There is a threshold issue to deal with. Your client's original offer contemplated a closing within 15 days, well before the end of calendar 2003, and not contingent on third party consents. It was on this basis that my client elected to proceed to attempt to negotiate the transaction. Your response indicates that your client no longer can perform on that timetable or on that basis. It now is proposing a transaction which could extend well into calendar 2004, and which has a risk that it will not close due to Korean governmental action or inaction. These are material changes. I would ask you to reconsider them. Unless you can revert to your client's original offer as

1/15/04

to the closing date and the absence of third party consents, my client will have to reconsider whether it is prepared to proceed with a sale of the property to your client.

We look forward to your response.

-----Original Message-----
**From:** R P Kutz [mailto:rpklaw@ite.net]
**Sent:** December 02, 2003 6:18 AM
**To:** Weiner, Andrew J.
**Subject:** reply to response

==================================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
==================================================================================

==================================================================================

his message contains information which may be confidential and privileged.
nless you are the addressee (or authorized to receive for the addressee),
ou may not use, copy or disclose to anyone the message or any information
ontained in the message. If you have received the message in error, please
dvise the sender by reply e-mail @mofo.com, and delete the message.
hank you very much.
==================================================================================

1/15/04

Memorandum

To:        Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
cc:
bcc:
From: "Global Realty" <globalrt@ite.net> @ DEUBAINT
Date:       12/04/2003 12:44:41 AM
Subject:    Request for appraisal report from Micronesia Appraisal
Company

Dear Bruce,

Mr. Jae Park, the buyer, is requesting an appraisal report for the New
Tumon Village Apartment Complex.  As I remember, Micronesia Appraisal
Company appraised the New Tumon Village Apartments around 2 to 2 1/2
years ago when the real estate market was better than it is now.  I am
assuming the appraisal value was in the neighborhood of 4 - 4.5
million, more or less.  Could you make a request to Micronesia
Appraisal Company to release the appraisal report to myself, Michael
Lee/ Global Realty.  The contact person at Micronesia Appraisal is Mark
Gruber, he is the president.  He will release the appraisal report to
me pending a written request from you.  The fax number to Micronesia
Appraisal is (671)-646-0233.

If you need any assistance or help to complete the deal with Mr. Park,
please do not hesitate to contact me.

Sincerely Yours,

Mike
Global Realty
Michael Lee Principal Broker<?xml:namespace prefix = o ns =
"urn:schemas-microsoft-com:office:office" />
P.O. Box 25375
GMF, Guam 96921
Tel: (671)-637-3090
Fax: (671)-637-3119


Delivery Priority:            Normal
Delivery Report:        Basic
Receipt Report:         No
Personal Categories:    Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----
(Embedded image moved to file: pic06618.pcx)

# BTC 97 SP, LLC

December 9, 2003

Mr. Jae Seung Park
P.O. Box 8801
Tamuning, Guam 96931

BY FACSIMILE

Dear Mr. Park:

Confirming our conversation of yesterday evening, BTC 97 SP has made a firm decision to discontinue negotiations with you regarding the sale of the New Tumon Village project. Over the past several weeks, your proposed transaction of "all cash, close in 15 days, conditioned only on acceptable title" has changed dramatically. In light of your request for up to 80 days to close, in addition to other changes, we have chosen to pursue other opportunities which we believe will result in a closing prior to year end.

Thank you for your interest. Should the situation change, we may well be back in touch with you.

Sincerely,

Bruce P. Morrison
Managing Director

cc: Mr. Kyu Young Cho
Mr. Michael Lee

BTC 97 SP, LLC
C/O DB REAL ESTATE, 1251 AVENUE OF THE AMERICAS, NYC07-2500 • NEW YORK, NY • 10020
PHONE: 646-324-5070 • FAX: 646-324-5082

# JAE SEUNG PARK

P.O. Box 8801 Tamuning, Guam 96931
Tel: (671) 646-8082/5248*Fax: (671) 646-4388

December 10, 2003

To : Mr. Bruce Morrison
Dutsch Bank
D.B. Real Estate
1251 Avenue of the Americans 9th floor
NYNY 10020

Subject : The New Tumon Village

Dear Mr. Morrison

I received your fax of December 09, and have discussed the situation with my
attorney and with the rest of the group. As my attorney told yours this morning, we are
now satisfied that bank approval for transfer of all the funds may be had within not more
than 15 Korean working days after the appraisal is turned over to the bank officials, and
probably fewer. Accordingly, we are prepared to take any action necessary to assure the
sellers that the funds will be on hand and the escrow closed on or before December 31,
2003, as outlined in our original proposal. I understand that the sale of the "foreclosure
parcel", is being accomplished today, and that the remaining questions between the
attorneys with regard to the sale contract are quite small, and should be quickly resolved.

