DUNCAN G. McCULLY, ESQ.
McCULLY & BEGGS, P.C.
Suite 200, 139 Murray Blvd.
Hagatna, Guam 96910
Tel: 671-477-7418
Fax: 671-472-1201
e-mail: mblaw@kuentos.guam.net

Attorneys for Defendant
BTC 97 SP, LLC

**IN THE DISTRICT COURT OF GUAM**

**TERRITORY OF GUAM**

| | |
|---|---|
| GUAM TUMON COMPANY, LLC, a Guam limited liability company, JAE SEUNG PARK, an individual, CENTRAL MILLS SUPPLY, LTD., a Korean corporation, MICHAEL LEE, an individual dba Global Realty, <br><br> Plaintiffs, <br><br> v. <br><br> BTC 97 SP, LLC, a Delaware limited liability company, DOES 1-10, real parties in interest, <br><br> Defendants. | CIVIL CASE NO. 03-00043 <br><br> **DECLARATION OF BRUCE P. MORRISON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

1. I, Bruce P. Morrison, declare and state as follows:

2. All matters stated herein are based upon personal knowledge and belief and I am so competent to testify if called upon to do so.

3. I was the managing director of BTC 97 SP, LLC (the "Defendant" or the

"Seller") from the date of its formation to December 31, 2003. James D. Egan has been the managing director of the Defendant since January 1, 2004. The Defendant is a wholly owned subsidiary of BTC Mortgage Investors Trust 1997-S1(the "Trust"). The Trust is controlled by Deutsche Bank Trust Company Americas ("Deutsche Bank"). I resigned my positions with both Deutsche Bank and the Defendant effective December 31, 2003.

4. The Defendant is the owner of Lots 5098, 5100-1 and 5090-REM-1, Tamuning, Guam, commonly known as the New Tumon Village Apartments (further referred to as the "Property").

5. For some time, the Defendant has been interested in selling the Property. In July of 2003, I received a telefax from Michael S. Lee of Global Realty introducing himself and stating that he had a client interested in purchasing the Property. A copy of the telefax is Exhibit 1.

6. I have had over 20 years of experience in buying, selling or financing commercial real estate. I have developed several practices which I routinely follow. One of my practices is to always obtain a confidentiality agreement before I provide information concerning properties which I am selling. Another is to obtain information about a prospective buyer's background, financial ability and reputation before engaging in negotiations. This practice is required by Deutsche Bank as a matter of credit policy. It is important for Deutsche Bank, or any bank for that matter, to avoid participating in a money laundering scheme or other criminal activity. I also want to determine if a buyer has the financial ability to pay the purchase price, before I begin negotiations.

7. In July, I informed Mr. Lee that I would not provide him or his client with information concerning the Property until he and his client had signed a confidentiality agreement. I also requested background information about his client. See Exhibits 2,3,4

and 5. A copy of the confidentiality agreement signed by Mr. Lee is Exhibit 6. I edited the agreement to limit the disclosure of information about the Property to Mr. Park. I did not receive a copy signed by Mr. Park until September 18, 2003 (See Exhibit 10).

8. During September and October, I received several telephone calls, telefaxes and e-mails from Mr. Lee requesting the Seller's price for the Property (See Exhibits 7,8,12,16,19,21,22, and 26).

9. On October 7 and 8, I provided Mr. Lee with information concerning the number and type of apartment units, land area, occupancy rates, revenues and profits from the Property (See Exhibits 13, 14 and 15). On October 9, Mr. Lee also met with the Seller's resident Guam property manager – Rick Cruz – and discussed the Property (See Exhibit 16).

10. On October 8, 2003 I spoke with Mr. Lee by telephone. He again requested the Seller's price for the property. I told him that the price was $4,000,000.

11. On October 9, 2003, Mr. Lee called and again asked for the Seller's "bottom line" price. I told him that I would not negotiate with myself and repeated that the price was $4,000,000. He asked that the Seller pay his real estate broker's commission. He explained that Mr. Park was a close personal friend and that he would be uncomfortable negotiating a commission with him. After the conversation, I received his e-mail confirming his request. (Exhibit 17)

12. On October 17, 2003, Mr. Lee sent his telefax requesting the Seller's position on paying his commission and for us to provide a "Final Selling Price" (See Exhibit 19). On the 19th, I provided Mr. Lee with a Non-Exclusive Listing Agreement (See Exhibit 20), which he signed and returned (See Exhibit 21).

