DUNCAN G. McCULLY, ESQ.
McCULLY & BEGGS, P.C.
Suite 200, 139 Murray Blvd.
Hagatna, Guam 96910
Tel: 671-477-7418
Fax: 671-472-1201
e-mail: mblaw@kuentos.guam.net

Attorneys for Defendant
BTC 97 SP, LLC



# IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| GUAM TUMON COMPANY, LLC, a Guam limited liability company, JAE SEUNG PARK, an individual, CENTRAL MILLS SUPPLY, LTD., a Korean corporation, MICHAEL LEE, an individual dba Global Realty, <br><br> Plaintiffs, <br><br> v. <br><br> BTC 97 SP, LLC, a Delaware limited liability company, DOES 1-10, real parties in interest, <br><br> Defendants. | CIVIL CASE NO. 03-00043 <br><br> **DECLARATION OF ANDREW J. WEINER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

I, Andrew J. Weiner, declare and state as follows:

1. All matters stated herein are based upon personal knowledge and belief

Page 1 of 6
Case 1:03-cv-00043   Document 17   Filed 02/04/2004   Page 1 of 6

ORIGINAL

and I am so competent to testify if called upon to do so.

2. I have been a partner with the law firm of Morrison & Foerster LLP in New York for over 13 years. I regularly advise and represent Deutsche Bank Trust Company Americas and its affiliates in its dealings with its real property.

3. In November, 2003, I was requested by Bruce P. Morrison to assist BTC 97 SP, LLC (the "Defendant" or the "Seller") in the sale of the New Tumon Village Apartments (the "Property"). On or about November 18, 2003, Mr. Morrison advised me of a potential sale with a buyer on Guam with whom Mr. Morrison had reached a preliminary agreement as to the sale price and the time and manner of payment of the price. Mr. Morrison informed me that the buyer, Jae Sung Park ("Mr. Park" or the "Buyer") was represented by an attorney on Guam, Robert P. Kutz.

4. After an introductory telephone conversation with Mr. Kutz on November 19, 2003, I provided him with my contact information. On November 21, 2003 Mr. Kutz responded by e-mail (See Exhibit 45). He requested that I prepare " a short form purchase agreement" as soon as possible. He attached a letter which proposed that the sale close on or before December 15, 2003. He also asked that a copy of the appraisal for the Property be immediately delivered to him (See Exhibit 45).

5. In the morning of November 24, 2003 I replied that a draft contract was almost complete and that he should speak to me about how and when the Seller would deliver the appraisal (See Exhibit 46).

6. In the evening of November 24, 2003 I forwarded to Mr. Kutz the first draft of a contract of sale (Exhibit 47). I noted on the cover e-mail that it had not been reviewed by my client and was subject to their comments. At Section 13.17, the draft specifically stated that "[T]he submission of this Agreement for examination does not constitute an

offer by or to any party. This Agreement shall be effective and binding only after execution and delivery by the parties hereto."

7. On November 24, 2003 I forwarded to Mr. Kutz information describing an encroachment by a fence from the Property into an adjoining lot. At Section 4.2.1 of the proposed Agreement of Sale, I had stated that the encroachment of the fence had to be accepted by the Buyer without any adjustment of the purchase price. Nonetheless, the encroachment of the fence was not one of the title exceptions noted on the October 13, 2003 Ownership and Encumbrance Report prepared by Pacific American Title and Escrow Company which had been the basis of the Buyer's offer to purchase the Property (See Exhibit 42).

8. On November 26, 2003 I forwarded a redlined draft of the Agreement of Sale prepared by McCully and Beggs, P.C. (See Exhibit 50).

