1  **ROBERT P. KUTZ, ESQ.**
   **LAW OFFICE OF ROBERT P. KUTZ**
2  **PO Box 7310, Agat, GU 96915**
   **Tel.: (671) 789-2500**
3  **Fax:  (671) 789-2503**
   **Email:** rpklaw@guam.net
4

FILED
DISTRICT COURT OF GUAM

FEB 13 2004

MARY L. M. MORAN
CLERK OF COURT

26

5              IN THE DISTRICT COURT OF GUAM

               TERRITORY OF GUAM
6

7                                          )   CIVIL CASE NO. <u>03-00043</u>
   GUAM TUMON COMPANY, LLC                 )
8  a Guam limited liability company,       )   **PLAINTIFFS' MEMORANDUM OF**
   JAE SEUNG PARK, an individual,          )   **POINTS AND AUTHORITIES IN**
9  CENTRAL MILLS SUPPLY, LTD.,             )   **SUPPORT OF PLAINTIFFS' MOTION**
   a Korean Corporation, MICHAEL LEE,      )   **FOR SUMMARY JUDGMENT**
10 an individual dba Global Realty,        )
                                           )
11      Plaintiffs and Counter-defendants, )          **AND**
                                           )
12              vs.                        )   **IN OPPOSITION TO DEFENDANT'S**
                                           )   **MOTION FOR SUMMARY**
13 BTC97SP, LLC, a Delaware limited liability )  **JUDGMENT.**
   company, DOES 1-10, real parties in interest, )
14                                         )
        Defendants and Counter-claimants.  )
15 _____ )

16

17                        **INTRODUCTION**

18       1.      It is hardly surprising that, when the parties to a lawsuit are both represented by

19  experienced counsel, a radically different interpretation can arise from the same set of facts and

20  circumstances.  Such is the case here.  Based upon the declarations of the Defendant's principal and its

21  counsel, together with a set of 62 printed documents, Defendants in this case contend that the parties

22  to this lawsuit, in their roles as prospective Buyer and Seller of real property, never reached any binding

23  agreement at all with respect to the sale.  Since no agreement was ever reached, say Defendants,

-1-

ORIGINAL

1  Defendants were free to terminate then-ongoing negotiations with the Plaintiffs, and sell the property to

2  someone else. Having reached this conclusion, Defendants have moved to dismiss all of the Plaintiffs'

3  complaint herein, or at least those portions of it which would permit Defendants to sell the property to

4  another Buyer.

5      2.    Plaintiffs and their counsel, based upon the same set of transactions and documents,

6  have reached precisely the opposite conclusion – i.e., that a binding contract of purchase and sale for

7  the real property was made between the parties, and that subsequent negotiation with respect to

8  additional terms proposed by both sides which might, or might not, be incorporated in the parties'

9  formal contract were not binding on either side unless both parties agreed to be bound.

10     3.    Since, as noted above, both parties rely upon essentially the same documentation in

11  support of their positions. Because the Defendant filed its motion to dismiss before Plaintiffs filed

12  theirs for specific performance, references in this memorandum and the declarations submitted with it

13  use the Defendant's motion exhibit numbering system. By so doing, it is respectfully submitted that

14  unnecessary duplication of paperwork, and the possible mis-identification of an exhibit by referring to it

15  in two different ways, will be avoided. Neither party disputes the authenticity or accuracy of the

16  exhibited documents, though they differ considerably in the meaning and import to be given to those

17  documents.

18     4.    At this point, for purposes of Defendant's motion and Plaintiff's cross-motion, neither

19  party asserts that such material facts are missing from the parties pleadings and exhibits as to prevent

20  the remedy of summary judgment in favor of one side or the other, notwithstanding the fact that no

21  formal discovery has been conducted. Such a finding of remaining material issues of fact requiring trial

22  is left, for now, to the Court.

23

# STATEMENT OF ISSUES

5.    The primary issue to be considered by the Court in resolving these cross-motions is whether any enforceable contract to purchase and sell the subject real property was entered into between the parties, or whether the objective intent of the parties, as expressed in the writings exchanged between themselves and their counsel, taken together, constituted nothing more than an unenforceable "agreement to agree".

6.    If a binding contract was formed, the Court must then proceed to determine whether it is sufficiently certain in its terms and conditions to be specifically enforced, and presuming that such a finding is made, whether or not mutuality of obligation exists on the part of the other party, such that equity would not be offended by a decree of specific performance. If mutuality exists, specific performance should be granted, and Defendant's counterclaims dismissed.

7.    On the other hand, should the Court find that no contract of any type was ever formed, then the Defendant should prevail as to its motion to dismiss the Plaintiffs' claims for specific performance and damages for breach. Until the time for appeals of such judgment has passed, or the judgment has been affirmed on final appeal, Defendant's motion to dissolve the lis pendens should not be granted. Otherwise, if BTC and the mysterious "new buyer" should decide to abandon their contract, nothing would remain of record to put future potential purchasers of the property on notice of Plaintiffs' claims.

8.    Finally, the Court should determine whether the actions of the parties – Defendants in breaking off the transaction with Plaintiffs, and Plaintiffs in bringing this lawsuit and filing its Notice of Lis Pendens – constitute bad faith on the part of either party, such that either party is estopped from proceeding with this action, or is otherwise subject to extraordinary sanctions or a remedy in damages, as provided for Seller's breach of a real estate contract pursuant to 20 GCA §2206.

Case 1:03-cv-00043    Document 29    Filed 02/13/2004    Page 3 of 27

## FACTUAL SUMMARY

9.     In or about July 4, 2003, Plaintiff Michael S. Lee (hereafter "LEE") contacted Bruce Morrison (hereafter "MORRISON"), Managing Director of Defendant BTC97 SP advising MORRISON that LEE's company, Global Realty, had obtained a client who was interested in purchasing the subject real property, a multi-unit apartment complex located in Upper Tumon, Guam, commonly known as the Tumon Village Apartments. Following this initial contact, LEE commenced negotiations for purchase of the Tumon Village property on behalf of LEE's clients, Plaintiffs Jae S. PARK and PARK's business associate, Kyu Young CHO, Chairman and Chief Executive Officer of Plaintiff Central Mills Supply Company, Ltd. From the beginning of negotiations, LEE represented to MORRISON that LEE's clients were interested in and willing to purchase the property in "as is" condition. [Defendant's Exhibits 1-23] As a result of this initial negotiation, Defendant BTC entered into a non-exclusive listing agreement with LEE for the sale of the property to LEE's clients.

