ROBERT P. KUTZ, ESQ.
LAW OFFICE OF ROBERT P. KUTZ
PO Box 7310, Agat, GU 96915
Tel.: (671) 789-2500
Fax: (671) 789-2503
Email: rpklaw@guam.net

FILED
DISTRICT COURT OF GUAM
FEB 13 2004
MARY L. M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

GUAM TUMON COMPANY, LLC, )
a Guam limited liability company, )
JAE SEUNG PARK, an individual, )
CENTRAL MILLS SUPPLY, LTD., )
a Korean Corporation, MICHAEL LEE, )
an individual dba Global Realty, )
)
    Plaintiffs and Counter-defendants, )
)
vs. )
)
BTC97SP, LLC, a Delaware limited liability )
company, DOES 1-10, real parties in interest, )
)
    Defendants and Counter-claimants. )

CIVIL CASE NO. 03-00043

DECLARATION OF JAE S. PARK IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

COMES NOW the undersigned, Jae S. Park, and does hereby declare that, if called as a witness, I could and would competently testify as follows:

1. I am a Member and Manager of Guam Tumon Company, LLC, Plaintiff in this action, and am an individual Plaintiff as well. I have personal knowledge of the events described herein, except as to those statements made on information and belief, and as to those statements, I am informed and believe that they are true.

ORIGINAL

2. In or about June, 2003, Broker Michael Lee, dba Global Realty, approached me with respect to the property at issue in this case. He expressed his belief that the property could be obtained at a reasonable price, and that the owners were eager to sell, if the sale could be accomplished in a short time with the property in "as is" condition.

3. After I examined the property with my associate, Mr. Kyu Young Cho of Korea whose controlled corporation is also a member of Plaintiff Guam Tumon LLC, I authorized Mr. Lee to begin negotiation for purchase of the property. Acting with my authorization, Mr. Lee exchanged a series of letters and emails with Bruce Morrison, identified as Exhibits 1-23 by Defendants in their motion for summary judgment in this case.

4. Because I was dissatisfied with Mr. Lee's conduct of the negotiation, I asked my attorney, Robert Kutz, to contact Bruce Morrison and discuss the situation with him. Although I am an experienced real estate investor and own other commercial properties, my native language is Korean, rather than English. To avoid misunderstandings, I asked Mr. Kutz to conduct negotiations with Mr. Morrison with regard to the purchase of the property on an "as is" basis, with minimal conditions of sale, and an all-cash payment in a very short time.

5. When Mr. Morrison refused to deal with Mr. Kutz and insisted on dealing directly with me, I agreed to do so because I believed that this transaction, unlike most large commercial real estate deals, was very simple, and that Morrison and I could make a contract to purchase the property which would bind both of us without the usual involved negotiations regarding condition of the property, financing, environmental concerns, and so forth. [Defendants' Exhibit 32]

6. As shown in Defendants' Exhibits 33-43, Mr. Morrison and I exchanged correspondence and had discussions with respect to the price to be paid for the property, the terms to be included in the deal, and price adjustment based on compensation to the broker, Michael Lee. As of

November 19, 2003, when I received Mr. Morrison's assurance that he had successfully renegotiated the broker's commission, and we had agreed on price, I considered Morrison's letter to be a firm offer to sell the property to me and my associate, Mr. Cho, on the conditions set in Mr. Kutz' prior letters. [Defendants' Exhibit 39]

7. In my letter of November 20, 2003, I told Morrison that we intended the letter as our irrevocable commitment to purchase the property on the terms stated in the previous correspondence, if Mr. Morrison agreed to provide the appraisal before close of escrow, as requested, instead of providing it at closing, as previously agreed. When he subsequently agreed to do that, I believed the purchase agreement was firm, and bound both Morrison and ourselves to complete the purchase and pay the cash purchase price as set out in the previous correspondence. [Defendants' Exhibit 43] Although I had understood that the primary reason for Morrison to accept the purchase price of $3,650,000 was his desire to complete the transaction and be paid in a short period of time, no specific date for close of escrow had been written or told to me by Morrison, so I suggested a closing date of December 15, 2003.

8. On November 21, 2003, believing that Morrison and I had made a binding agreement between us, I asked Atty. Kutz to request that Morrison's attorney have a short document prepared to formalize our agreement and deposit in escrow. [Defendants' Exhibit 45] While I expected that document to contain provisions naming an escrow holder, method of payment, and similar details, I was very surprised when my lawyer told me he had received a 26-page, single spaced draft agreement, which contained dozens of terms and conditions, most of which had not been discussed between Morrison and myself.

9. Accordingly, I asked Mr. Kutz to review the document, and let me know whether these additional proposals were the same as the deal we had made, or whether they were something

-3-

new which Mr. Morrison wanted to add. When Mr. Kutz told me that quite a few of the things contained in Morrison's long document were new, I consulted with Mr. Cho and decided that, if Morrison wanted to ask for new things, we would also ask for some new accommodation on our side. Accordingly, I told Mr. Kutz to request the possible extension of the escrow time to be sure that Korean funds could be released from Mr. Cho's preferred source.

10. When, at some point after we made our basic contract, Morrison told me he really wanted to close the deal and get his money before December 31, 2003, I contacted Mr. Cho in Korea, and discussed the situation with him regarding release of Korean funds. As result of my conversation, I was informed and believed that, if Morrison acted promptly to provide the appraisal to Mr. Cho, the funds would be released in time to meet Morrison's requested deadline. Although Morrison had agreed to provide the appraisal, neither he nor his Korean agent ever did so.