We understand your concern with respect to completion of this transaction, and are
prepared to cooperate fully with you to make sure that the sale can be completed on time.

I look forward to your response as soon as possible.

Sincerely yours,

Jae Seung Park

**McCully & Beggs, P.C.**

| | |
|---|---|
| **From:** | Weiner, Andrew J. [AWeiner@mofo.com] |
| **Sent:** | Tuesday, December 09, 2003 10:25 PM |
| **To:** | R P Kutz |
| **Cc:** | Bruce P. Morrison; Mark Beggs |

**Subject:** RE: Tumon Village Apts.

Sorry we did not connect on the phone. I was calling to confirm what you heard from Mr. Park. My client has made a firm decision not to proceed with a sale to Mr. Park at this time. The decision was made, among other things, by the material changes proposed by your client to the original terms which they had originally proposed (a 15 day closing, conditioned only on acceptable title). I had previously communicated to you that this was a real possibility, based on the proposed changes.

We appreciate the response made by your client, as indicated below, after the decision was made. However, I have confirmed with Bruce Morrison, on behalf of the seller, that the decision stands. Between now and the end of 2003, a different direction will be pursued.

-----Original Message-----
**From:** R P Kutz [mailto:rpklaw@ite.net]
**Sent:** December 09, 2003 1:31 AM
**To:** Weiner, Andrew J.
**Subject:** Tumon Village Apts.

Andy:

I got a call this morning from my client, Mr. Park, that Bruce Morrison had called him with statements to the effect that the sellers were still concerned about the buyers' ability to complete this transaction, and were contemplating calling off the deal altogether. Because of difficulties in understanding and translation, it was not clear to Mr. Park, nor to me, exactly what Morrison's position was.

Without more, I presume that this impasse is a result of your client's strong desire to be assured that this transaction will close this calendar year, rather than entertain the possibility that escrow could extend into 2004 as a result of some failure to obtain bank permission for transfer of funds in a timely fashion.

If indeed this is the case, my clients are now prepared to go yet one more step to reassure yours. Simply put, my clients will deposit $100,000 into escrow upon signing of the purchase agreement and appropriate escrow instructions (specifically including an escrow account to which the deposit and closing funds may be wired). They will argue to close within 15 Korean working days of the hand-over of the appraisal by the DB representative to the Korean Bank manager without condition of extension beyond that time. In other words, my clients will accept the risk that the permission will not be granted in a timely fashion, so that closing funds may be sent to escrow.

If the funds are not on hand to proceed with close by the date scheduled, subject of course to fulfillment of the other lesser conditions which we have previously discussed, your clients may cancel the escrow and receive the $100K deposit as liquidated damages.

I trust that your clients will find this proposal entirely satisfactory to their needs, and that we can proceed to complete the rest of the paperwork for this transaction immediately. As I

12/10/03

have mentioned to you, I am scheduled to leave Guam on December 14 (Guam date), and would like to get this transaction as far along the pipeline as possible in the next couple of days. If this proposal is agreed by your clients, please send me a confirming email, also dealing with the other concerns which we had temporarily set aside. Rather than continue to correspond by email, I will review your comments, discuss them with my clients as soon as possible, and respond to you by telephone tomorrow evening, your time, as early as I can do so.

Thanks for your attention and consideration in this matter.