13. On October 22, 2003, Mr. Lee stated that his client, Mr. Park, was getting

impatient and again asked for a price "so that we can begin negotiations" (See Exhibit 22). On October 22, 2003, I received a telefax from Mr. Park providing me with contact information (See Exhibit 23). The next day, Mr. Park requested that I deal with him directly (Exhibits 24).

14. On October 24, 2003, Mr. Park called and asked me for a "final price". I told him that the sale price was $4,000,000. On October 29, 2003, I telefaxed Mr. Park and told him that the Seller was having internal discussions about an acceptable price. I also followed my standard procedure and requested background information about him and his companies. I also told him I needed financial statements for him and the entity which he would use to purchase the Property (See Exhibit 25).

15. On October 29, 2003, Mr. Lee told me again that Mr. Park was becoming impatient (See Exhibit 26). Mr. Lee told me that Mr. Park had made a verbal offer to purchase the Property for $3,500,000 in cash (Exhibit 26).

16. On October 30, 2003 Mr. Park sent me his letter listing the businesses and real estate which he owned. He provided me with a list of the names of the suppliers to his wholesale produce business and with bank references. He said that he was ready to pay $2,500,000 in cash and would finance the balance of the purchase price with the bank (See Exhibit 27).

17. On October 30, 2003, I requested one of my associates to complete a due diligence background check on Mr. Park. I directed him to contact the bank references provided by Mr. Park.

18. On November 2, 2003, Mr. Lee told me by e-mail that if Mr. Park did not have a new "selling price" during that week, then Mr. Park would look more closely at other property which Mr. Lee had shown him (Exhibit 28).

19. On November 3, 2003, I communicated by e-mail with Mr. John Lee, the Senior Vice President of First Hawaiian Bank in Maite. I told him Mr. Park had said that he knew him. Mr. John Lee informed me by e-mail that Mr. Park was not a borrower but that he maintained deposit accounts at the bank. He provided me with an estimate of the average balances. On November 4, I attempted to reach Mr. John Lee by telephone. I spoke with him on November 5, 2003 to confirm that he knew Mr. Park. He was not familiar with the details of Mr. Park's businesses or finances.

20. During the weekend of November 1 and 2, I received a telephone call from Attorney Robert P. Kutz, while I was leaving a restaurant in Connecticut. Mr. Kutz described the details of an offer which he wished to make on behalf of Mr. Park. I told Mr. Kutz that I needed a letter of intent or term sheet, as I had previously told Mr. Park. On November 4, 2003, Mr. Kutz provided me with his letter communicating Mr. Park's offer to purchase the property for $3,300,000 (See Exhibit 29).

21. On November 4, 2003, I telefaxed Mr. Park and offered to sell the property for $3,750,000. I told him that if the terms were acceptable, I would have my attorney contact his attorney to prepare the necessary sale documents (See Exhibit 30).

22. On November 5, 2003, Mr. Kutz responded that Mr. Park and his "associates" would not accept my counter proposal. He extended an offer to purchase the property for $3,500,000. He said that Mr. Lee was willing to renegotiate his commission and that I should renegotiate my commission with my "principals" (See Exhibit 31). On November 7, 2003, I informed Mr. Kutz that I was neither a lawyer nor a broker, but was an officer of the company that owned the Property. I also informed Mr. Kutz that I had made it a practice of dealing only with my counterparties and not with the attorneys for my counterparties. I told him that, at the appropriate time, my attorney would deal with him directly (Exhibit 32).

Also on November 7, 2003, I proposed to Mr. Park a selling price of $3,700,000 and suggested that the price could be reduced if Mr. Lee reduced his commission. I told Mr. Park that I needed information concerning his partners and the entity which would purchase the Property, including the source of any funds which would be used for the purchase (See Exhibit 33).

23. On November 13, 2003, Mr. Park provided me with contact and other information concerning his proposed partner, Kyu Young Cho, in Korea. He also provided me with a copy of a certificate of deposit for slightly over $1,000,000 and the bank statement of his company (See Exhibit 34).

24. On November 13, 2003 I contacted an associate within Deutsche Bank who was responsible for investments in Korea. I requested his assistance in completing a background due diligence investigation of Mr. Cho's finances, business activities and reputation. I also requested he provide me with information concerning the procedure, difficulty and time frame for obtaining government/bank approval for a Korean company to transfer money out of Korea for a real estate investment in the United States.

25. On November 13, 2003 Mr. Park requested that I provide Mr. Cho with a copy of the current appraisal for the Property in order for Mr. Cho to obtain approval to transfer money outside of Korea (See Exhibit 35).