9. On November 28, 2003 I received a copy of Mr. Kutz's memorandum setting forth his twenty-three paragraphs of requested changes to the draft Agreement of Sale (See Exhibit 51). I responded with my e-mail of December 1, 2003 (See Exhibit 52). In my e-mail, I clearly objected to material changes proposed by Mr. Kutz on behalf of Mr. Park. Without limitation, I pointed out that he was "CHANGING THE ACCEPTED OFFER MATERIALLY" by making "THE DEAL ... CONTINGENT ON KOREAN GOVERNMENT APPROVAL, WITH AN UNCERTAIN TIME FRAME" (See Section 5 of Exhibit 52; capitalization as in the original). I asked that Mr. Kutz clarify Mr. Park's position. While noting that I did not know if the new terms would be acceptable to my client, I asked him to clarify if Mr. Park was asking for the right to terminate the contract and obtain the return of the deposit if Korean government approval was not obtained. I pointed out again that he was making a "MATERIAL CHANGE IN THE DEAL" (See Section 11 of Exhibit 52).

10. On December 2, 2003 I received Mr. Kutz's memorandum of that date responding to my questions (See Exhibit 53). At Section 5, Mr. Kutz verified that Mr. Park required the ability to extend the closing for up to eighty working days and if at the end of that period he did not have Korean government approval, then a $200,000 deposit would be divided between the Seller and the Buyer. At Section 11, Mr. Kutz stated that if we did not deliver the appraisal as demanded, there would not be any deal (Exhibit 53).

11. After discussing Mr. Park's position with my client, I responded with my e-mail of December 3, 2003 (See Exhibit 54). I pointed out that Mr. Park's original offer contemplated a closing within fifteen days which would not be contingent on any third party consents. "It was on this basis that my client elected to proceed and to attempt to negotiate the transaction. Your response indicates that your client no longer can perform on that timetable or on that basis." I went on to ask that his clients reconsider the material changes they had proposed and if they could not revert to their original offer as to the closing date and the absence of third party consents, then the Seller would have to "reconsider whether it is prepared to proceed with the sale of the Property to your client."

12. In response to my warning, I received Mr. Kutz's e-mail of December 4, 2003 stating that "[D]esignated escrow shortened to 15 Korean working days following a release of the appraisal, other details per my last e-mail." I did not understand what Mr. Kutz intended by that statement. I asked that he call me. When we spoke, I asked him if his client's proposal to allow the closing date to be delayed into 2004 had been withdrawn. Mr. Kutz stated that it had not. He stated that the Buyer only intended to shorten the time period after which they would have to increase the forfeitable portion of the down payment. I told Mr. Kutz that this issue could be a deal breaker.

13. On the evening of December 8, 2003 my client advised me that he had

decided to break off negotiations with Mr. Park and Mr. Cho and that he had communicated his decision to them. I was asked to communicate that decision to Mr. Kutz. In the evening of December 8, 2003, I telephoned Mr. Kutz to advise him; however, I was unable to reach him by telephone. On the following morning at 1:31 a.m., I received Mr. Kutz's new proposal (See Exhibit 59), which I reviewed the following morning upon arriving at my office. After forwarding the proposal to my client, I informed Mr. Kutz at 7:25 a.m. on December 9 that the Seller had made a firm decision not to proceed with the sale to Mr. Park. I explained that "the decision was made, among other things, by the material changes proposed by your client to the original terms which they had proposed (a fifteen day closing, conditioned only on acceptable title)." (See Exhibit 59)

14. After my e-mail, I spoke with Mr. Kutz by telephone and he pleaded with me to reopen negotiations and complete the transaction. After communicating with my client, I sent Mr. Kutz an e-mail stating that Mr. Morrison had declined to change his decision and he was proceeding in another direction (See Exhibit 60).

15. At no time during our several discussions did Mr. Kutz state that he believed a final and enforceable contract had been entered into between our clients in the exchange of correspondence which preceded the drafts of the Agreement of Sale.

16. True and accurate copies of Exhibits 45 – 48, 50 – 52, 54, 55 and 59 – 61 are submitted to the court with this Declaration. The dates used in this Declaration are New York time.

Sworn to under the laws of Guam and the United States proscribing a penalty for perjury.

1
2
3   _____
4   **ANDREW J. WEINER**
5
6   Dated: January 29, 2004
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28