10.     Between July and October, 2003, negotiations for purchase of the property by LEE's clients were conducted with MORRISON in part by Plaintiff LEE, in part by counsel for Plaintiff PARK, acting at the direction of Plaintiff PARK, and in part by Plaintiff PARK himself. As a result of these negotiations, on November 4, 2003 (Guam date), PARK's counsel wrote MORRISON and extended an all-cash purchase offer for the property in the amount of $3,300,000, payable in lump sum within 15 business days of acceptance of the offer. The offer was extended for the property in "as is, where is" condition, without warranty of any kind except warranty and delivery of clear, insurable title. As part of the closing documentation, the Sellers were to provide appropriate financial records, together with a copy of the most recent appraisal for the property, the contents of which need not be disclosed prior to close of escrow. [Defendant's Exhibit 29]

11.     On November 4, 2003 (New York date), Director MORRISON responded by fax to Plaintiff PARK that BTC had had internal meetings, and was prepared to counter-offer the property to PARK at a price of $3,750,000, still on an "as is" basis.  MORRISON further stated that if the price was acceptable, PARK should respond no later than November 11, including any terms on which acceptance was based.  [Defendant's Exhibit 30]

12.     On November 5, 2003 (Guam date), at PARK's request, Atty. Kutz responded to MORRISON's counter offer with a return counter offer, increasing the Buyers' proposed price to $3,500,00, and including particular terms and conditions with respect to the issue of "clear, insurable title", as a condition of sale, and including by reference the other terms sent to MORRISON on November 4.  [Defendant's Exhibit D]

13.     On November 7, 2003, MORRISON wrote to Atty. Kutz, correcting Kutz' misunderstanding with respect to the fact that MORRISON was a principal of the Seller, and neither a lawyer nor broker.  In the letter, MORRISON stated that: *further, during the entirety of my career, I have only negotiated with my business counterparts and not with a counterpart's attorney, a practice that I believe is prudent to continue."*  MORRISON then stated that his attorney would become involved at an "appropriate time", and then declared that in the interim, he would communicate directly with PARK.  [Defendant's Exhibit 32]

14.     Also on November 7, 2003 (New York date), MORRISON again responded directly to PARK, refusing the $3,500,000 offer, but re-offering to sell for the amount of $3,700,000, which might be further modified, should broker LEE be willing to decrease his agreed 4% commission in order to expedite the proposed sale.  [Defendant's Exhibit 33]  In fact, broker LEE did agree to reduce his commission from 4% of the sale amount to a flat fee of $100,000, pursuant to an amended non-exclusive listing agreement between BTC and LEE.  [Defendant's Exhibits 40-41]

15. Having successfully negotiated a reduced commission with **LEE, MORRISON** and **PARK** again discussed the adjustment of the purchase price, arriving at a final sale price of $3,650,00, to be paid in all cash, with closing at 15 days following opening of escrow. By fax on November 19, 2003 (New York date), **MORRISON** confirmed this oral agreement with **PARK**. [Defendant's Exhibit 39]

16. On November 20, 2003 (Guam date), Plaintiff **PARK** again faxed **MORRISON**, confirming the irrevocable commitment of **PARK** and his associate, Kyu Young **CHO**, to purchase the property for a cash price of $3,650,000. By this letter, **PARK** reiterated that the terms of the purchase would be those set out in the letters exchanged between **MORRISON** and Atty. **Kutz**, so far as the condition of the property and documentation to be supplied was concerned. One new element was added by **PARK** in this correspondence, that being a requirement that a copy of the property's appraisal, previously prepared for the Sellers, be provided to the Buyers during escrow so that it could in turn be presented to the Korean government as part of the process of obtaining Korean bank approval for transmission of a substantial portion of the balance of the purchase price from Korea to the Guam escrow holder. [Defendant's Exhibit 43]

17. **PARK** knew that it was important to **MORRISON** to close the escrow as soon as possible, so suggested a closing date of December 15, 2003, which closing could only be possible if **MORRISON** promptly provided the appraisal to Mr. **CHO** in Korea. **MORRISON** neither accepted nor rejected the suggested closing date, and at no time prior to this had **MORRISON** told **PARK** or **CHO**, either orally or in writing, that the Seller's obligation to perform would be conditioned upon close of escrow before December 31, 2003.

18. **MORRISON** made no objection to **PARK**'s statement that his November 20th letter constituted an irrevocable commitment to purchase the property on terms and conditions set out in the

1  letters exchanged between MORRISON and Kutz, with the single exception of a requirement for the
2  delivery of a copy of the appraisal prior to, rather than at close of escrow. Despite his announced
3  intention to deal with no one other than the principals involved, MORRISON's only direct response to
4  PARK or CHO before termination of the deal by MORRISON was a letter sent on November 25,
5  2003, by fax to Mr. CHO in Korea which confirmed that he (MORRISON) was sending a copy of the
6  appraisal to the Seller's representative in Korea, for further delivery to CHO. [Defendant's Exhibit 49]

7      19.    In the belief that PARK/CHO and MORRISON had made a binding agreement for the
8  purchase and sale of the property as of November 20, on November 21, PARK asked Atty. Kutz to
9  request that MORRISON's attorney have a short document prepared to formalize the purchase
10  agreement and deposit in escrow. [Defendant's Exhibit 45] No such short or simple document was
11  ever received. Instead, on November 25 (Guam date), counsel for Plaintiffs received an emailed 28-
12  page, single-spaced draft document entitled "Agreement of Sale" [1], originally prepared by Seller's New
13  York counsel, Andrew Weiner of Morrison and Forster, and thereafter amended by Sellers' Guam
14  counsel, Duncan McCully of McCully and Beggs. [Defendant's Exhibit 47 and 50] No copy of the
15  document was provided directly to PARK or CHO by MORRISON, and no discussion, verbal or
16  written, of the draft agreement or any of the new terms and conditions proposed by either party was
17  ever had between MORRISON and either PARK or CHO.