11. It was not until I received a copy of the letter sent to Mr. Cho by Morrison, dated November 25, 2003, that I had any idea that Morrison would refuse to turn over the existing appraisal until his 26-page proposed purchase and sale agreement had been signed. Believing at that time that since Mr. Morrison had sent out such a complicated document, with so many new terms, that he expected to take some time to complete it, and, further, that we would eventually be able to agree on terms, I did not object to his statement at the time. Instead, I instructed Mr. Kutz to continue to cooperate with him and negotiate in good faith to see if agreement could be reached on those new terms and conditions. [Defendants' Exhibit 50]

12. I am informed and believe and thereon declare, that although it could have, and would probably have made the transaction go more quickly had the existing appraisal been provided to Korean banking officials, as agreed by Morrison, I also believed that the existing appraisal had been prepared either by Micronesian Appraisal Service or by the Captain Company here on Guam, and that

if necessary, I could have obtained another appraisal of the property which would satisfy the requirements of the Korean banking officials, whether that appraisal was prepared by one of these firms or by another of the several real estate appraisers on Guam. Although I am informed and believe, and thereon declare, that a satisfactory appraisal could have been prepared to present to the Korean banking officials, and clear the funds as originally planned, I also believed that a new appraisal would cost approximately $12-20,000, and preferred not to incur this cost unless it was necessary. Had Mr. Cho and I known at the time that Morrison intended to use the withholding of the existing appraisal as a tool to obtain the new terms and conditions that he wanted, without agreeing to our own proposed new terms, I could have and would have ordered such appraisal prepared and presented to the appropriate officials in time to release the funds so that escrow could close on or before December 3, 2003.

13. In our basic transaction, Morrison and I did not discuss the amount of any payment into escrow, and because the deal was so short (only two weeks), and the sale was for all cash, rather than any installment payments, I did not think this was surprising. In the 26-page agreement, Mr. Morrison initially asked for a deposit on opening of escrow of 10% of the purchase price, or $365,000. Mr. Cho and I did not think this was reasonable, but as an effort to work with Mr. Morrison to see if we could agree on new terms and conditions, we proposed certain deposits in escrow, with increases in those amounts if escrow was delayed and so forth, all as set out in the emails between Mr. Morrison's attorney and Mr. Kutz. [Defendants' Exhibits 51-55] At no time did I think that this big document or the discussions between Atty. Kutz and Atty. Weiner was an offer to sell the property, since I believed we had already agreed to sell and buy it. Instead, I understood this to mean that Morrison wanted to add some new terms to the contract, and that they were not binding on anyone, unless we both agreed to them.

14. Mr. Cho and I were concerned, when Mr. Kutz showed me a copy of the email from Andrew Weiner, which arrived on December 4, Guam time, saying that unless we were willing to revert to the original offer as to closing date without Korean government consent, BTC would have to reconsider whether it was prepared to proceed with the sale of the property to us. At that time, we did not know that Morrison had conducted substantial negotiations or entered into any confidentiality agreement with anyone else regarding purchase of the property. On December 4, 2003, Atty. Kutz sent an email to Atty. Weiner, again suggesting ways to satisfy both parties, shortening the escrow so that the appraisal could be released and the sale closed as soon as possible [Defendants' Exhibit 57] No response was received from Mr. Morrison until December 9, when he called me and later faxed to say BTC 97 would "pursue other opportunities".

15. At this point, Mr. Cho and I did not think Mr. Morrison had any right to stop our transaction altogether or sell the property to someone else, but we understood his concern about the possibility of a delayed government approval. Accordingly, because of that, I wrote to Mr. Morrison on December 10 and confirmed to him that we would take any action necessary to assure the seller that funds would be on hand and escrow close on or before December 31, 2003. [Defendants' Exhibit 58] Since Mr. Cho and I had agreed to everything that Morrison had asked for, and would perform as he wanted before December 31, 2003, we did not believe that Morrison had the right to throw away our contract and sell the property to someone else. When Mr. Kutz told me on the afternoon of December 10th that he had received an email from Mr. Weiner saying that, no matter what we did, Morrison was not going to sell the property to us, Mr. Cho and I instructed Mr. Kutz to file a lawsuit and do whatever else was legally necessary to preserve our right to purchase the property as agreed.

-6-

16. After the lawsuit was filed, I still had hopes that we could settle the lawsuit by completing the purchase of the property as promised. Since I was travelling in California at the time, I contacted Mr. Lee, who had had considerable personal contact with Mr. Morrison, and asked him to try to tell Morrison that we were anxious to settle the lawsuit by completing the sale of the property. Since the December 31, 2003 deadline had already passed, I told Mr. Lee to let Morrison know that we were willing to proceed, but that if we did, we wanted to have the existing appraisal given to the bank (as we had originally requested) in order to obtain release of the funds Mr. Cho had originally intended to use to close the sale. Mr. Lee had no authority from me to do anything other than attempt to settle this case. I did not see the email he sent to Mr. Morrison before he sent it, and would not have approved him sending such an email without showing it to my lawyer first and getting his approval, which I am informed Mr. Lee did not do.

17. I am informed and believe that, as part of his motion to dismiss our lawsuit, Morrison's attorney has said that because the encroachment of a fence on the subject property was not shown on the title reports, and that since Morrison was unwilling to move the fence, agreement about the title to the property was never reached. To the extent that any objection to title could be made by myself or Plaintiff Guam Tumon Company, I expressly waive and release any defect of title arising out of the fence encroachment. Likewise, on behalf of Guam Tumon Company and myself, I expressly waive and release any other conditions of sale of the property which may have been proposed by our attorney, Mr. Morrison's attorney, myself, or anyone else which were intended to benefit the buyers, except those conditions of sale set out in the correspondence between myself, Atty. Kutz, and Mr. Morrison between November 4th and 20th, 2003.

The foregoing declaration is made under penalty of perjury of the laws of Guam.

Date: FEB 10, 2004          By: _____
                                JAE SEUNG PARK