Rob Kutz

cc: J.S.Park (Facsimile)

==================================================================

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),
you may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error, please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
==================================================================

12/10/03

60

Memorandum

To:         rpklaw@ite.net
cc:         Bruce P Morrison/NewYork/DBNA/DeuBa@DBNA
bcc:
From: "Weiner, Andrew J." <AWeiner@mofo.com> @ DEUBAINT
Date:       12/10/2003 08:52:27 PM
Subject:    Tumon


I relayed your message to Bruce Morrison and there is no change.  They
are proceeding in another direction.  Sorry

=======================================================================
=====

This message contains information which may be confidential and
privileged.
Unless you are the addressee (or authorized to receive for the
addressee),
you may not use, copy or disclose to anyone the message or any
information
contained in the message. If you have received the message in error,
please
advise the sender by reply e-mail @mofo.com, and delete the message.
Thank you very much.
=======================================================================
=====

Delivery Priority:           Normal
Delivery Report:       Basic
Receipt Report:        No
Personal Categories:   Tumon - Interested Parties - Michael S. Lee
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 12/16/2003
04:32 PM -----


(Embedded image moved to file: pic18190.pcx)

Memorandum

To:          globalrt@ite.net @ DEUBAINT
cc:          aweiner@mofo.com @ BANKERS_TRUST.COM
bcc:
From: Bruce P Morrison/NewYork/DBNA/DeuBa
Date:        12/11/2003 04:59:43 PM
Subject:     TVA


Michael -

I have not sent you the e-mail that I mentioned I was about to write to
you two days ago, since I assumed that the message that I conveyed to
you on the telephone was sufficient.  In response to your voice
messages, I reaffirm that BTC 97 SP has terminated negotiations and
discussions with Mr. Park, as I indicated in my letter to him of
December 9, a copy of which was sent to you.  There is nothing more to
do.

Regards,

Bruce

**********************************
Bruce P. Morrison
Phone: 646-324-3070
FAX:   646-324-7934
US Mobile:  917-678-1031
China Mobile:  86-1364-162-8339
**********************************

Delivery Priority:          Normal
Delivery Report:       Basic
Receipt Report:        No

Personal Categories:   Tumon - Interested Parties - Michael S. Lee


--

This e-mail may contain confidential and/or privileged information. If
you are not the intended recipient (or have received this e-mail in
error) please notify the sender immediately and destroy this e-mail.
Any unauthorized copying, disclosure or distribution of the material in
this e-mail is strictly forbidden.

**McCully_Beggs, P.C.**

**From:** Bruce P Morrison [bruce.p.morrison@db.com]
**Sent:** Wednesday, January 14, 2004 12:28 AM
**To:** mblaw; aweiner@mofo.com; james.d.egan
**Subject:** New Tumon Village Apartment - New Proposal to Purchase Real Property

```
********************************
Bruce P. Morrison
Phone: 212-250-4461
FAX: 212-797-2255
Mobile:  917-678-1031

********************************
----- Forwarded by Bruce P Morrison/NewYork/DBNA/DeuBa on 01/13/2004 09:27 AM
-----

                    "Global Realty"
                    <globalrt@ite.net        To:      Bruce P
Morrison/NewYork/DBNA/DeuBa@DBNA
                    >                         cc:
                                              Subject:  New Tumon Village
Apartment - New Proposal to Purchase Real Property
                    01/11/2004 11:07
                    PM
```

Dear Mr. Morrison,

Our Buyer's associates must receive approval from the Central Bank Government of Korea.  In order to receive approval for purchasing of any real property, they require an appraisal report or some document that is equivalent.  I would like to clarify that they have no intention to and will not negotiate the terms of the previously agreed selling price of $3,650,000.00, regardless of the appraisal value presented in the appraisal report.  Once again, the appraisal report is simply a formality that must be presented to the Government of Korea to release the funds.  The buyers have every intention of paying cash and will close escrow within 2 weeks of the Korean Government releasing the money.

Please take this offer from Mr. Park and Mr. Cho into consideration.  If you have any questions or if I can be of any further assistance, please do not hesitate to contact me anytime.

Sincerely yours,

1

Michael Lee

Global Realty
Michael Lee Principal Broker
P.O. Box 25375
GMF, Guam 96921

Tel: (671)-637-3090
Fax: (671)-637-3119

--

This e-mail may contain confidential and/or privileged information. If you are
not the intended recipient (or have received this e-mail in error) please
notify the sender immediately and destroy this e-mail. Any unauthorized
copying, disclosure or distribution of the material in this e-mail is strictly
forbidden.