26. On November 14, 2003, I told Mr. Park that we would be happy to provide Mr. Cho with a copy of the appraisal, but only after we agreed on a price and we had "gone to contract". By the phrase "gone to contract", I meant the signing of final written and comprehensive agreement of sale (Exhibit 36).

27. On November 14, 2003, I telefaxed my letter to Mr. Cho introducing myself and asking for his cooperation in our due diligence background investigation and that my

associate, Steven Cha, would contact him (See Exhibit 37).

28. On November 12, 2003, Mr. Lee told me by telephone that he would reduce his commission to $100,000 and proposed a sale price of $3,600,000. I then received his telefax confirming his two proposals (Exhibit 38).

29. On November 18, 2003 – November 19, 2003 on Guam – Mr. Park and I agreed by telephone to a purchase price of $3,650,000, provided the price was paid in cash within fifteen days. On the next day I sent him my letter confirming that discussion (See Exhibit 39). In that letter, I confirmed that if the sale would not close within 15 days, then the Seller would have to reconsider the final price.

30. On November 19, 2003, I also sent Mr. Lee a letter confirming a sale price of $3,650,000 and also confirming that he had agreed to reduce his commission to $100,000 (See Exhibit 40). I forwarded to him a copy of the Non-Exclusive Listing Agreement which I had modified by interlineation. I requested he initial the changes and return it (See Exhibit 41).

31. On November 20, Mr. Lee returned the modified Non-Exclusive Listing Agreement which he had initialed. He also provided me with a copy of the October 13, 2003 Ownership and Encumbrance Report (OER-03-8-4418) issued by Pacific American Title Insurance and Escrow Company ("PATICO")(Exhibit 42).

32. On November 20, 2003, Mr. Park provided me with his letter confirming the terms of the sale. He suggested that because of the Thanksgiving holiday, that the sale close on or before December 15. He said the funds would be deposited into escrow before that date. He said that he had directed his attorney, Mr. Kutz, to work with my attorney "to prepare and complete the sale documentation". However, in this letter Mr. Park changed the terms of his previous proposal and asked that the most recent appraisal be delivered

immediately, rather than at closing, to be used by his colleagues for "financing arrangements" in Korea (Exhibit 43).

33. On November 21, 2003, Mr. Cho also requested a copy of the appraisal be provided to him in order to obtain "approval of foreign direct investment from Korean government and bank" (Exhibit 44).

34. In response to Mr. Park and Mr. Cho's request for the appraisal, my attorney, Andrew J. Weiner informed Mr. Kutz that the appraisal would be released after we executed a final contract of sale. I did not wish to release the appraisal until I was certain that we had entered a final and binding agreement of sale with a buyer capable of purchasing the property. I did not want Mr. Park to use the appraisal to renegotiate the price or to raise new issues about matters referred to in the appraisal. Similarly, if the sale to Mr. Park and Mr. Cho fell through, I did not want the appraisal circulating among other potential buyers.

35. On November 25, 2003, I informed Mr. Cho that I had forwarded a copy of the appraisal to my associate in Korea – Steven Cha – and that it would be released to him after a "purchase and sale agreement has been signed". (Exhibit 49) I also requested that he telefax to me the personal and financial information which he had provided to Mr. Cha.

36. Based on information which I received from Mr. Cha and Mr. Cho, I determined that Mr. Cho had the financial ability to complete the purchase and did not appear to be engaged in any money laundering or other illegal activities. However, my associate Mr. Cha provided me with information about the regulatory process for approval of the export of money from Korea. Mr. Cha reported that Mr. Cho had told him that the transaction would require the approval of the Ministry of Construction and Transportation in Korea. He also reported that the timetable for the approval was uncertain.

37. On November 28, 2003, I reviewed a copy of Mr. Kutz's memo to Andrew Weiner requesting changes in our proposed agreement of sale. (Exhibit 51) I was extremely concerned by the number and extent of the requested changes. I was especially concerned that the Buyers had changed an essential component of our preliminary agreement by requiring that the sale be conditioned on Mr. Cho obtaining Korean government approval, which they anticipated may not be given until after December 31, 2003 (See Sections 11 and 14 of Exhibit 51). The proposed changes were material and unacceptable. Similarly, I considered the Buyer's proposal to reduce the deposit from $365,000 to $75,000 to be material and unacceptable.