18      20.    As is often the case when attorneys are zealous in protecting their clients and providing
19  for all possible contingencies, the Seller's draft agreement contained a substantial number of terms and
20  conditions not expressed in the letters exchanged between Buyers and Sellers, which letters formed the
21  basis of this transaction. Among additional terms and conditions included were those providing for the
22  potential transfer of a mortgagee's interest in a portion of the property, rather than fee simple transfer,

---

[1] No document actually entitled "Purchase and Sale Agreement" as phrased by MORRISON in Ex. 49, was ever produced by anyone.

waiver of applicable statutes of limitation and so forth. For their part, Buyers made cross proposals for escrow deposit amounts, opening and closing escrow dates, and possible extensions of such dates to obtain government approval. Of these various proposals, some were agreed between counsel for the parties, subject to final approval of their principals, while some remained unresolved as of December 3, 2003. Among those agreed was designation of an escrow holder, and the substitution of a new Guam limited liability company, the Guam Tumon Company (hereafter "COMPANY"), as nominee for the formed, and is designated a Plaintiff in this action, as its interest appears. From the Buyer's viewpoint, it was clear that the multiple new terms and proposals exchanged between the parties constituted a negotiated attempt to secure new terms and conditions to an existing deal, which terms would not be binding on either party unless both agreed. Neither side believed that the draft agreement, in and of itself, constituted an offer to buy or sell the property. [Declaration of PARK, para. 13]

21. On December 1, 2003 (New York date), as part of the ongoing exchange of email communications regarding proposed additional terms or conditions to the purchase agreement, MORRISON's New York attorney repeatedly referred to the "accepted offer", and clearly acknowledged that the purchasers' request for changes to proposed escrow dates and to closure conditioned on approval of fund release by Korean government officials, if implemented, would constitute material changes in the existing contract:

> "RESPONSE: We are confused by the statement about "a very short escrow". If the transaction were the 15 day close (i.e., 12/15/03) specified **in the offer by your client which was accepted**, a small deposit would be understandable (although we would want something in excess of $75,000). However, you are now changing **the accepted offer** materially; The deal is contingent on Korean governmental approval, with an uncertain time frame. The issue of the amount of the deposit cannot be resolved until these other issues are resolved."[Emphasis added; Defendant's Exhibit 52, p.3, para.5]

> "As to governmental approval, it is not clear whether you are asking for more time to obtain the approval or you are, in addition, saying that you can terminate the contract and obtain a return of the deposit if approval is not obtained. **In either event, this is a material change in the deal**. Before checking to see whether the seller is prepared to accept these new terms (and

*without suggesting that it is so prepared), it would be useful to know exactly what you are now proposing:* [Emphasis added; Defendant's Exhibit 52, p.5, para.11]

It should be noted that, in his declaration dated January 29, 2004, submitted in support of Defendant's motion for summary judgment, p.3, para. 9 thereof, Mr. Weiner not only reiterated his words *"changing the accepted offer materially"*, but makes no attempt to explain away the words "accepted offer", such that the words appear to be something other than what they are. Instead, in his declaration, Mr. Weiner affirms that his statement was made *"without limitation"*. [Declaration Weiner, p.3, para.9] The legal significance of Mr. Weiner's statement is discussed below, para. 46-48.

22.     On December 4 (Guam date), Atty. Weiner emailed Atty. Kutz, noting that the proposed changes to permit an extension of escrow time beyond the originally contemplated 15 days, in order to assure Korean government approval for fund transfer, constituted such material changes that: *"Unless you can revert to your clients' original offer as to the closing date and the absence of third-party consents, my client will have to reconsider whether it is prepared to proceed with the sale of the property to your client."* [Defendant's Exhibit 54]

### Bad Faith

23.     In fact, Mr. Weiner's client [MORRISON], had already agreed to meet with the new buyer, identified in MORRISON's supplementary declaration dated February 4, 2004 as the "Second Group" from whom, unknown to Plaintiffs, a previous purchase offer had been received. By December 5, 2003, MORRISON had already reached agreement on a purchase price (which is carefully omitted from MORRISON's supplementary declaration), and a commitment to close a new deal before December 31. In other words, at the point in time when PARK/CHO thought they were still negotiating the new terms in good faith with MORRISON, and were willing to take the risk that they could, if necessary, close the transaction before December 31 if the appraisal was promptly

1 provided, MORRISON already had a buyer in his pocket, with an undisclosed price and a firm
2 commitment to buy. [Supplementary Declaration MORRISON, para. 5-7]

3     24.    Following receipt of Weiner's December 4th email, Buyers responded by email between
4 counsel the same day, offering further accommodation to the Sellers. [Defendant's Exhibit 55] No
5 response was had from MORRISON until December 9 (Guam date) when PARK phoned
6 MORRISON, and MORRISON told, then faxed PARK to say he was stopping the transaction. By
7 letter directly from PARK to MORRISON, on December 10, 2003 (Guam date), the Buyers affirmed
8 that they did not require the contingency of Korean government approval as a condition of close of
9 escrow, and that they were prepared to open escrow immediately, and "do whatever was necessary" to
10 close within 15 working days or less, i.e., before the end of calendar 2003, if the appraisal was
11 forthcoming promptly. [Defendant's Exhibit 58]

12     25.    Notwithstanding this confirmation of willingness to abide by the terms of the original
13 letter agreements, regardless of other proposed conditions and terms exchanged between the lawyers,
14 MORRISON stuck by his declaration of BTC's intention to discontinue negotiations, withdraw from
15 the transaction, and "pursue other opportunities." On page 12 of his Memorandum in support of
16 Defendant's motion for summary judgment of dismissal, counsel for Defendant argues that "*Mr. Kutz*
17 *made no verifiable assurances of the Buyer's ability to perform before December 31, 2003*", and
18 furthermore, that as of December 10, 2003 "*it was doubtful that fifteen Korean working days would*
19 *have been before December 31, 2003.*" In fact, no such request for assurances or date verification
20 was ever made by Morrison or his counsel. Instead, MORRISON had by then decided to sell his
21 property elsewhere.