38. On December 2 or 3, I saw Mr. Kutz's response (Exhibit 53) to Mr. Weiner's communication (Exhibit 52) that the Buyer's proposed changes were unacceptable. I was extremely worried about the wrong turn the negotiations had taken. Rather than moving closer, the parties were moving further apart on terms which were of primary importance to the Seller. In fact, the Buyers were requiring that they be able to extend escrow for eighty days and that they be entitled to split the reduced deposit 50/50 should the sale not close. From this, I concluded that the Buyers anticipated that it could take a long time to obtain Korean government approval, if they could obtain it at all. Because the primary objective of the Defendant was to sell the Property before the end of the year, the possibility of closing in 2004 – or receiving liquidated damages if the sale did not close at all – was not acceptable.

39. Between December 3 and December 8, 2003, I received additional communications from my associate Mr. Cha concerning the Korean government approval process. He informed me that the process could be lengthy and that it was possible Mr. Cho may not be able to obtain approval, thereby confirming my suspicions.

40. On December 8, 2003, Mr. Park telephoned me. He said he thought the approval process would take more than fifteen days "so say thirty...". I told him that I did not like the way negotiations were proceeding. For example, the promise of an all cash closing within fifteen days had slipped to "30 days with the right the buy an additional 50 business days". I told Mr. Park that BTC 97 SP was breaking off negotiations immediately and would pursue other options for a deal that might close during 2003. After hanging up, Mr. Park called me back. He said that Mr. Lee – the broker – was upset. He said he wanted to make a deposit to keep the deal alive. I told him I would not accept a deposit and we were going to pursue other options.

41. On the next day, December 9, 2003, I telefaxed to Mr. Park a letter confirming that BTC 97 SP, LLC had made a "firm decision to discontinue negotiations with you regarding the sale of the New Tumon Village project" (See Exhibit 57). At that time, I considered my negotiations with Mr. Cho and Mr. Park to be terminated. It never entered my mind that Mr. Cho and Mr. Park believed that we had entered into a binding and enforceable agreement in any prior exchange of correspondence. In several of our telephone conversations, Mr. Park and I discussed and agreed that the terms of the purchase would be drafted by our attorneys and we would sign a formal, written contract.

42. On December 11, 2003 I told Mr. Lee that the Defendant had broken off negotiations (Exhibit 61).

43. After terminating negotiations, I received a copy of Mr. Kutz's e-mail to Mr. Weiner of December 9, 2003 (Exhibit 59) and Mr. Park's letter to me of December 10, 2003. (Exhibit 58) Mr. Kutz made the new proposal that if the closing did not occur within fifteen "Korean working days" after the appraisal was released, then the Seller would be able to retain the $100,000 initial deposit. Mr. Kutz and Mr. Park's proposals did not

change the underlying problem that the Buyer's performance was still conditioned upon Korean government approval. Therefore, the real possibility of not closing by the end of the year continued to exist. I was also concerned about our ability to resolve the other remaining issues in the draft agreement of sale.

44. After terminating negotiations, I reopened discussions with buyers on Guam who had expressed an interest in the Property in September or October. One group quickly provided me with financial and background information which verified its ability to purchase the property. We agreed on a purchase price. The buyer agreed on our form of an agreement of sale without any material change and without requiring the types of changes Mr. Kutz had been insisting upon.

45. On December 12, 2003, the new buyer and the Defendant signed an agreement of sale and the new buyer deposited 10% of the purchase price into escrow. Before December 31, 2003, the new buyer deposited the balance of the purchase price into an account on Guam. Because of this lawsuit, the Defendant and the new buyer were unable to close before December 31, 2003. The Defendant and the new buyer agreed to extend the closing date. The sale will close as soon as this lawsuit is resolved or the lis pendens is released.

46. On January 11, 2004, after the Defendant had filed its counterclaim against Mr. Lee in this action, I received an e-mail from Mr. Lee asking that the Defendant release its appraisal so Mr. Cho could obtain approval from the Korean government to purchase the Property (Exhibit 62). I was surprised by this request and declined to respond on advice of counsel.

47. I either wrote, received or was provided a simultaneous copy of all of the letters, memos and e-mails which are submitted to the court as Exhibits 1 through 62. The

Page 11 of 12
Case 1:03-cv-00043   Document 15   Filed 02/03/2004   Page 11 of 12

exhibits are true and accurate copies of the originals and were sent or received on the dates set forth on the exhibits, unless otherwise noted.

Sworn to under the laws of Guam and the United States proscribing a penalty for perjury.

_____
BRUCE P. MORRISON

Dated: January 29, 2004