22     26.    The fact that MORRISON sought to excuse his refusal to complete the transaction on
23 his perceived inability of the Buyers to complete the financing arrangements and close the deal before

December 31 arises entirely out of MORRISON's wrongful refusal to provide the appraisal in time to assure that Korean funds would be released and transferred to escrow in order to close as planned. In an action at equity, the Defendant cannot protect himself from a decree of specific performance by citing the failure to do an act necessary to complete the transaction, which act was clearly under the Defendant's sole control.

> "...the purchaser was entitled to specific performance, where the purchaser had obtained adequate financing and the only remaining event to occur to finalize the financing process was the appraisal of the vendor's property, which the appraiser had attempted to perform but could not perform since he was unable to make arrangement for an appointment with the vendors." [71 Am Jur 2d, Specific Performance, §137 citing Hoffman v. George, 267 Mont. 292, 883 P.2d 826 (1994)]

27.     In his memorandum of law, counsel for Defendant makes much of Atty. Kutz' statement, in his email to Atty. Weiner of December 4, "no appraisal, no deal." [Defendant's Exhibit 53, Section 11] Particularly when read in the context of the rest of Kutz' statements in that section, regarding the fact that MORRISON was well protected with respect to disclosure of the appraisal, the meaning of Kutz' statement is clear and unambiguous. Without an appraisal, there could be no deal on any terms, new or old, because the money could not be released from Korea, and the Buyers could not perform. The fact that MORRISON chose to ignore the protections he had, which included confidentiality agreements drafted by MORRISON and executed by both broker LEE and PARK [Defendants Exhibits 6 and 10], yet still continue to refuse to provide the appraisal offers but one logical explanation. That is, as of December 4, if not sooner, MORRISON had affirmatively decided to dump his deal with PARK/CHO, and proceed with the "second group" buyers. [Supplementary Declaration MORRISON]

-11-

## MEMORANDUM OF LAW

### Summary judgment is appropriate.

28.     Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment should be granted when no material facts are in dispute and a movant is entitled to judgment as a matter of law. Celotex v. Catrett, 477 U.S. 317, 325 (1986); Iizuka Corp. v. Kawasho International (Guam), Inc., 1997 Guam 10 (January 28, 1997). Once the moving party has met this burden, the nonmoving party must come forward and make some affirmative showing with specific facts that evidence exists to support its claims and that there is a genuine issue of fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." Rentacom Corp. v. Micronesian Hospitality, Inc., et al., Civil Case No. CV 1648-97, (Decision Mar. 16, 1999 at 2) quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).

### Specific performance is an available remedy.

29.     Both the general weight of authority and Guam law concur that specific performance of a contract to convey real property may be enforced. *"Specific performance is available when the contract involves property which is unique or possesses special value; real estate is assumed to possess that necessary quality. Thus, specific performance is the presumed remedy for the breach of an agreement to transfer real property. "* [71 Am Jur 2d, Specific Performance, §133]

-12-

30.     While it is correct that the remedy of damages for breach of a real property sales contract may also be had under Guam law, the statutory presumption favors the remedy of specific performance, in an appropriate case. The provisions of 20 GCA Chap. 3 govern an action for specific performance in Guam as follows:

> "§3220. *Performance may be compelled. Except as otherwise provided in this Part, the specific performance of an obligation may be compelled"* [20 GCA Chap. 3 §3220]

> "§3221. *No remedy unless mutual. Neither party to an obligation can be compelled specifically to perform it, unless the other party thereto has performed or is compellable specifically to perform, everything to which the former is entitled under the same obligation, either completely or nearly so, together with full compensation for any want of entire performance.*" [20 GCA Chap. 3 §3221]

> "§3222. *Distinction between real and personal property. It is to be presumed that the breach of an agreement to transfer real property cannot be adequately relieved by pecuniary compensation, and that the breach of an agreement to transfer personal property can be thus relieved.*" [20 GCA Chap. 3 §3222]

> "§3223. *Contract signed by one, may be enforced by other. A party who has signed a written contract may be compelled specifically to perform it, though the other party has not signed if the latter has performed, or offers to perform it on his part, and the case is otherwise proper for enforcing specific performance.*" [20 GCA Chap. 3 §3223]

> "§3225. *What cannot be specifically enforced.  ...  (6) An agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable.*" [20 GCA Chap. 3 §3225]

31.     The issues of mutuality and a sufficient certainty of terms to permit a remedy of specific performance are addressed separately below. As noted above, the threshold issue is to determine whether or not a contract has ever been made between the parties, and if so, the terms upon which the parties agreed to be bound.

**The actions of the parties, and the exchange of correspondence between BTC's MORRISON and Buyers PARK and CHO between November 14 and November 20, 2003, created an enforceable contract to purchase and sell the property.**

32.     In the present case, there is no dispute with respect to the parties to the transaction: BTC 97 as Seller, and PARK/CHO, as Buyers, whose interest was intended to be subsequently

-13-

1 transferred to a Guam limited liability company formed for the purpose. Neither is there any dispute

2 over two inarguably essential terms to the formation of a valid and binding contract: the Seller intended

3 to sell, and the Buyer intended to buy, the Guam Tumon Village Apartment property, as described in

4 the preliminary title report provided by the Sellers to the Buyers, Pacific American Title Company

5 Report No. OER-98-3-14651A. [Defendant's Exhibit 42] The purchase price and terms of payment

6 were clearly agreed as well -- $3,650,000, payable all cash at close of escrow, with escrow to close

7 within fifteen days of its opening. [Defendant's Exhibit 39] It was mutually understood, and is not

8 disputed, that the condition of all cash payment and a short escrow was important to the Seller, for

9 purposes which were not disclosed to the Buyer.

10          33.     Equally undisputed was the fact that the parties agreed to sell and purchase the

11 property in "as is" condition (the property having been heavily damaged by Typhoons Chata'an and

12 Pongsona), and that the Seller would make no warranties of any kind except warranty of clear,

13 insurable title to the property. [Defendant's Exhibits 30, 39, and 43]

14          34.     The parties agreed that documentation would be provided by the Sellers which would

15 include relevant financial records, maintenance agreements, lease/rental agreements and similar

16 documents with respect to the property, then in the possession of the Seller. [Defendant's Exhibit 29]

17 In fact, a substantial portion of such documentation, if not all of it, was provided by the Sellers to the

18 Buyers before the deal fell apart.

19          35.     Finally, it is undisputed that the parties intended to memorialize their agreement into a

20 formal document containing not only the terms and conditions of the sale itself, but additional matters

21 with respect to the anticipated escrow holder, manner of taking title, method of payment, and similar

22 details which would ordinarily and customarily be found in such a document. [Declaration PARK, p.

23 3, para. 7]

**Necessity for Appraisal**

36.     The parties also agreed that the Sellers would provide a copy of an appraisal of the property prepared at their request, because a property appraisal would be needed to obtain Korean government approval for direct foreign investment in real property, a circumstance of which both parties were aware by November 13, 2003.   [Defendant's Exhibits 35 and 36; Declaration MORRISON, para. 24]   The circumstances under which the appraisal would, or would not, be furnished to the Buyers, however, are at the heart of events which led to this lawsuit.

37.     Since MORRISON had previously assured PARK, by letter of November 14, 2003, that, *"Once we have agreed on price and we have gone to contract,[2] we will be more than happy to provide a copy of the appraisal,"* [Defendant's Exhibit 36]   PARK had no reason to believe his request that the appraisal be provided prior to close of escrow, rather than at its close, would be any problem for MORRISON, or would be any material change to the deal to which PARK had irrevocably committed himself and CHO, particularly when PARK had repeatedly assured MORRISON that the appraisal's statements or conclusions would have no effect on their irrevocable commitment to the contract.   [Defendant's Exhibits 29, 43 and 53]

38.     Had either PARK or CHO known in November that MORRISON did not intend to release the appraisal until he had obtained Buyer's agreement to all the new terms contained in his lawyer's 28-page draft, PARK and CHO could have and would have ordered a new appraisal of the property.   There was nothing magical about MORRISON's appraisal of the property – PARK and CHO were aware that any recent appraisal made by a licensed real estate appraiser, showing reasonable value for the property, would suffice for presentation to Korean banking/government officials.   That

---

[2] In his correspondence prior to November 20, 2003, MORRISON repeatedly uses the phrase, "go to contract" [Defendant's Exhibits 33 and 36], but never until his declaration submitted in this litigation, page 6, para. 26, did he tell anyone exactly what he meant by the phrase.

PARK and CHO did not choose to order their own appraisal was a matter of both time and economy, since a new appraisal would probably cost between $12,000-$20,000, take ten days or more, and seemed completely unnecessary under the circumstances. [Declaration PARK, para. 12; Declaration CHO, para. 5]

### The Parties' Intent to Contract

39.     The Court may take judicial notice of the well-recognized axiom of contract law, to the effect that the intent of a party to a contract is to be determined from the objective manifestation of their words and actions, not by some subjective, unvoiced reservation of rights, desires, or opinions. In the present case, MORRISON's unvoiced reservations with respect to the capability of Plaintiffs to perform, coupled with his unstated intent to hold the property appraisal as hostage to assure himself that Plaintiffs would comply with all of his proposed additional terms and conditions, but insist on none of their own, should be disregarded for purposes of determining the manifest intent of the Sellers to be bound by the terms of the deal they made. The fact that MORRISON may have regretted his deal, and sought to make a better one is not an excuse for his failure to perform as promised.

> "*If full consideration of the circumstances and the contract language indicates that there was a mutual intent to be bound to a preliminary commitment, the presence of .... reservations does not free a party to walk away from its deal merely because it later decides that the deal is not in its interest.*" [*Teachers Insurance and Annuity Association of America v. Tribune Company,* 670 F.Supp. 491 (1987)]

40.     Counsel for Defendant, in his memorandum, correctly notes that in order for a contract to exist, all the parties must agree to the same thing at the same time, and further correctly states, quoting *Takano-Towa Guam Co., Ltd., v. Mickey S. Cox,* 1993 WL 128214 (D.Guam A.D.):

> "*Whether or not writings or verbal communications resulted in an agreement sufficient to create an enforceable contract is determined by looking at the intent of the parties.*"[Defendant's Memorandum, p. 13]

41.     As the *Takano-Towa* court put it:

1
2

*The issue squarely presented by this case is whether the conversation that took place at the March 30, 1990 meeting gave rise to a binding, enforceable contract for Appellant to pay $300,000 to Takano-Towa."*

3    42.    Unlike the situation at bar, however, *Takano-Towa* dealt with an alleged oral

4  agreement of the parties to enter into a settlement of a business dispute, which oral agreement was

5  manifested only by a transcript of the tape-recorded conversation between the parties during settlement

6  negotiations. The court found that the parties apparently intended to agree, but had never reduced

7  their agreement to a writing signed by Appellant Cox (which was, of course, the usual and customary

8  method of creating a binding settlement agreement) and further, that a number of essential terms were

9  left in abeyance which clearly contemplated future negotiation and resolution by the parties. The court

10  further found that, at no time during the meeting which created a so-called agreement did Appellee

11  Takano-Towa make any promise that would create the mutuality of obligations necessary to form a

12  binding contract. [*Takano-Towa, p.5*] Accordingly, specific performance was denied. Such is not the

13  case here.

14    43.    At MORRISON'S insistence, all vital negotiations with respect to the essential terms

15  of the contract were to be, and in fact were, conducted between MORRISON and PARK. As

16  MORRISON noted in his November 4th letter to PARK, PARK was to communicate his acceptance to

17  MORRISON, who would then, presumably, consult his principals. Once terms proposed by PARK

18  were "*agreeable to BTC 97*", and only then, would MORRISON "*put our attorney in touch with your*

19  *attorney and we will start preparing the appropriate documents.*" [Defendant's Exhibit 30] In fact,

20  this is precisely what MORRISON did. Following PARK's final communication of irrevocable

21  commitment to purchase for the agreed upon price, by letter of November 20, 2003, MORRISON

22  directed his attorney to send documentation to PARK's attorney, which documents had admittedly not

23

1   even been reviewed by MORRISON when the first drafts were sent. [Declaration WEINER,

2   Defendant's Exhibit 47]

3        44.    After directing his attorney to send a draft agreement to Atty. Kutz, without even

4   knowing its contents, MORRISON never again initiated contact with either PARK or CHO.  Clearly,

5   he had done all the negotiating he intended to do, or felt he would need to do:  the rest of the details

6   were relatively unimportant, and could be safely left to subordinates.

### Execution of Formal Documents

8        45.    In his summary judgment memorandum, page 14-15, Defendant's counsel again cites

9   *Takano-Towa* in support of counsel's argument that the fact the Seller in the present case subsequently

10   prepared a formal written agreement is convincing evidence that it did not intend to be bound by the

11   previous exchange of correspondence.   Again, counsel's reference to *Takano-Towa* is clearly

12   inapposite, since in the *Takano-Towa* case, there never was a writing signed by Defendant/Appellant

13   Cox. The only writing presented was drafted by Plaintiff *Takano-Towa*, which the Defendant refused

14   to sign.  Here, the exchange of letters between the parties, between November 14 and November 20,

15   2003, taken together, form writings sufficient to bind either side to the commitments it made.

> *"Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation...* [*Washington Heights-West Harlem-Inwood Mental Health Council, Inc. v. District 1199*, 748 F.2d 105 (2d Cir.1984)] *"It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties."* [*Corbin on Contracts* §29 (1952)] [*Shann, Peter v. John S. Dunk*, 84 F.ed 73 (CA2 1996)]

> *"Also, if an informal agreement contains all the essential terms, it may be specifically enforced even if the parties contemplated the subsequent execution of a formal contract."* [71 Am Jur 2d, Specific Performance, §36 citing *D.H. Overmyer v. Brown*, 439 F.2d 926 (10th Cir. 1971)]

23   Moreover, as a New York District Court found:

-18-

> "*Without such legal recognition, parties*...[may be obliged] *to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms. At the same time, a party that does not which to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a "firm commitment" of "binding agreement."* [*Teachers Insurance and Annuity Association of America v. Tribune Company*, 670 F.Supp. 491 (1987)]

The reasoning of the Teachers Insurance court, made in MORRISON's and Weiner's hometown, is particularly appropriate here. As noted above, despite PARK's statement of "irrevocable commitment", in his acceptance letter of November 20, 2003, neither MORRISON or Weiner made any objection to PARK's clear statement of intent.

### Attorney Admissions

46.  As noted in paragraphs 21 and 22 above, MORRISON's counsel Andrew Weiner, a thirteen-year partner in one of the world's largest and most prestigious law firms, referred to "*the offer by your client which was accepted*" and "*the accepted offer*" in the course of his attempts to negotiate the various new terms proposed by either side in the wake of Weiner's submission of a 28-page single spaced agreement in lieu of the short-form purchase and sale agreement requested and expected by his counterpart, Atty. Kutz. In the same exchange of email correspondence, Weiner notes that the Buyer's requested condition of governmental approval would be a "*material change in the deal*" – the obvious implication of which is that there was, in fact, a deal, and that the Buyers were asking to change it.

47.  Generally, an attorney, merely by reason of his or her employment in connection with litigation , pending or prospective, has no power to affect his or her client by admissions of fact made out of court and not given for the specific purpose of dispensing with proof of the facts admitted. [71 Am Jur 2d, §169] This, however, is not always the case:

> "*Generally, if an attorney has authority to negotiate with reference to a particular matter or to present and collect a claim out of court, the admissions of fact made by the attorney in reference to the subject of his or her agency and in the course of the discharge of his or her*

-19-

*duty with respect thereto are competent evidence against the client."* [Citations omitted; 71 Am Jur 2d, §169, 170]

*"In order for the extrajudicial statement or admission to be binding on the client, it must appear, under principles applicable to other agents, that the attorney was specially authorized in this respect, aside from his or her mere employment in connection with pending or prospective litigation, and that the admission fell within the scope of the special authorization."* [Citations omitted; 71 Am Jur 2d, §169, 170]

48.     In the present case, it is abundantly clear that, having concluded his own negotiations with PARK, MORRISON specifically authorized his attorney to draft a sale agreement which might, or might not, also contain escrow instructions, and further authorized Weiner to conduct negotiations with his counterpart, Atty. Kutz, for the purpose of resolving what were clearly regarded by MORRISON as the details of "the deal". In undertaking to perform these duties, Atty. Weiner must have had a clear understanding of his client's position from the outset, and was certainly authorized to state it in his correspondence with his counterpart.[3] Whether the statements are regarded as statements of objective fact – i.e., that the deal existed, or whether they may be taken either as expressions of Weiner's own legal opinion as to the existence of the contract elements of offer and acceptance, or even if the statements are regarded as evidence of Weiner's own state of mind about his client's commitments, they are equally admissible, and should be given great weight under the circumstances of this case. As noted above, although he has had ample opportunity to do so, Atty. Weiner has not chosen to explain away or deny his statements, instead offering them "without limitation", thereby giving them even greater weight.

### "Material" vs. "Essential" Contract Terms

49.     It has been held in past cases that a decree of specific performance will be denied where less than "all the material terms and conditions" are included in the agreement sought to be enforced.

---

[3] In his email to Atty. Kutz, November 24, 2003, Weiner said: *"I also have instructions about when and how to deliver the appraisal."* Whatever those instructions were, neither Weiner nor MORRISON ever disclosed. [Defendant's Exhibit 46]

-20-

[*Schenectady Stove Co. v. Holbrook*, 101 N.Y. 45, 4 N.E. 4; *Monahan v. Allen*, 47 Mont. 75, 80, 130 P. 768] Modern courts, however, distinguish between "essential terms" and "material terms":

> "*A material term is any term properly bearing upon the subject matter of the contract. Essential terms are those items whose agreement is prerequisite to the formation of a contract.*" [*Shann, Peter v. John S. Dunk*, 84 F.ed 73 (CA2 1996)]

50.     As Defendants note in their memorandum of law, page 16, where essential terms are left for future determination, no binding contract results from preliminary agreements.   (Citations omitted.)   Guam law echoes this position in 20 GCA §3225, itself derived from former Civil Code §3390, as follows:

> "*§3225. What cannot be specifically enforced.   ... (6) An agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable.*" [20 GCA Chap. 3 §3225]

51.     The concepts involved in determining the existence or absence of essential contract terms, and the degree of certainty to be expressed is addressed in some length in 71 Am Jur 2d, and is worthy of repeating here.

> "*If it cannot be said as an inference of law from the mere inspection of a writing that anything of substance was left open to be agreed upon later, and the parties evidently thought they were bound, the fact that minor details were not stated does not defeat the enforceability of the contract; details of that order may be left open for future specification without destruction of the contract, because the parties accept by implication as to such matters the test of the reasonable or the customary if no other is available. Thus, even if an agreement is uncertain or incomplete in some respects, its specific enforcement may nevertheless be decreed if the uncertainty relates to matters that the law makes certain or complete by presumption, rule, or custom and usage.*" [71 Am Jur 2d, Specific Performance, §61]

52.     In the present case, the terms included in the agreement of the parties, as expressed in the exchange of their correspondence culminating in PARK's "irrevocable commitment" letter of November 20, 2003 were not only essential to the contract's formation, but were clearly expressed. They were:

a.   Parties – BTC 97 and PARK/CHO;

b. Property – the Tumon Village Apartment complex as described in the referenced PATICO preliminary report;

c. Price - $3,650,000.00;

d. Terms of Payment – All cash at close of escrow;

e. Time for Payment – Within fifteen days of execution of the formalized contract document and opening of escrow;

f. Other essential terms:

(1) Sale of the property would be in "as is" condition, with no Seller's warranties except that of clear, insurable title.

(2) Turnover of the Seller's existing property appraisal to Buyers, or to Korean government authorities prior to close of escrow;

(3) Turnover of other customarily applicable property documentation in the possession of Seller, at or before close of escrow.

With these issues clearly resolved, and accepted by both Buyer and Seller, nothing of substance remained to be negotiated at that point – nor was anything further negotiated between the principals.

53.    The fact that a substantial body of new terms and conditions were sought to be introduced both sides, after the contract was formed, to all of which the parties did not agree is not irrelevant, but is not controlling, either. That the changes were material is undisputed, but they were not essential. As it happened, the majority of the new terms proposed were agreed between the parties, through their counsel, where such matters dealt with the "housekeeping" aspects of the transaction – designation of escrow holder, controlling law, proration of rentals, taxes, tenant deposits, and the like. To the extent other material terms were not agreed, the court retains authority to imply them according to presumption, rule, or custom and usage, as noted above.

54.    As to the terms actually agreed by the parties as shown in the exchange of emails between counsel from November 20, 2003 to December 4, 2003, equity is not offended by inclusion of those agreed terms in the original contract. As to terms not agreed – escrow extension, liquidated

-22-

damages, etc., -- those terms were equally clearly perceived to be non-binding on either party unless both sides agreed, and may be omitted.

> *"Also, if, after execution of the contact leaving terms open to future negotiation, the parties actually reached a definite agreement as to the terms left open, specific performance will not be denied on the ground of uncertainty or incompleteness."* [71 Am Jur 2d, §60 citing *Duke v. Tobin*, 198 Va. 758, 96 S.E.2d 758 (1957)]

### Mutuality

55. As noted above, prominent among the several reasons the District Court of Guam Appellate Division refused to grant specific performance in the *Takano-Towa* case was the lack of mutuality of obligation between the parties.

> *"[C]ourts will not uphold agreements which contain indefinite and uncertain provisions regarding the obligations imposed upon the parties thereto, and which contracts are devoid of mutuality and consideration. Contracts must be definite enough to enable the court to ascertain what is required of the respective parties in the performance thereof."* [*Takano-Towa Guam Co., Ltd., v. Mickey S. Cox*, 1993 WL 128214 (D.Guam A.D.) citing *Richards v. Oliver*, 328 P.2d 544 (Cal.Dist.Ct.App.1958) (citations omitted)]

56. Though not cited by the *Takano-Towa* court, Guam statute conditions the remedy of specific performance upon mutuality of obligation:

> *"§3221. No remedy unless mutual. Neither party to an obligation can be compelled specifically to perform it, unless the other party thereto has performed or is compellable specifically to perform, everything to which the former is entitled under the same obligation, either completely or nearly so, together with full compensation for any want of entire performance."* [20 GCA Chap. 3 §3221]

57. In the present case, it is abundantly clear that, were the shoe on the other foot, Plaintiffs PARK/CHO and/or their assignee Plaintiff Guam Tumon Company could be compelled to perform their side of the contract. The terms of the buyer's obligations are clearly set out in PARK's letter to MORRISON of November 20, 2003, in which PARK states his irrevocable commitment to purchase on the terms and conditions previously described in the correspondence between the parties.

1     58.    Should MORRISON and BTC 97 have sought to enforce their contract against the

2 Buyers, they had but to provide their copy of the appraisal to Plaintiffs, or to Korean banking officials,

3 at any time after November 20, 2003. Nothing more was required.

4

5 **Defects of Title**

6     59.    In his memorandum of law, page 15, Defendant's counsel appears to set up a defense

7 to specific performance based on Buyer's acceptance of the encroachment of a fence into adjoining

8 property, and a possible right of redemption caused by a December 10, 2003 foreclosure sale.

9     60.    It should be first noted that neither of these defects are shown in the preliminary title

10 report upon which the Buyer's obligation to perform is conditioned, and moreover, Buyers have

11 affirmatively bound themselves to purchase the property in "as is" condition, which condition would

12 certainly include the existence and location of an encroaching fence.

13     *"Especially where the vendee is willing to take the vendor's defective title without asking for
an abatement in the purchase price will the vendor be prohibited from setting up his or her*

14 *defective title or insufficient estate as a defense to an action for the specific performance of
his or her contract."* [71 Am Jur 2d, Specific Performance, §137 citing *Triplett v. Brevard*

15 *Properties,* 94 Fla. 869, 115 So. 534 (1927); *Roth v. Hartl,* 365 Pa. 428, 75 A.2d 583 (1950);
*Paul v. Stanolind Oil & Gas Co.,* 83 S.W.2d 808 (Tex. Civ. App. Beaumont 1935), writ

16 refused.]

17     61.    The Defendant offers no evidence that the "possible right of redemption" from

18 foreclosure of a portion of the property would render title uninsurable, but even if that were the case,

19 the defect must make the title unreasonably doubtful to avoid specific performance in favor of the

20 Seller. The Buyer, of course, can waive the defect in his suit, if necessary.

21     *"§3228. Agreement to sell not enforceable for want of title. An agreement for the sale of
property cannot be specifically enforced in favor of a seller who cannot give to the buyer a*

22 *title free from reasonable doubt."* [20 GCA Chap. 3 §3228]

23

In the case at bar, it is undisputed that the "possible right of redemption" applies to a remnant portion of the property, consisting of a drainage ditch and part of a public road, which property itself was not even included in the PTR which forms the basis for the purchase of the property. Having no use for it, the Sellers agreed to convey the remnant property with the rest, without any additional consideration. Indeed, since the property, which is essentially worthless, was covered by a blanket encumbrance of over $12,000,000, it would indeed be a windfall for the Buyers if the former owners of the remnant which was foreclosed by the Seller should choose to redeem it.

### Defendant's "revocation" argument.

62. On page 16 of its memorandum of law, Defendant's counsel argues that the proposal emailed by Atty. Kutz to Atty. Weiner on December 9 [Defendant's Exhibit 59] constituted an attempt to revive a previously revoked offer. (Counsel also refers to Buyer's "unconditional agreement to close before December 15, 2003", but that date was merely suggested by PARK as of November 20, and seemed reasonable at the time. The December 15 date was never set as a condition of sale – instead, MORRISON repeatedly communicated to PARK and his counsel that it was essential that they close before December 31, 2003, not before December 15.)

63. Plaintiffs do not dispute Defendant's contention, again citing *Takano-Towa*, that a previously rejected offer could not be unilaterally accepted afterwards, but in the present case, MORRISON's offer to sell the property had been previously accepted and could not later be revoked.

> "§85322. *Revocation of proposal. A proposal can be revoked at any time before its acceptance is communicated to the proposer, but not afterwards.*" [18 GCA Chapter 85, §85322]

64. Defendant's attempt to revoke its own offer to sell, which had been accepted and agreed, was without force or effect.

### Broker Lee's post-litigation email

-25-

65.     Defendant's contention that broker Lee's fax to MORRISON of January 11, 2004 [Defendant's Exhibit 62], offered as evidence that the Buyers still considered themselves in the process of negotiating a deal, is without merit and should be rejected.   The communication was made one month after the lawsuit was filed, and was nothing more than an attempt to settle the litigation, as broker Lee was authorized to do by PARK.   [Declaration PARK, p. 7, para. 16] As such, it should be excluded from evidence pursuant to FRE 408.   In any event, the fax said nothing more than that the Buyers were ready, willing and able to proceed to complete the transaction as soon as an appraisal was provided to the Korean government, which is the same position held by the Buyers as of December 10, 2003.

## SUMMARY

66.     Based upon the foregoing, it is respectfully submitted that, as of November 20, 2003, the parties to this litigation entered into a binding and specifically enforceable contract for the sale of real property, on the following terms:

(a)     Parties – BTC 97 and PARK/CHO;

(b)     Property – the Tumon Village Apartment complex as described in the referenced PATICO preliminary report;

(c)     Price - $3,650,000.00;

(d)     Terms of Payment – All cash at close of escrow;

(e)     Time for Payment – Within fifteen days of execution of the formalized contract document and opening of escrow;

(f)     Other essential terms:

1.     Sale of the property would be in  "as is" condition, with no Seller's warranties except that of clear, insurable title.

2.     Turnover of the Seller's existing property appraisal to Buyers, or to Korean government authorities prior to close of escrow;

-26-

3. Turnover of other customarily applicable property documentation in the possession of Seller, at or before close of escrow.

67. In addition to those terms negotiated and agreed on or before November 20, 2003, the parties further agreed to some of the terms and conditions proposed in the exchange of email correspondence between Atty. Kutz and Weiner, which terms were based on Weiner's draft contract, and which were agreed by the parties through December 3, 2003. Those terms of agreement, which can be incorporated into an order for specific performance by reference to the second draft agreement [Defendant's Exhibit 50], and the exchange of email between Atty. Kutz and Weiner between November 28 and December 3, 2003. [Defendant's Exhibits 51-54] Proposed additional terms of sale, whether initiated by Sellers or Buyers should be disregarded.

68. It is further requested that, in considering and reaching its decision in this case, the Court should consider MORRISON's actions between December 3, 2003 and December 10, 2003, as set forth in paragraphs 23-27 above, and make a specific finding that Defendant's principal MORRISON acted in bad faith by deliberately withholding the necessary appraisal, conducting negotiations with a new buyer while pretending to negotiate with Plaintiffs, and finally, willfully and deliberately disregarding Plaintiffs' contractual rights by electing to dump the Plaintiffs' contract and secure another on, presumably, terms more advantageous to the Defendant.

69. Finally, it is requested that the Court find that, under the circumstances, Defendant's counterclaims are moot, deny Defendant's pending motion for summary judgment of dismissal, and grant Plaintiffs' motion for dismissal of Defendant's counterclaims.

The foregoing is respectfully submitted.

Date:  February 13, 2004

LAW OFFICE OF ROBERT P. KUTZ

By: _____
ROBERT P. KUTZ

-27-